**DeROLPH et al.**

v.

**The STATE of Ohio et al.**

Court of Common Pleas of Ohio,
Perry County.

No. 22043.

Decided Feb. 26, 1999.

*Bricker & Eckler, Nicholas A. Pittner, John F. Birath, Jr., Sue Wyskiver Yount, Quintin F. Lindsmith* and *Susan B. Greenberger,* for plaintiffs.

*Betty D. Montgomery,* Attorney General, *Jeffrey S. Sutton,* State Solicitor, *Mary Lynn Ready, Roger F. Carroll, Sharon A. Jennings,* Assistant Attorneys General, and *Joel S. Taylor,* for defendants.

*Ben E. Espy,* for *amicus curiae* Certain Members of the 122nd General Assembly.

*John T. Ryerson, Jr.,* for *amicus curiae* Ohio Association for Gifted Children.

*Hugh Calkins,* for *amicus curiae* Carey Exempted Village et al.

*Franklin J. Hickman,* for *amicus curiae* Ohio Association of County Boards of Mental Retardation and Developmental Disabilities.

LINTON D. LEWIS, JR., Judge.

This action at bar, on Remand from the Ohio Supreme Court, was heard by the undersigned Judge of the Court of Common Pleas for Perry County at New Lexington, Ohio, commencing August 24, 1998 and concluding September 3, 1998. Nicholas A. Pittner, John F. Birath, Jr., Sue Wyskiver Yount, Quintin F. Lindsmith and Susan B. Greenberger represented the Plaintiffs. Attorney General Betty Montgomery, State Solicitor Jeffrey S. Sutton, Assistant Attorney General Mary Lynn Ready, Assistant Attorney General Roger F. Carroll, Asssistant Attorney General Sharon A. Jennings and Joel S. Taylor represented the Defendants. A Brief of Amicus Curiae was filed by Ben E. Espy as Attorney for Certain Members of the 122nd General Assembly. A Brief of Amicus Curiae was filed by John T. Ryerson, Jr., on behalf of the Ohio Association for Gifted

**4**

Children. A Brief of Amicus Curiae was filed by Hugh Calkins on behalf of Carey Exempted Village, et al. A Brief of Amicus Curiae was filed by Franklin J. Hickman on behalf of the Ohio Association of County Boards of Mental Retardation and Developmental Disabilities.

## FINDINGS OF FACT

### I. BACKGROUND

#### A. Biographies of Witnesses

*Samuel Kern Alexander*

Dr. Samuel Kern Alexander is currently President of Murray State University, a comprehensive regional state university of Kentucky with approximately 9,000 students. (Alexander Tr. 1587–88) He is into his fifth year as president there. Dr. Alexander has revised the *American Public School Log,* published by West's Publishing Company, Wadsworth Publishing Company. He also authored, along with Dr. Richard Salmon of Virginia Tech, a book entitled *Public School Finance* by Allen & Bacon. He also wrote a chapter in *The Faces of Education,* which is a description of international education programs. His résumé also lists articles he has had published since 1993. (Alexander Tr. 1588–89; Pl. Exh. 467) Dr. Alexander was a member of the Panel of Experts whose charge was to devise a remedy pursuant to the Court's decision in *DeRolph.* (Alexander Tr. 1589)

As to further background of Dr. Alexander, the Court incorporates its findings of fact relating to Dr. Alexander as set forth at pages 1–2 of this Court's findings of fact arising from the original trial.[1]

*John G. Augenblick*

In 1992, John Augenblick was retained by the group of Ohio school districts known as the Alliance for Adequate School Funding to develop a foundation level (base cost). The Alliance schools are relatively wealthy schools. Dr. Augenblick utilized an inferential approach in connection with his 1992 work for the Alliance. (Augenblick Tr. 692–94) In 1995, Dr. Augenblick was asked to do another project with the Alliance involving special education and vocational education. He was unable to complete that work because he was unable to collect the requisite data. (Augenblick Tr. 696) In 1994–1995, he was asked to serve on the Panel of Experts by Dr. Ted Sanders. (Augenblick Tr. 697)

The primary market for Dr. Augenblick's services are state legislatures or other agencies connected with state legislatures. (Augenblick Tr. 809) Dr.

---

1. Findings of Fact, Conclusions of Law, Order & Memorandum, July 1, 1994, hereafter cited as: Trial Courts Findings 1994, pp. ——.

Augenblick worked for the State of New Hampshire in 1985. Subsequently, the New Hampshire school funding system was found to be unconstitutional. (Augenblick Tr. 810–11) Dr. Augenblick volunteered services for the State of Colorado. He is currently contemplating assisting in a challenge to part of the funding system in place in Colorado. (Augenblick Tr. 811–12)

Dr. Augenblick has never taught in Ohio. He is not licensed to teach in Ohio. He has never physically been in a school facility in Ohio except for one instance. All of the information he has about Ohio has come from sources other than first-hand information. (Augenblick Tr. 812)

Dr. Augenblick acknowledges that he does not have current knowledge of the funding system in all 49 states other than Ohio. (Augenblick Tr. 813)

Dr. Augenblick graduated from Massachusetts Institute of Technology in 1969. (Augenblick T.Tr. 656)

Dr. Augenblick received a Master's Degree from Columbia University Teacher's College and a Doctorate of Education from the University of Rochester in 1981. (Augenblick T.Tr. 657)

Dr. Augenblick taught 5th and 6th grades in public school for three years in Connecticut after graduating from M.I.T. (Augenblick T.Tr. 661)

Dr. Augenblick was research director of the New Jersey Commission on Finance in Higher Education to look at funding of higher education. (Augenblick T.Tr. 663)

Dr. Augenblick worked with the Education Commission of the States (ECS). The ECS established in 1965 is an interstate compact consisting of about 47 state legislative bodies as a way for State level policy leaders to share information and try to devise solutions concerning educational issues. (Augenblick T.Tr. 664)

Dr. Augenblick worked for ECS for seven years beginning in 1977. One of the projects he worked on was creating a chart to describe the school funding systems in all 50 states.

Dr. Augenblick was director of ECS for three years. Other than Hawaii, Dr. Augenblick worked with every state regarding educational issues. (Augenblick T.Tr. 668)

At ECS, Dr. Augenblick worked on all aspects of school finance issues. (Augenblick T.Tr. 676)

In 1983 Dr. Augenblick formed his own consulting company. His company provides technical assistance regarding school finance issues. (Augenblick T.Tr. 672)

Dr. Augenblick has been asked to help design school funding systems in New Hampshire, Colorado, Louisiana, Kentucky, Kansas, Nebraska, and Ohio. (Augenblick T.Tr. 673)

Dr. Augenblick has served as an expert on behalf of plaintiffs challenging the validity of a state's school funding system. (Augenblick T.Tr. 682)

Dr. Augenblick has also served as an expert witness on behalf of states in defending school funding systems. (Augenblick T.Tr. 684)

Dr. Alexander, Plaintiff's expert, testified Dr. Augenblick is a school finance expert. (Alexander T.Tr. 1684)

Dr. Fleeter, a witness called by Plaintiffs, testified that Dr. Augenblick has a very good reputation as one of the nation's leading experts in school finance. (Fleeter Depo. 167–168)

Mr. Maxwell testified that Dr. Augenblick is one of the 10 or 12 school finance experts in the country. Mr. Maxwell's organization BASA invited Dr. Augenblick to lecture at a workshop on school finance issues. (Maxwell T.Tr. 1475)

*Charles V. Barr*

Charles Barr has been Superintendent of the Groveport Madison School District ("Groveport Madison") for 10 years. He began his career in education as a teacher at Brice Elementary in Groveport Madison from 1965 to 1971. He was principal of Asbury Elementary School from 1971 to 1980. He was director of pupil personnel in the district from 1980 to 1981 and then proceeded to be administrative assistant from 1981 to 1982. He held the position of Assistant Superintendent from 1982 until he became Superintendent in 1987. (Barr Depo. Exh. 1; Barr Depo. 9–13)

Superintendent Barr is a member of the American Association of School Administrators, the Buckeye Association of School Administrators, the Alumni Association for Educators at the Ohio State University, and the American Association for School Development. (Barr Depo. 14)

*Charles Brown*

Charles Brown is the Assistant Director, Division of School Finance within the Ohio Department of Education. Mr. Brown is in charge of the Office of School Management Assistance and has held that position from 1989 to the present time. In that capacity, he is responsible for providing technical services to school districts in connection with school district borrowing, fiscal analysis, staffing analysis, technical studies, building reorganization and related matters. Mr. Brown last testified in this case on December 22 and 23, 1992 when he was deposed. (Brown Depo. 4–6)

*David Brunson*

David Brunson is Assistant Director of the Ohio Legislative Budget Office, a division of the Legislative Service Commission. The Legislative Service Commission is governed by a group of legislative leaders who are appointed to the Commission and who govern the staff of the Commission. The Service Commission staff does most of the professional work of the Ohio General Assembly. It specializes in legal and general research, bill drafting, and bill analysis. (Brunson Depo. 5–6)

The Legislative Budget Office (the "LBO") was created by a resolution of the Service Commission in 1973 and is governed by a group of legislators that are appointed to the Legislative Budget Committee. The Legislative Budget Office is also governed by the Service Commission director and the Service Commission itself. The Legislative Budget Office specializes in fiscal and economic related research. It answers questions by legislators and provides fiscal information on bills being considered by the General Assembly through fiscal notes or other means. (Brunson Depo. 6) The Legislative Budget Office is a non-partisan organization. (Brunson Depo. 7)

As Assistant Director of the LBO, Mr. Brunson supervises the office budget and supervises a group of staff people that are in the tax and education areas. Mr. Brunson identified as a particular area of his expertise the fields of tax and education, particularly elementary and secondary education. (Brunson Depo. 7–8) He joined the Legislative Budget Office in 1974 and has been employed there continuously since that time. (Brunson Depo. 9)

Mr. Brunson graduated from East Carolina University in 1972 with a major in math and a minor in economics. He received a master's degree in economics from The Ohio State University in 1974. (Brunson Depo. p. 8.)

*Charles D. Buroker*

Charles D. Buroker has been Superintendent of Lima City Schools since 1988. (Buroker Depo. 31) He has also taught courses for Wright State University as an adjunct professor. (Buroker Depo. 32) As to further background of Charles D. Buroker, the Court incorporates its findings of fact relating to Charles Buroker as set forth at pages 3–4 of this Court's findings of fact arising from the original trial.

*Matthew Cohen*

Dr. Matthew Cohen is an employee of the Ohio Department of Education. He was last deposed in this case on March 19, 1993. Between the time of his last deposition and the current time, he has been the head of the Policy Research and Analysis Division of the Ohio Department of Education. He has held that position since 1993 or 1994. Dr. Cohen is the supervisor to Dr. Jim Payton, Dana

Shams and Francis Rogers, each of whom also has testified by deposition in this case. (Cohen Depo. 4–6)

*Elizabeth Marie Connolly*

Elizabeth Marie Connolly is the Director of Policy and Communication for the Ohio Senate Majority Caucus and has been since December 1996. In this position, Ms. Connolly provides research and communications assistance to Senate Republican members on pending legislation and coordinates efforts between Republican Senators and the Legislative Service Commission. The Legislative Service Commission usually drafts the first version language of a bill per the legislator's described intent. (Connolly Depo. 19)

Ms. Connolly graduated from Mount Union College in 1985 with a bachelor's in political science. Since graduation, she has worked at the Statehouse in a number of research positions for the Republican party. Connolly was a staff member of the Governor's task force in response to DeRolph. She worked with Senator Finan and Terry Geiger, brainstormed, reviewed reports on school funding, and facilitated communication between senators and the Legislative Services Commission. (Connolly Depo. 20)

Ms. Connolly began working at the Statehouse in December 1985 as a Legislative Service Commission Intern. In 1987 she was a legislative aid and in 1994 became a research assistant with the Senate Majority Caucus. In December 1996 she became Director of Policy and Communications for the Senate Majority Caucus. (Connolly Depo. p. 8)

*Robert Cupp*

Robert Cupp is a member of the Ohio Senate, representing the Twelfth Senate District, which is an area in West Central Ohio. He currently serves as President *Pro Tempore* of the Ohio Senate. (Cupp Tr. 334) He has been a member of the Senate since 1985. (Cupp Tr. 337) In 1987, Senator Cupp was appointed to the Senate Education Committee and has served on that committee ever since. That committee addresses issues involving primary and secondary education and reviews the school funding portion of the biennial budget as it proceeds through the Senate. (Cupp Tr. 338–39) He also served as chair of the School Finance Panel of the Gilmore Commission on school funding. He is chair of the Joint House Senate Committee on Technology. (Cupp Tr. 339–40)

Senator Cupp is familiar with the Supreme Court's decision in this case issued March 1997. (Cupp Tr. 343) In the fall of 1997, he was asked by Speaker Davidson and the President of the Senate if he would coordinate a group of interested legislators to put together a plan that could be drafted into legislation and considered by the General Assembly. He was familiar with Dr. Augenblick's proposal of July 1997. (Cupp Tr. 344)

No evidence was presented to the Court that Mr. Cupp holds himself out as a statistical expert, tax analyst, or expert in education.

Senator Cupp grew up on a farm around Columbus Grove in Allen County. He received a bachelor's degree in political science from Ohio Northern University. He graduated from Ohio Northern University law school in 1976. He served as Assistant City Law Director and Prosecutor for Lima until 1980. From 1980 until 1984 he served as an Allen County Commissioner. In 1984 he was elected to the Ohio Senate from the 12th District. He has served on the Senate Education Committee from 1987 until the present. The committee has jurisdiction over all issues involving primary and secondary education. In 1987 he chaired the School Finance panel of the Gillmore Commission on School Funding. The Commission looked at the issues of school funding in Ohio, identified the problems and recommended ways to improve it. Senator Cupp is currently chairing a Joint House Senate Committee on Technology which is looking at the implementation of technology in schools. (T.Tr. 337–345)

*Jo Ann Davidson*

Jo Ann Davidson was first elected to the Ohio General Assembly in 1980. She currently holds the position of State Representative from the 24th House District and is Speaker of the House. In her 18 years in the legislature, Speaker Davidson chaired the House Finance Committee and for 12 years chaired the House Budget Committee.

Speaker Davidson described March 24, 1997, the day the Supreme Court issued its decision in this matter, as "not a very good one." She was surprised and disappointed. She tried to "deal with the shock of the decision." However, she felt somewhat better after she developed an understanding that the Supreme Court had not taken into consideration what the legislature had done since 1991. (Davidson Tr. 7–8)

Speaker Davidson was not presented to the Court as an expert witness. Rather, she was presented as a fact witness who identified the State's legislative response to the Supreme Court's decision and the process which preceded the enactment of certain pieces of legislation.

While Speaker Davidson clearly has expertise in the legislative process, including the legislative budget process generally and as it relates to funding primary and secondary education, there was no evidence presented to the Court laying any foundation that Speaker Davidson has expertise and qualifies as an expert in school funding methodologies, regression models, statistics, financial projections, financial impact projections, school district budget management, or, for that matter, primary and secondary education at either the state or local level. Speaker Davidson herself testified, "I do not believe in my earlier testimony I

even claimed to be an expert * * *. I do not hold myself out to be an expert in methodologies of school funding." (Davidson Tr. 2320–22) In the field of education, Speaker Davidson did not feel competent enough to opine as to whether a *minimum* student teacher ratio of 25:1 was academically "a good thing." (Davidson Tr. 259–61)

There was no evidence presented that Speaker Davidson is either a tax analyst or an education analyst. Accordingly, while the Court finds instructive Speaker Davidson's testimony as to her descriptions of the legislation at issue, the Court gives little weight to her testimony as to the expected impact of that legislation.

As background, Speaker Davidson was a volunteer in the public schools and president of the PTA for an elementary and junior high school. She served on the Reynoldsburg City Counsel. She was elected to the General Assembly in 1980 as a representative from the 24th House District. She is currently Speaker of the House. Previously she chaired the House Finance Committee. For 12 years she chaired the Budget Committee of the House.

*Paolo DeMaria*

Paolo DeMaria has been the Director of the Office of Budget and Management ("OBM") since he was appointed in March 1998. In this position, Mr. DeMaria oversees financial transactions of the State, including everything from budget preparation to financial reporting. By virtue of being Director of OBM, Mr. DeMaria is a member of the Information Learning and Technology Authority and the School Facilities Commission. Mr. DeMaria's education includes a bachelor's degree in economics and political science and a master's degree in public administration. After receiving his education, Mr. DeMaria began working for the Ohio Legislative Services Commission as an intern. Mr. DeMaria worked his way up to his current post through fiscal analyst positions with the Senate Republican Caucus staff and then being the assistant director of the Office of Budget Management. (DeMaria Tr. 1237–43)

*William Driscoll*

William Driscoll is a partner in the consulting firm of Levin & Driscoll. He received a bachelor's degree from the University of Notre Dame and a Juris Doctor degree from the College of Law, The Ohio State University, in 1975. From 1983 until October 1991, he was employed by the Ohio Department of Taxation. He left the position of Deputy Tax Commissioner in 1991 to form the consulting firm of Levin & Driscoll which currently provides consulting services in the area of taxation for a wide range of clients. (Driscoll Depo. 4–6) Mr. Driscoll and his partners served as members of the Panel of Experts. (Driscoll Depo. 9) The clients served by Mr. Driscoll include the Ohio Department of

Education, the Ohio School Boards Association, and the Education Tax Policy Institute. (Driscoll Depo. 7)

Mr. Driscoll was contacted by Dr. Cohen of the Ohio Department of Education in the late fall of 1996 and asked to begin working on options that the State might have in anticipation of a decision by the Supreme Court in *DeRolph.* (Driscoll Depo. 16–17) Prior to March 24, 1997, Mr. Driscoll was involved in the work of the BEST organization at the request of the Ohio Department of Education. (Driscoll Depo. 18–19)

*Howard Bruce Fleeter*

Howard Bruce Fleeter is employed by The Ohio State University as an Assistant Professor in the School of Public Policy and Management. Dr. Fleeter completed his bachelor's degree in economics at Northwestern University and spent six years at Berkeley where he completed his Ph.D. in Public Finance in May 1990. (Trial Court's Findings 1994, p. 5) Since the time of his deposition in this case in 1993, Dr. Fleeter has worked as a consultant to the Ohio Department of Education, has worked with the Ohio School Boards Association and the Education Tax Policy Institute. In 1993–94, he worked on a project dealing with moving from a unit funding system for categorical programs, particularly special education, to a pupil-based funding system. (Fleeter Depo. 5–6)

*Carolyn Funk*

Carolyn Funk has been a school district treasurer for 19 years. She began her career as a treasurer with Salem City Schools in 1979, and recently moved to be the Treasurer for Youngstown City Schools in 1997. She has a bachelor's degree in fine arts, pursued further course work in business management, and has her master's degree in educational administration. (Funk Depo. 6–10)

*John Goff*

John Goff is the Superintendent of Public Instruction for the State of Ohio. He last testified in this case in 1993. He became the State Superintendent of Public Instruction in the fall of 1995. In Dr. Goff's capacity as State Superintendent of Public Instruction he served as co-chair of BEST, a coalition of organizations working for comprehensive school reform. (Goff Depo. 11–13) His co-chair was Mr. Bob Wehling, Senior Vice President of Proctor & Gamble. (Goff Depo. 14)

Dr. Goff has been in education for 38 years, 25 in Ohio. He was a high school mathematics teacher, junior high school mathematics teacher, junior high assistant principal and junior high school principal. He has a Bachelor of Science in education with an emphasis in math, a master's in education administration and Doctorate in Education administration. He was Assistant Superintendent and Superintendent of Vandalia Butler School District. In 1981–1989 he was Super-

intendent of Kettering School District. He then became Assistant Superintendent of the Ohio Department of Education. He became State Superintendent in 1995. As State Superintendent he is a member of the School Facilities Commission and Information Learning and Technology Authority. (Goff T.Tr. 457–464).

*Colleen Grady*

Colleen Grady is an expert in gifted education. She holds a Bachelor of Science degree in finance and accounting from the University of Nebraska (1984) and has held a variety of positions in industry, accounting, and business management. She is currently a member of and vice-president of the Strongsville Board of Education. She is in her fifth year as a member of the Board of Education and has served as president of that board for two years. Ms. Grady has volunteered in the field of education in a variety of capacities including serving in leadership positions for a number of organizations, including the PTA and gifted organizations. She has been asked to be a presenter at both national and state conferences in general education, parental involvement and gifted education over the last seven years. Ms. Grady has served two terms as the president of the Strongsville Association for Gifted Children. The Strongsville Association for Gifted Children provides resource materials, in-service for professionals and parents, and program provided enrichment for 400 to 450 students within the district and surrounding districts. (Grady Depo. 11–13) She has been a member for eight years of the National Association for Gifted Children and currently serves as co-chair for the Parent–Community Division. She is also a member of the State of Ohio Superintendents' Gifted Advisory Council, which was created in October 1977 by Dr. John Goff. She has also served as a charter member and a member for the last six years of the Strongsville City Schools Gifted Advisory Council. She has been a member of the Ohio Association for Gifted Children for the last seven years and has been a member of its governing board for the last five years. She has served in three major capacities for the Association: scholarship endowment trustee, vice-president of the organization, and currently advocacy co-chair. (Grady Depo. 5–10; 19)

The purpose of the Ohio Association for Gifted Children is to disseminate information on the educational, social, and emotional needs of gifted children to provide support and opportunities for self-education and self-improvement, professional development for educators, parents and other interested individuals, and to provide scholarships and programs for gifted students. Currently, the association has approximately 1,200 members, and the governing board meets four to five times per year. The organization publishes a quarterly publication entitled *The Review* and holds an annual conference which is attended by approximately 900 persons. The governing board is approximately 22–24 persons with representatives from around the state. Ms. Grady and Ms. Sheldon have been the

advocacy co-chairs of the Ohio Association for Gifted Children for two years. (Grady Depo. 17) As advocacy co-chairs she and Ms. Sheldon work with individual school districts, traveling to 25 to 30 districts a year and addressing parents and teachers about issues within gifted education. Ms. Grady speaks about the effectiveness of gifted advisory councils and testifies before the General Assembly relative to budget matters and policy matters. She serves as a representative to the State Gifted Advisory Council. Ms. Grady and Ms. Sheldon serve as co-directors of a consortium research and demonstration project which is identifying research-based best practices in diverse school districts, their costs, and improved data collection and reporting at the school district level. Surveys were sent to every district in the State of Ohio to accomplish this study. (Grady Depo. 18) The comprehensive cost study of gifted education will be the first of its kind. (Grady Depo. 37) This study is the study of gifted education referred to in House Bill 770, upon which the legislature intends to base future decisions regarding gifted education. The study is funded by a grant through the Department of Education. (Grady Depo. 54–55)

As advocacy co-chair for the last two years, Ms. Grady has had the opportunity to testify before both the House and the Senate of the General Assembly, and has provided a variety of information and analysis to the Department of Education, and to the State Board of Education, as well as to the General Assembly. She and Ms. Sheldon are recognized as individuals with the knowledge and expertise dealing with fiscal and policy matters and the state of gifted education in Ohio. (Grady Depo. 24)

*Kirk Grandy*

Kirk Grandy is Treasurer of the Southern Local Schools and has held that position since September 1992. He is the Treasurer of the Perry-Hocking Educational Service Center (ESC) and has held that position since June 1, 1996. He has about 6 years of experience as a treasurer. Mr. Grandy is a working treasurer in that he not only supervises but he does the everyday work also. (Grandy Depo. 6–8) Mr. Grandy has an associate's degree in Business Management and an associate's degree in Accounting from Hocking College in Nelsonville. He has also taken classes at Ohio University working toward a bachelor's degree. Mr. Grandy worked for the State Auditor's Office from October 1989 through August 1992 in the division called Management Advisory Services, which is now known as Local Government Services. Mr. Grandy was involved in assisting school districts with financial forecasts and certifying deficits, assisting with conversions to GAAP (General Accepted Accounting Principles), consulting services, financial reconciliations, and financial reconstructions. (Grandy Depo. 11–12) Mr. Grandy holds a license from the Ohio Department of Education to be a school treasurer. (Grandy Depo. 111)

*Kirk Hamilton*

Kirk Hamilton has been Superintendent of South–Western City Schools since January 1, 1998. (Hamilton Depo. 8) Prior to that, he was Superintendent of Batavia Local Schools in Clermont County and had been in that position since the fall of 1994. (Hamilton Depo. 10–11)

*Allan Hutchinson*

Allan Hutchinson is the Treasurer of the South–Western City School District and has served in that position since November 1991, nearly 7 years. He has also served as Treasurer of the Whitehall City Schools, the Gahanna City Schools and the Apollo Joint Vocational Schools in Lima and has work experience in the Auditor of State's Office. His total work experience as a treasurer is 15 years. He has a bachelor's degree in Business Administration and Finance from Milligan College in East Tennessee and a master's degree in Education from Ashland University. (Hutchinson Depo. 6–7) Mr. Hutchinson was involved in the process of developing rules for implementing the set aside requirements and for the five-year projection documentation with the State Department and the Auditor's Office. (Hutchinson Depo. 9, 16)

*Thomas W. Johnson*

Thomas W. Johnson is currently a member of the House of Representatives of the General Assembly of Ohio and has been a member for 22 years. (Johnson Depo. 5) He represents the 96th House District which includes all of Morgan County and parts of Muskingum, Washington, and Athens Counties.

Representative Johnson is currently chair of the House Finance and Appropriations Committee (the "Finance Committee") and is in his fourth year of that position. (Johnson Depo. 6) Prior to being chairperson, he was the ranking Republican member of that committee and has been a member of that committee for 22 years. (Johnson Depo. 7) The Finance Committee examines and passes budget bills, capital bills, and other legislation relating to finances. One of the regular tasks of the Finance Committee is to look at school funding, which is a component of virtually every biennium budget bill. (Johnson Depo. 7–8)

*Timothy Scott Keen*

Timothy Scott Keen has been the Director of Finance for the Ohio House of Representatives since 1995. As Director of Finance, Mr. Keen works primarily for the Republican caucus on matters relating to the budget and taxes, including working with the House Finance and Appropriations Committee, interacting with various state agencies regarding proposed legislation, analyzing proposed legislation, and communicating with the Senate. As the Director of Finance, Mr. Keen was a staff member of the School Funding Task Force. Mr. Keen has a Bachelor of Arts in communications and a master's degree in public policy. Mr. Keen's

career began as a budget analyst in the Ohio Legislative Budget Office and he worked his way up through budgetary or fiscal analyst positions until reaching his current post. (Keen Depo. 5–11) Mr. Keen has become very familiar with the school funding formulas and statutes from his work with the legislature. (Keen Depo. 11)

While working on House Bill 650, Mr. Keen reviewed and became familiar with the Panel of Experts' report, Dr. Augenblick's report, and the Fair Share Plan developed by the Legislative Budget Office. (Keen Depo. 19)

*Stephen P. Klein*

Dr. Stephen P. Klein is employed as a Senior Research Scientist with Rand Corporation in Santa Monica, California. In addition, he operates his own consulting practice. Rand Corporation is a research institute with approximately 1,000 employees of which over half are at the Ph.D. level in a wide variety of disciplines. Dr. Klein graduated from Tufts University with a bachelor's degree in psychology in 1960. He received his master's degree and his Ph.D. in industrial psychology from Purdue University with a doctorate being awarded in January 1965. Following receipt of his doctorate, he was employed by the Educational Testing Service in Princeton, New Jersey, for 4 years before moving to UCLA, where he taught in the graduate school of education. In connection with the Educational Testing Service, Dr. Klein conducted research dealing with evaluation and educational program development, educational testing, and various kinds of analyses in the field of education. At UCLA, he taught in the graduate school of education where he did research and taught courses in research methods testing and measurement. His teaching work included research methodology, statistics in education, and educational and testing measurements. (Klein Depo. 1, 4–9)

While at Rand, Dr. Klein has designed, conducted, and supervised research projects in a wide variety of areas. Currently, Dr. Klein is working on a research project for the National Science Foundation designed to determine whether or not certain teaching methods are achieving desired outcomes. In connection with that research, he reviews 11 sites around the country, gathers data at each site regarding teaching practices, student performance in mathematics, and a variety of community factors including public schools in Columbus, Ohio. In connection with his research work, Dr. Klein has published over 200 papers in a variety of fields, including education, health, criminal justice, fuel, and military manpower. In addition to that, he has authored a book on the licensing of teachers. He has testified in a number of cases, has served as a consultant to the United States District Court and has testified in Congress.

In addition to his work in education, Dr. Klein also serves as an advisor to Boards and Bar Examiners in over two dozen states, including the State of Ohio. A substantial portion of Dr. Klein's work includes utilization of statistical analysis,

including regression techniques. In addition, Dr. Klein has served on three blue ribbon committees for the National Research Counsel. Dr. Klein is currently serving on a panel that involves a nationwide examination of school finance plans for public schools at the K–12 range. Dr. Klein is serving on this panel with Jim Guthrie, Alan Odden, Robert Schwab, Dennis Epple, and Ted Sanders, who formerly served as Superintendent of Public Instruction in the State of Ohio. In connection with that service, Dr. Klein has been asked to coordinate a subcommittee to look at the issue of school funding adequacy. (Klein Depo. 21–23)

Due to illness, Dr. Klein's testimony was submitted by deposition. It was taken at his home in Santa Monica, California, on Wednesday, September 2, 1998. Dr. Klein's curriculum vita was identified as Plaintiffs Exhibit 488.

*David E. Lanning*

David E. Lanning is the Superintendent of the Southern Local School District Board of Education. Mr. Lanning holds a Bachelor of Science in Education with a major in English from Ohio University and received a master's degree in Administration from the University of Dayton in 1984. Mr. Lanning has taken additional course work from Ohio University and from the University of Dayton. He taught 5 years at Zanesville High School as an English teacher, worked 13 years at Berne Union High School, became Principal of Miller High School in the Southern Local School District for 3 years, and has been Superintendent for 2 years. (Lanning Depo. 5–7)

*Richard Maxwell*

Richard Maxwell is employed by the Buckeye Association of School Administrators. His current job title is Deputy Executive Director for Governmental Relations. Mr. Maxwell publishes a school finance newsletter, conducts workshops on school finance four to six times a year, and also teaches school finance and school facilities classes for Ashland University. He has taught at Ashland for the past 18 years. In addition, he has authored a text book now in its second edition called, *Ohio School Finance—A Practitioner's Guide to Ohio School Finance.* The book has been adopted as a textbook by several universities in Ohio. Mr. Maxwell has also served as a consultant for individual school districts. He has been a local school district superintendent, a county school district (now known as ESC) superintendent, an administrator and a teacher. He has been involved in public education for a total of 36 years and has been engaged in the study of Ohio school finance for 34 years. A current copy of Mr. Maxwell's vita is included as Plaintiffs Exhibit 464. In his capacity as Deputy Executive Director of Governmental Relations, he has been involved in the passage of House Bill 412, Senate Bill 55, House Bill 650 and House Bill 770.[2] (Maxwell Tr. 1358–61)

---

2. Substitute House Bill 412, hereafter cited as H.B. 412; Substitute Senate Bill 55, hereafter cited as S.B. 55; Substitute House Bill 650, hereafter cited as H.B. 650; Substitute House Bill 770, hereafter cited as H.B. 770.

As to further background of Mr. Maxwell, the Court incorporates its findings of fact relating to Mr. Maxwell as set forth at page 9 of the Court's findings from the original trial.

*Jan L. Osborn*

Dr. Jan L. Osborn is the Superintendent of the Putnam County Educational Service Center (ESC), a position that he has held for the last five years. The Putnam County ESC is a regional education service agency that provides services to nine local districts in Putnam County. (Osborn Depo. Exh. 8, pp. 1–2) Dr. Osborn has published articles that have been distributed to other special education professionals. He has completed twenty-four years at the Putnam County Educational Service Center during which time he has had different responsibilities directly or indirectly with special education. (Osborn Depo. 6, 8–9, 14–15) From 1995 to 1997, Dr. Osborn was the chair of the State Superintendent's Advisory Panel on the education of students with disabilities, which is mandated under the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. § 1412(a)(21)(A)). One of the duties of the panel is to advise the Ohio Department of Education (ODE) of the unmet educational needs of students with disabilities. (34 C.F.R. § 300.652(a)). Dr. Osborn is the chair of the board of the Northwest Ohio Special Education Regional Resource Center which provides support services to school districts in thirteen counties. (Osborn Depo. Exh. 8, pp. 1–2) Dr. Osborn has been a member of an advisory group of four persons called The Four Plus Two Committee, which advises and assists John Herner, Director of Division of Special Education, Ohio Department of Education, and also Dr. Jane Wiechel, Director of Early Childhood Education, Ohio Department of Education. The committee provides feedback and concerns to the two directors. The advisory group meets at least once a month, but during increased activity of the legislature, it might meet as often as once a week. (Osborn Depo. 65)

Dr. Osborn has attended between 2,000 and 4,000 individualized education program (IEP) conferences since 1977. (Osborn Depo. 87)

*Stacy Overly*

Stacy Overly is the Treasurer of the Chillicothe City School District. He has been the district's treasurer for 2 years and has a total of 7 years of experience as a treasurer in Ohio school districts. He has a Bachelor's of Business Administration and a Master's of Business Administration from Ohio University. (Overly Depo. 5–6)

*Jim Payton*

Dr. Payton is employed by the Ohio Department of Education in the Policy Research and Analysis Division. He works under the general direction of Dr.

Matthew Cohen in conducting simulations of the effects of proposed legislation and other simulations conducted at the request of members of the General Assembly and others. Dr. Payton last testified in this case in February 1993. His current position is identical to the one held by him at that time. (Payton Depo. 4–6)

As to further background of Mr. Payton, the Court incorporates its findings of fact relating to Mr. Payton set forth at page 12 of the Court's findings of fact arising from the original trial.

*William L. Phillis*

William L. Phillis testified in this case in the fall of 1993. Since that time he has served as the Executive Director in a consultant relationship with the Ohio Coalition of Equity and Adequacy of School Funding. He has also served as an Assistant Professor at Ashland University until June 1998. He has continued to write articles for Banks Baldwin's Ohio School Law Journal. The courses he has taught are graduate-level courses in education, including personnel administration, school facilities and grounds, and superintendency. In his role as Executive Director of the Coalition, Dr. Phillis has sought to advance the mission of the Coalition, which is to secure a high quality of education for each young person in the State. The Coalition's membership consists of approximately 550 school districts throughout the State. (Phillis Tr. 1980–84)

As to further background of William L. Phillis, the Court incorporates its findings of fact relating to Mr. Phillis as set forth at pages 12–13 of the Court's findings of fact arising from the original trial.

*Francis Rogers*

Francis Rogers is an employee of the Ohio Department of Education assigned to the Office of Policy, Research and Analysis. Mr. Rogers works there under the direction of Dr. Matthew Cohen. (Rogers Depo. 11–12) Mr. Rogers received his bachelor's degree from The Ohio State University in 1988 and in 1990 a Master of Arts Degree from the University of Georgia with majors in geography and research. Prior to joining the Ohio Department of Education, Mr. Rogers worked at the Mid–Ohio Regional Planning Commission in Columbus, Ohio, from 1990 through 1993. (Rogers Depo. 9–10)

*Warren G. Russell*

Warren G. Russell is currently Director of Legislative Services for the Ohio School Boards Association. As a policy analyst, legislative agent, and lobbyist for the Ohio Department of Education, the Buckeye Association of School Administrators, and the Ohio School Boards Association, Mr. Russell has spent 20 years covering hearings, analyzing proposals, and providing testimony on education related legislation. A particular focus of Mr. Russell's has been in the area of

school finance. Mr. Russell produced an administrator's guide to the biennial budgets for fiscal years 1994–1995, 1996–1997, and 1998–1999. Those guides included an analysis of the biennial budgets which Mr. Russell wrote and were presented in August 1994, 1996, and 1998 at budget analysis seminars which were attended by over 1,000 school administrators. Mr. Russell planned two seminars relating to the instant case, one entitled, "After *DeRolph*," held in April 1997, and a second seminar entitled, "Proposed *DeRolph* Remedy," held in May 1998. Two resource guides were produced for these seminars. Mr. Russell has read, analyzed, and participated in the legislative process on the pieces of legislation which have been listed in the State's statement of compliance with the *DeRolph* decision, filed with this Court March 24, 1998. He has likewise followed proposed and enacted legislation which he believes has or will have an impact on the local tax structure of public schools and other local entities. Such bills involve changing the assessment rate on personal tangible taxes, eliminating the inventory portion of personal tangible taxes, the deregulation of the telecommunication and gas utility industries, and the proposed deregulation of the electric utility industry. He has also been involved in issues relating to the overpayment of personal tangible taxes, particularly the General Electric Corporation's overpayment of personal tangible taxes in excess of $12 million, which affected 72 school districts in Ohio, causing them to repay such overpayment plus interest. (Russell Depo. Exh. 1; Russell Depo. 6–7)

As to further background of Mr. Russell, the Court incorporates its findings of fact relating to Mr. Russell as set forth at pages 14 and 15 of the Court's findings of fact arising from the original trial.

Since Mr. Russell last gave testimony in this case in 1993 as a State witness, he continued his employment at the Department of Education, which provided staffing to the Panel of Experts, and was the Department's Director of Governmental Relations. (Russell Depo. 29, 163) He was involved in the development of the State Board's legislative positions and proposals. He left the Department of Education in January 1995, and has been with the Ohio School Boards Association since that time as their Director of Governmental Relations. He helped form the Education Tax Policy Institute and directs its research activities. (Russell Depo. 163)

*Daria Shams*

Daria Shams has been employed by the Ohio Department of Education for approximately 10 years. All of that time he has been employed in the Simulation Unit. He holds a Bachelor of Science in Business Administration and Public Administration and a master's degree from The Ohio State University. (Shams Depo. 5)

*Stephen Sites*

Stephen Sites has served as the Treasurer of the Dawson–Bryant Local School District for the past nineteen years. (Sites Depo. 5–6) Mr. Sites was educated in the Dawson–Bryant District and went on to earn a degree in accounting from Ohio University. (Sites Depo. 6)

*Ernest Strawser*

Ernest Strawser is the treasurer of the Jackson City Schools and has held that position for the last twelve years. Mr. Strawser graduated from Ohio University with a degree in finance, received a master's in public administration from Central Michigan University, and has attended Ohio University in the doctoral program. Before his employment with the Jackson City Schools, Mr. Strawser worked for the State Auditor's Office for four years. Mr. Strawser has been very active in the treasurers' professional association, the Ohio Association of School Business Officials, and has served as its president. He has worked with the Secondary School Principals Association, Elementary School Principals Association, Buckeye Association of School Administrators, Ohio School Boards Association, and the Ohio Department of Education, and has made presentations at more than 40 seminars for these organizations on a variety of topics, including school finance in general financial projections for districts, five-year projections and implementation of H.B. 412 requirements. He participated on an external advisory committee for the Department of Education for nine to ten months, providing practitioner input to the formulation of rules for the implementation by H.B. 412 and has spoken extensively on the topic of implementing the requirements of H.B. 412. Mr. Strawser has worked with the State Auditor's Office on a spread sheet for use by school treasurers to complete the 5–year projections required by H.B. 412. Six or seven times during his tenure as Jackson City Schools Treasurer, Mr. Strawser has been employed as a consultant to other school districts. (Strawser Tr. 1756–1760; 1767; 1801) Mr. Strawser has significant experience analyzing Ohio school funding levels and the impact of legislation upon local districts, and the Court found that Mr. Strawser's background and experience qualified him as an expert witness. (Strawser Tr. 1774)

*John Sonedecker*

Dr. John Sonedecker is the Superintendent of the Mt. Vernon City School District in Knox County and has been since 1996. (Sonedecker Depo. 12) Prior to that, he had been Superintendent of the Gahanna School District for 2 years, (Sonedecker Depo. 11–12) was Assistant Superintendent of the Newark City School District, and had been an administrator in the Upper Arlington School District for 10 years. (Sonedecker Depo. 9, 26)

Dr. Sonedecker is currently chair of the State Superintendent Technology Committee. (Sonedecker Depo. 6) He is a member of the School Net Instructional Design Team which is engaged in identifying competencies that students need at various levels and staff competencies in order for technology to make a difference in schools. (Sonedecker Depo. 20) Dr. Sonedecker formerly served on the committee which was involved in the development of the State report card. (Sonedecker Depo. 27) He has expertise relating to the environment in which teaching and learning occurs and has done presentations and consultations with the Association for Supervision and Curriculum Development as well as the Buckeye Association for School Administrators. (Sonedecker Depo. 25–27)

*Donald Washburn*

Donald Washburn is currently the Superintendent of the Plaintiff Dawson–Bryant Local School District, having held that position since August 1992. Mr. Washburn testified at the trial of this matter in 1993, and the Court hereby incorporates its findings from that trial regarding Mr. Washburn's background and work experience. (Trial Court's Findings 1994, pp. 21–22)

At the time of trial in 1993, Mr. Washburn was a member of several governing boards and was serving or had served on five committees to which he was appointed by a representative of the Ohio Department of Education (ODE); two committees dealt with teacher in-service, the other two dealt with revision of state regulation of special education, and the fifth was the Lerners Outcome Panel, that was charged with restructuring all elementary and secondary standards for education in Ohio. In 1989, Mr. Washburn was recognized as the outstanding visionary in the State of Ohio by the ODE. (Trial Court's Findings 1994, p. 22)

Since 1993, Mr. Washburn has been active on several state committees as well as the professional organization BASA (Buckeye Association of School Administrators). He has served four years on the legislative committee of BASA and has recently been elected to its executive committee. Mr. Washburn received the BASA Exemplary Leadership Award in 1997. He participated in the Ohio School Leadership Institute, involving 160 hours of instruction in leading schools through changes and restructuring. The Institute is sponsored by the Ohio Department of Education and BASA and is funded through a grant of the legislature. Also, Mr. Washburn was one of two superintendents from Ohio selected by Dr. John Goff to attend six days of training in integrating technology into the educational process sponsored by the North Central Regional Educational Laboratory (NCREL). (Washburn Tr. 1893–95)

At the request of the Governor's Office, Mr. Washburn gave a presentation on interrelation of collaboration in the public schools system at the National Governors' Meeting in St. Louis, Missouri, in 1996. In 1998, he co-presented with Dr.

Robert Slavin, who is one of the leading educational researchers in the country, at Johns Hopkins University on implementing the Success For All reading program. (Washburn Tr. 1893–95)

*James Williams*

James Williams has served as Superintendent of the Dayton City School District since 1991. Before that, he served as Deputy Superintendent at Dayton City Schools for three years. (Williams Depo. 9) He is responsible for the fiscal and academic operation of the school district. (Williams Depo. 10)

B.   School District Descriptions and Economic Climate

*Chillicothe City Schools*

The average daily membership (ADM) for the Chillicothe City Schools in FY98 was approximately 3,688. The average income of the district was about *$31,529* in tax year 1996, but in FY98 the district had an aid for dependent children (ADC) percentage of 17.9. The district has received no equity funds. (State's Exh. 76).

The district will receive 8/10ths of a percent increase ($42,000) in State funding for FY99, but will be required to pay $200,000 of additional costs for special education services to the Ross County Educational Service Center (ESC). (Overly Depo. 55–56 )

Chillicothe City Schools five-year projections show a deficit of $1.6 million in FY01 that grows to a deficit of *$5.7* million in FY03. (Overly Depo. Exh. 1)

*Dawson–Bryant*

The Court incorporates its findings as to Plaintiff Dawson–Bryant Local School District from its findings of fact issued following the original trial of this matter:

"There is very little industry in the Dawson–Bryant School District and surrounding region. Most of the people who reside within the school district that have employment, work outside the district and, in many instances, outside the state. Average income in the district is quite low compared to other districts in the state. The largest employer within the Dawson–Bryant Local School District is the school system.

"The residents of Dawson–Bryant passed a 5.9 mill levy in May of 1993. Because there is no industry in the district, the tax is placed directly upon residents. Obviously, residents of the district do not have discretionary income to pay additional taxes. Thus, a tax levy for operations is not a viable option." (Trial Court's Findings 1994, p. 67)

Except as to events since 1993, the testimony of Superintendent Washburn and Treasurer Sites indicated no change in this description of the district, and the State has offered no testimony indicating any change in these conditions.

The ADM for the Dawson–Bryant Local School District in FY98 was approximately 1,393. The average income of the district was about $24,053 in tax year 1996 and the district had an ADC percentage of 22.5 in FY98. (State's Exh. 76, p. 16) The district's TANF count (formerly ADC count) has dropped approximately 25% in the last three years. The free and reduced lunch count of the district has gone from 32% in 1991 to a district-wide average of above 60% in FY98, with a 63% average at the elementary level. (Washburn Tr. 1916–17)

The district's five-year projections show a deficit of $73,000 in FY02 that grows to a deficit of one-half million dollars in FY03. (Sites Depo. Exh. 1)

*Dayton City Schools*

The ADM for the Dayton City Schools in FY98 was approximately 25,790. The average income of the district was about $26,246 in tax year 1996, and the district had an ADC percentage of 44.5 in FY98. (State's Exh. 76, p. 22)

*Groveport Madison*

The Groveport Madison Local School District has many of the same problems that an urban district has even though they are considered a suburban school district. (Barr Depo. 204–05)

The ADM for the Groveport Madison Local School District in FY98 was approximately 5,921. The average income of the district was about $31,813 in tax year 1996, and the district had an ADC percentage of 8.9 in FY98. The district has received no equity funds. (State's Exh. 76, p. 10)

The five-year projection for the Groveport Madison Local School District shows a deficit in FY99 of approximately $45,000 that grows to a deficit of $10.2 million in FY03. (Barr Depo. Exh. 12)

*Jackson City Schools*

The Jackson City Schools has an overwhelming need for facilities. (Strawser Tr. 1814; 1816–17) The district residents increased their rate of taxation by 25% between the years 1990 and 1997. At the same time, expenditure per pupil for the district decreased relative to the state average from $800 less per pupil than the state average to $1,100 less per pupil than the state average. (Strawser Tr. 1777; 1806)

The Jackson City Schools' ADM in FY99 is approximately 2,549, the district's average income is about $25,990, and the ADC percentage is about 18.37. (Strawser Tr. 1860, 1785)

The district's five-year projections show a deficit of approximately $123,400 in FY00 that grows to a deficit of $2.095 million in FY03. (Pl. Exh. 487)

*Lima City Schools*

70% of the students in the Lima City School District are enrolled in the free and reduced lunch program. The district is one of the poorest districts in the State of Ohio in terms of local property tax as well as personal income. (Buroker Depo. 117) The Court incorporates its findings as to Plaintiff Lima City School District from its findings of fact issued following the original trial of this matter:

"a. The general population of the suburban area around the City of Lima has grown slightly over the past ten years, while the population within the city has declined. Of the population decline over the past ten years, 85 percent is represented by individuals under the age of 18 who are white. As a result of the population shifts, demographics of the Lima City School District have continued to change to the end that school districts contiguous to the City of Lima have grown substantially, with one having grown over 200 percent since 1974.

"b. People who move into the Lima City School District tend to be people who are moving to take advantage of low-income housing. As a result, the individuals who attend the Lima City Schools tend to be poor.

"c. Lima City School District has not proposed the passage of additional tax levies to its voters because it has one of the lowest tax bases and one of the lowest per capita incomes of any school district in the State of Ohio. The tax payers of the district are already assuming a significant burden. In addition, the voters of the city experience municipal overburden charges through the require-ment that they pay for the services of water, sewer, and police protection. Thus, the existing tax burden, combined with an ever increasing population living below the poverty line, makes the prospect of passage of an additional tax levy unlikely." (Trial Court's Findings 1994, pp. 67–68)

Except as to events since 1993, Superintendent Buroker's deposition testimony contained no change in this description of the City of Lima and Lima City School District and the State has offered no testimony indicating any improvement in these conditions.

The Lima City Schools' ADM in FY98 was approximately 5,917. The average income in the district for tax year 1996 was $25,203, the ADC percentage for FY98 was *31.5*. (State's Exh. 76, p. 1)

The five-year projection for the Lima City Schools shows a deficit in FY01 that grows to $6.9 million in FY03. (Buroker Depo. Exh. 7)

*Mt. Vernon City Schools*

The City of Mount Vernon has a population of approximately 15,000 and the school district has about 4,200 students. The district itself encompasses an area outside the city and is approximately 158 square miles. (Sonedecker Depo. 31)

The Mount Vernon City Schools' ADM in FY98 was approximately 4,224. The average income in the district for tax year 96 was $30,316, and the ADC percentage for FY98 was 9.1. The district received no equity funds. (State's Exh. 76, p. 16)

*Putnam County Educational Service Center*

The Putnam County Educational Service Center (ESC) serves nine local school districts including Columbus Grove, Continental, Jennings, Kalida, Leipsic, Miller–City, New Cleveland, Ottawa–Glandorf, Ottoville, and Pandora–Gilboa. Of the nine local school districts in Putnam County, five are in the lowest wealth quartile in the state. Seven districts are ranked in the poorest 291 districts and are therefore eligible for State equity funds. (Osborn Depo. 25–26; Osborn Depo. Exh. 8, p. 2) The Putnam County Educational Service Center offers classes for multi-handicapped, severe behavioral handicapped, developmentally handicapped, and preschool handicapped children. The Educational Service Center provides a supplemental service teacher, gifted education teachers in three locals, gifted education coordinators for all nine locals, 1.6 special education supervisors throughout the county, work study coordinators, speech therapists, and a school psychologist. The Educational Service Center also provides services in general education, including general supervision K–12, a technology coordinator, a preschool program in six locals, an early intervention coordinator, and a substance abuse educator. The Educational Service Center also operates over twenty different grants. It provides programs and services for all nine locals. The Educational Service Center employs about 78 people, with most all of the employees out providing services in the various local school districts. The Educational Service Center has four employees that could be considered administrative: treasurer, assistant to the treasurer, administrative secretary and superintendent. (Osborn Depo. 26–27) The Putnam County Educational Service Center is a fiscal agent for a countywide insurance consortium, which involves managing approximately $1 million per year. The budget of the Educational Service Center is around $4 million per year. (Osborn Depo. 43–44)

*Southern Local Schools*

The Court incorporates its findings as to Plaintiff Southern Local Schools from its findings of fact issued following the original trial of this matter:

"The economic situation in Southern Perry County and in Plaintiff Southern Local School District is poor. Employment is scarce, companies have closed their

doors, and some of the larger employers in the county, coal businesses, have ceased operations. At one time the railroad was the major employer in the county, but it has closed its operations." (Trial Court's Findings 1994, p. 69)

Except as to events since 1993, the testimony of Superintendent Lanning and Treasurer Grady indicated no change in this description of the district, and the State has offered no testimony indicating any change in these conditions.

The Ohio Department of Education simulation printout of June 1998 indicated that the Plaintiff Southern Local School District in Perry County has a valuation per pupil of $24,177, which ranks it 607th in the state. Its federal average income per return for tax year 1996 was approximately $23,279, ranking it 604th in the state. Its current operating millage for FY97 is 33.3, ranking it 494th in the state. Its class one effective millage for FY97 is 23.83, ranking it 474th in the state. The district's expenditure per pupil for FY97 was $5,329, ranking it 299th in the state. (Lanning Depo. Exh. 2)

The ADM for the Southern Local School District in FY98 was approximately 1,102. The average income of the district was about $23,279 in tax year 1996, and the district had an ADC percentage of 22.9 in FY98. (State's Exh. 876, p. 24)

While the expenditure per pupil for the Southern Local School District has increased between FY91 and FY97, so also has the percentage of teachers with bachelor's plus 150 hours of education and also increased is the percentage of teachers with a master's degree. The average teacher's experience in the district has also increased. These increases in teacher education and experience cause additional salaries to be paid to teachers. Also, the district's teacher-to-pupil ratio has increased between FY91 and FY98. (Lanning Depo. Exh. 4)

The five-year projections for the district show a deficit in FY01 that increases substantially through FY03. (Grandy Depo. Exh. I)

*South–Western City Schools*

South–Western City Schools has a student population of 18,500, the seventh largest in the state. (Hamilton Depo. 15,229) It has 28 school buildings, including 3 high schools. It is a unique district which includes rural, urban, and suburban areas. It includes Grove City, a city with the population of 25,000 to 27,000, an area known as Westland which adjoins West Broad Street, and Franklin Heights which borders and includes part of the City of Columbus. (Hamilton Depo. 15–16) Its community population includes areas where the average value of a home is $175,000 and most of those homes have one or more parents with a college education. The community also includes homes where the average income is below the poverty level and families live in subsidized housing. (Hamilton Depo. 16) The district employs about 2,100 employees. (Hutchinson Depo. 7)

The ADM for the South–Western City Schools in FY98 was approximately 18,493. The average income of the district was about $32,196 in tax year 1996, and the district had an ADC percentage of 11.3 in FY98. The district received no equity funds. (State's Exh. 76, p. 10)

The five-year projections of the district show a deficit in FY02 of $8.35 million that grows to a deficit of $28.7 million in FY03. (Hutchinson Depo. Exh. 4)

*Youngstown*

The Court incorporates its findings as to Plaintiff Youngstown City School District from its findings of fact issued following the original trial of this matter:

"The Youngstown City School District's local revenue has been hurt by the economy of the Youngstown area. The Youngstown business community has been devastated since the steel mills closed down, and the City of Youngstown has given tax abatements to industry in an attempt to draw business to the area. The combination of the steel mills closing and the abatement process has had a detrimental impact on the Youngstown City School District's financial projections." (Trial Court's Findings 1994, p. 69)

Except as to events since 1993, Treasurer Funk's deposition testimony indicated only a worsening of these conditions.

The ADM for Youngstown City Schools in FY98 was approximately 12,599. The average income of the district was about $22,905 in tax year 1996, and the district had an ADC percentage of 57.5 in FY98. (State's Exh. 76, p. 20)

The Youngstown City Schools has three outstanding emergency school assistance loans for a total of $37,202,587. (Brown Depo. 67–68) The district's five-year projections show a deficit of $6.6 million in FY99 that grows to a deficit of $49 million in FY03. (Funk Depo. Exh. I)

C. Overview of Legislative Activity

*School Funding Task Force*

After the Supreme Court issued its decision in March 1997, there was assembled what became known as the School Funding Task Force. The Task Force included the Governor, Speaker of the House, and the President of the Senate, minority leaders of the House and Senate, and was chaired by then State Budget Director R. Gregory Browning.[3] (Davidson Tr. 77) The Task Force also had a staff which included representatives of the Department of Education, The Office of Budget and Management, and the Legislative Budget Office. The staff

---

3. Budget Director Browning was a witness for the State Defendants in the original trial in 1993.

included Jack Jackson of the Ohio Department of Education, Dave Brunson from the Legislative Budget Office, Mike Spino and Anthony Tripody from the Office of Budget and Management and, to a lesser extent, Liz Connolly and Tim Keen. (Cohn Depo. 87–88)

Dr. Goff was appointed to the School Funding Task Force by the Governor in April 1997. Matt Cohen was assigned by Dr. Goff as a staff member from the Ohio Department of Education. Dr. Cohen involved Department of Education employees Dana Shams, Jim Payton and Francis Rogers in performing the work that he performed. (Goff Depo. 50, *53* ) Dr. Goff directed Dr. Cohen and his staff members to work with other members of the School Funding Task Force. (Goff Depo. 55) Dr. Goff received periodic reports from Matt Cohen concerning the work of the department staff in connection with the School Funding Task Force. (Goff Depo. 57)

The Task Force staff generated many types of analysis and data, particularly from the Department of Education and the Legislative Budget Office. (See Section IV, infra) At about this time, the Department of Education also engaged Dr. John Augenblick as a consultant and requested that he develop a methodology to determine the base cost of an adequate education. Dr. Augenblick issued a report to the Task Force in July 1997. (Davidson Tr. 27–28)

*Engagement of Dr. Augenblick*

The engagement of John Augenblick was thoroughly discussed with the staff members of the School Funding Task Force prior to the decision to engage the services of Dr. Augenblick. (Cohen Depo. 93) Dr. Cohen believed that each staff member of the School Funding Task Force was familiar with Dr. Augenblick's work from his participation on the Panel of Experts. (Cohen Depo. 95)

In the course of developing his recommendations, Dr. Augenblick met with the staff of the School Funding Task Force on several occasions, discussed ideas and tried to get a feel for the direction the task force members were interested in going. The task force members most often met with in that regard were Mike Spino, Anthony Tripody, Jack Jackson, Dr. Matthew Cohen and David Brunson. In addition, Debra Zadzi and Wendy Zahn from the Legislative Budget Office were present, as well as Dr. Bruce Gensemer for at least one of those meetings. (Cohen Depo. 105–06)

*Work of the Task Force, Staff, Augenblick, and Others*

In connection with the work of the staff members of the School Funding Task Force, Dr. Augenblick had the primary responsibility to develop a base cost and Dr. Gensemer, Dr. Fleeter and Dr. Cohen had the responsibility to develop the "add ons" (cost-of-doing business factor, special education, DPIA, and transportation). (Cohen Depo. 112–14)

At the time that John Augenblick was hired by the School Funding Task Force, it was understood that his work would involve utilizing the inferential process. The task force had discussed, understood and agreed that that was the approach to be utilized by Dr. Augenblick; no alternatives were discussed. (Cohen Depo. 123)

The staff of the School Funding Task Force (core group) met approximately ten times during the course of developing recommendations for the School Funding Task Force. Dr. Augenblick was present for approximately half of those meetings. (Cohen Depo. 306–07)

Dr. Goff did not consider gathering any new or additional data in connection with the recommendations of the School Funding Task Force other than data that already existed within the Department of Education's files. (Goff Depo. 67–68)

Each of the options considered for inclusion in Dr. Augenblick's recommendation were presented to and discussed with the staff members of the School Funding Task Force. Each of the options considered also had information showing the *cost* of the choices under consideration. (Cohen Depo. 144–45)

Base cost options were reviewed with the staff members of the School Funding Task Force and with Dr. Augenblick. Dr. Augenblick urged the staff members of the School Funding Task Force to consider using the expenditure flow model (EFM) screen as a measure of efficiency. (Cohen Depo. 153) No studies or analyses were conducted to determine whether or not school districts with high or low expenditures as measured by the expenditure flow model were efficient or inefficient. (Cohen Depo. 155) Cohen Deposition Exhibit 4 represents the database from which the various options considered by the staff of the School Funding Task Force and Dr. Augenblick were derived. (Cohen Depo. 174)

The base cost recommendation arrived at by Dr. Augenblick and the staff members of the School Funding Task Force was presented to the School Funding Task Force in late June 1997. After that time, the focus shifted to work being done by Drs. Gensemer and Cohen on the development of recommendations for special education funding, DPIA and related recommendations. (Cohen Depo. 181–83)

Cohen Deposition Exhibit 9 is an outline of the report proposed to be authored by John Augenblick in connection with his work for the School Funding Task Force. The outline was prepared by Dr. Cohen and given to Dr. Augenblick. (Cohen Depo. 209–11) Dr. Cohen's work with the staff of the School Funding Task Force concluded when Budget Director Browning presented a proposal to that task force in the summer of 1997. (Cohen Depo. 224–25)

Attachments 1 through 10 and 14 to Dr. Augenblick's July 1996 report (Cohen Depo. Exh. 13) were prepared by the Ohio Department of Education. (Cohen Depo. 238, 244–47, 254, 265–69, 271, 274) The issue of what documents to attach to Dr. Augenblick's report was discussed with the School Funding Task Force staff as well as with Dr. Augenblick. (Cohen Depo. 277) The staff members of the School Funding Task Force decided that "everything that they could possibly present would be part of an attachment to the report." (Cohen Depo. 315)

Dr. Fleeter was asked to recast Dr. Gensemer's paper and recast the work into a different format. He was not asked to undertake any independent study or analysis of the work conducted by Dr. Gensemer. (Cohen Depo. 281) The work performed by Dr. Fleeter on behalf of the staff members of the School Funding Task Force became a paper attached to the Augenblick report. (Cohen Depo. 143) It was this work that was the basis for the special education weights. (See "Special Education," *infra*)

Senator Espy, a member of the School Funding Task Force, proposed that the 1990 school facilities study be updated to the current year. That proposal was rejected by vote of the School Funding Task Force. (Goff Depo. 109)

The basic premise of the School Funding Task Force's approach is represented by the statement conveyed to Dr. Goff by Director Browning: "By using the performance accountability standards as criteria for establishing the cost of a basic education, we are linking our cost estimate to our desired outcomes." (Goff Tr. 612)

The work of the School Funding Task Force was governed by the timeline for getting issues on the ballot in the fall. One of the issues discussed for inclusion in the ballot would have limited the authority of the Judiciary to review issues regarding school funding. (Goff Tr. 6, 12–13) Director Browning, as Chair of the School Funding Task Force, issued "School Funding Policy Recommendations" on July 1, 1997. One of his recommendations was three amendments to the Ohio Constitution, including limiting the reviewing authority of the judiciary regarding school funding. (Pl. Exh. 502; Joint Resolution 2)

*Activity Moves to Legislature*

By mid-summer, three material pieces of legislation were pending in the General Assembly in response to the Supreme Court's decision. Those were S.B. 55, generally known as the academic accountability statute; H.B. 412, generally known as the fiscal accountability statute, and Senate Joint Resolution 3, which would have placed on the ballot a 1¢ sales tax designed to raise $1.1 billion for funding primary and secondary education. (State's Exh. 2; Davidson Tr. 202–3)

Governor Voinovich sent a memorandum to the members of the General Assembly dated December 16, 1997 describing the Governor's proposal, which

was moving through the Legislature in the summer or late summer of 1997. (Johnson Depo. 33–34; Johnson Depo. Exh. 1) The proposal included:

- Increase the State's sales tax from 5% to 6%, constitutionally earmarking the increase for schools.

- Provide $5.8 billion in State assistance for school facilities over a 10–year period, including $2.8 billion in State issued debt. The State assistance is estimated to leverage an additional local contribution of about $7 billion, creating a total facilities program of approximately $12.8 billion.

- Allow school districts to pass levies that are not subject to H.B. 920 property tax growth restrictions.

- Increase the cigarette tax by 12¢ per pack to yield a total of $102 million in additional revenue annually.

- Decrease the rollback on business and commercial property by half (from 10% to 5%), saving the State $103 million. (Johnson Depo. Exh. 1)

At the end of July 1997, Senate Joint Resolution 3 failed to emerge from the House Finance Committee by 1 vote. (Johnson Depo. 30–1) This represented a defeat of the Governor's proposal and the Legislature had to start anew. (*Id.*)

When the Governor's proposal failed, the Legislature enacted S.B. 55 and H.B. 412. (Johnson Depo. 35)

Shortly thereafter, there was formed a joint subcommittee of finance of both the House and Senate Finance Committees co-chaired by Representative Johnson and Senator Roy Ray. (Johnson Depo. 35–36). The purpose of the Joint Committee was to review how the Legislature might determine the cost of an adequate education program and to address the many concerns of the legislators, which included concerns over costs. (Johnson Exh. 3; Depo. 44)

At about the same time in the fall of 1997, Senator Robert Cupp, President *Pro Tempore* of the Ohio Senate, was asked by Speaker Davidson and the President of the Senate if he would coordinate a group of interested legislators to put together a plan that could be drafted into legislation and considered by the General Assembly. (Cupp Tr. 344)

The working group made modifications to Dr. Augenblick's proposed methodology by altering the "outlier" screens, eliminating the EFM screen, and using unweighted instead of weighted averages. (Cupp Tr. 350–63) The working group's recommendations were ultimately adopted into legislation in the form of H.B. 650. (Cupp Tr. 364) H.B. 650 passed the Legislature on January 31, 1998. (State's Exh. 2)

The actual decision to increase the median income screen came from Senator Cupp's working group. In fact, it was composed of 8 to 10 House and Senate

Republicans. It was not a bipartisan working group. It included no one who claimed to be an expert in statistics and no one claimed to be an expert on Dr. Augenblick's methodology. (Cupp Tr. 406–07)

Goff Deposition Exhibit 10 is a communication to the members of the Ohio General Assembly from State Superintendent Goff and Bob Wehling, co-chair of the BEST organization. The comparison made as of January 29, 1998, compared the BEST position with that proposed in H.B. 650 and related legislation. Among the points of disagreement advanced by Dr. Goft were the fact that (1) the cost of the proposed legislation for base foundation level was 10% below the BEST recommendation, (2) BEST recommended up to $700 million per year in school facilities compared to the $170 million per year in current legislation, (3) BEST recommended immediate implementation of the cost-of-doing business factor with a range of 0–18%, while proposed legislation would phase that cost-of-doing business factor in over a period of six years, (4) BEST proposed property tax reform to allow local property taxes to rise with inflation to meet the local share of basic education costs, and no similar proposal was made in the pending legislation. (Goff Depo. Exh. 10, pp. 2–5)

The General Assembly enacted legislation that placed on the ballot what came to be known as State Issue 2 which was a proposed 1 cent sales tax designed to provide the long-term structure of funding for the changes in school funding enacted in H.B. 650. (DeMaria Tr. 1273–74) State Issue 2 failed in May 1998.

II. FACILITIES

A. Ohio School Facilities Commission

The Ohio School Facilities Commission was established by Senate Bill 102, which was signed into law on May 20, 1997. The first meeting of the Commission was on June 12, 1997. The Commission is a separate State agency charged with overseeing all of the State's K through 12 construction, both the funding and construction of projects. The Commission has 18 employees, and approximately 100 private sector architects, engineers and construction managers who are under contract to help administer projects. Randall Fischer is the Executive Director of the Ohio School Facilities Commission. The Commission consists of three voting members, who are the Director of Administrative Services, Superintendent of Public Instruction, and Director of Office and Management. There are, as well, four non-voting legislative members. (Fischer Tr. 965, 975; Fischer Depo. 32, 34)

The Ohio School Facilities Commission oversees the following programs:

- The former Building Assistance Program (Classroom Facilities Act)
- The Classroom Facilities Assistance Program

- The Emergency Repair Program
- The Big 8 Program
- The ADA (Handicap Accessibility) Program
- The Energy Conservation Program (Fischer Tr. 976; Fischer Depo. 36)

Since the creation of the Facilities Commission, the Ohio Department of Education no longer has direct involvement with school construction. However, the Department of Education each year is required by law to provide the Facilities Commission with the equity list of school districts. Previously, the Department of Education was responsible for administration of the Building Assistance Program, as well as programs of limited duration that pertained to emergency school repairs, handicap accessibility (ADA compliance), and asbestos abatement. (Fischer Depo. 35, 37; Trial Court's Findings 1994, pp. 148–202)

The Mission Statement of the Ohio School Facilities Commission is:

"The Mission of the Ohio School Facilities Commission is to provide funding, management oversight, and technical assistance to Ohio school districts for construction and renovation of school facilities in order to provide an appropriate learning environment for Ohio's school children."

All members of the Facilities Commission, as well as its Executive Director, share the view that the educational facilities and environment have a great impact on a child's ability to learn. As set forth in the Mission Statement, "appropriate learning environment" includes classrooms, gymnasiums, restrooms, cafeterias, school buildings, school grounds, playgrounds, and athletic fields. (Fischer Depo. 4–7; Fischer Depo. Exh. 5)

Two types of inspections are performed by the Facilities Commission. Site visits are conducted to inspect and assess facility needs, for either the Emergency Repair Program, or the Classroom Facilities Program. Inspections are also made of ongoing new construction projects. Other than these inspections, there are no regular site inspections of public school facilities in Ohio. (Fischer Depo. 39)

Since becoming Executive Director of the Facilities Commission at the time of its creation, and until shortly before the August 24, 1998 hearing, Mr. Fischer has visited only about 12 school districts. At the request of the Attorney General, in preparation for the August hearing, he was asked to videotape school districts' facilities in order to document improvements. Mr. Fischer then visited 16 other school districts, and included in his videotape (State's Exh. 29) 13 districts with new construction. Included in those 13 districts were 11 districts that were on the 1990 Building Assistance List. Of those 11 districts, two, Washington Niles and Union Local, were still under construction. Some of the districts depicted on the videotape had had construction completed years before, such as Symmes

Valley (1993), Northwest Local (1994), Southern Local (1993), and Valley Local (1993). (Fischer Tr. 1087–88, 1159; State's Exhs. 29, 52)

Of the 11 school districts depicted on the videotape (State's Exh. 29) that were included in the 1990 Building Assistance List, nine also applied for Emergency Repair funds. Of those, four districts (Dawson–Bryant, Federal Hocking, Symmes Valley and Vinton County) applied for more than the $500,000 cap placed by the State on Emergency Repair funds going to any one district. (Fischer Tr. 1166)

When Mr. Fischer videotaped Dawson–Bryant School District, he did not inspect or examine any areas of the school buildings represented by the shortfall of $150,000 in the emergency repair grant to the district from the State. Similarly, he did not videotape or photograph any of those areas of the buildings for which application for emergency funds was made, but no grant was received. (Fischer Tr. 1172)

Mr. Fischer also videotaped Federal Hocking School District. However, he did not tape any areas of that district's buildings represented by the shortfall of $200,000 in emergency repair funds applied for but not received by Federal Hocking. Similarly, Mr. Fischer did not videotape any areas of the buildings in the Nelsonville–York School District which represented the shortfall of $280,000 in the Emergency Repair Program.

Of the five school districts depicted on the photographs presented at the hearing (State's Exh. 30 A–E), all of those districts were on the 1990 Building Assistance List, and two of the districts still do not have completed projects— Washington–Niles Local (under construction) and Western Local (close-out phase). Mr. Fischer had no idea who took these photographs. (Fischer Tr. 1165, Fischer Depo. 240; State's Exh. 52)

B. 1990 Ohio Public School Facility Survey

Randall Fischer, Executor Director of the Ohio School Facilities Commission, testified that he is familiar with the 1990 Ohio Public School Facility Survey. The 1990 Survey identified $10.2 billion in facilities needs for public primary and secondary schools in Ohio. The Facilities Commission utilizes the Facilities Survey, when preparing site assessments and developing master plans for new facilities through the Classroom Facilities Assistance Program. As part of a facilities assessment performed by the Facilities Commission of a school district, the Commission updates the survey forms used in the 1990 Survey. These updates are done by private sector architects and engineers retained by the Commission. (Fischer Depo. 41; Trial Court's Findings 1994, pp. 158–61)

The Facilities Commission has not undertaken any efforts to update the 1990 Ohio Public School Facility Survey. Similarly, the Commission has not undertaken any effort to determine the total amount of facilities needs for public schools in Ohio. Mr. Fischer testified that he is unaware of any agency, branch or department of the State of Ohio that has undertaken such an effort. (Fischer Depo. 43–44)

However, in 1997 the Legislative Budget Office undertook a study to determine the estimated costs of public school capital facilities. Brunson Exhibit 29 is a memorandum from Deborah Zadzi to Brian Perera, dated August 8, 1997, pertaining to "capital project estimates." Attached to that memorandum is an update, prepared by the Legislative Budget Office ("LBO"), of the 1990 Ohio School Facility Survey. (A portion of the attachment to this exhibit was omitted while copying. A full and complete copy is Brunson Exhibit 49.) In her memorandum, Ms. Zadzi of the LBO writes:

"Attached please find a spreadsheet that shows the estimated state and local costs for capital facilities. Our estimates show that the current need is approximately $16.5 billion. Of this amount, the State's share would be $7.2 billion and the local share would be $9.3 billion."

The total estimated costs of school facility needs was $20.1 billion. However, this figure was reduced by $4 billion because "districts spent $4 billion on capital projects from FY1990 through FY1996. . . ." In arriving at the new costs, the LBO used an inflation factor of 1.97 for districts in the first through tenth percentiles, and a factor of 1.5 for all other districts. (Brunson Exh. 29)

Even though he is Executive Director of the Ohio School Facilities Commission, Mr. Fischer testified that he was not aware of the Legislative Budget Office update of the 1990 Ohio School Facility Survey. (Fischer Tr. 1084–85)

The School Funding Task Force of the General Assembly did consider an update of the 1990 Facilities Survey, but none was done. Dr. Goff suggested a limited update of the Survey, consisting of visits to 168 buildings, as opposed to visits to the over 3,000 public school buildings in Ohio. Similarly, this was not done. The Facilities Commission has not been requested to do any other updates to the 1990 Facility Survey. The Facilities Commission has not undertaken any effort to determine the total amount of facility needs of public school districts. (Fischer Depo. 99–101; Fischer Tr. 1083; Fischer Depo. Exh. 4; Goff Depo. Exh. 8; Gaff Depo. 116–17)

Dr. Phillis has reviewed a Government Accounting Office survey of Ohio school facilities indicating that Ohio is worst among the states in the nation in public school facilities. (Phillis Tr. 2032)

Between 700 and 800 school buildings that were recommended for demolition in 1990 are still in use today. (Phillis Tr. 2034)

C. Classroom Facilities Assistance Program (Building Assistance Program); 1990 Building Assistance List

The Classroom Facilities Assistance Program (referred to by Mr. Fischer in his testimony as the "Building Assistance Program"), R.C. Chapter 3318, was created in 1957 and was in effect until 1997. This program was then renamed and retooled, to become the Classroom Facilities Assistance Program. The programs are similar, in that they are not just a repair program. (Fischer Tr. 1020; Trial Court's Findings 1994, pp. 151–56)

In 1989, the Ohio Department of Education approved 44 school districts for Classroom Facilities Assistance pursuant to R.C. Chapter 3318. (The "1990 Building Assistance List," Fischer Depo. Exhs. 6, 7, 10; Pl. Exh. 378; State's Exh. 33) The 1990 Building Assistance List described a total of over $414,000,000 in value of approved facilities needs. As of the date of the first trial in this case, only 18 of these districts had been approved for school building assistance, passed the requisite levies, and had funds made available for school construction. Twenty-six (26) of the 44 districts remained on the approved building list, for which no funds had been made available. All of the children identified as "improperly housed" in 1989 in the 44 districts continued to be improperly housed unless the school district had provided facilities without State assistance. (Trial Court's Findings 1994, p. 153)

State's Exh. 33 (Bates stamp attachment 569) and 52 describe the "Status of the 1990 Building Assistance List." Of the 44 school districts, only 14 of the projects have been completed. Nine of the projects are in the close-out phase, and another nine are under construction. One district, Norwalk City Schools, has not obtained voter approval for facilities construction. As stated by Mr. Fischer, after eight years, the 1990 Building List projects still are not completed. (Fischer Tr. 1021, 1162, 1174, 1176; Fischer Depo. 159)

Whereas the total cost of approved facilities needs for the 44 school districts on the 1990 Building Assistance List was $414,000,000, the actual cost for 43 of the 44 school districts (not including Norwalk) was $482,571,528, representing over 16% increase in project costs. (State's Exh. 52)

Norwalk City Schools did not place on the ballot the issue of levy approval for facilities because, according to the superintendent, there was a lot of competition from a parochial school, and the district did not think it would be successful on the ballot. The facilities needs of the Norwalk students are not any less than any other child in any other school district on the 1990 Building Assistance List. At the present time, Norwalk is ranked 307th on the equity list of school districts.

As such, Norwalk will not qualify as an equity district eligible for new facilities funds under the Classroom Facilities Assistance Program, enacted in 1997. Since it is not an equity district, Norwalk will not be considered for Classroom Assistance funding until all of the 292 equity districts are first taken care of. Nevertheless, in 1990 the State of Ohio believed that Norwalk's facility needs were of sufficient seriousness that the State placed the district on the preferred list of 44 school districts first eligible for Building Assistance funds. (Fischer Depo. 159; Fischer Tr. 1176)

With reference to Funds for Emergency Repairs, even with new construction completed under the Building Assistance Program, seven school districts on the 1990 Building Assistance List still needed to apply for emergency funds from the State for Emergency Repairs. (Fischer Tr. 1167)

D. Classroom Facilities Assistance Program

In addition to completing the facility projects on the 1990 Building Assistance List, Senate Bill 102, passed in 1997, creates another building assistance program—the Classroom Facilities Assistance Program. This is a self-executing program, where there are no applications for building construction assistance submitted by any school district. The program is supposed to address the district's entire facility needs. Eligibility is based upon a district's standing on the equity list of school districts. Non-equity school districts are not eligible for Classroom Facilities Assistance. Administration of the Program lies with the Ohio School Facilities Commission. (Fischer Depo. 138–39; Fischer Tr. 1021)

Senate Bill 102 requires that the Facilities Commission begin at the top (poorest) of the equity district list for each fiscal year and work its way down the list, to assess and develop master plans for a district's facility needs based on a ten-year enrollment projection. The Commission notifies a school district that its turn on the equity list is coming up shortly. The Commission then sends out an assessment team consisting of architects and a staff member from the Commission to evaluate the condition of the facilities. (Fischer Tr. 1022–23)

Once the assessment is completed and a master plan is approved by the Facilities Commission, the Commission places a cost on the project. If the project is then approved by the Facilities Commission, it then goes to the State Controlling Board for its approval. If approved by the Controlling Board for Classroom Assistance funds, the school district then must pass a levy for its local share within one year of Controlling Board approval. School districts must pay a local share of the facility project, determined by a formula that takes into consideration the school district's debt and wealth. If a district fails to pass its levy within this one-year period, the State will no longer reserve these funds for that district's project, and will take those funds and move to the next eligible

school district on the equity list. When and if there is another appropriation of funds by the General Assembly for the Classroom Facilities Assistance Program, then the district who failed to pass a levy within the one-year period will again become eligible for the funds. However, that district still must pass the requisite levy. (Fischer Depo. 142, 155, 157; Fischer Tr. 1032, 1035)

The period from notification of the school district that its turn on the equity list for classroom assistance is coming up, to completion of construction, takes about four years. (Fischer Tr. 1034)

Of the 18 school districts which have been approved for funds under the Classroom Facilities Assistance Program, two school districts, Trimble Local in Athens and Crooksville in Perry County, have gone to the ballot three times each and failed to pass the requisite levies. Trimble ranks 2nd poorest on the equity list, and Crooksville ranks the 20th poorest. Both school districts have been evaluated by the Facilities Commission, which has determined that each district has valid facility needs. Absent either of these two school districts' obtaining funds under the Classroom Facilities Assistance Program, the only other funds that would be available to them would have been Emergency Repair grants or ADA (Handicap Accessibility) Program funds. However, both of these programs are out of money. The cost of replacement or renovation of the facilities will continue to rise as each year passes and the facilities needs of these districts are not corrected. (Fischer Tr. 1178, 1180, 1190; Fischer Depo. 157)

Mr. Fischer testified that from 1957 to 1991, $174 million was spent by the State in this 35–year period on school facilities, for an average of $5.1 million per year. He further testified that the total appropriations for school facilities from 1992 to 1998 was $1.072 billion which, over that six years, averages to $212 million each year. He concluded that State funding for facilities for the 1992–98 period represents a 4,000% per year increase in funding over the 35–year period from 1957–91. (Fischer Tr. 976–77) The Court finds such testimony not credible. Rather, since 1992, only 32 building assistance projects have been completed, amounting to only $225 million in State spending. This equates to only $37.5 million each year in State funds. (Fischer Tr. 1034) Further, in the 35–year period from 1957–91, in 25 of those years there was no appropriation by the General Assembly for facility funds. (Trial Court's Stipulated Exh. 45, which shows State appropriation of facility funds only in years 1957, 1959, 1963, 1965, 1967, 1969, 1973, 1985, 1990, 1992, amounting to not $174 million of State expenditures, but $179 million) Additionally, an average of $212 million each year for six years means that the total appropriation for this period from 1992–98 would have to be $1.272 billion, and there is absolutely no evidence before this Court that the State of Ohio appropriated any such amount for facilities over this six-year period.

In moving its way down the equity list, the Facilities Commission has completed inspections of only 48 equity school districts. It is the intent of the Commission to inspect 91 of the equity districts, at which time the Commission will stop its inspections. The Facilities Commission has no plans to perform any inspections of the facilities of the remaining 201 equity districts, nor any of the 319 non-equity school districts. (Fischer Tr. 1079, 1082)

Wellston City School District, 47th on the equity list, is the last district which has been approved for Facilities Assistance by the Facilities Commission and State Controlling Board, although there are no State funds yet appropriated. (State's Exh. 46; Fischer Depo. Exh. 13)

Presently, 27 school districts have building assistance projects in the design and construction phase. However, included in this list are school districts contained in the 1990 Building Assistance List. (Fischer Tr. 1034, 1036)

State's Exhibit 33 is a memorandum from Randall Fischer dated February 2, 1998, updating the Facilities Commission on the status of various programs administered by the Commission. The exhibit to the memorandum marked "Classroom Facilities Assistance Status" (Bates stamp 567) is an update of the projects that are ongoing, including school districts on the old 1990 Building Assistance List. This list contains the 19 school districts that in the fall of 1997 passed the requisite levies for building assistance. Of those 19 school districts, five appear on the 1990 Building Assistance List. Exhibit 33 also notes that Southern Local in Meigs County, also on the 1990 List, had not passed its issue. (Fischer Tr. 1053)

State's Exhibit 46 (Fischer Depo. Exh. 13) is a request prepared by Mr. Fischer to the Ohio School Facilities Commission to approve eight school districts for Classroom Facilities Assistance funding, and also to conditionally approve an additional nine districts for facilities funding. These 17 school districts are listed in the attachment to the memorandum, and also are identified in State's Exhibit 50, "Districts Proposed for November 1998, Classroom Facilities/Equity." After receiving Mr. Fischer's request, the Facilities Commission approved the eight school districts for which it had funds available, and conditionally approved the nine districts for which there were no funds. The State's share of the facility costs for the eight districts was $140 million. The funds had been appropriated by the General Assembly. However, for the other nine districts no funds had been appropriated by the General Assembly. The State's share of these facility projects amounts to $200,000,000. No State funds are available for these nine school districts. (Fisher Tr. 1181, 1184; Fischer Depo. 147–48)

Only if the Controlling Board approved these 17 projects could the school districts go forward and place a levy on the ballot for voter approval of the local share. The Controlling Board approved all 17 projects at its meeting on August

18, 1998, even though there are no funds for the nine conditionally approved school districts. In fact, presently there is no money left in the Classroom Assistance Program. After Controlling Board approval, the 17 school districts had only two days, until August 20, 1998, to file to place their issues on the ballot for the fall election. (Fischer Tr. 1185, 1191)

In order to obtain voter approval of facility issues, school districts need sufficient time to prepare and campaign for these levies, in order to convince their electorate to vote for the issues. This is why the Facilities Commission gives local districts one year to pass the requisite levy for their local match of facility funds. Danville School District is on the equity list, but informed the Facilities Commission that it did not want to go to the voters for approval in the fall of 1998. The district felt that it did not have enough time to launch a successful campaign. (Fischer Tr. 1187; Fischer Depo. 153)

Assuming that the nine school districts, for which no Classroom Facilities Assistance funds are available, place their levies on the ballot and the levies pass, if the General Assembly does not appropriate the $200,000,000 of the necessary State funds, then the projects will not go forward. (Fischer Tr. 1187; Fischer Depo. 149)

Fischer Deposition Exhibit 15 is a March 12, 1998 letter from Randall Fischer to Senator Richard Finan, President of the Ohio Senate. This letter was written by Mr. Fischer in response to Senator Finan's inquiry as to the status of the five Plaintiff school districts. Mr. Fischer informed Senator Finan that of the five Plaintiff districts in the *DeRolph* litigation, Lima, Youngstown and Northern Local School Districts are on the FY98 equity list. As of March 12, 1998, Youngstown was ranked 70th on the equity list, Lima was ranked 71st, and Northern Local ranked 99th. However, for the FY99 equity list, Youngstown jumped over 31 school districts, and moved from 70th to 39th on the list. Lima moved from 71st up to 36th on the equity list, jumping over 34 school districts in terms of eligibility for Classroom Assistance funds. However, Northern Local had the misfortune of falling 14 places farther back in terms of eligibility for Classroom Assistance, from 99th to 113th place on the FY99 equity list. (Fischer Tr. 1058, 1196, 1198–99)

Jackson City School district was 130th on the FY98 equity list, but on the FY99 list Jackson moved to 144th in eligibility for Classroom Assistance funds. (Fischer Tr. 1199)

The equity list for FY2000 will also contain fluctuations among equity school districts in their ranking for eligibility for Classroom Assistance funds, assuming any funds are appropriated by the General Assembly. (Fischer Tr. 1200)

If there are any cost savings obtained on a Classroom Facilities project, the extra funds remaining go back to the State alone, and not the school district, even though the school district has contributed its local share of the project. (Fischer Tr. 1206–07)

Although concern was expressed at the hearing of this case by Mr. Fischer and Speaker Davidson about whether the economy of Ohio could absorb outlays for many school facility projects occurring at the same time, the Court finds that there was no credible evidence presented by the Defendants that the infusion of any amount of monies into school facility construction would be prohibitive, either from an ability of construction companies and tradespersons to complete the work, or as to the availability of construction workers and materials. The only evidence presented as to the infusion of construction funds into school facilities was that there have been no delays in completion of any of the school construction projects that are underway in Ohio, except that in southeastern Ohio there have been two- or three-month extensions on several projects. (Fischer Tr. 1207)

Mr. Fischer testified that the Facilities Commission would like to limit its work to 15 to 20 school district construction projects each year. With 249 equity districts remaining (including the nine districts which have been approved for facility assistance but for which no monies are available), at 15 projects each year (which are more projects than the Facilities Commission is presently doing), it would take over 16 years to just go through the list of equity districts. This assumes that the General Assembly would appropriate enough funds for these projects each year. (Fischer Tr. 1202)

With reference to the Classroom Facilities Assistance Program, the Ohio School Facilities Commission has discussed the issue of inflation and decided to reserve one year's worth of inflation for pending projects, and then to decide in July 1999 whether or not existing projects need to be adjusted for inflation. The inflation rate used by the Commission is 3% for hard costs only. (Fischer Depo. 175)

There is no cap on the cost of facilities under the Classroom Facilities Assistance Program. (Fischer Tr. 1022)

State's Exhibit 34, a map of Ohio, contains green dots on an overlay representing the former Building Assistance Program and present Classroom Facilities Assistance Program projects. However, the green dots include school districts which have not yet passed their local levies for matching funds, and also the nine districts for whom projects were approved by the Facilities Commission and Controlling Board, but for whom no funds are available from the State. (Fischer Tr. 1189)

E.  Emergency Repair Program

In 1991, the Ohio Department of Education maintained an Emergency School Repairs Program.  Funds available under the program were allocated on a first come, first served basis to school districts which applied for funds, regardless of wealth.  Each school district that applied for funds was eligible for a total of four grants, with each grant having a maximum amount of $50,000.  The total amount of grants available from the State under this program for 1991 was $2,000,000. (Trial Court's Findings 1994, pp. 156–57)

Grants under the program could be used by schools for repairs to buildings, child safety, removal of leaking gasoline storage tanks, replacement of boilers and heating devices, etc.  No funds could be used for additions or new buildings. (Trial Court's Findings 1994, p. 156)

Ninety school districts requested emergency grants in 1991;  however, only 76 school districts received funds from the State.  The grants made pursuant to the 1991 program did not meet all of the needs of the schools who applied, nor those who received grants.  (Trial Court's Findings 1994, p. 156)

In 1997, Senate Bill 102 was enacted, which established the Emergency Repair Program.  Funds under this program were not disbursed until 1998.  Accordingly, there was a seven-year gap between the 1991 emergency repair program and the distribution of funds under Senate Bill 102, where the State of Ohio did not have in place any program directed to providing funds to public schools for emergency repairs.  (Fischer Tr. 1106)

The purpose of the 1997 Emergency Repair Program was to fund districts' most urgent facility needs, to take care of emergency needs.  (Fischer Depo. 69; Fischer Tr. 978)

Each school district was eligible to receive up to a maximum of $500,000 in emergency repair funds.  A school district had to apply for the funds.  No matching funds were required from the local school district.  (Fischer Depo. 67, 72;  Fischer Tr. 989, 992)

The Ohio School Facilities Commission was charged with administering the Emergency Repair Program.  Senate Bill 102 stipulated the ten categories that were eligible for emergency repair funding.  Among the ten categories were any repairs to buildings in order to meet the requirements of the Life Safety Code. The Life Safety Code is the Ohio Basic Building Code, which governs all construction in Ohio.  (Fischer Tr. 984–85)

The Facilities Commission established three priorities of emergency repairs:

• Priority One was a situation that would pose an eminent danger to the occupants of a school building.

- Priority Two was a repair that, if left unattended, would potentially be a danger.

- Priority Three was a repair that was classified as a minimal hazard to both property and occupants.

(Fischer Tr. 988, 1108–09)

The priority of what was to be repaired was left to the school districts in conjunction with four Site Evaluation Teams hired by the Facilities Commission to perform evaluations of each school district that applied for funds. The State was divided into four regions, and each Site Evaluation Team was responsible for one of the four areas of the State. The Site Evaluation Teams were:

1. Sherman Smoot Company, which inspected 59 school districts in Southern Ohio, south of 1–70, from Pennsylvania to Indiana

2. Quandel Group, which inspected 90 school districts in the tier north of 1–70, going toward an east-west line through Mansfield

3. Ruhlin Company, which inspected 48 school districts (110 school buildings) in northwest Ohio

4. Regency Construction, which inspected 57 school districts in northeast Ohio

The responsibilities of the Site Evaluation Teams were to evaluate the 254 equity school districts' applications for emergency repair funds, prioritize the problems in the school districts, and make recommendations to the Facilities Commission about who and what should be funded. (Fischer Depo. 70, 72, 86, 284, 303, 309; Fischer Tr. 985, 1109–10, 1133–34, 1137)

In July 1997, the Ohio Schools Facilities Commission sent out notices to all 611 school districts in the State, advising them of the Emergency Repairs Program and the need to make application. This was done because the Facilities Commission and Mr. Fischer interpreted the law to the effect that all school districts in the State were eligible for these emergency repair funds, and not just equity districts. However, the Facilities Commission was notified by the General Assembly that the legislature's intent was that only equity districts would be eligible. (Fischer Depo. 80, 84; Fischer Tr. 1112)

Nevertheless, applications for emergency repair funds were received by the Facilities Commission from non-equity school districts. However, no non-equity districts have received emergency repair funds. (Fischer Depo. 70, 84)

The Facilities Commission received applications from 254 equity districts before the application deadline of January 15, 1998. All of the items contained in these applications for emergency repair grants fell within the categories for emergency repairs. (Fischer Tr. 990, 1124; State's Exh. 39; Fischer Depo. Exh. 11)

Some of the initial applications for emergency repair funds included applications for outdoor athletic facilities repairs. A few grants were given for such repairs, but the Facilities Commission then decided not to approve these types of emergency repair items. Therefore, applications for emergency repairs of deteriorated bleachers, ball diamonds that may have sewage coming up on to them, or anything dealing with outdoor athletic facilities were not approved by the Facilities Commission. However, as admitted by Mr. Fischer, deteriorating outdoor facilities can pose a dangerous situation, and a risk to those persons who, for example, use stadiums. (Fischer Depo. 216–18; Fischer Tr. 1125)

A number of schools submitted applications which exceeded the $500,000 limit. State's Exhibit 39 (Fischer Depo. Exh. ii) is a memorandum from the Emergency Repair Program Manager of the Ohio School Facilities Commission, recapping all applications and grants for emergency repair funds, setting forth the equity districts which received funds, items each district applied for, and those items for which funds were granted, and for which no funds were granted ("if funds allow"). Mr. Fischer testified that at the present time, the Facilities Commission does not have the monies to fund those repairs marked "if funds allow." (Fischer Depo. 132; Fischer Tr. 1115; State's Exh. 39; Fischer Depo. Exh. 11)

The Plaintiff Northern Local School District, Perry County, submitted an application for emergency repairs for which it did not receive grants, including handicap access needs repairs (ADA accessibility) of $44,500 in Sheridan High School, and electrical and safety repairs of $39,500 and $44,500, respectively, in Thornville and Glenford Elementary Schools. (Fischer Tr. 1115; State's Exh. 39; Fischer Depo. Exh. 11)

Similarly, Plaintiff Lima City School District applied for emergency repairs, and had projects contained in its application for which it did not receive any emergency grants, including $245,000 for air ducts and other ventilation devices, and structural safety repairs amounting to approximately $44,000, both categories of repairs within the scope of the Emergency Repair Program. (Fischer Tr. 1119; State's Exh. 39; Fischer Depo. Exh. 11)

Likewise, Plaintiff Youngstown City School District submitted applications for emergency repairs, including asbestos removal repairs to 13 school buildings, for which funds were not received. (Fischer Tr. 1120; State's Exh. 39; Fischer Depo. Exh. 11)

Jackson City School District submitted an application for emergency repair funds, which included categories for which it did not receive funds, amounting to $400,000 for removal of asbestos in three school buildings. (Fischer Tr. 1122; State's Exh. 39; Fischer Depo. Exh. 11)

A total of $165,000,000 in applications was received from equity districts and several non-equity districts. The equity districts applied for more than $157,000,000 in emergency repair funds. (Fischer Tr. 991, 1122)

Initially, $100 million was appropriated by the General Assembly for the Emergency Repair Program. From this $100 million the Facilities Commission distributed emergency repair monies to equity school districts. This $100 million was expended by November 12, 1997. Later, under H.B. 650, the General Assembly earmarked another $30 million for emergency repairs. A total of 254 equity districts received emergency repair funds, amounting to approximately $118 million. (Fischer Depo. 123; Fischer Tr. 1001)

Of the $130 million appropriated for emergency repairs, plus an additional $1.8 million in bond profits added to this amount, $118 million in repairs was approved. $2.5 million has been paid to the Site Evaluation Teams. The approximate $10–11 million remaining in the Emergency Repair Fund represents a reserve being maintained by the Facilities Commission. No other funds are available for this program. Accordingly, there is a shortfall of $39,000,000 in the amount requested by equity districts for emergency repairs, and the amount of funds that was available. (Fischer Depo. 76; Fischer Tr. 1123–24)

For those categories of emergency repairs under the Emergency Repair Program, there are no other funding sources available from the State of Ohio to provide any monies to the school districts for these emergency repairs, except for Big 8 funds (to eight urban districts) and whatever may be available under the Classroom Facilities Assistance. This applies not only to the 292 equity districts, but to the 319 non-equity districts as well. (Fischer Tr. 1126; Fischer Depo. 137)

Randall Fischer, Executive Director of the Ohio School Facilities Commission, and Doug Miller, the Commission's Emergency Repair Program Manager, compiled a list of five sets of questions which they submitted to each of the four Site Evaluation Teams on June 22, 1998. The purpose of submitting these questions was that the four teams had visited the 254 equity districts which had received emergency repair funds, which represent 87% of the equity districts in the State. Messrs. Fischer and Miller thought it would be a good sampling of the overall conditions of these facilities. These four Site Evaluation Teams (Ruhlin Company, Regency Construction, Quandel Group and Sherman Smoot Company) are all very reliable and competent project managers. Among them, they had visited and spent time in all *254* equity districts which received Emergency Program Fund grants. Several of these companies also have been selected as project managers for Classroom Facilities Assistance. (Fischer Depo. 281, Fischer Tr. 1129–31)

Fischer Deposition Exhibit 27 is the Quandel Group's responses to the questions asked by the Facilities Commission. Quandel reported that of the 90 school

districts it had inspected, five districts, or 6%, had "Emergency Health Safety Issues"—a "condition that could, at any time, pose a serious threat to those who visit a particular facility." Quandel further reported:

"The majority of the items that we encountered in this program fall into the Expensive Deferred Maintenance Issue category [65% of issues]. Many of the Districts that we visited do not appear to have significant funds available for these types of repairs, so expensive would be a relative term. Typical repairs in this category would be heating system/ventilation system repairs, structural masonry repairs, roof repairs and other related items. In most cases, these repairs have been needed for many years but have not been completed. The second greatest number of repair items that we encountered were facility/building system upgrades. Typical items would be building handicap accessibility improvements, fire alarm and emergency/egress lighting upgrades and electrical upgrades.

"* * *

"Many of the buildings had extensive Deferred Maintenance Issues as a result of age of the facility and applicable building systems, such as roofs, boilers and exterior masonry. These items need to be repaired or replaced as the buildings age and many districts reported that they did not have the funds available to perform more than 'band-aid' repairs to keep the buildings operational. These items are repairable and will allow the buildings to remain functional.

"The most noticeable difference between a new OSFC guideline compliant facility and the average Emergency Repairs facility is the lack of handicap accessible buildings, outdated by functional fire alarm systems and emergency/exit lighting. Few of the buildings that contained more than one story allowed complete access to all floors for handicap students, via elevators, chair lifts or ramps. This also includes entrances and doors. Most prevalent is an absence of handicap accessible restrooms, including compliant fixtures and general accessibility. Most of the buildings were not designed to be handicap accessible or even have the potential to be made handicap accessible."

Responding to these questions posed by the Facilities Commission, "Are these repairs a result of poor maintenance practices or a lack of maintenance? Etc. Do you see any trends or patterns across the portfolio relative to facility conditions?", Quandel reported:

"As Construction Manager for the Emergency Repairs Grants Program, The Quandel Group, Inc. has visited ninety (90) different School Districts and several hundred different buildings. While each District has issues that make their Emergency Repairs Grants Projects unique, there are similarities in most of the buildings that we have seen.

"The most prevalent type of repair item that was requested and approved for the Emergency Repairs Grants Program are Deferred Maintenance Projects that the districts have not performed on their own. Most of the buildings we reviewed are at least twenty years old and, in many cases, more than fifty years old. Most of the Emergency Repair Grants Items are parts of a building system such as the roof, exterior masonry or heating system that have exceeded their life expectancy. This has not been a result of poor maintenance practices as much as time and the elements. In most cases, Districts have been able to extend the usefulness of a given item through constant, but limited, repairs, but they inevitably need to be replaced.

"The second most common Emergency Repair Grants Item is upgrades of existing items to meet current code, with the most common being handicap accessibility issues. As stated above, most of the buildings are at least twenty years old and were not designed to meet ADA requirements. This results in the district having to make costly upgrades including elevators, chair lifts, restroom remodeling and fixture replacements. Some buildings, due to numerous additions with split levels throughout, will never be completely handicap accessible without spending an extraordinary amount of money on elevators and/or chair lifts.

"Additionally, the code requirements for fire alarms and emergency/egress lighting has changed since these buildings were constructed and the Districts have not upgraded their systems accordingly. While functional, many of these systems do not offer the best protection for the staff and students in the event of an emergency.

"Most electrical systems, including service and outlets, were not designed to handle the demands of the modern classroom. Most audiovisual devices and many teaching aids require numerous electrical outlets that most older buildings do not have. The result is a patchwork of extension cords and power strips overloading an outdated system.

"As stated previously, we did not encounter many true 'emergency situations' that could have resulted in harm to staff or students without immediate attention. Typically, these are the result of structural failure, creating the possibility of material falling off a building or in an extreme case, the building being in danger of collapsing. These items also are Deferred Maintenance Items that were not repaired to the point of creating a life safety issue.

"In general, the maintenance personnel that we encountered appeared to be very conscience of [sic, conscientious about] their buildings and did an excellent job of keeping the facilities clean. The maintenance personnel take a great deal of pride in the condition of their buildings and attempt to make do with the resources that they have available. Most Districts reported, however, that even

though they have dedicated maintenance staffs, they do not have the money to make real repairs and must continually make band-aid fixes.

"* * *

"In summary, we feel that after visiting several hundred buildings in ninety (90) different School Districts that the majority of the repair items that we reviewed were Deferred Maintenance Items that the School Districts have not completed. Without repair, some of these items may become Emergency Health Safety Issues, as is the case with the Emergency Health Safety Issues that we did witness (see Section # 1). Many other times are code upgrades such as handicap accessibility, fire alarm upgrades and emergency/egress lighting upgrades. With funds, many repairs and upgrades can be made to allow these buildings to operate safely, but not at the same level as a new facility."

(Fischer Depo. Exh. 27; Fischer Tr. 1132–33; 1135–36)

Fischer Deposition Exhibit 28 is The Ruhlin Company's responses to the questions posed to it by the Facilities Commission. Ruhlin reported that it had visited 48 school districts and over 110 school buildings, and reviewed over 400 individual requests for emergency repair grant monies for such items as roof repairs, boiler replacements, and life safety and ADA modifications. Ruhlin reported:

"At first glance, the school buildings we visited were clean and well kept. Floors were waxed, walls were painted and the restroom facilities, although old and antiquated, were well maintained. This says a lot about the maintenance staff whose job is to maintain these old buildings and about the students and faculty who take pride in their schools. But beyond the fresh coats of paint and abundant cleaning supplies, there lies a definite need for long term maintenance and repair of the building's exterior envelope and mechanical and electrical systems. Many of these buildings were built in the late 1920's and early 1930's. Although the roofs are not original, many are over 20 years old and have reached the end of their expected life. Masonry tuckpointing has been neglected in many buildings and exterior windows are old and leaking. The electrical systems are not able to handle today's power requirements for computers, TV's and other electronic equipment. Because of the rural nature of many of the schools, well water and septic systems are utilized and do not meet today's current EPA standards and need [to be] replaced. Boilers are old and are nursed through each heating season with yearly retubings and expensive maintenance. These issues represent just one (1) aspect of the district's concerns—that of maintaining their current facilities. Another issue and expense the schools are faced with today concern upgrading their buildings to meet current life safety and ADA accessibility needs. Elevators and chairlifts are needed in multi-level buildings to accommodate disabled students. Restrooms must be modified to meet ADA

criteria and emergency egress lighting and up-to-date fire alarm systems are often non-existent.

"* * *

"A majority of the school districts that we visited have accurately identified their maintenance requirements and have completed a master list of building needs. This list was often used to compile the Scope of Work items we created for our Site Evaluation Report. It is not, then, through a lack of planning or inability of the school district's to identify their own maintenance and facilities upgrade requirements that many of these projects have not been done, but it is through a lack of available funds that many of these projects have not been done. The maintenance staff at these schools have done a very good job with minor repairs and general upkeep given the funds they have to work with. But often-times, limited funds only allow for limited fixes and a roof can be patched only so many times or a boiler retubed so often. Large capital improvements projects, which cannot be accomplished by the maintenance staff, are often deferred indefinitely.

"While reviewing the school district's requests, we estimate that approximately 1% of the projects reviewed represented a true emergency. These included asbestos containing ceiling materials that were flaking off and a domestic water system that was unfit for drinking. For the most part, the schools we reviewed are clean, well-kept buildings that need [to be] updated for items such as ADA compliance and fire alarms. The majority of all schools reviewed are doing their best effort to accommodate ADA compliance and most of the schools have handicapped students to care for. In small communities the only building that handles severely handicap students is the local school system. Fire alarms for the majority of the buildings are functional but not ADA compliant and in some instances extremely outdated. Some of the buildings we reviewed still used a manual pull system (pulling a metal rod) as the only alarm. All of the buildings we reviewed had indoor restrooms. We did not review any building that used an outhouse or a service station as a restroom. Most of the restrooms were clean and well maintained, although very few met current ADA requirements.

"* * *

"Projects to upgrade a portion of a facility or a building system to current code standards were on every list. Many of the schools deal with handicap students on a daily basis. Electrical upgrades are necessary in most schools because of computers, air conditioning to cool computer rooms, and other technology upgrades. Most buildings built before 1960 didn't anticipate the future electrical needs of students and teachers. This area could have been significantly higher if more money was available. And if you want to prevent emergencies (life

threatening) from happening, this is where the money should be spent. Upgrades to current code standards made up 38% of the total projects reviewed.
"* * *

"Overall, the school districts we visited could be rated at a six (6), using a rating criteria of one (1) for a building that should be condemned and ten (10) for a new facility designed to OSFC Guidelines. This rating could be slightly higher if the majority of schools didn't have significant code violations for ADA and fire alarms." (Fischer Depo. Exh. 28; Fischer Tr. 1134)

Fischer Deposition Exhibit 29 is Regency Construction Services, Inc.'s responses to the questions posed to it by the Facilities Commission. Regency was responsible for 57 school districts. Regency reported that "[a]ll the fire alarm systems [it] reviewed did not meet NFPA and OBBC codes." The NFPA refers to the National Fire Protection Agency code, which is incorporated into the Ohio Basis Building Code (OBBC). Continuing, Regency reported:

"The SET (Regency) observed that many systems consisted of pull stations and horns; some throughout the building and some with no smoke detectors. Most districts had no battery back-up for the fire alarm panel and the buildings generally were not sprinkled.

"The districts reviewed for egress lighting usually had a limited number of illuminated exit signs to identify the building exit route. Similarly, there was no emergency egress lighting available to illuminate the path of egress from the building, and exit signs were not battery powered."

Regency concluded:

"It appears due to lack of funding that school districts have not been able to implement preventive maintenance on a large scale.

"Roofs and boilers are two building components that have typically been 'band-aided,' or patched to extend their life.

"Thousands of dollars have been spent patching. The intent is to extend building component life and delay costly replacement. Patching stops the immediate crisis and is generally a temporary solution to a larger, growing problem. Many times, other building components are damaged as a result of recurring 'patching,' rather than whole system replacement.

"Many boilers either had no controls or the controls were not functioning. Many districts were keeping their boilers operating but acknowledged that some areas of their building were cooler than other areas.

"It also appears that egress lighting and fire alarm systems are not given attention until a local authority mandates the district to upgrade the system.

"Buildings are generally clean.

"Inoperable exterior doors are chained because they do not close.

"Windows have been neglected and caulking and sealants, over the years, have deteriorated making the units inefficient.

"Sewage system upgrades typically are dealt with when mandated by the EPA." (Fischer Depo. Exh. 29; Fischer Tr. 1150, 1152)

Fischer Deposition Exhibit 30 is the Sherman R. Smoot Company's response to the questions posed to it by the Facilities Commission. Smoot inspected 59 school districts in its area of the State. Smoot reported that the majority of repairs requested by the schools "dealt with long term deferred maintenance items—i.e., roofs, fire alarm systems, electrical service upgrades, boilers, etc." Emergency Health Safety Issues made up 7% of the requested repair work. (Fischer Depo. Exh. 30; Fischer Tr. 1137)

The Emergency Repair Program grants did not bring all school buildings up to code. (Fischer Depo. 296)

The four Site Evaluation Teams found that Emergency Health Safety Issues— conditions posing an immediate danger to building occupants and visitors— comprised from 7% to 10% of the emergency repairs for which the school districts requested emergency grants. In addition, each Site Evaluation Team reported to the Facilities Commission that it observed a large percentage of requests that were deferred maintenance issues. The Site Evaluation Teams concluded, and Mr. Fischer agreed, that these deferred maintenance items, if not corrected, could pose an immediate danger to the health and safety of the children and other occupants of school buildings. (Fischer Depo. 287, Fischer Tr. 1137–39)

All four Site Evaluation Teams reported to the Facilities Commission that many of the school districts they inspected did not have the funds available for performing the deferred maintenance repairs. Further, all four companies reported that the requested repairs were not the result of poor maintenance practices by any of the school districts. Mr. Fischer agreed that many of the school districts in Ohio, and particularly the ones that were inspected by the four Site Evaluation Teams, do not appear to have significant funds available for the expensive deferred maintenance repairs referred to in the Site Evaluation Team reports. (Fischer Depo. 290, 294–95, 298; Fischer Tr. 1140, 1142–46, 1157)

Mr. Fischer testified that he has no knowledge that any of the 254 school districts evaluated by the four Site Evaluation Teams have squandered any of their monies with reference to their abilities to perform routine or deferred maintenance or emergency repairs. Similarly, Mr. Fischer testified that he has no knowledge that any of the 254 districts misspent any monies so that they could not repair any of the conditions existing within the facilities. Additionally, Mr.

Fischer testified that he had no evidence that any of the 254 school districts engaged in any malfeasance in connection with having funds available to perform necessary facility repairs. The Court finds that there was no evidence presented that any school district had squandered funds, misspent funds, or engaged in any malfeasance or bad management practices such that it was unable to perform any emergency repairs or deferred maintenance items. Likewise, no evidence was presented whatsoever that any Ohio school district engaged in poor maintenance practices, except as necessary repairs were not performed due to lack of funds. (Fischer Depo. 311; Fischer Tr. 1148–49)

At trial Mr. Fischer testified that the items mentioned in the Site Evaluation Team reports to the Facilities Commission "are being taken care of." (Fischer Tr. 1155) The Court finds such testimony not credible. The unrefuted evidence in this case is that the four Site Evaluation Teams chosen by the State for the Emergency Repairs Program clearly found that many of the emergency repair items for which the 254 equity school districts made application for grants remain as they were—repair and maintenance items for which the districts simply do not have the monies to address. Such deferred maintenance items could, in a very short period of time, rise to emergency Health Safety Issues, posing immediate risk of harm to children and adults.

F. Big Eight Program

The Big 8 Repair Program is like an emergency repair program, but directed to the eight largest urban districts in the State: Cleveland, Columbus, Cincinnati, Akron, Canton, Youngstown, Dayton and Toledo. This program was established by Senate Bill 102, which appropriated $100 million for the program. Eligibility for inclusion in the Big 8 Program was determined by the number of Aid to Dependent Children (ADC) students that a district had in its schools. However, Mr. Fischer was unable to explain the relationship between the number of ADC students in a school district and the condition of that district's buildings. Mr. Fischer testified that he did not know how the $100 million appropriated in Senate Bill 102 was arrived at. There were no studies performed which showed the facilities needs in the Big 8 districts, for purposes of the appropriation in Senate Bill 102. (Fischer Tr. 1003, 1201; Fischer Depo. 223)

The Big 8 Program is a dollar-for-dollar match. There is $100 million available from the State, and the eight school districts are required to match funds from the State. (Fischer Tr. 1007)

Big 8 funds cannot include any monies for new construction. (Fischer Tr. 228)

The amount of funds available to each of the eight districts, assuming local matching dollars are available, is set forth in State's Exhibit 32 (Fischer

Deposition Exhibit 16), a memorandum from Mr. Fischer pertaining to this program.  (Fischer Depo. 221;  Fischer Tr. 1004)

The Facilities Commission required each Big 8 school district to submit a 5–year capital plan describing by category and by building what repairs were proposed to be funded.  State's Exhibit 32 (Fischer Depo. Exh. 16) summarizes the capital plans for each Big Eight district, detailing the types of repairs that were proposed to be funded.  The Facilities Commission used the same ten categories for the Big 8 Program as were utilized in the Emergency Repair Program.  The Facilities Commission approved all capital plans.  (Fischer Tr. 1005;  Fischer Depo. 223, 226, 237)

The Big 8 districts were well aware of the funds they had available to them when they each applied for Big 8 funds.  Accordingly, the districts did not exceed in their applications those amounts.  Mr. Fischer testified that the districts just tried to match what funds they had available to them.  (Fischer Depo. 226)

Each Big 8 school district must certify that the use of local funds will not cause the school district to be placed in fiscal watch or fiscal emergency.  However, Plaintiff Youngstown City School District is in fiscal watch or fiscal emergency.  Although Youngstown schools had $4.2 million available from the State under this program, it was able to provide matching funds of $930,000.  (Fischer Depo. 238; State's Exh. 32;  Fischer Depo. Exh. 16)

Although $100 million was appropriated for the Big 8 Program, the eight school districts have not been able to provide their local match for the funds.  Rather, the districts, as a whole, have only been able to match about $49 million.  (State's Exh. 3.2;  Fischer Depo. Exh. 16;  Fischer Tr. 1007–08)

G.   ADA Program (Handicap Accessibility)

The 1990 Ohio Public School Facility Survey identified a total cost of $153,000,-000 to make school buildings handicap accessible.  However, since the passage of the Americans with Disabilities Act (ADA), the obligations for Ohio public schools are considerably more than $153 million set forth in the 1990 Survey.  (Trial Court's Findings 1994, p. 161)

By January 25, 1995 all public schools in Ohio were required to be handicap accessible, as mandated by the federal government.  (Trial Court's Findings 1994, p. 162)

The State of Ohio provided grants for architectural barrier abatement for fiscal years 1990 and 1991.  For fiscal years 1990 and 1991, only $3.38 million was appropriated by the General Assembly for architectural abatement among public schools in Ohio.  From FY91 until 1997, no monies were appropriated by the

State for assistance to public school districts for handicap accessibility. (Trial Court's Findings 1994, p. 162; Fischer Depo. 47)

In 1997, House Bill 215 created the Disability Access Program (ADA Program), and appropriated $5 million. This program is administered by the Ohio School Facilities Commission. The program provided funds specifically for handicap access to school facilities. School districts were eligible to receive up to a maximum of $100,000 for handicap accessibility projects. (Fischer Depo. 48; Fischer Tr. 1014–15, 1089)

Funds from the 1997 ADA Program were used to build ramps, provide vertical circulation to the buildings, elevators, and providing appropriate space within bathrooms. (Fischer Tr. 1018)

The 1997 ADA Program was a grant program. School districts needed to apply for funds. Eligibility for ADA funds was based upon valuation per pupil, and the lowest ranking equity districts were the most eligible. However, the 21 largest school districts in Ohio were not eligible, no matter their valuation per pupil. School districts were eligible to receive up to a maximum of $100,000 for handicap accessibility projects. (Fischer Tr. 1089–90, 1015)

Equity and non-equity districts applied for ADA grants. Fischer Deposition Exhibit 2 lists all those school districts which applied for grants. The last school district to be approved for a grant was Central Local, ranked 107th on the equity list. (Fischer Depo. 60; Fischer Depo. Exh. 2)

The ADA Program was a matching fund program, in that the school districts were required to fund a portion of the project, the amount of local share being dependent on where the district stood on the equity list. (Fischer Depo. 58; Fischer Tr. 1017; Fischer Depo. Exh. 2, State's Exh. 38)

Applications for grants were due by February 6, 1998. There was an overwhelming response to the ADA grants. Applications were received by the Facilities Commission from 210 school districts, totaling $14,740,000, with total matching funds committed by the districts of $18,997,000. However, only 53 school districts received ADA grants, totaling $4.6 million, and the Facilities Commission retained $368,917 as a contingency balance. Accordingly there was a shortfall of $10,000,000 in amounts requested by the 210 districts and amounts granted under the ADA Program. (Fischer Depo. Exh. 2; Fischer Tr. 1016, 1091–92, 1094; Fischer Depo. 52, 56, 64)

The total cost for all applications for ADA grants, including local matching contributions, was $33,373,000, which was the total amount to complete the requested projects within the $100,000 cap for each district, if all 210 school districts had been approved and funded. (Fischer Depo. 63)

Whereas the State contributed $4.6 million for the approved ADA grants, local contributions were $903,000. (Fischer Depo. 59)

The 210 school districts that applied for ADA funds had a total of 8,626 disabled students. The 53 districts which received funds had a total of 973 handicapped students, and the 157 districts which applied for but did not receive funds had a total of 7,653 handicapped students. (Fischer Tr. 1095; Fischer Depo. 52, 56; Fischer Depo. Exh. 2)

Not all public schools in Ohio are handicap accessible. Mr. Fischer, Executive Director of the Ohio School Facilities Commission, testified that he does not know how many school buildings are not handicapped accessible. (Fischer Tr. 1097)

The General Assembly has not appropriated any more funds for the ADA Program which, except for a small contingency fund, is out of money. (Fischer Tr. 1090; Fischer Depo. 50)

State's Exhibit 34 is a map of the State of Ohio, with red dots on an overlay. These red dots represent the 53 school districts which received some funds from the ADA Program. However, there is no representation on the Exhibit of those 157 school districts which applied for ADA funds and who did not receive any such monies. (Fischer Tr. 1093)

Some funds for handicap accessibility were available under the Emergency Repair Program. Over $16 million worth of applications for handicap accessibility were received through the Emergency Repair Program, but only $13.5 million was funded. These requests for handicap accessibility projects were limited under the Emergency Repair Program to equity districts. Accordingly, since 1991, the State of Ohio has expended only about $18 million for ADA compliance, through the ADA and Emergency Repair Programs. (Fischer Tr. 1016, 1098)

H.   Energy Conservation

The Energy Conservation Program was created in 1985. It is a loan program which can be utilized by school districts if they identify energy conserving measures, such as changing light bulbs, installing insulation, and new furnaces. (Fischer Tr. 1018)

There is no State funding involved in the Energy Conservation Program—no State funds go to the schools to fund these expenditures. Rather, it is a program whereby the State simply allows school districts to borrow money for the energy conservation measures. This borrowing is primarily from banks. (Fischer Tr. 1099)

### I. Asbestos

The 1990 Ohio Public School Facility Survey identified $328,000,000 in funds needed for the abatement of asbestos in public school buildings. This figure must increase because not all school districts were included in the asbestos portion of the survey. (Trial Court's Findings 1994, p. 164)

Asbestos is a recognized hazard and danger to school building occupants. The problem of asbestos is recognized by the Ohio School Facilities Commission. (Trial Court's Findings 1994, pp. 163–67; Fischer Tr. 1100)

For FY90, $18,000,000 was appropriated by the General Assembly for asbestos abatement in public schools. For FY91 the General Assembly appropriated $6,000,000 for asbestos abatement. For FY90, $140,000,000 in applications were received from public school districts for the $18,000,000 in available funds. For FY91, applications totaling $51,000,000 were received for the $6,000,000 in available funds. (Trial Court's Findings 1994, pp. 164–65)

Since FY91, the State of Ohio has not had any program specifically directed toward asbestos abatement in its public schools. (Fischer Tr. 1104)

### J. Future Funding

The Classroom Facilities Assistance Program, Emergency Repair Program, and ADA Program (Handicap Accessibility) are all out of money. (Fischer Tr. 1109)

With reference to future funding of the Classroom Facilities Assistance Program, the only provision in law that applies is H.B. 770, which simply requests the Governor and Director of Budget and Management to request $300 million each year in Classroom Assistance funds from the General Assembly. H.B. 770 does not mandate a minimum of $300 million be appropriated to school facilities; rather, the Bill only requires that the Governor and the Director of Budget and Management request of the General Assembly to appropriate that amount. The next General Assembly is not obligated to appropriate a minimum of $300 million for Classroom Facilities Assistance. (Fischer Depo. 164; Fischer Tr. 1061; DeMaria Tr. 1303)

There have been numerous occasions where the Governor has requested the General Assembly take action and the General Assembly has refused, such as the billion dollar sales tax increase, cigarette tax, and softening of H.B. 920's impact. (DeMaria Tr. 1305)

There are no provisions in law about future funding of the Emergency Repair Program or of the ADA Program. There are no requirements in the law that the Governor or Director of the Office of Budget and Management request any amounts for Emergency Repairs or ADA Program funds. No one can give any

opinion with any degree of certainty as to what future funding from the State will be. (Fischer Depo. 163)

Mr. Maxwell expressed a serious concern about school facilities including the fact that "We don't have a permanent source of revenue to handle the facilities needs in this state, and they are dramatic." (Maxwell Tr. 1423–24)

At the current rate of progress, it will take nearly fifty-five years to remedy currently identified school facilities needs. (Phillis Tr. 2234–35)

Plaintiffs' Exhibit 496 includes a chart comparing the magnitude of school facilities needs by district with the ability of those districts to raise funds through local bond issues to meet those needs. (Phillis Tr. 2037)

Plaintiffs' Exhibit 497 is a scattergram followed by several pages of charts showing the percent of the total tax duplicate that each school district would have to be indebted to in order to meet current facilities needs. For example, the Morgan Local School District would be required to go into debt in an amount up to 30.7% of the total tax duplicate in order to meet its school facilities needs. (Phillis Tr. 2045)

The chart demonstrates that for both low and high valuation districts, many would have a difficult time meeting their facilities needs even if they voted indebtedness to the 9% maximum statutory limit. (Phillis Tr. 2046)

Plaintiffs' Exhibit 498 contains the same information as is portrayed in 497 but it is re-ordered by total valuation per pupil. Page 10 indicates that 401 districts out of the 552 which have not received State building assistance, 72.6%, could not meet their facilities needs even by incurring the maximum legal amount of indebtedness. (Phillis Tr. 2047)

The scattergram on page 1 of Plaintiffs' Exhibit 498 demonstrates that both low and high valuation districts are unable to meet their facilities needs with locally voted funds to the 9% debt limit. (Phillis Tr. 2048)

Dr. Goff believes that low wealth districts would have an extremely difficult time raising sufficient millage to fully respond to their facilities needs. (Goff Depo. 112)

In his capacity as co-chair of BEST, Dr. Goff agreed with a recommendation that approximately $700 million per year be dedicated to funding for school facilities. Individually, Dr. Goff would support additional funding for school facilities of at least $500 million per year. (Goff Tr. 626–27)

Although appropriations for building assistance have improved over the last several years, the facilities issue is so immense and so critical that monies provided by the State fall far short of what is needed to address the issue. If the State were to provide $750 million a year of State funds for school facilities, this

would probably leverage an additional $300 to $400 million of local funds resulting in over $1 billion available for building assistance in addition to construction spending by districts outside the context of the building assistance problem. (Russell Depo. 129–30) Funding of the school facilities program at the level of $750 million a year of State funds is the absolute minimum necessary to address the school facilities program. Such an amount, along with leverage from local funds, estimated to total over a billion dollars, is not beyond the capacity of Ohio's construction industry. (Russell Depo. 127, 129–30)

Speaker Davidson testified that the legislature intends to allocate for building needs in the future "no less than $300 million per year." (Davidson Tr. 84–85) As to whether any more dollars should be allocated for school facility needs, she has a concern as to whether "the system can handle" such greater funds. She testified:

"All the experts working with us were indicating that there is only a certain amount of money per year that can be absorbed in the system. Quite frankly, it takes a period of time to move that money out. * * * I think we felt that $300 million was a good minimum amount to start with and what the system could absorb and use at one time." (Davidson Tr. 85–86)

There was no foundation laid before the Court as to whether the Speaker herself has any expertise as to how much money "the system" can absorb. The State presented no expert witness to the Court who had performed any type of survey or study as to the limits of what level of school facilities money could be efficiently and appropriately handled within the State. Thus, not only did the State present no corroborating expert testimony on this subject, such testimony is directly contradicted by the testimony of Warren Russell, who testified that the *minimum* level of funding the State should provide for school facilities needs is $750 million, which he testified would leverage another $300 to $400 million locally and that this level of spending could be absorbed by the system. (Russell Depo. 129–30)

As to the 4% set-aside for capital and maintenance in H.B. 412, Speaker Davidson views this as an expression by the Legislature that "we've issued or are now beginning as a state to make billions of dollars of investments in school buildings, that there's a legitimate expectation that the local school districts will maintain these buildings. In fairness to the taxpayers of their district, and fairness to the taxpayers of the State." (Davidson Tr. 100) The Court finds this rationale to be inconsistent with the fact that according to the testimony presented by Randall Fischer of the Ohio School Facilities Commission, less than 10% of the school districts in this state have or are scheduled to receive school facilities funds, yet 100% of the school districts are required to comply with this capital and maintenance requirement.

Speaker Davidson also testified:

"And consequently, there are—at least are indications that that appropriate maintenance has not always taken place in some schools districts, not only about half of our school districts actually have permanent improvement levies. And I don't think that it's an expression that with your ability, you would like to have well maintained, and the requirement that they begin to look at this in a more serious nature." (Davidson Tr. 100–01)

In the context of the fact that income from a district's permanent improvement levy can be included in the capital and maintenance set-aside, the Court infers from this testimony a legislative intent to give districts an incentive to pass permanent improvement levies, the income from which would be included in the capital and maintenance set-aside. Such incentive to increase reliance upon local property taxes is contrary to the Supreme Court's decision.

### K.  School Districts

#### 1.  Dawson–Bryant Local School District

Plaintiff Dawson–Bryant Local School District was one of the districts that was approved for Building Assistance funding (1990 Building Assistance List). Of the $14.5 million project, approximately $2.5 million was provided by local taxpayers. (Washburn Tr. 1960) The district was approved in 1990 and construction began in 1994. The district built a new high school, remodeled the old high school into a middle school, did some remodeling at the elementary, built a three-story addition at the elementary and closed two elementary buildings. Based on the limited budget for the project, the district had to make difficult decisions. The Board of Education was not able to purchase property, so the high school was built on a small piece of property adjacent to the middle school on land donated by the county commissioners. The building took up the baseball field and practice area. Consequently, the band and high school football team still have to practice on the baseball field, and there are a lot of times when there are conflicting schedules as to which student activity gets the practice field. The Board had to eliminate some remodeling that had been hoped to be accomplished. For example, the middle school could not be rewired and the science labs in the middle school could not be updated. Also, due to the limited budget for the project, the district has one HVAC system, one band room, one art room, and one library serving both the middle school and the high school. This is not an ideal situation because of the intermingling between middle school and high school students. Additionally, when the HVAC system goes down, both buildings are shut down and there are no alternatives to move students or make arrangements to have a split schedule. Also, in the high school, the district was not able to put

in equipment for an electronic foreign language laboratory. (Washburn Depo. 1896–99)

Even using equity funds and emergency facilities funds, the Dawson–Bryant Local School District has not been able to complete the remaining three buildings appropriately. Further repairs, such as updating plumbing and electrical wiring, are still being done. Additional repairs such as placing a longer-lasting, lower maintenance metal roof on the high school were removed from the budget due to immediate money constraints. The District will be forced to operate with an asphalt shingled roof on its high school, which will require more frequent maintenance and replacement and will cost more to the District in the long term. (Sites Depo. 27–28)

Following completion of the Building Assistance project at Dawson–Bryant, the district had emergency needs for repairs of the buildings of approximately $800,000. These needs included a water filtration system, to permit the HVAC system to work properly and to avoid boiler tubes bursting and flooding the boiler room. (This filtration system was eliminated from the original project due to lack of funding.) (Washburn Depo. 1900–01) Additionally, management into the HVAC system had been eliminated in the original project due to cost concerns. As a result, if the weather got below 10°, some of the units were freezing up and bursting and flooding the school and classrooms. In the brand new building, ceilings were collapsing and flooding. (Washburn Tr. 1901) Additional needs at the middle school and elementary school included asbestos abatement, puffing in an up-to-date fire alarm system, smoke detector system and emergency lighting egress system. The district was not able to complete all of the emergency needs that they had requested. (Washburn Tr. 1902) Since the emergency repair requests were made, the district has identified other needs of which it was not aware at the time of emergency repair application. The district is ineligible for funding at this time for those needs. (Washburn Tr. 1902)

The emergency projects of Dawson–Bryant had a lot of bids on each project and came in under budget. The number of contractors without work in the area contributed to the lower bids and resulting lower costs. (Washburn Tr. 1902)

Although the Dawson–Bryant bids came in under budget, the district has been denied and is unable to obtain the additional emergency monies up to the $500,000 limit. (Washburn Tr. 1905–07)

If a school district's bids on emergency repair projects come in under budget, and if the district has identified other areas that need to be addressed, the money cannot be applied toward those other areas if the additional areas were not part of the approved scope of work from the inception. (Washburn Tr. 1961)

Under the Building Assistance project, Dawson–Bryant did not have adequate funding to expand the kitchen and cafeteria area as well as provide adequate classroom space. The district found serving six sessions in the cafeteria a day interrupted the educational process and took away a considerable amount of time from instruction. The district applied for and was granted additional funds to expand the kitchen and cafeteria, and the district hopes to go to bid on that project in October 1998. As a part of the project, the district will need to move an underground storage tank, for which there is no State assistance available. Dawson–Bryant is funding $80,000 as its 20% match of local funds on the kitchen and cafeteria expansion project. The district anticipates the need for an additional $160,000 of local funds for that project. The district still uses two modular buildings at the elementary and was not able to eliminate those modulars. Modulars are more combustible than a block and mortar building, and parents and staff members have a lot of concerns about security and monitoring access to modular buildings. Third graders and kindergartners must leave the modulars and go into the school building to use the restroom. (Washburn Tr. 1903–05, 1907–08)

Extremely important in preparing students to take the 9th grade proficiency tests, which they take in the spring of the 8th grade year, are the problem solving, critical thinking, and analytical skills—that come through teacher demonstration and the use of laboratories. Dawson–Bryant is unable to upgrade the middle school science labs. (Washburn Tr. 1908)

Dawson–Bryant is unable to fund repair of its track, which serves the middle and high school students for physical education and extracurricular activities and is used by the community. The track was built in 1984 and is in need of $90,000 in repair. The district is also unable to take out the 1953 bleachers in the middle school that need to be replaced for extracurricular activities and for assemblies for the entire student body. The cost of the replacement would be $60,000. (Washburn Tr. 1908–09)

Dawson–Bryant has two buildings that are no longer in use by students, both of which have a considerable amount of asbestos in them. Neither of the buildings has any chance of being handicapped accessible, and one is heated with a coal furnace. The buildings are a liability to the district, and the district does not have any options as to what to do with them. (Washburn Tr. 1909–10)

Dawson–Bryant receives $16,000 per year generated by the one-half mill payback under the Classroom Facilities Act, which is to be used for maintenance of the district's school buildings. The State provides no other funds specifically for maintenance of school buildings. Under H.B. 412 requirements, the district will be required to set aside in the Capital and Maintenance part of its budget 2% in FY99, which is approximately $120,000. (Washburn Tr. 1911–12)

### 2. Southern Local School District

Although the Plaintiff Southern Local School District received $480,000 in emergency repair money, the district still has facility needs. One of the biggest needs is for additional classroom space. When the complex that was opened in 1993 was built, the district was working within tight budget constraints. Subsequently, in FY99 it does not have enough classrooms, because the district has, for instance, 156 special education students, and it needs rooms for those students. The district has taken a supervisor out of an office and made that office into a classroom. The district has utilized the band storage room as a special education classroom. In the summer of 1998, the district was taking a custodians' lunchroom and making an office out of that. The district needs classrooms in order to meet the recommended 15 to 1 pupil to teacher ratio. In order to go to the all-day, every-day kindergarten, the district needs additional classrooms. The district anticipates it will need eight to ten classrooms just in the elementary and middle schools. (Lanning Depo. 69–70)

Southern Local also needs additional space for lunchroom and gymnasium areas. The district has had a problem where three physical education classes are going on in one small gymnasium all at the same time. The commissary or cafetorium is shared by the elementary and middle school, and the students eat in three different shifts. The district still has middle school students who also have to eat at the high school, so the cafetorium is not large enough and the kitchen area is not large enough. The student body has grown in the last decade by about 100 students. These increased needs were anticipated when the new building was constructed, but the district realized that it did not have enough money to build as many classrooms as it anticipated needing. Further renovations at the high school were not able to be done as well. (Lanning Depo. 71)

The administration building at the Southern Local Schools is in a modular home about 30 years old. (Grandy Depo. 43)

The district does not have the capacity to build additional buildings. (Grandy Depo. 45)

The industrial arts shop at the Miller High School presents safety concerns due to the overcrowded nature of the facility. (Phillis Tr. 2092; Pl. Exh. 499, p. 13)

### 3. South–Western City School District

The largest problem facing South–Western City Schools is that it has more students than it has space and it continues to be a growing district. The district is growing at a rate of approximately 300 to 500 students per year. 500 students is an elementary school. (Hamilton Depo. 21)

Beginning the 1998–99 school year, South–Western implemented split sessions. This is an alternate school schedule which allows the district to maximize facilities in view of its shortage of space. Grades 10 through 12 attend from 7:00 a.m. until 1:30 p.m. Grade 9 attends from 11:00 a.m. to 6:00 p.m. The overlap is accommodated by the fact that students attend vocational school, instrumental and vocal music, etc. (Hamilton Depo. 22, 260–61)

At the middle school in the South–Western City School District, 7th and 8th grade students attend from 7:00 a.m. until 12:30 p.m. and 5th and 6th grade students attend from 1:00 p.m. until 6:30 p.m. This schedule essentially doubles the capacity of the middle schools. Grades K through 4 attend a traditional school day with no split sessions. (Hamilton Depo. 261–62)

In addition to the increased cost of staff and faculty, split sessions increased transportation costs in the South–Western City School District. It is estimated that the increased operating costs resulting from split sessions is approximately $3 million. This includes additional security, additional lighting, $50,000 spent on secured storage for teachers sharing rooms, all of which moves the district "down that deficit path a little faster." (Hamilton Depo. 262)

The State does not dispute and the Court accepts Dr. Hamilton's testimony that "split sessions [are] a bad thing." It limits opportunities for children, especially underclassmen at the high school who will not be able to take some of the classes they would have been able to take which were predominately upper-class offerings. It also impairs extracurricular activities which are now delayed until 6:30 at night. It creates significant disruptions to families where even Dr. Hamilton himself may not see one of his own children for a week at a time. Moreover, split sessions may have a more adverse impact upon at-risk children who already have trouble with unstructured and unsupervised time. (Hamilton Depo. 266)

The South–Western City School District will be employing over 20 additional staff members, including an additional assistant principal in every middle school to accommodate split sessions. (Hamilton Depo. 146)

In November 1993, the South–Western City School District passed a bond issue which allowed the district to build two elementary schools and placed additions on several other middle schools and elementary schools. This new space became immediately full upon its completion. (Hamilton Depo. 23, 218) Last year the district paid $200,000 to rent non-traditional school space. It has modular classrooms which were brought in to help on a temporary basis that are now in such a state of disrepair they need to be replaced because they have been in service 20 years. (Hamilton Depo. 23)

Beginning in the fall of 1988, the middle schools and high schools of the South–Western City School District will be open from 6:00 in the morning until 6:00 at night. Thus, buildings that normally were rented will now be used by students, reducing rental income to the district. In FY97, the district used only one recreation center for classroom space, but in FY98 the district used two recreation centers for classroom space and one for Head Start space. (Hutchinson Depo. 27–28) The district's high schools are projected to be at about 2,200 students in buildings that can house about 1,500 students. As a result of going to split sessions in FY99, the South–Western City Schools will need to add additional classified staff to cover the hours from 6:00 a.m. to 6:00 p.m. (Hutchinson Depo. 28–29, 43–44)

The South–Western City School District is approximately 2,400 students over the functional capacity of the buildings. (Hutchinson Depo. 46)

The South–Western City School District bought an IGA building at an auction and renovated the building for additional classroom space for the technical school. (Hutchinson Depo. 58–59)

The South–Western City Schools, based on current enrollment, needs four elementary-style buildings which will house fifth and sixth grades. The district will also need a technical school that will accommodate a larger number of students and a more upscale technical school because most of the equipment is out of date. The district also needs a fourth high school because the two largest high schools are almost a whole high school over capacity. The package is about $128 million which, if it passes, may be the largest school bond issue in the State of Ohio. The district will receive absolutely no dollars from the State of Ohio to help with the facility needs even though they are in a rapidly growing district. (Hutchinson Depo. 122)

The South–Western City School District's Property Services Department conducted a study during the last two years and identified between $65 and $70 million in existing needs to bring the district's buildings up to code. (Hamilton Depo. 103–04) As to educational adequacy, if the district does not have enough space, there are problems with the kinds of spaces available. Children are being tutored in closet spaces and custodial closets and supply rooms are converted into instructional spaces. (Hamilton Depo. 104) Dr. Hamilton testified:

"We spend an adequate amount of money to keep up our inadequate facilities. That might be a better way to say it. Our facilities are inadequate. Our efforts to maintain them in a safe and orderly way I think are adequate." (Hamilton Depo. 105)

Without any evidence from the State to the contrary, the Court accepts this characterization from Dr. Hamilton as true.

Some of the buildings in South–Western City School District rely on their own waste treatment plants and wells and it is not unusual for one or more of those buildings to miss a day of school during the year because of problems with the well pump or water quality. (Hamilton Depo. 21) Park Street Middle School has sections dating back to the 1920's and has been recommended to be razed and replaced. (Hamilton Depo. 24–25)

Building deterioration presents health and safety concerns. Park Street Middle School has a locker room in its basement, half of which has been required to be sealed off because of a sewage backup problem. This problem has not been repaired because the district is concerned about spending money on this problem in a building which may be torn down and replaced the following year. (Hamilton Depo. 25–26)

### 4. Northern Local School District

Plaintiffs' Exhibit 500 is a videotape of conditions in the Plaintiff Northern Local School District. The videotape shows modular units in use, a crack in the wall outside the junior high school, the pole barn construction for a phys ed/cafeteria for the high school, and water damage from roof leakage. (Phillis Tr. 2101–02)

At 6.09 in the Sheridan High School portion of the tape, there is shown an uneven hallway due to the building settling which represents a safety problem for pupils. (Phillis Tr. 2103–04)

At 8.17 on the tape appear the modular buildings in the Thornville Elementary School buildings without bathrooms. (Phillis Tr. 2104)

At 8.54 on the tape is the facility in Northern Local School District that is being rented for preschool handicapped children. (Phillis Tr. 2104–05)

At 10.4 in the Sheridan High School portion of the tape is a view of the reconstructed ceiling following the collapse of the ceiling over the stairwell. It also shows deteriorating ceiling in a classroom adjacent to the hallway where the ceiling collapsed. (Phillis Tr. 2105)

The photograph on page 5 of Plaintiffs' Exhibit 499 is of the Thornville Elementary School showing the 1908 date of construction. (Phillis Tr. 2086–87)

Photographs on page 7 and page 8 of Plaintiffs' Exhibit 499 show repair of the ceiling that had collapsed at the Thornville Elementary building. (Phillis Tr. 2088–89)

Dr. Phillis has also observed the Thornville Elementary School in the Northern Local School District. Pupils attending Thornville Elementary are in modular units without restrooms. In order to access restrooms, it is necessary to go from

the modular unit to the main building via an open, uncovered walkway. The room used as a cafeteria was not large enough to accommodate 350 students. (Phillis Tr. 2064–65)

None of the restrooms observed by Dr. Phillis in the Northern Local School District is handicapped accessible. (Phillis Tr. 2085)

Additional evidence of conditions at Northern Local School District are presented in State's Exh. 29 which is a videotape that documents improvements at Northern Local through the Emergency Repair Program. The district received a $500,000 grant which went for new windows and doors at both elementary schools and a new heating and air conditioning system at Glenford Elementary. The district is ranked 99th on the Equity and will be assessed in the coming calendar year. (T.Tr. 1041)

5. Mt. Vernon City School District

Sonedecker Deposition Exhibit 6 is a report to the Mt. Vernon Board of Education which describes permanent improvements funded from the levy and completed during the years 1990 through 1996. (Sonedecker Depo. Exh. 6, fax page 7–11) It also contains a schedule of proposed permanent improvement projects for the years 1997–2002 as to each school building with cost estimates totaling $2.5 million. (Sonedecker Depo. Exh. 6, fax pages 12–20) The permanent improvement levy generates approximately $500,000 a year. (Sonedecker Depo. 166, 173) The list of projects to be addressed with permanent improvement monies as shown in Exhibit 6 are not all inclusive because there are other facility needs which are not designed to be addressed through the permanent improvement fund, such as the two 90–year old buildings which will ultimately need replacement as well as an inadequate high school auditorium. (Sonedecker Depo. 171)

Sonedecker Deposition Exhibit 8 is a portion of original Trial Exhibit 318, the 1990 Ohio Public School Facility Study, as it relates to the Mt. Vernon School District. That study showed facility needs of $16,229,903. $4.5 million of that amount related to the middle school, which was replaced in 1993. (Sonedecker Depo. 33) The 1990 facilities list was addressed where funds were available, but there still remain a number of needs from the 1990 list that still must be addressed. (Sonedecker Depo. 179)

Dr. Sonedecker testified, "[I]f you take what's been done between 1990 and now, and if you reestablish priorities, and this be aware only speaks to projects that are intended to be funded out of existing permanent improvement money, then there still is a gap between what we've been able to address locally and what still needs to be done." (Sonedecker Depo. 184) Mt. Vernon is not an equity district. In that regard, Dr. Sonedecker testified:

In fact, the—one of the frustrations is that we first do not qualify as an equity district, and we have shown local commitment through building a new school, having a permanent improvement levy, allocating more really than the required amount in terms of facilities in our general budget, and we still have gaps. And so it's frustrating that we are not at this point part of some of the State initiatives as far as supporting facilities. (Sonedecker Depo. 41)

It would take approximately $10 million to replace the two 90–year old elementary school buildings. (Sonedecker Depo. 186)

### 6. Groveport Madison Local School District

The Groveport Madison School District has ten buildings. Six are elementary schools with grades K through 5. It has two middle schools with grades 6 through 8. It has one high school with two campuses, one for 9th graders and one for grades 10 through 12. Its oldest building is an elementary school building in the Village of Groveport which is over 50 years old. The two middle schools were built around 1970. Part of the 9th grade high school building was built in the 1950's. The other high school building which services grades 10 through 12 was built around 1967. (Barr Depo. 205–07)

The Groveport Madison School District has unmet facility needs, including leaking roofs, crumbling blacktop, deteriorating concrete, heating and air conditioning, all of which need to be repaired to protect the investment of the facilities themselves. (Barr Depo. 212; Barr Depo. Exh. 24)

The Groveport Madison School District applied for but did not receive a half million dollars in emergency funds. It needs to remove an underground storage tank. It also has a new handicapped student attending the 9th grade and is required to provide an elevator. (Barr Depo. 128, 209–10)

Groveport Madison is 376th on the equity list. (Barr Depo. 182) As to this, Superintendent Barr testified:

"Q. What's your understanding of the significance of that position on the equity list?

"A. That I'll be long dead before we would ever get to where we could share any of the funding for that equity. I know we're going to need buildings before then."

(Barr Depo. 182)

### 7. Dayton City School District

With reference to facilities in the Dayton City Schools, it is always a crisis situation. The school district brought in consultants with reference to their total

facilities needs, and the total figure is $320 million, including ADA compliance, and replacing nine buildings. Dayton has *53* buildings, 49 of which are schools. (Williams Depo. 109–110)

All of Dayton's buildings have roofing problems. (Williams Depo. 85) The district has determined that the roof problems are caused by flat roofs, and the roofs are old. (Williams Depo. 107)

In Dayton the average age of their buildings is 60 years of age. (Williams Depo. 106) It will take $20 million for ADA compliance for Dayton schools. (Williams Depo. 115–16) The State must find a way to catch up with facility needs and put in preventative maintenance. It is not going to happen by directing school districts to put X number of dollars in capital improvement line items, because the school districts are so far behind. There simply is not enough money in Dayton schools to deal with the facilities issues. Further, Dayton does not qualify for emergency funds anymore. Moreover, the State is not doing anything to deal with the facilities needs of those non-equity districts. (Williams Depo. 152–53)

The emergency repairs were funded for two buildings, Edison and Carlson schools, up to $500,000. Presently, the law allows school districts to borrow only ½ of 1% of the valuation of property, which for Dayton would have been $1.7 million. So Dayton approached the State to look at alternative ways to deal with repairs in their schools, and suggested legislation look at that issue, but the General Assembly refused. (Williams Depo. 86)

8. Lima City School District

The Lima City School District received emergency funding for school facilities in the amount of $500,000. This was $500,000 to take care of a $20 million problem.

The Lima City School District has a high school building built in 1954, two middle schools built in 1968, and a third middle school built in 1920. The district has rubber roofs which need to be replaced because they are beginning to wear out. Virtually every roof in the district will need to be addressed in the next five years. All of the district's buildings are brick and need to be tuck pointed. Concrete is popping out. The district has univent systems which sit in the classroom and convert hot water to heat. Almost all of the traps in this system need to be replaced. Three buildings in the district sit over swamps which have deteriorated significantly the pipes underneath the building. The district has parking lot and sidewalk problems which need to be addressed and asbestos abatement is an ongoing problem. (Buroker Depo. 277–78)

The buildings in the Lima City School District also require plumbing and electrical upgrades. The middle schools require new electrical service to accommodate computers. The district has problems with fascia falling off its building. In particular, the high school has had bricks fall out and fall on the sidewalk. Fascia has fallen off onto the sidewalk. No one was injured. (Buroker Depo. 280–81)

The Lima City School District's newest building was built in 1968 and almost all of the tiles are asbestos which cost $22,000 per room to replace. (Buroker Depo. 158)

The Lima City School District constructed an administration building in 1968 which has asbestos. It costs $45,000 a year to maintain the asbestos, such as when a roof leaks and the asbestos in the ceiling becomes friable, requiring removal. (Buroker Depo. 161–62)

Lima City School District is currently being assessed to receive funds under the Classroom Facilities Assistance Program. (T.Tr. 1057)

9. Youngstown City School District

Due to the lack of spending on capital outlays, Youngstown's physical facilities are not in good repair. The bare minimum of maintenance has been performed on the schools, "keeping the buildings from falling apart and the roofing from leaking have been accomplished, at a minimal basis." Other slightly more substantial repairs, such as replacing windows, have not been done. (Funk Depo. 21)

Youngstown received $430,000 in 1998 for emergency facilities repairs, such as roof repairs and asbestos abatement. (Funk Depo. 22)

10. Canton City Schools

Dr. Phillis visited the Canton City Schools. The 1990 Facility Survey showed a need of $72 million for Canton. The updated survey showed needs in the range of $107 or $108 million and a study by the Ohio Facilities Commission indicated needs in the amount of $159 million for Canton City Schools. During a visit to the Cedar Elementary School, Dr. Phillis observed a heavy ceramic ceiling tile crash to the floor and disintegrate when nudged. (Phillis Tr. 2058–60)

Dr. Phillis also observed Canton City Schools elementary children in a temporary facility containing a plot of ground approximately 45 feet by 50 feet with one jungle gym and slide combination as a playground for 460 children.

Canton will be receiving some funding under the Classroom Facilities Act Program.

11. Other School Districts

Dr. Phillis personally observed the Wilton Elementary School in Vinton County, a building that has no handicapped ramps, a coal-fired furnace, one classroom with no heating duct, and coal dust in the classrooms. (Phillis Tr. 2074–75)

Dr. Phillis has also observed West Muskingum School District, in particular Dillon Elementary. In that school the gymnasium has been subdivided for use as a cafeteria and a series of classrooms with library materials on the stage. Teachers conduct tutoring in the hallways and use the hallways for storage and other teaching activities. They have portable classrooms that are terribly overcrowded. During the time of his visit, a media person was struck on the head by a drop of raw sewage. (Phillis Tr. 2072–73)

The Bloom–Carroll Middle School was built in the early 1900's. The main part of the building has brick on the outside that is cracking away and in danger of falling off. (Phillis Tr. 2049–51)

Dr. Phillis has also visited Tri–Village Schools, which is a school district in Darke County near the Indiana border. At the time he observed water leaking into the building through the ceiling and being funneled into buckets. Dr. Phillis also observed holes in the floor. (Phillis Tr. 2062–63)

Dr. Phillis visited the Westfall Local School District and in particular the Monroe Elementary building. He walked through water on the floor of the Monroe Elementary building while he was there. He was there on two occasions and observed water on the floor on both occasions. Dr. Phillis also detected the odor of sewage which is not in his opinion an appropriate atmosphere. (Phillis Tr. 2054–56)

On the day of Dr. Phillis' tour of Westfall Local School facilities a legislator showed up with an authorization for emergency money in the amount of $500,000. Previously, Dr. Phillis had understood the district was not eligible for emergency funds. (Phillis Tr. 2056)

Monroe and Darby Elementary Schools do not have sufficient classrooms for all-day, every-day kindergarten. (Phillis Tr. 2056–57)

Dr. Phillis also observed York Elementary School in Morgan County. York Elementary has no cafeteria and in order for students to access the cafeteria, it is necessary for them to cross State Route 555. Despite all precautions school personnel might take if a coal truck or vehicle of any size lost its brakes, there is potential for serious injury or death of children. (Phillis Tr. 2070–71)

During the last academic year, Dr. Phillis also visited the Morgan Local School District, in particular, the Malta building in that district. He observed that the

building, which was built before 1900 has sunk about six inches. The doors do not fit the door frames due to uneven leveling. They have no cafeteria so they set up tables in the hallway. (Phillis Tr. 2067–68)

Representative Tom Johnson's legislative district includes approximately 12 school districts. His legislative district is a large, low-density district where historically coal mining was a large employer which has "regressed." It is a financially poor rural district where incomes are generally earned from small businesses, farming, or part-time farming. Representative Johnson testified that during the last year he has visited almost every school building in his legislative district. The school district with the worst condition of buildings relative to other school districts is Morgan Local School District. Morgan Local is a poor district but is not poor enough to receive building assistance money from the State. Representative Johnson testified that "the schools are in bad repair and many of them should be replaced." One school building is "actually sinking." Children in one elementary school which does not have facilities for a cafeteria need to walk across a state highway to another building for lunch. (Johnson Depo. 5, 6, 70–72, 77–79, 83)

The Jackson City School District is in need of facilities. A building in the "new" section is 50 years old. Class sizes are unreasonable, but the facilities are inadequate to reduce class sizes. At Kinnison Elementary School, the cafeteria doubles for a gym when it is raining or bad weather outside and is used for any kind of assembly. But all 280 elementary children cannot assemble in that room. The district could probably salvage two of the buildings and make them suitable for instruction, but the high school is wholly inadequate and does not have a chemistry lab to enable its students to take AP chemistry exams, for example, and the district is faced with overwhelming odds. The facilities needs of the district are overwhelming compared to its capacity. The district cannot finance its facilities needs without State assistance. (Strawser Tr. 1814, 1816–17)

The State has the capacity to remedy the school facilities problem within a reasonable period of time. The State has not done so and has no plan to do so. (Phillis Tr. 2234)

A number of years ago, the Putnam County ESC was moving special education classrooms around from district to district based upon availability of classrooms. Then, two of the lower range classes were housed under built-in bleachers in the gymnasium. A third classroom was moved from a small 12 × 12 room which had been a teachers' lounge, to a converted food storage room with no windows in FY98. (Osborn Depo. 135) In the classroom under the bleachers, one girl had to be lifted out of the wheelchair by an aide; then, the chair was collapsed, pushed into the room, opened up, and the girl was placed back into the chair. Therapies for the last several years have been conducted in the hallway or entrance of the

gymnasium, as well as speech therapy conducted there, because the rooms were so small. Inappropriate behavior of students occurred and frustrated staff members left the program because three and four professionals were working with seven or eight youngsters in a very confined area. (Osborn Depo. 140; Osborn Depo. Exh. 8, p. 13) Because of this situation, the nine local districts in Putnam County agreed to have the ESC secure modular classrooms for FY99 with an approximate cost of $231,000. (Osborn Depo. 137)

Pandora–Gilboa High School and Ottawa–Glandorf Elementary have students with mobility impairments who are using stair-trac climbers that require supervision by aides or teachers. (Osborn Depo. Exh. 8, p. 13; Osborn Depo. 139) Minor renovations and an elevator cost Continental Local Schools in Putnam County approximately $200,000 that was paid out of the district's general fund. (Osborn Depo. 138)

Ottawa–Glandorf is approximately 311th on the equity list, and even though they are housing children from low quartile wealth districts in the multi-handicapped program through the Putnam County ESC, the district is not a high priority to receive facility funds from the State, because it is so low on the list. (Osborn Depo. 150)

III. ELIMINATE BORROWING

A. Phase–Out Of Spending Reserve Loan Program

1. Spending Reserve Loan Program

Spending reserve loans involve short-term borrowing. Spending reserve loans are made from banks or other lending institutions, not from the State of Ohio. (Goff Tr. 588)

The Office of School Management Assistance determines the amount of a school district's spending reserve by adding the first and second tangible personal property tax settlement amounts together, dividing that by 2, and subtracting from the quotient the amount received by the district in the first settlement. (Brown Depo. 17) The amount received by a school district in tangible personal property taxes is not uniform from district to district. (Brown Depo. 17)

The Legislative Budget Office has not performed any analysis or calculations to determine whether H.B. 650 and 770 will actually lead to a reduction in the need of school districts to borrow money. It has not been asked to undertake such research or analysis. (Brunson Depo. 186)

2. School Districts Approved for Year–End Spending Reserve Loans in Fiscal Year 1998

Brown Deposition Exhibit 3 represents a year-end report reflecting the number of districts applying for and approved for spending reserve loans for FY98.

A total of forty-two (42) school districts were approved for such loans. (Brown Depo. Exh. 3, pp. cb 1838–40)

Brown Deposition Exhibit 2 represents a listing of school districts approved for year-end borrowing as of the end of the 1998 fiscal year (June 1997 through July 1, 1998). As of the end of June 1998 the Cincinnati School District had outstanding emergency school assistance loans in the amount of $42,121,237. The Cincinnati School District was approved for an additional borrowing (year-end spending reserve loan) of $21,720,000. In order to be eligible for such a loan, the district had to project a year-end deficit. (Brown Depo. 22)

3.    School District Borrowing in Fiscal Year 1999 as Compared to Borrowing in Fiscal Year 1998

The only significant difference in spending reserve borrowing between FY99 and FY98 is that the amount of the spending reserve will be measured at 40% rather than 50% of the school district's spending reserve. (Brown Depo. 29–30)

School district borrowing to avoid a year-end deficit will continue to take place during FY99. (Goff Depo. 133)

School districts faced with a year-end deficit will continue to be required to borrow funds to maintain school operations. (Goff Depo. 136)

No expenditure reductions are necessary for spending reserve borrowing in FY99 or thereafter. (Brown Depo. 30)

B.    School Solvency Fund—New Debt

1.    School Solvency Fund Procedures

The school solvency assistance program operated by the Ohio Department of Education went into effect July 1, 1998. (Brown Depo. 99)

Brown Deposition Exhibit 5 is a draft of the solvency assistance fund advancement procedures prepared by the Department of Education. (Brown Depo. 106) The nine bulleted criteria listed on Brown Deposition Exhibit 5 represent the conditions that must be present in order for a school district to receive an advancement from the solvency assistance fund. In addition, a district may be eligible if it is in a condition of fiscal emergency. (Brown Depo. 108)

As a condition of applying for a school solvency assistance fund advance, school districts are required to provide a plan for reduction of expenditures for a two-year period. (Brown Depo. 101)

In order to receive funds through the school solvency assistance fund, the district must reduce its programs and services and expenditures in order to present a plan of correction. The process is identical to the process required of

districts borrowing funds under what was previously known as the emergency school assistance loan program; the only difference is that schools do not have to pay interest.  (Goff Tr. 589)

The plan for reduction of expenditures required in connection with an advancement of funds from the solvency assistance fund need not provide for a reduction of expenditures by the amount of the school district's spending reserve loan. (Brown Depo. 111)

Charles Brown of the Ohio Department of Education believes that school districts continue to be prohibited from closing their doors or delaying the opening of school for lack of funds and if they lack sufficient funds to operate they are required to *borrow* funds to operate.  (Brown Depo. 108)

Mr. Brown would not know how to advise a school district that projected an operating deficit but did not meet any of the criteria set forth in the school advancement fund procedures.  (Brown Depo. 110)

2.  Funding of the School Solvency Assistance Program

The school solvency assistance fund was initially funded at $30,000,000.  The $30,000,000 funding was based on amounts needed for emergency school assistance loans in FY98.  (Brown Depo. 139–40)

Mr. Brown believes that an additional $10,000,000, for a total of $40,000,000, may be needed to meet the demands on the solvency assistance fund for FY99. (Brown Depo. 140)

In some instances loans were approved in FY98 even though it was understood that the proposed reductions were not sufficiently large enough to provide for the solvency of the school district at the end of the loan period.  (Brown Depo. Exh. 1, pp. 1716–17)

3.  Similarities Between the Solvency Assistance Fund and the Emergency School Advancement Fund

H.B. 412 establishes a solvency assistance fund for school districts.  While the terminology is different, this program is largely a continuation of the existing loan fund.  The only substantive difference between this new fund and what was called the emergency school advancement fund is that there is no interest rate charged school districts from the new fund.  Regardless of the use of the term advancement, it remains a loan.  School districts will continue to be required to borrow and the circumstances which have led school districts to borrow in the past have not been altered under the legislation.  (Russell Depo. 115, 165)

### a) No Elimination of System of Borrowing

There has been no elimination of the system of borrowing which remains virtually unchanged, with the only exception being that interest is not charged. (Russell Depo. 165) Not only has there not been a change in the circumstances which have traditionally contributed to a school district's falling into the need to borrow, but also the new legislation may have exacerbated those circumstances by phasing out a district's ability to borrow over the fiscal year funds based on personal tangible tax. (Russell Depo. 165–66)

As to the "new" solvency assistance fund replacing the emergency loan fund, the Court finds the following testimony of Superintendent Barr to be persuasive:

"I think it should never have been put in, the emergency loan should never have been put in, and neither should this. If a school district does not have the dollars to pay its bills, I think they ought to close their doors. I just can't—you know, we're told to run schools more like a business, and yet, you know, yet we don't. We are not allowed to run them like a business. In 1976 our school district closed its doors, and then following that there was a law passed that said we could not do that.

"The loan fund, as I know it, does nothing but perpetuate you spending the next year's money. You're cutting out the programs which is—there seems to be a dichotomy here as far as what the purpose of the school district is. And I agree that all school districts should be fiscally responsible, but our purpose for being is to educate students. And if you can't educate students on the money that you've got coming in, then something has got to change. So to go out and borrow against your next year just digs your hole deeper. I've lived that. That's been my tenure of superintendent is to try to get out of the hole, but we are required to dig the hole deeper each year.

"I believe that the solvency assistance fund does not resolve any problems.

"You are talking in some way to ease the pain and not have the suffering at once. I guess my feeling is, I've been through that, we've been bled to death slowly. It's the frog in the water and you turn the heat on and he doesn't jump out because he doesn't feel it all at once. I believe had there been in 1976, had schools closed down and people saw what the need was, that we wouldn't be in this situation today.

"Now what is this, '98, and we've still got the same problems I dealt with back then. I don't see any difference now. We've been dealing with this thing for years, and here we are still dealing with it. I don't see any changes that have been made positive as far as our school district is concerned in these years." (Barr Depo. 77–80)

b) The School Solvency Assistance Fund Procedures Mirror
The Emergency School Assistance Loan Procedures

Under the emergency school assistance loan procedures, the first step was to request approval from the State Superintendent of Public Instruction for a loan. (Brown Depo. 103) Under the school solvency assistance fund procedures, the first step is to request the State Superintendent of Public Instruction to approve an advancement from the fund. (Brown Depo. 103)

Under the emergency school assistance loan procedures a district was required to borrow money under a spending reserve loan as a condition of obtaining approval for an emergency school assistance loan. Under the school solvency assistance fund advancement procedures, a district is first required to borrow funds under a spending reserve loan as a condition of receiving an advancement from the school advancement fund. (Brown Depo. 104)

Under both the emergency school assistance loan fund and the solvency assistance fund, a district is required, as a condition of receiving funds, to submit to the Superintendent of Public Instruction a plan to reduce expenditures or to increase revenue to bring the district into fiscal solvency. (Brown Depo. 104)

Under both the emergency school assistance loan fund and the solvency assistance fund, loans or advances to a school district are repaid by reductions in the school district's foundation payments. (Brown Depo. 104–05)

The repayment period for both emergency school assistance loans and solvency assistance advancements is normally a period of two years. (Brown Depo. 105)

4.  Debt of Individual School Districts

The Groveport Madison City School District will end this last fiscal year (FY98) in a deficit. It will have money to carry forward only as a result of borrowed dollars. Its deficit for the year is in the range of $2.5 to $3 million. (Barr Depo. 65 ) Barr Exhibit 7 is a schedule of Groveport Madison's outstanding debt schedule as of June 30, 1998. (Barr Depo. 66–67) This includes "tax anticipation" borrowing whereby the district has borrowed against anticipated revenue from levies. (Barr Depo. 69) The schedule in Exhibit 7 also shows a loan relating to the Rickenbacker Port Authority problem. Not only did the district suffer from the loss of revenue from Rickenbacker Port Authority, but the State's funding formula treated the district as if Rickenbacker was still paying those taxes, causing a further reduction in State aid. Superintendent Barr characterized this as a "double whammy." (Barr Depo. 70) Because of the unusual circumstances, the District received an interest-free loan in the amount of $1,615,195 approved directly from the State Controlling Board. This is a loan the District is required to pay back. (Barr Depo. 70–71) The District received a

State emergency loan in the amount of $2 million in May 1996, and another State emergency loan in the amount of almost $3.9 million in May 1997. (Barr Depo. Exh. 7) The District has a total outstanding debt of over $9.5 million with accrued or accruing interest totaling almost $880,000. (Barr Depo. Exh. 7) The District may have to borrow additional money at the end of fiscal year 1999 to avoid a deficit. (Barr Depo. 75)

The Youngstown City School District has received $3.3 million in equity money in fiscal year 1999. (Funk Depo. 33) In order to complete fiscal year 1998, Youngstown had to borrow $17.2 million. (Funk Depo. 27) For fiscal year 1999, Youngstown anticipates being $6.6 million in debt. This amount grows in fiscal year 2000 to over $20 million in debt. The debt trend continues to the projected fiscal year 2003, where the District is anticipated to be almost $50 million in debt. (Funk Depo. Exh. 1)

School Districts such as Cleveland, Youngstown, New Lexington, Ledgemont and Switzerland of Ohio will be required to access funds under the school solvency assistance fund in the coming year. (Goff Depo. 139) There may be additional districts that will also be required to access that fund. (Goff Depo. 140)

C. Set–Aside Requirements Mean Additional Borrowing Or New Property Taxes

Districts unable to make the H.B. 412 required set-asides from available funds will be required to either borrow additional revenue, reduce expenditures, or seek additional tax levies. (Brown Depo. 133)

School districts will have difficulty putting aside the set-aside percentages required by H.B. 412 this year and the next several years absent either increased income or other adjustments. Additional school district borrowing could be required. (Goff Depo. 142)

School Districts that project a deficit within the first three years of the 5–year fiscal projection are required either to go on the ballot for an additional tax levy or cut spending. (Goff Tr. 634)

D. Debt Incurred by School Districts Prior to 1998 Will Burden School Districts Through 2007

Brown Deposition Exhibit 3, pages cb 1841 through cb 1851, represents a summary of school district year end borrowing for the years 1990 through 1998. In FY98, a total of 50 school districts borrowed $54,723,516. In FY97, a total of 64 districts borrowed a total of $41,385,787. (Brown Depo. Exh. 3, p. cb 1851; Brown Depo. 24)

Brown Deposition Exhibit 1 is a composite report of emergency school advancement loans issued between 1979 and 1998. A total of $160,219,000 in emergency school assistance loans was borrowed in FY97. Those loans will require a payment of an additional $46,984,447 in interest for a total of principal and interest of $207,203,447 in FY97 alone. (Brown Depo. Exh. 1, p. 1716) In FY98 a total of $29,103,189 was borrowed by way of emergency school assistance loans together with accrued interest of $2,983,485 for a total of principal and interest of $32,086,674. (Brown Depo. Exh. 1, p. 1717) In FY99, assuming no additional borrowing, school districts will be required to repay a total of $62,286,604 in principal and interest on emergency school assistance loans and in FY2000 $54,832,989; FY2001 $36,617,488; and FY2002 $38,610,267. (Brown Depo. Exh. 1, p. 1718) School District Mandatory Repayment of Emergency School Assistance Loans (assuming no additional borrowing beyond March 24, 1998) will not be paid off until 2007. (Brown Depo. Exh. 1, p. 1719) The last emergency school assistance loans were approved by the State Controlling Board on February 9, 1998, when eleven emergency school assistance loans were approved. (Brown Depo. 56)

Repayment of outstanding emergency school assistance loans through 2007 will be accomplished by making payments of principal and interest to lenders from funds that would otherwise go to the school district as school foundation payments. (Brown Depo. 70–71)

Plaintiff Youngstown City School District presently has outstanding three emergency school assistance loans for a total of $37,202,587. (Brown Depo. 67–68)

E.  Effect Of Borrowing On The Quality Of Education

The Ohio Department of Education Office of School Management Assistance advised school districts to borrow money through the emergency school assistance loan program prior to March 23, 1998. Prior to March 23, 1998, emergency school assistance loan requirements included the following: (1) districts were required first to borrow as much as was available through the spending reserve loan process and (2) school districts were required to prepare and submit plans for the reduction of expenditures, including reduction in teachers, reduction in school programs, and deferral of the purchase of textbooks, equipment and supplies. (Brown Depo. 52–54)

F.  The Same Forces Continue To Increase Reliance On Property Taxes

The loss of taxable property value, including tangible personal property value, is another circumstance that can cause a district to lose revenue. In that event additional local funding by way of additional property taxes is required. (Brown

Depo. 38–39) The Ohio Department of Education Office of School Management Assistance advises school districts faced with the loss of revenue to seek additional operating tax levies. (Brown Depo. 40) The Ohio Department of Education Office of School Management Assistance would also advise school districts to seek year-end borrowing authority. (Brown Depo. 41)

School districts identified in a state of fiscal emergency are required to submit proposed tax levies to the voters. (Goff Tr. 607)

G. Fiscal Watch

1. Requirements for Fiscal Watch Status

Districts become subject to monitoring by the State Superintendent of Public Instruction pursuant to fiscal watch if they have borrowed money and have a projected deficit of 8% or more. (Brown Depo. 81)

Districts subject to fiscal watch are required to submit a plan for a reduction in expenditures sufficient to repay any loans. Districts with greater than 10,000 students that have a projected deficit of greater than 15% are identified as "fiscal emergency districts." (Brown Depo. 85)

Fiscal watch does not preclude the requirement that school districts engage in collective bargaining but such agreements are subject to approval of the State Superintendent of Public Instruction. (Brown Depo. 82)

Seven school districts are presently subject to fiscal watch. (Brown Depo. 80)

2. Plan for Emerging from Fiscal Watch

When a district is placed in fiscal watch, it has 60 days to prepare a plan as to how it will emerge from fiscal watch, which includes a 5–year projection. Groveport Madison prepared such a plan, which was approved. This plan is Barr Deposition Exhibit 3, which is the "Financial Recovery Plan" for Groveport Madison Schools. (Barr Depo. 35–36) This plan has been approved by the State without revisions. (Barr Depo. 37)

The fiscal recovery plan for the Groveport Madison Local School District did not require the elimination of any specific classes, only those classes which less than 25 students elected to take. As such, the District has no authority to reinstate canceled classes where less than 25 students have elected to take those classes without approval of the State Superintendent of Schools. (Barr Depo. 54–55)

3. The Groveport Madison Local School District is in State of Fiscal Watch

The Groveport Madison Local School District was placed in fiscal watch due to its severe financial condition in February 1997. (Barr Depo. 22–23)

Barr Deposition Exhibit 2 is the declaration of fiscal watch issued from the Auditor of the State of Ohio on February 14, 1997. The Auditor of State certified an operating deficit of the general fund of the Groveport Madison Local School District in the amount of $5,474,000, which exceeds 8% of the general fund revenues for the prior fiscal year.

Superintendent Barr testified and, with no contradicting evidence, the Court accepts as true that—the events that led Groveport Madison to be placed on fiscal watch are that it did not have enough income to provide for all services required by law, negotiated by agreement, or other reasons that require the district to provide services. At one time, the District received approximately 60% of its funds from State aid and this amount has continually eroded over the years Mr. Barr has been superintendent. (Barr Depo. 28) A contributing factor to the fiscal problems of Groveport Madison occurred when the district's largest taxpayer, Rickenbacker Port Authority, declared itself tax-exempt and stopped paying taxes. This led to a 10–year Court battle which the District ultimately won. However, Rickenbacker Port Authority was allowed to have a 5–year repayment plan, affecting 7 fiscal years, which impaired the District's ability to keep up with expenses. (Barr Depo. 28–29)

By being on fiscal watch, the Groveport Madison Local School District is under such tight supervision that its Board of Education is not permitted to authorize expenditures or to offer a course in violation of the financial recovery plan. The district has even been assigned a State monitor who attends board meetings to make sure the board takes no action inconsistent with the financial recovery plan. The district monitor is Loren Briggs. There is no evidence the monitor from the State has any role as to the district's academic improvement, only financial improvement. (Barr Depo. 56–58)

The State does not contest and the Court accepts as true Superintendent Barr's testimony that "probably the most devastating things to the program in our district was establishing a 25 to 1 minimum pupil-teacher ratio with 125 minimum student per instructional day for the staff. What that required us to do, that if we didn't have 25 students sign up for a class, we cut that class out." (Barr Depo. 41)

Groveport Madison eliminated many courses during the school years 1997–98 and 1998–99. (Barr Depo. 42–43; Barr Depo. Exh. 4) Courses were canceled when there were fewer than 25 students who signed up for a course or, where even if as many as 40 students signed up for a course, the course would have

been canceled if the teacher did not have the minimum number of 125 students enrolled a day, so that the teacher would have been reassigned to classes that did have the minimum number of students to make up that teacher's day. (Barr Depo. 44–45) Eliminated classes include calculus, all German language classes, all advanced physical education classes, drafting, and second- and third-year accounting courses, several preschool classes, all advanced placement classes, and all honors classes. (Barr Depo. Exh. 4; Barr Depo. 48–53)

4. Fiscal Watch Status of Other Ohio School Districts

The State Superintendent of Public Instruction has supervisory jurisdiction over the finances of the Cincinnati City School District, Southern Local School District, Columbiana School District, Trotwood–Madison School District, Lorain City School District, Struthers City School District and Bridgeport City School District. (Brown Depo. 76–77) Fiscal watch legislation provides for supervision of the finances of districts that have received an emergency school advancement loan and have a projected deficit in excess of 8% of revenue from the previous year. (Brown Depo. 77)

H. Fiscal Emergency

The Fiscal Emergency program is to aid a district with financial matters—it is not intended to increase its academic performance. (DeMaria Tr. 1339–40)

Fiscal emergency districts have seven member commissions with broad powers to undertake fiscal management for the school district including the abrogation of certain contracts, the displacement of the superintendent and treasurer, the authority to propose an additional tax levy to voters and the authority to bind the school district to loans. (Brown Depo. 85–87, 89)

A district gets out of fiscal emergency by reducing its level of indebtedness to a level below 15%. (Goff Tr. 549)

Recovery plans for districts subject to fiscal watch or fiscal emergency have a projected duration of five years. (Brown Depo. 94)

Brown Deposition Exhibit 4 indicates 67 school districts which, as of July 7, 1998, represented districts potentially subject to either fiscal watch or fiscal emergency in FY99. (Brown Depo. 98)

School districts in fiscal watch or fiscal emergency are required to engage in collective bargaining and have no choice not to do so if otherwise required. (Goff Depo. 256)

Fiscal emergency districts currently include Switzerland of Ohio, Plaintiff Youngstown, Cleveland, Ledgemont, New Lexington, and Jackson Milton. (Brown Depo. 87)

Youngstown City School District currently is in Fiscal Emergency. Under Fiscal Emergency, the District is exempted from setting aside the budget reserve under H.B. 412. (Funk Depo. 16)

## IV. ELIMINATE FOUNDATION PROGRAM AND RESIDUAL BUDGETING

### A. The Panel of Experts

Following this Court's decision in 1994, the State assembled a Panel of Experts in 1994–95 to analyze school funding. (Augenblick Tr. 696–97) The panel included John Augenblick, Kern Alexander, James Guthrie, and William Driscoll. (*Id.*) Staff was provided by the Department of Education. (Russell Depo. 29) The Panel of Experts used a methodology that included both inputs and outputs and arrived at a base cost for an adequate education. This resulted in a report issued by the Department of Education in July 1995. (*Id.*, 697–9; Cohen Depo. 79). Annualized to FY99, the recommended base cost would be $5,051 per pupil. (Brunson Exh. 15) There was no legislation enacted in response to the findings of the Panel of Experts.

Mr. Driscoll and his partner, Richard Levin, were named to the panel as the Ohio tax experts. (Driscoll Depo. 10–11; Cohen Depo. 16) Mr. Driscoll prepared a draft of the report of the Panel of Experts under the supervision of Dr. Matt Cohen of the Ohio Department of Education. Driscoll Deposition Exhibit 1 represents that draft. (Driscoll Depo. 13–14)

Dr. Cohen was aware, at the time of Dr. Augenblick's employment as a member of the Panel of Experts, that Dr. Augenblick had also been in the employ of a group of school districts known as the Alliance for Adequate School Funding. (Cohen Depo. 14)

All of the data utilized by the Panel of Experts was provided through the Department of Education. (Rogers Depo. 81)

Dr. Alexander's recommendations to the Panel were:

• Read the lower Court decision to determine what was needed to be done.

• Devise a strategy for the collection of data for the various kinds of programs that would make up an adequate system or provide for an adequate system of education in Ohio.

• Eradicate wealth disparities or basing a child's education on wealth.

• Conduct an intensive analysis of the educational needs, the program costs, and ultimately the taxing system that would produce the revenues to fund that adequate program. (Alexander Tr. 1591)

● Establish committees of curriculum experts to determine what should be required in the schools and look at the educational needs of the population.

● Take these programs and apply them to those needs and come up with a cost.

This would be a comprehensive approach to an analysis of an adequate program. (Alexander Tr. 1592)

Dr. Alexander's concern from the beginning of the discussions with the Panel of Experts was that there was not an analysis to determine an array of inputs that would be important to a remedy. He had brought before the Court at the original trial an intensive analysis of the curriculum that more affluent and less affluent school districts in Ohio had. He had found that the more affluent school districts had more extensive offerings in high schools throughout the state, and the comparisons were quite dramatic. Accordingly, he contended that the Panel should look at the curricula of those wealthy districts and analyze them. Further, the Department of Education should build upon that kind of a data source, collect information, and construct a program. (Alexander Tr. 1593) Dr. Alexander's suggestions were not taken. The Department of Education did not perform this comprehensive analysis that he recommended to the Panel of Experts. (Alexander Tr. 1594)

This comprehensive approach advocated by Dr. Alexander is known as the "Comprehensive Best Practice," and has been around a long time. (Alexander Tr. 1595)

Plaintiffs' Exhibit 468 is a memorandum sent to the Panel of Experts by Ted Sanders, dated October 6, 1994. This memorandum shows inputs and output measures for 27 school districts. The methodology and analysis attached to the memorandum arrive at a base cost figure of $4,370 per pupil. The base cost was predicated upon the 80th percentile of expenditure of the 27 school districts. (Alexander Tr. 1596)

Plaintiffs' Exhibit 469 is a memorandum dated October 21, 1994 sent to Dr. Alexander from the Department of Education. The subject of the memorandum was: "Determining a Base Cost for an 'Adequate' Education, October 20, 1994." (Alexander Tr. 1599) This paper had 12 input and output variables. The base costs were estimated at various levels. These average base costs were as follows:

55–65 percentile $3,944
65–75 percentile $4,141
75–85 percentile $4,505
85–95 percentile $4,767 (Alexander Tr. 1600)

The 12 inputs and outputs are described on the last page of Plaintiffs' Exhibit 469. (Alexander Tr. 1601)

Plaintiffs' Exhibit 470 is a memorandum sent by the Ohio Department of Education, Office of Policy, Research and Analysis, to the expert panel members

and is dated October 24, 1994. Attached is a memorandum from Jim Payton of the Ohio Department of Education, which states that John Augenblick had reviewed the October 20, 1994 work and came up with another way to look at the data to determine a base cost figure. (Alexander Tr. 1601)

Augenblick modified the approach that the Panel of Experts had used to now include 44 selected school districts and identified those districts that had 6 or more input/output measures at or about the 70th percentile. The result of that analysis was that Augenblick had calculated a weighted average base cost of $4,366 per student. In this final calculation of $4,366 per student as his base cost, Augenblick calculated the average base cost for only 10 school districts. (Alexander Tr. 1603)

An immediate concern with reference to the work of the Panel of Experts was the cost of the program. (Alexander Tr. 1604)

By early October, a procedure had been established in the Panel of Experts as to how the State was going to establish the base cost. It was going to use the Augenblick procedure, with which Dr. Alexander was not familiar. It was novel. (Alexander Tr. 1605) In other words, the State of Ohio had decided to use this particular Augenblick approach and based it on available data. This had significant problems, according to Dr. Alexander, because of the importance of this undertaking and the fact that the Panel was to respond to the declaration of unconstitutionality of the entire system. (Alexander Tr. 1606)

Plaintiffs' Exhibit 471 is an October 31, 1994 memorandum to Kern Alexander and Dick Salmon from Jim Payton of the Ohio Department of Education. (Alexander Tr. 1606) This memorandum pointed out that the base cost funding that had been determined by Dr. Augenblick required further modification, and that the non-instructional special education cost adjustment of about $182 per student needed to be subtracted from that base cost. This memorandum notes that John Augenblick "has given us [the Ohio Department of Education] his approval for using the base cost of $4,184." (Alexander Tr. 1607)

Plaintiffs' Exhibit 472 is a November 7, 1994 memorandum from Jim Payton of the Ohio Department of Education to the Panel of Expert members. (Alexander Tr. 1607) There were two base costs that were set forth in this memorandum. The first base cost was $4,857 per student, being an average per pupil cost for 31 school districts that met or exceeded criteria. The second base cost was $4,350 per student, or 8 districts that met or exceeded criteria established by the Ohio Department of Education. Using the $4,350 as the foundation level, the Ohio Department of Education simulated this proposal which resulted in a total State and local cost of $12,680,200,000. This would require an additional $4,861,800,000 in new revenue. (Alexander Tr. 1608)

Plaintiffs' Exhibit 473 is "Proposals For the Elimination of Wealth-based Disparities in Public Education," which is a report submitted to the Ohio legislature by Ted Sanders and the Panel of Experts, dated July 1995. Dr. Alexander did not participate in the drafting of the report. (Alexander Tr. 1609) This proposal recommends a basic expenditure of $3,928 per pupil. Dr. Alexander did not advocate the methodology or the base cost figure contained in the report. (Alexander Tr. 1610)

Dr. Alexander did not agree with the report of the Panel of Experts, since he had argued for a more extensive array of inputs to form a foundation program. He also advocated that they should have more outputs. Dr. Alexander's concern was that this process established a procedure that was not stable—that as variables were added or variables were taken away, costs changed. (Alexander Tr. 1611) Dr. Alexander was also critical because there was no attempt to create new data—to obtain new data from local school districts to establish a cost-based foundation program. The Panel of Experts simply plugged data that was available from the Department of Education's files and put them in the formula in various ways. The data that were included were then put in and taken out, reducing the cost or making costs variable. (Alexander Tr. 1612)

Dr. Alexander criticized the recommendations made by Dr. Augenblick as set forth in his July 17, 1997 report to the Ohio School Funding Task Force. (State's Exh. 15) First, the procedure that was developed by the Panel of Experts was modified substantially. (Alexander Tr. 1614) Also, there was no internal integrity to the process advocated by Dr. Augenblick, either in the Panel of Experts' report or his July 17, 1997 report. By adding and taking away of variables, the costs changed. (Alexander Tr. 1614) Further, from the beginning, Dr. Alexander had argued to the Panel of Experts that there should be much more extensive and precise determination of costs and inputs. However, Dr. Augenblick's July 17, 1997 report got rid of all the inputs except one. Both the Trial Court and Supreme Court decision for several pages had explained inputs. However, with one stroke of the pen by Dr. Augenblick, the inputs were wiped-out of the entire consideration. (Alexander Tr. 1615)

Dr. Cohen, Dr. Payton, and Mr. Shams and Dr. Ted Sanders all participated in the development of the methodology incorporated in the Panel of Experts report. (Rogers Depo. 86–87)

As used in the Panel of Experts' report, the term "basic instructional costs" includes all instructional expenditures paid from the foundation amount but does not include expenditures for the maintenance of school buildings and would not include certain types of equipment. (Rogers Depo. 94–95)

Dr. Goff agrees with the provisions of the Panel of Experts report that define an adequate education as being "more than barely enough. It means an

education by which a student has a reasonable prospect of obtaining the academic or vocational skills needed to succeed at the next level of educational endeavor or in the labor market." (Goff Depo. 35)

Dr. Augenblick endorsed the report issued by the Panel of Experts and submits that the methodology applied by the Panel of Experts is rational. (Augenblick Tr. 870)

The Panel of Experts' base cost, when updated with 1996 information, was $5,051 for FY99. (Rogers Depo. Exh. 3; Rogers Depo. 126, 130)

B.  Augenblick's Base Cost "Methodology"

1.  Background—Inputs and Outputs

State minimum standards enacted in 1983 were no longer enforced after 1990. Since 1990 there has been consideration of creating a new set of minimum standards.  Proposed standards are before the General Assembly but have not been enacted as of July 30, 1998.  (Goff Depo. 239)

At the present time, the performance standards by which schools are judged are their performance on proficiency tests and dropout and attendance rates. (Goff Depo. 240)

Proficiency tests are fundamentally drawn from model curricula.  (Goff Tr. 468) The Department of Education does not review, monitor, or enforce model curriculum and the State Superintendent of Public Instruction can provide no assurance that any school district is actually offering the model curriculum. (Goff Tr. 560–61) Proficiency tests are given to fourth graders, sixth graders, ninth graders and twelfth graders.  (Goff Tr. 475) Final cut scores for citizenship, math, reading and writing will be phased in by the 1998–99 school year.  (Goff Tr. 493)

The areas of testing on the proficiency tests include citizenship, math, reading, writing and science.  However, the science test is not used as part of the report card established by S.B. 55.  (Goff Tr. 477–78) The sixth grade proficiency test subject areas also are excluded from the school district report card because the Department of Education only had one good year's data.  (Goff Tr. 491)

The ninth grade proficiency test measures only minimums.  It is a basic knowledge test for pupils at the end of the eighth grade.  (Goff Depo. 202) The ninth grade proficiency test is intended to measure a minimum level of competence.  The ninth grade proficiency test is based on eighth grade work.  (Goff Tr. 478, 481, 484)

The twelfth grade proficiency test does not measure what a child prepared to enter college would be expected to know.  (Goff Depo. 203)

## 2. Augenblick Used Outputs and Ignored Inputs

At the beginning of his work for the school funding task force, Dr. Augenblick came to be aware that the Department of Education had been working with a group of "output measures." (Augenblick Tr. 706)

The Ohio Department of Education recommended eighteen performance criteria that were substantially included in S.B. 55. Departures from the recommended criteria included the use of a 60% passage rate for the twelfth grade proficiency test rather than 75% and the absence of any standard for the sixth grade tests or for science tests at any level. (Goff Depo. 85–86)

Dr. Augenblick agrees that the use of inputs would provide some degree of assurance as to the quality of educational program being measured by the outputs. (Augenblick Tr. 823–24)

Cohen Deposition Exhibit 17 is a fax from Jim Payton to Dave Brunson reflecting the various types of "input" data available from the Department of Education. (Cohen Depo. 362) None of the input measures was used by Dr. Augenblick.

The 18 criteria utilized by Dr. Augenblick in developing recommendations to the school funding task force are the same criteria utilized in the development of school district report cards. (Goff Tr. 509) (See "Senate Bill 55" *infra* )

The rationale for Dr. Augenblick's approach is the belief that if some districts can attain desired objectives with a given level of spending then all districts, if they receive the same amount of spending, should be able to achieve those objectives. (Augenblick Tr. 716)

## 3. Dr. Augenblick's Methodology and the State's Involvement in its Selection

Dr. Augenblick characterized the budgetary residual approach as being a situation where "You simply back into it because you know how much money you want to spend and you determine a number that spends that much money." (Augenblick Tr. 725)

The market basket approach or as Dr. Augenblick characterized it, the "resource cost model," is an approach that can be used to develop a school funding system. (Augenblick Tr. 725–26) However, Dr. Augenblick chose to use an "inferential" approach and focus solely on outputs. (Augenblick Tr. 727)

Dr. Augenblick's recommendations were based solely on FY96 data. (Goff Tr. 509)

Driscoll Deposition Exhibit 4 represents a description of the methodology utilized by Dr. Augenblick which Mr. Driscoll prepared at the direction of Dr. Matthew Cohen of the Ohio Department of Education. At the time of preparing

the memo, June 4, 1997, Mr. Driscoll was not only aware of the methodology but also the amount to be recommended by Dr. Augenblick.

In May 1997, the Legislative Budget Office and the Department of Education ran a series of scenarios as to possible criteria to create an achievable model for determining the base cost of an adequate education. (Brunson Depo. 106–08) An example is Brunson Exhibit 7, which is a school performance review that shows six possible performance criteria and how many of those six criteria each district meets. The criteria include attendance and drop-out rates, as well as the fourth, ninth, and twelfth grade proficiency tests. (Brunson Depo. 85–89)

Brunson Exhibit 9 is a fax transmission from Matt Cohen at the Department of Education to Mr. Brunson at the Legislative Budget Office dated May 20, 1997, and which has attached to it "base cost calculation scenarios." The four scenarios attached show combinations of the following scenarios:

1. Districts which meet 17 of the 18 performance criteria;

2. Districts which meet all 18 performance criteria,

3. Establishing "outlier" screens at 5th/95th percentile for valuation and median income; and

4. Establishing "outlier" screens at 10th/90th percentile for valuation and median income. (Brunson Depo. 103–04)

The only information derived at the bottom of each of these scenarios is the *weighted* average base cost per pupil. It is also apparent that when the screens are moved to the 10th/90th percentile, the base cost per pupil is significantly lower—in each case by over $300 per pupil.

Two days later Dr. Cohen faxed to Mr. Brunson additional base cost calculation scenarios. (Brunson Depo. Exh. 10; Brunson Depo. 105) The four attached scenarios again apply screens at 5th/95th and 10th/90th percentile for both valuation and income (never having different, separate percentiles for valuation and median income), but alter the number of performance criteria to 14 and list those districts which in one scenario achieve 13 of the 14 performance criteria and then those districts which achieve all 14 performance criteria. Again, the bottom line in each of these scenarios shows the *weighted* average base cost, but there is also added what appears to be the total ADM of all the listed school districts. Mr. Brunson summarizes this information on the fax cover sheet of Exhibit 10. (Brunson Depo. 105) Again, it is very apparent from his summary that whenever screens are changed from 5th/95th percentile to 10th/90th percentile, the base cost per pupil is materially lower.

Brunson Exhibit 12 is another school performance review that appears to be similar in format to Exhibit 7. It has a run date of May 19, 1997. While it has

six performance criteria, the proficiency tests are shown as one criteria for each grade because a year's worth of proficiency tests are collapsed into one indicator rather than four separate indicators. (Brunson Depo. 111)

Brunson Exhibit 13 is another performance review run May 20, 1997. This is similar in format to Exhibits 7 and 12, except that each performance criteria is specifically broken out as a separate column.

Brunson Exhibit 14 is composed of five more scenarios of fiscal year 1996 performance data. Again, the scenarios differ as to whether districts meet 17 of the 18 performance criteria, all 18 performance criteria, setting the screens at 5th/95th percentiles, and setting the screens at 10th/90th percentile. Again, each of these scenarios has a bottom line which shows the weighted average base cost per pupil and it is apparent that when the 10th/90th percentiles are applied, the cost per pupil is materially lower. These scenarios were run on May 21, 1997. These scenarios are virtually identical to the scenarios contained in Brunson Exhibit 9 faxed May 20, 1997, as they have the same school districts listed in virtually the same scenarios, except that the May 20 runs apply the "base cost" as a data source whereas the May 21 runs in Exhibit 14 use "base expenditure" as data. This indicates that by using base cost as opposed to base expenditure, the cost per pupil will be lower.

Brunson Deposition Exhibit 15 is entitled "selected options for review for base cost estimate." It is a compilation of various alternatives which were under consideration by the Governor's task force for coming up with a set of criteria. (Brunson Depo. 113–14) In the twelve columns of different scenarios (excluding the column for the panel of experts), the screens are set at either 5th/95th or 10th/90th. They are always the same for both valuation per pupil and median income. That is, if the screen is 10th/90th, it is always 10th/90th for both valuation per pupil and median income. In none of the scenarios are the screens set at one percentile for valuation and a different percentile for median income. After applying these twelve scenarios, there is shown information as to the characteristics of the district's responsive to the scenarios. There is then a separate category called "Base Cost Estimates (FY96 Dollars)." This shows the weighted average of every scenario. In every case, where the screens are set at 10th/90th percentiles, the base cost is lower compared to the corresponding column where the screens are set at 5th/95th. Moreover, there is a fourth category where a 2.8% inflation has been applied to each of the base cost numbers and projected separately for fiscal years 1997, 1998, and 1999.

Brunson Deposition Exhibit 16 has a first page which is identical to Brunson Deposition Exhibit 15. However, attached to it are twelve computer runs that appear to exactly correspond to the twelve scenarios shown in Exhibit 15. That is, the attachments to the first page of Exhibit 16 are the computer runs that

show the detail of the twelve scenarios shown in Exhibit 15. Each of those runs has a date of May 28, 1997. Each of them uses *weighted* average expenditure per pupil and shows at the bottom what that number is. (Brunson Depo. Exh. 16)

The last page of Cohen Deposition Exhibit 17 is a chart showing twelve different scenarios for the establishment of a base school funding amount. That page was prepared by Dr. Cohen's office in connection with the work of the core group and was shared with that group. (Cohen Depo. 364–65, 367)

The Office of Budget and Management prepared a one-page document summarizing four options from the Augenblick methodology. (Cohen Depo. 370–71; Cohen Depo. Exh. 18) Cohen Deposition Exhibit 26 (also Brunson Exh. 16) was reviewed and discussed by the core group of the School Funding Task Force in early June. Various options identified on the exhibit were considered and discussed by the core group at that time. (Cohen Depo. 401–03) Either at that meeting or at a meeting shortly thereafter, it was decided that the base cost would be $3,930. The specific options reviewed by the core group at that time included twelve options. However, a substantial number of other options had been considered. (Cohen Depo. 407–09) *The base cost of $3,930 was selected by consensus of the individuals who attended the meeting after considering the wealth screens.* (Cohen Depo. 409)

Cohen Exhibit 28 is a listing of options from which the final selection of Dr. Augenblick's "base cost" figure was made (option 8). Cohen Exhibit 28 displays a range of base cost options from a low of $3,916 to a high of $5,051 (FY99). (Cohen Depo. 400; Depo. Exh. 26)

Neither Dr. Augenblick nor the core group ever recommended a base cost of $3,851 for FY99, which was ultimately enacted in H.B. 650. (Cohen Depo. 444)

Cohen Deposition Exhibit 28 is a letter from John Augenblick to Greg Browning, Chairman of the School Funding Task Force, dated June 10, 1997. By that letter, Dr. Augenblick explained the methodology utilized to formulate his recommendations. References in the letter to "staff group" referred to the core group of Dr. Cohen and other staff members of the School Funding Task Force. The twelve approaches referred to in the letter refer to those options set forth in Cohen Deposition Exhibit 26. The letter was reviewed by Dr. Cohen before it was submitted to Chairman Browning. (Cohen Depo. 412–14)

Cohen Deposition Exhibit 33 represents a cost estimate of the various components recommended by Dr. Augenblick. The estimate was prepared by Dr. Cohen after Dr. Augenblick's recommendations had been submitted to the School Funding Task Force and, to Dr. Cohen's knowledge, represented the first time that anyone had attempted to determine the total cost of their recommendations

taken together. That analysis indicated approximately $1.8 to $2 billion dollars in additional cost for FY99. (Cohen Depo. 425–29)

Dr. Cohen made the decision to utilize the title "efficiency screen" in Rogers Deposition Exhibit 3. The screens set forth in Rogers Deposition Exhibit 3 were applied in the sequence indicated on the exhibit. Had the screens been applied in a different order, the numbers would have been different. (Rogers Depo. 133) Rogers Deposition Exhibit 3 represents the final version of the data set forth in the exhibit. (Rogers Depo. 137)

The second page of Rogers Deposition Exhibit 3 represents a chart showing the distribution of base salaries of the 102 districts that comprised Dr. Augenblick's base salary recommendation. (Rogers Depo. 140)

In the process of developing Rogers Deposition Exhibit 3, Mr. Rogers did not conduct any analysis to determine how many of the districts removed by "wealth screens" (valuation and income) passed or failed the performance criteria either at the top or bottom ends of the distribution. (Rogers Depo. 164)

Rogers Deposition Exhibit 4 is a collection of printouts showing, for each of the districts included under each option set forth in Rogers Deposition Exhibit 3, the identity, location, basic expenditure, basic expenditure ADM, median income, valuation per pupil and number of criteria met. Printouts similar to Rogers Deposition Exhibit 4 were prepared each time that different options were considered. Rogers Deposition Exhibit 4 was also prepared at the direction of Dr. Cohen at about the same time as Rogers Deposition Exhibit 3 was prepared. (Rogers Depo. 155)

The testimony of Mr. Brunson, as well as the numerous documents produced from the Legislative Budget Office, indicate that cost was always a consideration as evidenced by the computer runs of different scenarios. That is, the foregoing evidence of very specific consideration of the cost of changes to methodologies is evidence of continued residual budgeting. (See also "Badges of Residual Budgeting," *infra.*)

C.   Problems & Defects in Augenblick's Methodology

1.   General Deficiencies in Dr. Augenblick's Approach

Dr. Augenblick was involved in three different studies of school finance in Ohio, each one involving different methodologies and each one attaining different results. (Augenblick Tr. 938–39) All of the performance criteria utilized by Dr. Augenblick were intended to be given equal weight. (Goff Depo. 201)

In connection with the 1992 analysis of Ohio's school funding system conducted by Dr. Augenblick, he believed the following statement to be true, "The inferen-

tial approach is used by people who do not want to do, deal with questions of what ought to be. Rather, such people, including economists, tend to evaluate actual behavior and tend to infer a reasonable standard based on the patterns of that behavior." (Augenblick Tr. 818)

Dr. Klein criticized Dr. Augenblick's use of 17 of 18 performance criteria. Such a standard "produces unreliable results as to whether districts are or are not meeting various standards. One reason for this is that a single student taking one test can determine whether a district does or does not meet a given performance standard." (Klein Depo. 36–37) Defendant Dr. Goff agrees. (Goff Tr. 554) The Court finds this criticism to be valid.

Some of the 18 performance measures utilized by Dr. Augenblick are, in reality, weighted differently than others. This is because it is much more difficult to pass some proficiency tests than others. In addition, the dropout rate carried a lot of weight, because less than half of the school districts were able to satisfy that particular goal. (Klein Depo. 159–60)

## 2. Problems with Base Cost 18 Criteria

The Department of Education does not review, monitor, or enforce model curriculum and the State Superintendent of Public Instruction can provide no assurance that any school district is actually offering the model curriculum. (Goff Tr. 560–61)

Dr. Goff would expect school districts with similar demographic characteristics to attain similar results on the proficiency tests. Conversely, districts with dissimilar demographics would be expected to show different results. (Goff Tr. 564)

School attendance correlates with performance on the ninth grade proficiency test. Dr. Goff is not aware of any studies done by the Department of Education to determine the factors that cause pupils not to attend school. (Goff Tr. 565)

## 3. Undue Reliance Upon Proficiency Tests

States outside Ohio do not use the Ohio proficiency tests. Proficiency tests are not normed and there is no way to tell whether a child has passed by a small or large amount. (Goff Depo. 200)

Determining whether a child passes or fails an Ohio proficiency test does not indicate the ability of that child to compete with students who attend school in other states. (Goff Tr. 555)

Dr. Klein criticized the use of proficiency tests as a standard as being arbitrary in that it was limited to four subject matter areas. Other subject matter areas, such as science, foreign language, arts and music that schools devote resources

to, are not measured and any efforts the school district makes in those areas are not represented. (Klein Depo. 37)

Dr. Augenblick utilized proficiency tests because he thought they were in use by the State Board. He did not know if they had been enacted as policy by the Department of Education or as law by the State of Ohio. (Augenblick Tr. 857)

Dr. Augenblick agreed that if the State's policy changed with respect to proficiency test scores, the analysis of base cost should change as well. His belief about when that should occur is based on his understanding of H.B. *650* and the period for review required therein. (Augenblick Tr. 866–67)

Dr. Augenblick has never undertaken any analysis of the specific spending requirements imposed on public schools in Ohio either by State minimum standards or otherwise. (Augenblick Tr. 936)

Pages 5 through 12 of Cohen Exhibit 25 are additional listings of school districts selected without using 12th grade proficiency tests as part of the screen was not made by Dr. Augenblick but, rather, by Dr. Goff and Budget Director Browning. (Cohen Depo. 398–99; Augenblick Tr. 858)

The term "cut score" defines the established score or number of points a student must achieve in order to pass each proficiency test. Cut scores have been phased in over a number of years. (Rogers Depo. 55) An increase in the cut score required for passage will, generally, result in a reduction in the number of students identified as having passed the test. (Rogers Depo. 57) Since Dr. Augenblick's study, the State Board of Education has increased the cut scores for a number of proficiency tests. (Goff Depo. 207–09)

The use of the twelfth grade proficiency test in developing the "Augenblick number" was discussed between John Goff and Greg Browning. They, rather than Dr. Augenblick, made the decision to use the high school proficiency test at a 65 percent cutoff rather than the 75 percent cutoff. (Cohen Depo. 356–57)

Options 7 through 12 on Rogers Deposition Exhibit 3 represent passage of the twelfth grade proficiency tests at a rate of 60 percent. Options 1 through 6 represent passage of the twelfth grade proficiency tests at a rate of 75 percent. (Rogers Depo. 136)

Plaintiffs' Exhibit 524 includes a printout of school district performance based on FY97 proficiency tests and attendance data. Applying the increased cut scores characterized by Dr. Goff as the "2000 standards," only 19 school districts met 17 of the 18 performance standards utilizing the FY97 data. Those 19 districts were not "screened" based on either property valuation or income. (Goff Tr. 617–20; Pl. Exh. 524, p. 35)

### 4. Overemphasis on Graduate or Dropout Rates

Dr. Goff believes that the dropout rate as set forth in the law (S.B. 55) and used by Dr. Augenblick as one of the 18 criteria is a mistake and that a cohort concept should be used as a means of measuring graduation rate. In using a "cohort concept," the Department of Education selected a group of ninth graders and followed them through their senior year. From this study, the Department of Education recommended a 90 percent graduation rate. (Goff Depo. 206–07)

### 5. Arbitrarily Screening Out Districts Due to Wealth

In determining the base cost of education, Dr. Augenblick screened out the wealthiest 5 percent of districts and the poorest 5 percent of districts. Augenblick's use of the modification of output criteria was simply an arbitrary decision. (Alexander Tr. 1622)

Wealth determines the quality of a child's education in Ohio. Wealth is the determinant. When Augenblick simply says that he is cutting off 90,000 children on one end or a percentage of children because they are in wealthy districts, then he is attacking the main variable that created the discrimination—wealth. (Alexander Tr. 1622)

Dr. Augenblick did the same thing that Dr. Guthrie had done (in his analysis for the State Defendants in 1993): he cut the top wealthy districts and the bottom poor districts, saying that they do not matter. Again, however, wealth is the determinant of disparities in the State of Ohio. (Alexander Tr. 1623)

What Augenblick did was to remove wealth-based disparities as a factor in arriving at the base cost. (Alexander Tr. 1623)

Dr. Augenblick did not do any analysis to determine if wealthy districts spend too much or poor districts spend too little. The first thing that he did was to eliminate the poorest and wealthiest schools based on the top and bottom 5% of property valuation and income. (Augenblick Tr. 735, 852; State's Exh. 23)

Dr. Augenblick selected districts that "he felt were unusual." He did not select "outliers" *per se*. (Augenblick Tr. 853) The way he selected districts was to eyeball the graph. (Augenblick Tr. 853–54) Dr. Augenblick is aware of no literature in the field of school finance that would support making decisions by simply eyeballing a chart. (Augenblick Tr. 854)

Rather, the federal government uses expenditure as a cutoff (Alexander Tr. 1624; Maxwell Tr. 1573–74)

Even the State's witnesses agreed that the use of wealth screens in Dr. Augenblick's analysis eliminated, at the low end, few if any districts that would otherwise have been eliminated because they failed to meet the performance

criteria. A significant number of districts on the high end that were eliminated would have passed the performance criteria. A significant number of districts on the high end that were eliminated would have passed the performance criteria. Dr. Cohen had made a determination of the number of districts at the high end that were eliminated in this fashion. Both Dr. Augenblick and the staff members of the School Funding Task Force were aware of this circumstance. (Cohen Depo. 244–46)

Of the 103 districts utilized in H.B. 650, the district with the lowest base cost per pupil spent $2,755 per pupil and the highest spent $5,898. (Augenblick Tr. 879; State's Exh. 77) Both the lowest and highest spending districts were able to achieve the goals identified by Dr. Augenblick in his study. Dr. Augenblick had undertaken no analysis to establish whether the highest spending district (Grandview Heights) was spending more than it needed to spend to attain those goals. (Augenblick Tr. 881)

Districts at the high end of the income in valuations were excluded because it was felt that they "probably provide extras that go beyond what we consider to be a base cost or a base level of basic education." (Cohen Depo. 301) No analysis was undertaken of programs offered by any of the school districts excluded from the study based on income. (Cohen Depo. 302)

Dr. Augenblick was not surprised to know that none of the districts eliminated on the low side of income and property valuation met the performance standards utilized in his study. Dr. Augenblick conducted no study or analysis to determine any connection between the passage of proficiency tests and any aspect of school programming. (Augenblick Tr. 857)

The Court finds that the wealth screens proposed by Dr. Augenblick were used arbitrarily.

6. Disregard for a District's Per Pupil Expenditures and Programming, as Well as Student's Demographics and Socioeconomic Status

Dr. Augenblick had established a procedure where 102 school districts were selected, but the selection process did not analyze what kind of an educational program those school districts provided. Neither Dr. Augenblick nor the Panel of Experts ever examined the 102 school districts selected by Dr. Augenblick to determine what kind of an educational program they were providing. Further, these 102 school districts were not analyzed to determine what kinds of children were educated in those districts. (Alexander Tr. 1615)

The base cost analysis utilized by the school funding task force and its staff gave no information concerning specific programs offered by any school district other than the fact that a certain percentage of students were able to pass the

proficiency test. There was no information concerning pupil-teacher ratios, honors courses, or advanced placement courses. Dr. Cohen did not consider that information to be important. (Cohen Depo. 499)

Dr. Alexander went to the website of the Department of Education and looked up the 102 school districts to determine if they had advanced placement courses in high schools, that allow a student to take college quality courses for college. (Alexander Tr. 1652) Dr. Alexander found that there was substantial difference among the 102 school districts—some districts had no AP course, others had a few, and several of the districts had extensive AP courses. (Alexander Tr. 1653)

The use of the expenditure flow model in establishing the screens set forth in his study was discussed with the staff of the School Funding Task Force. Dr. Augenblick did no analysis to determine whether or not districts that were high or low in the types of expenditures measured by the expenditures flow model represented either efficiency or inefficiency. (Augenblick Tr. 867–68)

Of the school districts utilized by the General Assembly in arriving at its base cost figure, some of those school districts are located in towns where there are colleges. This impacts those school districts positively, since students would have access to college resources in those towns. The students' parents are probably at a higher educational level. The State does not know what any of these school districts are bringing into the system as a base before the extra benefits of being near a college are added. (Alexander Tr. 1752)

Cohen Exhibit 25 includes, at pages 2 and 3, a listing of school district types. The 9 separate types listed on page 3 are derived from 15 variables that cluster around four dimensions; rural, SES, poverty and size. The 102 districts selected by Dr. Augenblick's methodology did not include any type 4 districts (urban, low SES, very high poverty) or any type 6 districts (major urban, very high poverty) while only one type 1 district (rural, high poverty) and four type 7 districts (urban/suburban) were included. (Cohen Depo. 395; Depo. Exh. 25, 26)

Dr. Augenblick understood that the sample he used in establishing recommendations for a base cost excluded all of the big cities and a number of other types of socioeconomic districts recognized by the Department of Education. It did not matter to him that the sample was not representative of all of Ohio school districts. (Augenblick Tr. 873–75) Dr. Augenblick admitted, "Those districts are not designed to be representative of all the districts in the state. They are merely all of the districts that meet all of the criteria." (Augenblick Tr. 747)

7. Cannot Premise the Cost of Education on a Single Year's Data

The foundation level for Fiscal Year 1997 was $3,500 per pupil and in Fiscal Year 1996 $3,315 per pupil. (Am.Sub.H.B. 117) The foundation level for Fiscal

Year 1995 was $3,035 per pupil. (Sub.H.B. 715) The foundation level for Fiscal Year 1994 was $2,871.

State average expenditure per pupil for the 1997–1998 school year was $6,036 per pupil. (State's Exh. 6, p. 9)

Of the 18 performance criteria utilized by Dr. Augenblick, 12 of the 16 academic goals dealt with pupils from ninth through twelfth grade, which represents pupil performance that is the accumulation of their entire academic career. Yet Dr. Augenblick related Fiscal Year 96 dollars to those test outcomes—that circumstance, together with the fact that many students, particularly in the big cities, may have been educated in other places does not produce reliable results. "So relating dollars spent in '96 with performance in '96 is generally frowned on." (Klein Depo. 39) The Court finds these objections to be well taken and agrees that no base cost can be derived from the methodology utilized by Dr. Augenblick that will provide any assurance of adequate funding.

### 8. Adjustments Are Unrelated to Costs

The regression analysis utilized by Dr. Gensemer and the staff members of the School Funding Task Force utilized school district actual expenditures for FY96, minus federal and transportation. (Cohen Depo. 495) .

Dr. Augenblick's regression analysis analyzed school district expenditures in FY96 and tried to predict those expenditures using a combination of variables such as percentages of ADC students in the community and percentage of students in various levels of special education. The variables utilized by Dr. Augenblick are set forth in the last page of Attachment 13 to Dr. Augenblick's report on the page titled "Summary of Regression Results." The regression model relied upon by Dr. Augenblick is not a reliable method of making recommendations for special education, DPIA, cost-of-doing business or transportation. (Klein Depo. 48)

Dr. Augenblick believed that it was necessary to reduce expenditures for DPIA, cost-of-doing business, special education and transportation by a factor of .8 in order to adjust the weights back so they would not produce more in spending than was spent during the 1995–1996 year. (Augenblick Tr. 894–95) Dr. Augenblick did not perform the calculations that resulted in the determination of the .8 reduction factor, nor did he independently verify that the calculation was accurate. (Augenblick Tr. 895–96)

Dr. Augenblick's recommended formula for special education. DPIA, cost-of- . doing business and transportation were all drawn from regression analysis that was done by someone other than himself. (Augenblick Tr. 910–11)

Through the utilization of a regression model of cost variation, Dr. Gensemer developed a set of factors that assigned a single weight incorporating special education, ADC and cost-of-doing business. The core group (staff members of the School Funding Task Force) did not wish to present a single adjustment factor and, thus, Dr. Fleeter was engaged to "decompose the components of the regression into a formula that separated components for special education, DPIA and cost-of-doing business factors." (Cohen Depo. 185)

In attempting to "interpret" the work done by Dr. Gensemer, Dr. Fleeter found it necessary to apply a .8 reduction to each of the individual cost factors (cost-of-doing business, DPIA, and special education). (Cohen Depo. Exh. 13, p. 4; Cohen Depo. 339) Dr. Cohen felt that application of the reduction factor was necessary to keep the separate weights assigned by Dr. Fleeter for DPIA, special education and cost-of-doing business consistent with the single weight developed by Dr. Gensemer. If the Gensemer regression was wrong, the Fleeter interpretation was also wrong. (Cohen Depo. 340)

Dr. Klein would not trust Dr. Augenblick's model utilized to develop weights for special education, DPIA and cost-of-doing business as being reliable. A .8 adjustment factor was applied to reduce the weights for each of these adjustments. Neither Dr. Klein nor his associates could determine how the .8 adjustment factor utilized to reduce special education, DPIA and cost-of-doing business recommendations was derived. Dr. Klein was not aware of any circumstance under which it would be appropriate to apply such a reduction factor. (Klein Depo. 66) The Court finds this persuasive.

Augenblick's attempt to utilize the regression model to come up with adjustments to special education, DPIA and cost-of-doing business is "junk science." (Klein Depo. 53–54)

The model utilized to produce recommendations for "adjustments"; special education, DPIA and cost-of-doing business is fundamentally flawed because it rests on an assumption that is not credible, namely that the districts spend as much as they need to spend to respond to their cost pressures. In addition, the coefficients for some of the factors are not credible. For example, the negative coefficient for the percentage of adults with a BA degree, the fact that according to the model school districts spend roughly 31 cents of every dollar they receive from the State, and the fact that the model indicates that districts like Cleveland do not need to spend as much as a district like Youngstown despite having very similar amounts of ADC pupils are all indications of structural flaws in the model. Having very similar percentages of ADC pupils is one factor that shows that the coefficients are not credible. (Klein Depo. 72)

One of the reasons that Dr. Augenblick's model is unreliable is that there are many factors that affect school spending not explained by the model. (Klein

Depo. 49) For example, the model indicates that a school district with an ADC rate of 10 percent would spend an additional $138.67 for each additional percent of ADC pupils. However, the model also indicates that in the big six cities, one would subtract out $11.30 for each additional percent increase in ADC pupils. (Klein Depo. 50)

Thus, for example, the Cleveland City School District has approximately 66 percent ADC pupils, while Youngstown has approximately 62 percent. According to Dr. Augenblick's model, in Youngstown the district would spend 62 × $13.77 for each additional ADC pupil, while in Cleveland one would have to subtract spending for each additional ADC pupil. The model would suggest that Youngstown needs five or six times as much money for each one percent of ADC pupils as one would have in Cleveland. Such a result flies in the face of general conventional wisdom in the field that need increases geometrically as the percent of ADC goes up. (Klein Depo. 51–52)

The regression model utilized by Dr. Augenblick also indicates that as the percent of adults with a BA degree goes up, school districts spend $36 less per student. That result also flies in the face of what we know about the relationship between the education level of the community and school spending. (Klein Depo. 53)

Another flaw in the regression analysis utilized by Dr. Augenblick to develop "adjustments" to the base cost is that it assumes causality. Causality means the underlying assumption that the district spent as much as it did because it had a particular characteristic that drove it to spend as much as it did. The implication being that because it had a high percent of high cost special education pupils, it would spend more. However, there is no evidence of a cause and effect relationship because one cannot get such a relationship from correlational data. Correlation does not mean cause. (Klein Depo. 162)

In illustrating the difference between correlation and cause, Dr. Klein gave the example of the minister's salary going up in correlation with the increase of the price of a bottle of scotch. There is no cause and effect relationship, though the two sets of numbers may be highly correlated. (Klein Depo. 163)

The model utilized by Dr. Augenblick cannot be trusted to predict additional costs associated with special education, conditions of pupils in poverty, or cost-of-doing business. (Klein Depo. 57–58) The adjustments must be considered as part of the foundation program. The methodology utilized to establish adjustments is clearly wrong and the system recommended as a result cannot be trusted.

The adjustments included in Dr. Augenblick's report recommended funding for special education, DPIA, and cost-of-doing business were based on the assumption that in FY96 districts spent as much as they needed to spend to provide an

effective education for their students. (Klein Depo. 44–45) However, Dr. Fleeter admitted that no district spent as much as it needed to spend to provide an effective education. (Fleeter Depo. 95) If districts cannot spend what they need to spend to produce an adequate education, then looking at spending from what was actually spent to work backwards to what the cost pressures are is not going to work. (Klein Depo. 142) The Court finds that the regression analysis was not reliable or credible.

In his report, Augenblick noted that he was asked to improve and recalculate the base figure. This means that arbitrariness comes into play. A formula that lends itself and invites arbitrary manipulation is not a formula that is stable and that the Government can rely upon. (Alexander Tr. 1621)

The spreadsheet utilized to formulate the foundation recommendation offered by Dr. Augenblick ($4,269 for FY99) was prepared by the Ohio Department of Education and not by Dr. Augenblick. (Cohen Depo. 174–75)

Dr. Goff was aware that the calculations utilized by Dr. Augenblick in preparing his 1997 report were done by the Department of Education staff. (Goff Depo. 90)

Augenblick noted that if he applied the Panel of Experts' criteria for 1996, the base cost figure would be $4,649. According to Dr. Alexander, the capriciousness of the selection of these data has reduced Augenblick's recommendation from $4,649 down to $3,930. (Alexander Tr. 1626)

The Court gives great weight to the testimony of Dr. Klein and Dr. Alexander and their substantial, credible criticism of Dr. Augenblick's methodology.

9. Deficiencies in Determining Funding and Weights for Special Education

The Department of Education undertook no studies to determine whether or not the weights assigned to the two categories of special education pupils used in Dr. Gensemer's regression model bear any relationship to the actual cost of educating those pupils. (Cohen Depo. 253)

In the course of his work, Dr. Gensemer did not have data that would show the amount of money that it cost to provide a program of special education for handicapped children. No such data exists within the Department of Education. (Cohen Depo. 185)

The data analyzed by Dr. Gensemer and interpreted by Dr. Fleeter did not include student placement data—data indicating the level of service received by pupils identified as being within a particular classification of handicapped pupils. (Cohen Depo. 348–49)

The analysis that gave rise to the weights for special education was based on an analysis of school district expenditures for the 1995–1996 school year. At the time of his deposition, Dr. Augenblick did not know what year the analysis related to. He did not know then and did not know at the time of his testimony whether the regression analysis was weighted or unweighted by school district but acknowledges that it would have made a difference. (Augenblick Tr. 891–92)

The special education weights recommended in Dr. Augenblick's report (State's Exhibit 15) were derived from the regression analysis attached to Dr. Fleeter's paper which is Attachment 13 to Dr. Augenblick's report. (Augenblick Tr. 889; Cohen Depo. 287) Dr. Augenblick did not specify the parameters of that analysis nor did he conduct that analysis. Dr. Augenblick did not make the decision to divide handicapped pupils into three groups for funding purposes. Dr. Augenblick conducted no analysis to determine whether or not it was appropriate to divide the special education population into three groups for funding purposes. (Augenblick Tr. 890–91)

Attachment 4 and Attachment 8 are different regression runs utilizing the same database and essentially the same model, yet producing different coefficients for the high cost of special education pupils. All of the coefficients are interdependent. A change in any variable could change the results with respect to all other variables. (Klein Depo. 55–56, 72)

10. Recommendation for DPIA is Flawed

The staff members of the School Funding Task Force did not conduct any analysis to determine the actual needs of pupils in conditions of high poverty. (Cohen Depo. 327–28)

Four different options were considered for DPIA funding. One option would "take what emerges from the Fleeter analysis and plug that in." Another option was to look at that in a way that was in a slightly different level of funding. A third option was to look at the squared term even though it was not statistically significant as being important in using that in a funding formula. And the fourth option is actually a graphical representation of the old system. Dr. Augenblick recommended to the staff members of the School Funding Task Force the use of the "squared term" option. (Cohen Depo. 323)

Dr. Augenblick recommended a squared term for the formula for DPIA funding because he believed that a curved pattern was what most people expected in connection with DPLA expenditure, notwithstanding the fact that his analysis suggested that the straight line approach was more appropriate. (Augenblick Tr. 907)

Dr. Augenblick's recommendations with respect to the DPIA formula were drawn directly from the regression analysis conducted by Dr. Cohen and Dr. Gensemer. (Augenblick Tr. 908–09)

Attachment 8 to Dr. Augenblick's report (a regression model with two variables for ADC) was prepared by the Ohio Department of Education at the request of Dr. Gensemer. It was prepared at the request of Dr. Augenblick to reflect a curvilinear relationship between percent ADC and funding. The relationship represented by Attachment 8 is not statistically significant. (Cohen Depo. 268–69)

A basic problem in the measurement of the number of students in conditions of poverty occurs because, due to welfare reform, the number of pupils counted in the TANF count are declining. However, the number of students in conditions of poverty is as great or greater than was previously the case. (Cohen Depo. 194, 195)

D. Conclusions Regarding Augenblick's Methodology

Dr. Klein's criticism of Dr. Augenblick's methodology for deriving a base cost is first and foremost, the fact that the methodology assumes that there are going to be adjustments. Second, the use of 5% screens on property valuation and income biases the results because it ignores the fact that the districts on the bottom hardly meet any of the goals and screens that a lot of districts on the top meet. The use of proficiency standards (75% passage rate) is arbitrary because many subjects are not covered and unreliable because one student can determine whether the entire district meets the standard or not. The data are only for a single year, which also raises a reliability issue. FY96 dollars probably have a relatively small impact on how well students achieve in taking tests in 1996, particularly ninth through twelfth graders whose education is affected by all that came well before 1996. (Klein Depo. 74)

Dr. Augenblick's recommendations cannot be relied upon with any assurance that they will provide adequate funding for Ohio's public schools. (Klein Depo. 74)

Dr. Klein disagreed with the methodology utilized by Dr. Augenblick to screen out certain districts from his base cost analysis because there is no rational basis for taking off the top five and bottom five percent of districts based on wealth. This methodology produced biased results. In addition, the sequence in which the screens were applied influences the result. If the screens were utilized in different order, the result would have been different. (Klein Depo. 29–30)

Elimination of the top and bottom five percent of districts based on wealth and property valuation biases the computation of the base figure downward by several

hundred dollars per pupil. Fifty-two or fifty-three districts removed from the top of the sample based on income and wealth all passed the performance screens while only two or three districts removed at the bottom met the 17 of 18 performance screens. (Klein Depo. 32–34)

Dr. Klein characterized Dr. Augenblick's analysis as "cherry picking" in the sense that the appearance of evenhandedness is not there. Eliminating the poorest 5 percent of districts had no impact because those districts were unable to satisfy the performance screens. (Klein Depo. 34) The Court agrees with Dr. Klein's assessment.

Had Dr. Augenblick not removed districts based on property valuation and income, the average basic expenditure would have increased between $200 and $250. (Klein Depo. 35)

The school districts selected by Dr. Augenblick's methodology were not representative of Ohio school districts and were a highly biased sample. (Klein Depo. 41)

The Court gives great weight to Dr. Klein's testimony and finds his conclusions in the seven paragraphs above persuasive.

The methodology utilized by the staff members of the School Funding Task Force and Dr. Augenblick assumed that each of the 102 districts selected spent an adequate amount of money for the basic cost of education in FY96. (Cohen Depo. 177, 495)

If one simply eliminates school districts and funds without fully assessing the districts' programming, student demographics, or students' cultural, social or economic differences, as was done by Dr. Augenblick, then the remaining districts likely do not have any problems but have low cost. (Alexander Tr. 1617)

Dr. Augenblick used 18 output measures. To choose 17 of 18 criteria that must be met in order to fall within Augenblick's 102 school districts is simply an arbitrary selection of criteria. The 18 performance criteria provide no information about the educational programs offered in the school district. (Alexander Tr. 1627)

In his report, Augenblick notes that the selected 102 school districts are not representative of all school districts in the state. Dr. Alexander is critical of this sampling, because any sample of school districts that one uses to fund all of the school districts in the state should be representative, by definition. Otherwise, one could simply go to school districts from Pennsylvania or Montana and do the same thing, and conclude that those dollars are going to be used in Ohio. (Alexander Tr. 1625)

The Court finds Dr. Alexander's testimony credible and further finds the foregoing three paragraphs persuasive.

E.  Legislative Reductions and Modifications Affecting Augenblick

After hiring Dr. Augenblick as a school funding expert to develop a new school funding methodology, the Legislature materially altered his methodology so that the base cost amount was significantly reduced.  It also enacted new legislation which adds costs not measured by his new methodology.

The Department of Education was involved in the discussions leading up to H.B. 650 until approximately two weeks before its adoption when the General Assembly ceased asking for input.  Dr. Goff concurred in the base foundation level amount of $4,269 per pupil recommended by Dr. Augenblick.  He became aware that that amount would not become the foundation level at approximately the same time that the General Assembly stopped asking for input from the Department of Education.  (Goff Depo. 146)

In a letter to Dr. Goff dated July 18, 1997, Dr. Augenblick estimated that the total cost of his school funding recommendations in FY99 would amount to approximately $9.5 billion including (1) $7.458 billion for base costs, (2) $864 million associated with the cost-of-doing business factor, (3) $399 million for special education, (4) excess costs of $364 million for at-risk pupils, and (5) $375 million for transportation.  (Goff Depo. Exh. 11, p. 2;  Goff Depo. 178)

Mr. Driscoll was asked to simulate the amount of additional State funding required to fund base costs as recommended by Dr. Augenblick as well as other costs forwarded by members of the General Assembly through Dr. Cohen at the Department of Education.  (Driscoll Depo. 42–43) The additional cost of establishing the foundation level at $4,269 for FY99 together with the other recommendations submitted by Dr. Augenblick was approximately $1.8 billion.  (Driscoll Depo. 113)

As will be discussed below, the evidence indicates that this additional cost led to legislative reductions in Dr. Augenblick's methodology.

1.  Enlargement of Wealth Screens

Dr. Augenblick recommended the use of screens set at 5% of the top and bottom of both median income and median valuation.  H.B. 650 altered this methodology by moving the screen as to median income to the 10% level. (Brunson Depo. 19)

Increasing the wealth screens from 5% to 10% increased the number of districts screened out by wealth and the number of districts that met the performance standards.  Generally speaking, a higher number of districts meet-

ing the performance standards on the high end of the wealth spectrum were screened out than on the low end. In each of the examples set forth on Cohen Deposition Exhibit 16, applying the 10% screen resulted in a lower average expenditure per pupil than applying the 5% screen. (Cohen Depo. Exh. 16; Cohen Depo. 359)

The idea of moving the median income screen from 5% to 10% originated as a group of options David Brunson of the Legislative Budget Office presented to various members of the General Assembly. He looked at the median income screen graph and observed that the curve changed at approximately 90%. Mr. Brunson suggested to the legislators that they might want to consider this and form their own opinion. (Brunson Depo. 20)

Brunson Exhibit 1 is a graph showing the relationship of school districts and their respective median income. It is on this graph that Mr. Brunson observed the curve changing at 90%. (Brunson Depo. 21–23) Mr. Brunson understands that in Dr. Augenblick's methodology, the use of such screens is to eliminate "outliers." Mr. Brunson does not know what the statistical definition of an "outlier" is. (Brunson Depo. 23) He acknowledges that the definition of an outlier is not "where the curve changes." (Brunson Depo. 24) As such, his recommendation to move the screen was not based on any statistical expertise.

Mr. Brunson testified that as to those districts on the median income graph which were above the 90th percentile:

"On this ranking, districts above the 90th percentile are very likely to be of a different character than districts that are significantly lower.

"Because of their high incomes they are likely to be suburban, homogenous, wealthy districts.

"They are very likely to meet 18 of those [performance] criteria." (Brunson Depo. 24)

Significantly, Brunson further acknowledged that the districts in the bottom 10% of median income would include very few who would meet the performance criteria. He bluntly acknowledged: "Generally, performance is related to income *in a very significant fashion.*" (Emphasis added.) (Brunson Depo. 27–28)

Mr. Brunson understood that by moving the bottom screen of median income from 5 percent to 10 percent it was unlikely to carve out districts that were meeting the performance criteria, but that by lowering the top percentage from 5 percent to 10 percent, he would be removing districts that meet the performance criteria. (Brunson Depo. 28–29) He bluntly acknowledged that by moving the median income screen from 5 percent to 10 percent, the impact was to reduce the average cost per pupil that effective schools spend, noting, "[I]f you eliminate the

high income districts, you will be lowering the cost of an effective district." (Brunson Depo. 29–30)

In summary, Mr. Brunson knew that the purpose of the screen was to eliminate statistical outliers, did not know the definition of statistical outliers, does not know if the districts between the 90th and 95th percentile of median income screens are statistical outliers, but knew that the impact of altering the median income screens, both top and bottom, from 5% to 10% would be to lower the base cost of districts identified as effective schools. (Brunson Depo. 23–24, 29–30)

Exhibit 2 is a series of slide presentations, the last page of which is a graph charting median income in school districts, identical to Exhibit 1, except that additional percentages are identified. This second graph is dated November 18, 1997, whereas Exhibit 1 is dated November 1, 1997. The graph in Exhibit 2 shows the location of additional percentiles, including possible screen locations as low and as high as 30% and 70% respectively. (Brunson Depo. 25–27) This latter graph identifies specifically the location of the bottom 10% as well as the top 10%, unlike Exhibit 1, which identified the 90% cutoff, but did not identify the bottom 10% cutoff. This is further evidence that initial consideration of the movement of the median income screens was done only as to the wealthier districts, not the poorer districts. This, combined with the testimony cited above, is evidence of a conscious consideration by the State to adjust the income screen in Dr. Augenblick's methodology with an intent to lower the base cost calculation. This inference is reinforced by the admission that the reason the median income screen was recommended to be moved from 5% to 10% was because there is a *stronger* correlation between performance and median income. (Brunson Depo. 28, 32)

While Mr. Brunson recommended a change in the mediation income screen, Senator Cupp's working group actually decided the modifications to Dr. Augenblick's proposed methodology by altering the median income "outlier" screen from the 5th/95th percentile to the 10th/90th percentile, eliminating the EFM screen, and using unweighted instead of weighted averages. (Cupp Tr. 350–63) The working groups' recommendations as to the base cost of an adequate education were eventually adopted in the form of H.B. *650*. (Cupp Tr. 364)

The working group was comprised of 8 to 10 House and Senate Republicans. It was not a bipartisan working group. It included no one who claimed to be an expert·in statistics and no one who claimed to be an expert on Dr. Augenblick's methodology. (Cupp Tr. 406–07)

As to the working groups' decision to modify the median income "outliers" screen from Dr. Augenblick's recommendation of the 5th/95th percentile to the 10th/90th, Senator Cupp testified:

"Q: Tell me again, in your working group, was it just because the curve seems to go up at the 90th percentile that the 90's percentile was picked?

"A: Yes. We were looking at—the whole purpose is we understood the purpose of eliminating the so-called outliers is that where you get significant differences from the rest of the sample is those are the ones you wanted to take out. So you're looking at something that's much more similar. In other words, eliminate the anomalies. When you look at the chart, it appeared that the real change was at the—where the graph begins to start curving up markedly was around the 10% rather than the 5%.

"Q: So it's where it curves up? That's where the working group decided that's really where you make the cut?

"A: Yes.

"Q: And that's as sophisticated as that decision got?

"A: Yes.

"Q: There was no expert saying, as a matter of our profession, in the field of statistics, where it curves up, those are statistical outliers? Anybody saying that?

"A: No. There is a general understanding that you—where you see something that's markedly different on the graph, that's where the districts that are different in some significant degree from the others are. It was a fairly common understanding. * * *

"Q: And if you look back at the State's Exhibit 78, one thing you don't see on the bottom is at the 10% percentile, there is no big change in the curve; is there?

"A: No, there's not.

"Q: So there's only a change in the curve where they get wealthier, right?

"A: The pronounced—yes. The pronounced curve is at the upper end of the scale.

"Q: And so that change in the curve at the wealthier end was decided to be justifiable to lop it off at both ends by 10%?

"A: Yes. That was generally the—I guess the consensus the information we got, that it's better to do it at both ends of the spectrum rather than do something at one and something else at the other." (Cupp Tr. 421–24)

Senator Cupp admitted that under his view of "rational methodology," the Legislature could have fashioned a rational methodology to establish a base cost of an adequate education in FY99 which would have resulted in a virtual identical foundation level as that which was in place in FY98. (Cupp Tr. 408–09)

Consistent with the testimony of Representative Johnson, Speaker Davidson, and David Brunson, it is apparent to the Court that the decision to alter the median income screen which the evidence shows lowered the base cost per pupil was based on no expert recommendation whatsoever and is circumstantial evidence that cost was a consideration in the alteration of that income screen.

In summary, Dr. Augenblick used a *5%* screen for median income. The Legislature arbitrarily went even further than Dr. Augenblick and expanded it to a 10% screen. This change from Dr. Augenblick's study screened out some of the higher performing schools who provided an education at a greater cost, which resulted in lowering the basic expenditure amount by almost $400 per student. (Connolly Depo. 23–27; Alexander Tr. 1646; Klein Depo. 61)

2. Use Of *Unweighted* Averaging (Average Of Averages)

The use of unweighted school district values in H.B. 650 also produced a significantly lower result. If the goal of the analysis is to produce per pupil expenditures, then the data should be weighted by pupil. (Klein Depo. 62) Yet, the legislators changed Dr. Augenblick's weighted averages to unweighted averages because they deemed the appropriate unit of analysis to be the school district, not the pupil. (Keen Depo. 22)

Dr. Augenblick used weighted averages in determining a cost figure. The Panel of Experts and the Legislative Budget Office Fair Share Plan also used weighted averages. The Legislature, however, decided to use unweighted averages, so that if a large urban district has 20,000 students at a cost per pupil of $7,000 and a small suburban district has a student population of 1,000 and a per pupil cost of $3,000, these districts will be equally weighted. By using unweighted averages, the Legislature lowered the per student base cost or education by approximately $60. (Connolly Depo. 27–29; Alexander Tr. 1648–49; Brunson Depo. Vol. 2, pp. 17–19) Although other iterations of the data set forth in Rogers Deposition Exhibit 3 were considered, none of those iterations considered using an unweighted average. (Rogers Depo. 135)

The Department of Education prepared an analysis for Senator Watts that compared the cost of using weighted averages, unweighted averages, and the median based on four different scenarios—(1) Augenblick criteria except with median income at 10/90 percentile, (2) same scenario except without EFM filter, (3) original Augenblick criteria, and (4) original Augenblick criteria without EFM filter. It is apparent that the sole function of this document is to determine the cost difference in these scenarios. That is, the only results reported in this analysis is the cost difference. This document calculates the cost difference in weighted versus unweighted averages, the cost difference between unweighted

averages and the median, and the cost difference between weighted averages and the median. (Brunson Depo., Vol. 2, pp. 20, 22; Brunson Depo. Exh. 42)

The second scenario described above is the scenario enacted in H.B. 650. An asterisk has been placed in the line for the unweighted average showing a base cost for fiscal year 1999 of $4,063, the base cost identified in H.B. 650.

After the legislature modified Augenblick's methodology by changing the median income screen to 10/90 percentile and eliminating the EFM filter, further modifications were made to the methodology by changing it from using weighted averages to unweighted averages. This resulted in lowering the per pupil cost $61. This change multiplied by a statewide ADM of $1,746,322 (Brunson Exh. 20) would clearly have the effect of a statewide reduction in funding of $106,525,640. Thus, by simply changing Dr. Augenblick's recommended methodology, as well as every other suggested methodology, from weighted to unweighted, the State lowered proposed funding by this amount.

Considering Dr. Augenblick's proposed methodology the Court considers changing the methodology to use unweighted averages to be further evidence of the State's engaging in residual budgeting under the guise of altering the components of a purportedly rational methodology to achieve a specific fiscal result. Unweighted may be permissible, but to change without any basis causes the action to be suspect. In fact, Senator Watts argued that neither weighted nor unweighted averages should be used, but that the median should be used, which would have resulted in an even lower base cost by $148 per pupil. (Brunson Depo. Vol. 2, p. 26; Brunson Exh. 42)

The combined impact of these two changes of Dr. Augenblick's methodology (utilizing a 10% income screen and unweighted averages) amounted to a reduction of $440 per pupil. (Klein Depo. 158)

3. Guarantees

H.B. 650 was enacted with several guarantees. There is a guarantee as to basic aid, a guarantee on categoricals, a guarantee on transportation, and a guarantee on DPIA. (Russell Depo. 75) A guarantee is an indication of structural problems within the funding system and properly drawn school funding legislation would only require a minimum number of guarantees affecting a minimum number of districts. (Russell Depo. 76)

Another problem with H.B. 650 is the phase out of equity aid to poor school districts. For fiscal year 1998, certain districts received more than the base cost of $4,063 per pupil as set in H.B. 650. The basic aid amount in 1998 was $3,663 per pupil. Some districts were receiving more than $700 per pupil in equity money which meant that the State was providing them with over $4,300 per

student. With the phase out of equity aid, however, those low wealth districts would receive a reduction in State aid, but for the guarantee. At a minimum, the phase out of equity aid causes little to no increase in State aid. This is again an example of the guarantee being an indication of a structural flaw in the system. (Russell Depo. 87–88)

Amounts included in Payton Deposition Exhibit 4 under the heading, "Special Ed Portion Of Guarantee FY99," represent an allocation made by Dr. Payton in an effort to determine the percent of the "guaranteed" amount that represented special education funding. (Payton Depo. 67–68)

In FY99, 41 school districts will receive DPIA funds by reason of the guarantee provisions of H.B. 650. (Shams Depo. Exh. 8)

For FY99, 131 districts will receive basic aid guarantees and 69 districts will receive transportation guarantees. (Shams Depo. Exh. 7; Shams Depo. 88)

The transportation guarantee is also one year only. The transportation guarantee applies to 51 school districts for FY99. One hundred thirty-two (132) districts are subject to the fundamental aid guarantee in FY99 for a total of 309 districts subject to either the fundamental aid guarantee or the capping provision. (Maxwell Tr. 1409)

4. Caps

School district funding is subject to two different caps: a total cap and a per pupil cap. Districts receive the larger amount available under the two caps. The total cap is based on a 10% increase in revenues above amounts received in FY98. The per pupil cap represents a 6% increase. (Shams Depo. 55–56) A funding cap representing a 10% increase or a 6% per pupil increase will remain in effect for each year through 2002. The cap will limit the maximum amount of increase that a district can receive in the current year as compared to the prior year. (Payton Depo. 121)

The caps operate to provide a lesser amount of revenue than would be received but for the operation of the cap. (Shams Depo. 59)

Speaker Davidson testified as to the caps that it was a general feeling "that a 10% increase is a significant increase and that we wanted to be sure that the districts effectively used the money, and then when it's capped, we phase it to the new dollar amount." (Davidson Tr. 172–73) The Court gives this testimony little weight, as no evidence was presented to the Court that any study or analysis had been done as to whether or not school districts could efficiently use funding which exceeded 10% of their funding from the prior year. Dr. Cohen was not aware of any analysis that would suggest that school districts could not absorb more than 10% in additional funding from year to year. (Cohen Depo. 501–02) The

Department of Education has done no studies that would indicate the need for a funding cap. (Payton Depo. 121) This lack of any analytical evidence to support the purported rationale for these caps causes the Court to infer and find a budgetary motivation for the caps.

Payton Deposition Exhibit ·5 ˙represents the estimated extent of reduction in special education funding as a result of the capping provisions of H.B. 650. (Payton Depo. 71–72) The total amount of reductions for all school districts[4] due to the cap for FY99 is $9,314,360. (Payton Depo. Exh. 5, p. 1535; Payton Depo. 75)

Mr. Shams prepared a memorandum demonstrating a conflict in the legislation concerning the manner in which the·"caps" are to be applied. Mr. Shams has had a number of meetings with legislative representatives but is still uncertain as to the manner in which to treat the conflict described in his memorandum. (Shams Depo. 79–80; Shams Depo. Exh. 5)

One of the concerns expressed by Mr. Shams was that the application of the cap could impact federal funding by having an adverse impact on "federal maintenance of effort" requirements. (Shams Depo. 83–84)

A total of 198 districts will have their funding limited based on the operation of the 10% cap and an additional 16 based on the per pupil cap. (Shams Depo. 85; Shams Depo. Exh. 6) The funding cap results in the reduction in school district revenue for FY99 of $134,000,000. (Shams Depo. 90)

Mr. Shams had studied the effect of phasing out equity aid for school districts. He determined that the phase-out would result in some districts receiving a relatively lower increase than others as a result of the loss of equity funding. (Shams Depo. 47–48)

The application of the funding increase cap to South–Western City School District highlights disparities now institutionalized by the caps. If South–Western City School District grows by approximately 500 students, increasing enrollment by approximately 3%, the basic aid and categorical funding of those new 500 students would apply toward the 10% cap which would reduce the true effect of the cap to a 7% increase when offset by the increased student population. (Hamilton Depo. 67–68)

Without the statutory cap, South–Western City School District would have received $4.82 million in special education funding. (Hamilton Depo. 238) With the application of the cap, however, this amount is reduced to $3.836 million. (Hamilton Depo. 238–40) This again is an example where the State has established a formula to determine the appropriate amount of funding for special

---

4. Note that the exhibit reflects 111 while the text reflects only 11 districts.

education and then fails to provide that level of funding by as much as $1 million. (Hamilton Depo. 244) This problem is compounded by the cumulative effect over the years which was best described by Dr. Hamilton as follows:

"[T]hat's based on if it costs $4.8 million for us to educate those 1,423 students, if that's what it costs us, and if the state's going to give us $3.8 next year, then that's a million dollars of general revenue at our school district we are going to have to spend, and, you know, it's another $900,000 the next year, and another $800,000 the next year, and now we are $2.7 million behind where we'd have been had the calculated rate been applied up front."

(Hamilton Depo. 246)

Hamilton Exhibit 3 is a document known as the SF–12 Worksheet which contains the calculation of the estimated amount of funds South–Western City Schools will receive for fiscal year 1999. This estimated calculation appears to have a run date of July 7, 1998. It shows State funding for fiscal year 1998 to have been $37,085,100. State funding for fiscal year 1999 under the new legislation totals $44,622,610, but when adjusted by applying the 10% cap (the larger of the two possible caps, 10% total dollars versus 6% per pupil dollars) that number is reduced to $40,793,610. (Hamilton Depo. Exh. 3)

Despite not having conducted any analysis of the effect of the capping provision, Dr. Augenblick was willing to tell the Court he believed it to be reasonable. (Augenblick Tr. 927)

One of the concerns expressed by Mr. Shams in attempting to implement H.B. 650 related to the operation of the "cap." On May 1, 1998 he wrote to Liz Connolly, Senate Republican Caucus:

"Based on the provisions of H.B. 650, after the total funding amount for FY99 has been calculated a cap based on 110% of the total or 106% of the per pupil FY98 funding is applied to some districts' calculations. In fact based on our simulations, 199 districts are subject to the total and 16 districts are subject to the per pupil caps. These caps tend to reduce the amount of increase a district receives in total funding in FY99 relative to FY98 to the aforementioned levels."

(Shams Depo. Exh. 5)

Director DeMaria echoed the sentiments of Speaker Davidson that the phase-ins and caps under H.B. 650 are appropriate because big increases in funding require that they be implemented in an "orderly and efficient" manner. (DeMaria Tr. 1322) However, the Court was presented with no evidence of any study or analysis performed by any State agency or any expert as to whether school districts would have trouble absorbing more than a 10 percent increase from year to year. Funding for the Department of Rehabilitation and Correction received

dramatic annual increases of more than 10 percent, much of it for jail construction. (DeMaria Tr. 1323–24)

During the years of FY92 through FY95, the Department of Rehabilitation and Correction had budgetary increases of 8.7 percent, 10.7 percent, 15 percent and 18 percent. The General Assembly deemed that the Department of Rehabilitation and Correction could adequately absorb those increases of funding without a phase-in process. For the Department of Education, however, phase-ins and caps on funding were deemed necessary in H.B. 650. The rates of increases for the Department of Education during the same years were a negative 1.5 percent, then a positive 8.4 percent, 3.9 percent and 4.8 percent. (State's Exh. 54)

5. Phase–In

H.B. 650 further lowered Dr. Augenblick's recommendations by phasing in the base cost over four years, beginning FY99 at $3,851 per pupil. Consideration of a phase in of the funding system occurred only after the total cost of Dr. Augenblick's recommendations were finalized. (Driscoll Depo. 78) Dr. Augenblick's report contained no recommendation concerning phasing in of either the base foundation cost amount or add-ons. (Augenblick Tr. 911–12)

If $4,063 is truly the base cost of an adequate education, Ohio has been below that base cost, adjusted for inflation, for at least the last three years. Moreover, by design, H.B. 650 will not provide funding for that base cost of an adequate education over the next four years. (Davidson Tr. 293–94, 296)

As with the caps, there was no expert testimony presented to the Court that a phase-in was required because the school districts could not handle more. This Court finds that the decision to phase-in the new base cost appears to be largely driven by the State's own budgetary considerations.

6. Special Education Weights

The weights developed by Dr. Gensemer and further interpreted by Dr. Fleeter were intended, when added to the base cost, to represent an adequate amount for the education of all pupils funded by the particular model in use. The weights were relative and would vary in accordance with the base foundation amount. (Cohen Depo. 191)

7. New Unfunded Mandates

The methodology in H.B. 650 is a modification of Dr. Augenblick's methodology and comes to a lower base cost of $4,063. (Davidson Tr. 233) This is derived from a list of 103 school districts and the amounts those districts spent on a per pupil basis for fiscal year 1996. (Davidson Tr. 233) H.B. 412 and S.B. 55 were

not in existence in 1996. Thus, if there is now an additional cost per pupil as a result of H.B. 412 and S.B. 55 that any of these 103 effective school districts must spend, that is not reflected in the methodology in H.B. 650. (Johnson Depo. 24–25) Moreover, there is no mechanism for adjusting the base cost number to take into consideration the costs of S.B. 55 and H.B. 412, except that this issue may be considered by a commission to be appointed in the year 2001. In view of the undisputed testimony from school districts as to the specific additional costs of the set-aside requirements of H.B. 412 (see, *e.g.,* testimony of Superintendents Barr, Buroker, and Hamilton) and the Legislative Budget Office's own analysis of the additional costs S.B. 55 will have on school districts, the Court finds that even if the base cost of $4,063 set in H.B. 650 was arrived at in an otherwise appropriate manner, by adding the cost of H.B. 412 and S.B. *55,* this base cost number is already below what would be the true base cost number.

H.B. 412 requires a set-aside of 4 percent for textbook instructional materials, 4 percent for capital maintenance, and a 5 percent budget reserve. The set-aside requirements will impact school funding in Ohio for districts that are already having difficulty meeting their current expenditures. In addition, the set-asides will impact districts that have borrowed funds or will be required to pay back borrowings. (Maxwell Tr. 1415)

H.B. 412 provides no source of revenue to fund the set-asides. Districts may be required to pass additional tax levies to meet the requirements of the legislation. If they are unable to obtain additional funding they will be required to borrow. (Maxwell Tr. 1416)

S.B. 55 has been referred to as an academic accountability bill. It will require an increase in units for graduation for some school districts by requiring 21 Carnegie units for graduation. It also increases required units in the areas of math, English, social studies, and science. (Maxwell Tr. 1417–18)

Compliance with the requirements of S.B. 55 will require an increased cost for school districts. For example, additional science courses may require additional science laboratories. Other curriculum changes may require additional personnel. (Maxwell Tr. 1419)

S.B. 55 also includes a provision called the fourth grade guarantee. Under that provision a student who does not pass the fourth grade proficiency test will be required to receive summer school and intervention. The State has provided no additional funds to pay the cost of those requirements. (Maxwell Tr. 1420)

The school district report card provided by S.B. 55 utilizes Fiscal Year 2000 standards for proficiency tests. With respect to the standards utilized in H.B. 650 to establish school funding levels, the standards were 1996 standards. (Maxwell Tr. 1421–22)

Representative Johnson co-sponsored S.B. 55 in the House. (Johnson Depo. 13–14) He thinks that the increase of the minimum graduation requirements from 18 to 21 credits required by S.B. 55 "could require additional costs" to the school districts in his legislative district, but does not have any specific numbers on the needed funding increases. (Johnson Depo. 14–15)

H.B. 412 assumes that the school districts will receive additional dollars as a result of the increased base cost funding. (Johnson Depo. 20–21) At the approximate time S.B. 55 and H.B. 412 was enacted, Senate Joint Resolution No. 3 was moving through the Legislature. (Johnson Depo. 30) Senate Joint Resolution No. 3 proposed a 1¢ sales tax which would be dedicated to fund primary and secondary education. This legislation passed the Senate, but failed to get out of the Finance Committee by one vote. (Johnson Depo. 30–31) This was part of the Governor's proposal that Representative Johnson supported because additional dollars would be needed in the future. (Johnson Depo. 31–32)

The academic requirements of S.B. 55 will cause Groveport Madison to incur additional expenses. The requirement that Groveport Madison must offer summer remediation will be a new cost. The remediation mandated for students who do not pass the fourth grade proficiency test will be an additional cost. (Barr Depo. 156–57)

The Department of Education Simulation Unit was not asked to provide any simulation of the impact of budget set-asides required by H.B. 412 either prior to or since the enactment of that legislation. (Payton Depo. 10–12)

The Simulation Unit was also not asked to simulate the impact of the phasing out of spending reserve loans and the implementation of the school assistance solvency fund. (Payton Depo. 12–13)

Generally, when the Simulation Unit simulates the impact of proposals on school districts, they include all of Ohio's school districts in the request unless asked to exclude certain school districts. (Payton Depo. 36)

Neither the Simulation Unit nor the Department of Education was asked to simulate the impact of changes required by S.B. 55, including increased graduation requirements, increased course offering requirements, and graduation and course offering requirements. (Payton Depo. 14–15) The Department of Education did not know the total additional cost to school districts that would result from S.B. 55. (Goff Depo. 123–26)

The Simulation Unit for the Ohio Department of Education in 1997 had available data reflecting the beginning teacher's salary, average teacher salary, pupil-teacher ratio, pupil-administrator ratio, and pupil-support staff ratio for Ohio school districts. (Payton Depo. 25) There is no reason to believe that the data was not accurate. (Payton Depo. 35–36)

The Simulation Unit was not asked to simulate the effects of H.B. 650 prior to its enactment. (Payton Depo. 38)

At the time S.B. 55 and H.B. 412 were being considered by the General Assembly, there were also under consideration additional revenue measures that would have raised approximately $1.2 billion for school operations. (Goff Depo. 127–28)

H.B. 412 will require some districts to spend monies in ways that they had not previously spent money. (Goff Depo. 129) Many school districts do not have budget surpluses of 8% per year or more. (Goff Depo. 129–30)

School Districts were ultimately given the accountability and responsibility for complying with S.B. 55 and H.B. 412, but the additional funding that was considered by the General Assembly concurrently with those two measures was not approved. School Districts got the accountability but not the money. (Goff Depo. 131 and Tr. 570)

See also additional findings regarding H.B. 412 and S.B. 55 in Section VI, C, *infra.*

F. Conclusions Regarding Legislative "Base Cost" and Legislative Reductions

1. The State's Funding System Is Irrational

The State does not know what it is financing with this new legislation (H.B. 650). The base cost funds something, but the State does not know what it is funding. There is no attempt to determine what is thorough or what is efficient. (Alexander Tr. 1618)

Dr. Augenblick pointed out that new information and new criteria can be identified as "more reliable data become available." Dr. Alexander testified that if the Department of Education had responded to the Court and come up with the data needed, then the consideration of base cost would not simply have been confined to a few proficiency test scores as outputs to determine the base funding level. Reliable data could have been collected and a program could have been fashioned. (Alexander Tr. 1626)

Dr. Augenblick defines the terms "rational" and "reasonable" interchangeably and would define either as something that involves the application of some degree of judgment. (Augenblick Tr. 923–24)

Dr. Augenblick would consider the use of his model rational even if it produced a lower base cost than was used in Ohio for the previous year or the previous two years. However, Dr. Augenblick did not recommend a cap on the funding available to schools in his July 1997 report. (Augenblick Tr. 926)

Dr. Augenblick was unable to indicate the number of districts he believed were necessary in order to establish a base cost. He believed that 8 districts were too few and that 102 were adequate. Dr. Augenblick deemed some of his other options using a small number of districts, such as Exhibit 6 (State's Exhibit 17), which used as few as 12 districts, as rational approaches. (Augenblick Tr. 882)

Dr. Augenblick believes that a foundation level is "rational" if "there is some procedure that one can go through to get to that number and it's not the budget residual number." (Augenblick Tr. 771) And, if DPIA, special education and the cost-of-doing business are addressed, Dr. Augenblick believes that the special education weight assigned by H.B. 650 to the most severely impaired pupils was *inappropriate* because there is no additional payment by the State for the cost of educational programs for such children until the local school district's costs have reached $25,000. (Augenblick Tr. 777) However, he believes that the power equalization provisions of H.B. 650 alleviate his concerns in that "there is additional money that could be available to pay for that." (Augenblick Tr. 777)

State's Exhibit 17 is a chart put together by the Department of Education staff in connection with a meeting Dr. Augenblick had with the staff group. "[The] Staff group was working with me to do the work for the task force." (Augenblick Tr. 753) Dr. Augenblick believes that *all* of the choices reflected on State's Exhibit 17 are rational. (Augenblick Tr. 757)

The Court finds that the legislation passed by the Ohio General Assembly is not a rational plan. This is because of the reasons Dr. Alexander set forth in his criticisms of the Panel of Experts and Augenblick's recommendations. The system is capricious because it allows picking and choosing of factors. (Alexander Tr. 1644) In addition, the legislation enacted by the General Assembly entirely eliminated inputs. (Alexander Tr. 1646) To simply dismiss inputs by saying that they are cumbersome is arbitrary. Inputs should have been utilized in the formulation of legislation and costed out. Further, the legislature eliminated the one input that Augenblick had, which was a percentage of administration and operations. There is no good rationale to do this. (Alexander Tr. 1647)

The heart of the issue in this case is what is an adequate education, and the Department of Education did not determine that. All the manipulations done by the General Assembly and Augenblick simply plug in an amount of money that is available. (Alexander Tr. 1648)

Other reasons as to why the new legislation is not rational are that the General Assembly does not know what level of programs is being offered, and what the quality of programs is. It has set in place a blind system of determination as far as adequacy or quality of educational programs that would prepare a student for the global economy. Further, the General Assembly has not gone very far in resolving the major concern that wealth is the determination of a child's edu-

cation, and quality of a child's education. The State of Ohio has not attended to adequacy in any kind of a structured or reasonable way, and it has not addressed the wealth issue in a reasonable or rational way. (Alexander Tr. 1654)

The General Assembly, in setting in place a blind system, ignored the trial and Supreme Court's opinions concerning inputs into education. These opinions refer to the components of an education: their curriculum, personnel, necessary operational aspects, and capital outlay aspects of a program that provide a reasonable, logical and adequate program. This was not done by the General Assembly. Rather, the legislature simply backed into an amount of money and has assumed that it pays for something. This is a State system of education, and therefore it is important that the General Assembly and the Ohio Department of Education know what the quality of education is that is being provided. (Alexander Tr. 1655)

Dr. Goff agrees that inputs are important to the educational process, as are outputs. (Goff Tr. 552)

The General Assembly has failed to establish a foundational level of inputs to assure that it is value–adding anything. Proficiency tests do not touch upon value added. Test results simply say that the school district happens to have students who have passed proficiency examinations. (Alexander Tr. 1753)

Apart from the extent to which his recommendations were adopted in H.B. 650, no state has ever adopted the specific methodology that Dr. Augenblick recommended in Ohio for school funding. (Augenblick Tr. 939) Mississippi, which was 50th among the states in the Union in school funding, adopted a portion of Dr. Augenblick's plan. (Augenblick Tr. 940–41) Only two states use any aspect of the approach recommended by Dr. Augenblick. Mississippi and Kentucky use only a portion of the outcomes-based approach in one section of each state's school funding system. (Augenblick Tr. 722)

Dr. Augenblick agrees that, if funding for any component of the adequate school funding system (basic aid, cost-of-doing business, special education, transportation and DPIA) is insufficient, the difference must be made up from some other source. (Augenblick Tr. 921–23)

If the base cost of the school funding formula is set too low then the weights added to that base cost will produce a net result that is also less than it should be. (Cohen Depo. 494)

Dr. Augenblick had conducted no analysis with respect to the impact of power equalization equity funds, textbook subsidy, gap aid, or vocational or gifted funding on the operation of H.B. 650. Nor has Dr. Augenblick considered, in any respect, the impact of the set–aside requirements imposed by H.B. 412. (Augenblick Tr. 958)

Dr. Augenblick had conducted no study to determine the effect of the reduction in the base cost from his recommendation to actual funding amounts provided by H.B. 650 and H.B. 770 for fiscal year 1999. Notwithstanding that lack of information, Dr. Augenblick was prepared to opine that, in his judgment, it was reasonable. (Augenblick Tr. 928–29)

The Court gives all of Dr. Augenblick's opinions little weight regarding H.B. 650 and H.B. 770, to wit, educational programming in the State of Ohio.

### 2. Cost–Of–Doing Business

The phase in of the cost-of-doing business factor discriminates against high cost school districts because those districts are not getting the full amount they would have gotten but for the fact that they are faced with increased cost pressures. (Klein Depo. 67)

### 3. No Adequate Adjustments for Districts That are Not "Pure"

Under Dr. Augenblick's methodology, the demographics of the schools that survive the various screens does not matter. According to Dr. Augenblick, the 102 "effective" districts identified under his methodology are not designed to be representative of all the districts in the state, but only "all of the districts that meet all of the criteria." (Augenblick Tr. 747) Of the districts which meet all of the criteria, Dr. Augenblick testified, "You really want them to be pure. [These are] supposed to be the districts that have the easiest time, in a sense, of providing education services." (Augenblick Tr. 748)

Augenblick testified that for those districts that are not pure and who have "problems that we are going to go back and adjust for later," he would find ways "to put back in all of the things that we took out in developing this basic spending level," such as categorical funding for special education or DPIA. (Augenblick Tr. 748) So, for example, for those many districts who spend well above Dr. Augenblick's base cost number (before even considering the legislative reduction of that number) and who do not meet 17 of the 18 performance criteria, Dr. Augenblick believes those districts which are not pure and which have "problems" will be "adjusted for later," through categorical spending.

Dr. Augenblick acknowledged that the reason he did not care about large cities being excluded from his analysis was the belief that the adjustments for such things as cost-of-doing business, special education, DPIA and transportation adequately responded to the additional needs of the large cities. He acknowledged, however, that if those adjustments were inadequate, then the funding in all respects for those large city districts would be inadequate. (Augenblick Tr. 959–60)

The Court finds, however, that there was no evidence presented to the Court as to how categorical funding under H.B. 650 and 770 materially assists those districts that do not "have the easiest time." (Augenblick Tr. 959–60) There is no increase in funding of gifted education. (See Gifted, *infra.*) Vocational education funding is actually decreasing. (See Vocational Education, *infra*) As to DPIA funding, even if one ignores the additional mandated costs of all-day kindergarten and class size reduction, such funding is targeted only to a limited category of pupils, and even then only to a limited number of schools who qualify.

For example, in FY99, only 105 school districts will qualify for all-day kindergarten DPIA funds because they have a DPIA index of 1 or more. (State's Exh. 82) Only 190 districts have a DPIA index of .60 or greater, qualifying for DPIA funding for class size reduction. (*Id.*) Even for those districts that are eligible to receive this funding, the funding is directed only to grades K through 3. Moreover, the DPIA funding for safety and remediation is based upon a formula that relies upon each district's DPIA index and an ADC headcount. Thus, for those students in grades 4 through 12 who do not live in poverty and who are not special education students, there is no additional funding based on them. Accordingly, the Court finds Dr. Augenblick's assumption that the State would provide additional funding in categorical items for the districts that are not "pure" and which have additional problems is illusory.

G. Special Education

1. Unit Funding Prior to FY98

a) Unit Funding Was Inadequate

Prior to the changes brought about by H.B. 650, funding for special education had been determined on a "unit" basis. A special education unit produced approximately $40,000 depending on the training and experience of the individual teacher and the type of unit. There were circumstances in which the value of the unit funding produced a lesser amount of revenue than the district would receive without the unit, counting handicapped pupils as part of the Average Daily Membership. (Cohen Depo. 56–58)

The Ohio legislature has not addressed the State minimum teachers' salary schedule since the early 1990's. In essence, unit funding, which was based on the State minimum salary schedule has been stagnant since that time. (Osborn Depo. 53–54)

During the period from 1984 to 1995, special education was underfunded in Ohio by approximately $198,000,000. The $198,000,000 represents the amount by which funding for special education fell below the level of funding for non-special education. (Driscoll Depo. Exh. 5; Driscoll Depo. 76–77)

Dr. Osborn testified before the House Finance Committee in 1997 regarding the fact that the value of units has not kept up with increases in basic aid. By reviewing the number of years of experience and training of teachers, Akron City Schools selectively turned back approximately 80 to 85 units and in so doing increased their basic aid amount by approximately $1.2 million in State aid. (Osborn Depo. 77) The problem with unit funding was that the rate of increase in unit funding has not kept up with the increases in basic aid since 1985. (Osborn Depo. 79)

### b) Number of Units Was Inadequate

There were also a large number of teacher units that were not funded in Ohio over the years. Districts were using either Title VI–B federal funds or local dollars to fund those units. (Osborn Depo. 79–80) Requests for approximately 1010 units could not be funded by State unit funding in FY96. The number of unfunded unit requests continued to rise each year with the number for FY98 at approximately 1170. (Osborn Depo. Exh. 8, p. 6)

The Putnam County Educational Service Center did not request additional units that were needed for supervision because those units are a last priority for funding. Additionally, the value of a unit was less than the funding received if the children were counted in basic aid, so districts would lose money by taking a unit. Essentially, the only units that were requested by districts would be MH classrooms where the teacher to pupil ratio would be one to six or eight students. (Osborn Depo. 141)

For FY98, educational service centers received an average of $9,460 per pupil in State aid for handicapped pupils educated in Educational Service Center programs exclusive of any excess costs paid by the school district of residence. (Payton Depo. 62–63) (Shams Depo. Exh. 2; Shams Depo. 23)

### 2. H.B. 650 Funding for Special Education

Of the additional funding provided by H.B. 650 for FY99 over FY98, $150,761,-000 is attributable to increases in funding for special education for school districts, ESCs, and other entities such as county boards of mental retardation and developmental disabilities (MR/DD). (State's Exh. 64, p. 3)

After application of the cap, the amount of additional funding for special education in FY99 over FY98 to school districts and ESCs is $125,536,000. (State's Exh. 64, last page)

Between FY98 and FY99, State funding for special education to school districts and ESCs increased from $159.36 million to $184.59 million. This increase is approximately $125 million, or a 23.4 percent increase. Between FY98 and FY99, other line items that pertain to special education show an increase from $537.53

million to $663.065 million, an increase of $25.225 million or a 15.8 percent increase. Some of these line items do not benefit school districts or ESCs, such as MR/DD and Institution Funds, MR/DD transportation, and MR/DD Vehicle Purchase. The grand total increase between FY98 and FY99 is the two categories combined is approximately a $150.76 million increase, or a 21.63 percent increase. (State's Exh. 64, p. 3)

The press release of the legislative leadership following the passage of H.B. 650 announcing an appropriation of $942 million for special education, resulting in a $304 million or a 47 percent increase for special education (State's Exh. 8) was erroneous. (State's Exh. 64)

3. No Cost Studies Exist Regarding Special Education

There are no substantial cost studies on special education in Ohio. (Osborn Depo. 21)

Dr. Cohen has not conducted any study or analysis to determine whether special education funding pursuant to H.B. 650 is adequate to meet the needs of special education pupils in Ohio, nor has any such analysis been conducted with respect to the DPIA or foundation formulas in H.B. 650 and 770. (Cohen Depo. 444–46)

In response to the concern that Ohio did not have any cost data on special education, Dr. Osborn volunteered Putnam County to John Herner, Director of the Division of Special Education, Ohio Department of Education, for data gathering so that the cost of special education could be shown and the value of the money spent on special education could be shown. However, the study fell by the wayside. (Osborn Depo. 68–69) With data from the Putnam County ESC, the gross cost by category of special education student can be computed by dividing total costs by the number of students to obtain the cost by program. (Osborn Depo. 70–71)

In his 1994 report for the Ohio Department of Education on moving from a unit funding system to a per pupil based funding system for special education, Dr. Fleeter could not obtain cost data for special education. He could not put together by category of disability expenditures of local, state, or federal funds. (Fleeter Depo. 6, 61) Dr. Fleeter's analysis in 1997, which was attachment 13 to John Augenblick's report, again, relied upon no actual special education cost data. (Fleeter Depo. 99; Fleeter Depo. Exh. 1, Attachment 13)

Dr. John Augenblick indicated that he was not provided with enough actual cost data to do a cost base analysis of special education. He found that speech only students, were not statistically significant in his study. These students

number between 30,000–40,000 and are served by over 200 speech therapists representing over $20–$30 million in State funding. (Osborn Depo. 67)

Apart from involvement of Department of Education staff and work being done by Dr. Augenblick, Dr. Goff was not aware of any work having been done by the Department of Education to determine the actual cost of providing educational programs to handicapped pupils. (Goff Depo. 159)

4. Development of Special Education Weights

Dr. Howard Fleeter was charged with taking Dr. Bruce Gensemer's regression analysis and interpreting it differently than the way it came out the first time. (Fleeter Depo. 58) Dr. Fleeter did not run the data, and he never had any of the data. He just had conversations with the people who did have the data. (Fleeter Depo. 98, 106)

A big assumption of Dr. Fleeter's regression analysis was that expenditures were reflective of an adequate education. (Fleeter Depo. *95*, 124) If the reality is that, on balance, most of the students were not getting an adequate quality education, then the results will be numbers that are too low but will not reflect that they are too low. Dr. Fleeter did not have any information that the FY96 expenditures upon which the regression analysis was based were adequate. (Fleeter Depo. 124–25)

Dr. Fleeter admitted that school districts are not free to spend as much they desire. As a result the regression produced coefficients that are smaller than they otherwise would have been. (Fleeter Depo. 125–26)

Out of Dr. Fleeter's analysis of a regression run by other persons came the recommendation for the three special education weights. Dr. Augenblick's report stated that the use of three groups or weights for special education was an informed policy decision. Dr. Fleeter testified that the use of three weights was a team decision that was "an artifact of what came out of the regression analysis, ... it was just something as everyone talked about this, you know, this is something that will work, does it make any difference? No. Okay. Then if it's simpler, let's go ahead and do it. That's my sense of how that decision got made." (Fleeter Depo. 144–45; Fleeter Depo. Exh. 1)

The regression analysis was an estimate of what districts were expending in various categories of expenditures. Dr. Fleeter testified, "If it costs much more to educate an LD kid, then what you would expect would be that districts with a high percentage of LD kids would see a blip in their expenditure patterns, and the same for any of the other specific factors which would make it more costly for a district to provide an adequate education." (Fleeter Depo. 61–62)

The analysis was undertaken without any particular cost data on special education. (Fleeter Depo. 99) The analysis did not include any data about students that were served in special education programs in an educational service center. (Fleeter Depo. 100)

All of the districts in the state were included in the regression analysis except four. (Fleeter Depo. 64–66) If none of the districts was able to have expenditures that reflected an adequate education program, then the regression results would reflect something less than adequate. (Fleeter Depo. 62–63) The regression data looked at FY96 expenditures of districts. (Fleeter Depo. 60)

Dr. Payton was not aware of any study having been done by the Department of Education that would indicate that the weights reflected in the H.B. 650 formula provide an amount sufficient to pay the cost of providing special education programs for handicapped pupils. (Payton Depo. 55)

5. Problems and Concerns About Special Education Funding Under House Bills 650 and 770

a) The Move to Per Pupil Weighted Funding for Special Education

H.B. 650 eliminated unit funding for special education programs and replaced it with two streams of revenue. The first stream is that which the district receives as the result of counting all handicapped pupils in the foundation formula; thus, for FY99 a school district will receive $3,851 for each handicapped pupil as a result of including pupils in Average Daily Membership (ADM). (Maxwell Tr. 1377) The second stream of revenue for special education results from "weights" assigned based on the nature of the handicapping condition. There are three categories of special education students with two basic weights. The amount of money received is the product of the weights times the foundation amount ($3,851) times the state aid ratio. (Maxwell Tr. 1378) The state aid ratio is based on how much state basic aid the school district receives as a percent of the foundation level. (Maxwell Tr. 1378)

The two weights used for three categories of special education are .22 and 3.01. (Maxwell Tr. 1379)

After H.B. 650 was enacted, Dr. Jan Osborn could not find an answer to his question as to who arrived at the weights for special education. He asked a number of the legislators regarding the source of the weights including Senator Robert Cupp, Craig Burford, Rep. Ross Boggs, Rep. Vein Sykes, Rep. Darryl Opfer, Sen. Robert Gardner, Rep. Randy Gardner, Rep. Tom Johnson, staffers of the legislature, including Liz Connolly, Tim Keen, Dave Brunson from LBO, and Sue Klar from LSC. (Osborn Depo. 53–61) Dr. Osborn also met with John Herner, Director of the Division of Special Education, Ohio Department of

Education, staff member George Chowry [*sic*], Superintendent John Goff, Assistant to Superintendent James VanKeuren, Nancy Eberhart, Barb MacDonald, Dr. Matt Cohen, John Rochester, legislative liaison for the department of education, Paul Marshall, Dana Shams, and Jim Payton. In none of these meetings was Dr. Osborn able to determine the origin of the weights that were included in H.B. 650. (Osborn Depo. 56–61, 64–66)

Under the pre-H.B. 650 funding process, special education was unit funded and the money was paid directly to the educational service centers. After H.B. 650, special education was funded on a weighted basis and paid directly to the districts. The districts could then contract with the educational service centers for special education services. While the service relationship between the districts and educational service centers did not substantially change, the effect of this on paper was to make it look as though the districts received more money. (Connolly Depo. 51–52; Depo. Exh. 6)

The elimination of unit funds and moving handicapped students into the basic aid formula is a one-time event occurring in FY99. In years after FY99, the only additional funding a school district will receive by reason of providing educational services to a handicapped student is based on the weight. (Maxwell Tr. 1380)

By moving special education students into the ADM count in FY99, some districts, but not wealthy districts will receive additional funding in FY99 over the unit funding system. For FY00, however, special education students will not be new students in the ADM count and, thus, there will not be the increased level of funding for special education between FY99 and FY00 as there was between FY98 and FY99. (Osborn Depo. 94, 108)

In the change from unit funding to a pupil weighted funding formula for special education students, a misperception is that $3,851 will be received by each school district for each child who is on an individualized education program (IEP). The reality is that many of these students were already counted in basic aid. Speech only students are already counted in basic aid. Also, children who are identified as learning disabled, but only receive instruction from a small group instructor or tutor, are already counted in basic aid, under the unit funding system. Between 60,000 to 70,000 children out of the 226,000 children in IEPs were already counted in the basic aid count before FY99. (Osborn Depo. 41–42)

Amounts included in Payton Exhibit 4 under the column titled, "Formula Due To Special Ed ADM FY99" represent an estimate of amounts of money that school districts would receive based on pupils that were in special education units in FY98 but that would be counted in the formula ADM and receive formula aid in FY99. A comparison of special education funding for FY98 compared with FY99 is represented in columns in Payton Deposition Exhibit 4 titled, "Total Special Ed FY98" compared with "Total Special Ed FY99." (Payton Depo. 65)

Although the "unit" funding system was dissolved in H.B. 650, H.B. 770 requires that school districts honor required pupil to teacher ratios found in the rules for the education of handicapped children in the Ohio Administrative Code, often referred to as the "blue book." (Osborn Depo. 93) Thus, the required low teacher to pupil ratios and the personnel costs for special education remain unchanged.

### (1) Arbitrary Reductions By the Legislature Overview

Mr. Brunson prepared a handout for a group of legislators to inform them of the Augenblick plan and alternatives to that plan. (Brunson Depo. Exh. 18) This handout was issued sometime in the winter of late 1997. (Brunson Depo. 122) A chart contained in the handout shows the weights recommended by Dr. Augenblick for the different levels of handicap, the value of those weights at a base cost level of $4,269 (the base cost recommended by Dr. Augenblick), the number of pupils in each category as of fiscal year 1997, and the total cost of each category as well as the total cost of all categories. This chart illustrates the total cost of special education using the Augenblick weights and methodology is $1.226 billion. Of that amount, approximately $733 million is the base cost of each pupil before applying the weights and approximately $493 million is the cost of the weights. The Court observes that Mr. Brunson reported that under Dr. Augenblick's recommended methodology, the most severe category of handicap would have a cost of $93,961 per pupil and that there were 492 such pupils in fiscal year 1997, for a total cost of $46 million.

Dr. Augenblick's methodology led to a base cost number of $4,269 per pupil. (Russell Depo. 67) The Legislature adjusted the methodology, which resulted in the legislatively determined base cost of $4,063 per pupil. (Russell Depo. 67–68) As to special education, Dr. Augenblick recommended 3 separate weights for 3 categories of handicapped, but the Legislature enacted 2 weights to be applied to the 3 categories.

As to the most severe category of handicap, H.B. 650 did not apply Dr. Augenblick's recommended weight of 21.01, but applied a weight of 3.01 and then provided that if a district can show a cost of such a student in excess of $25,000, the State would pay half of that amount above $25,000. (Brunson Depo. 126; Davidson Tr. 167) The Legislature's lowering of the weight for this third category is compounded by its lowering of the base cost upon which the weight is multiplied. (Russell Depo. 66–68)

The Legislature modified Dr. Augenblick's approach as to how the weights are actually calculated, moving from a true weighted per pupil formula to a modified formula, which has the result of lowering how much money a school district receives for special education students. (Russell Depo. 68–69) Additionally, by

the Legislature's reducing the base cost number for fiscal year 1999 to $3,851, it further reduced the value of the special education weights creating an even greater shortfall. This is then compounded by a 10% cap on the calculation. The special education weights are further affected with the problem of phantom revenue, which is duplicated in the calculation for special education students. In essence, Dr. Augenblick determined what he thought would be an appropriate method of determining an appropriate level of funding for special education and the General Assembly then:

- Dramatically lowered one of the recommended weights.

- Altered the weighting system itself, changing it from a true weighted formula to a modified weighted formula, which had the effect of lowering the funding.

- Lowered Dr. Augenblick's recommended base cost, thus further lowering funding for special education which was tied to the base cost.

- Lowered the base cost amount even more by phasing it in, thus further lowering the amount of funding for special education not only at the base cost level, but on a compounded basis by virtue of the weights.

- Infected the calculation of special education funding with phantom revenue, which will further inhibit growth in special education funding. This problem existed in Dr. Augenblick's methodology and was not altered by the Legislature.

- Subjected special education funding to the 10% or 6% caps in H.B. 650, which can only lower and not increase special education funding.

All of this leads to the conclusion that the system of funding for special education students is not a cost based system. (Russell Depo. 69–71)

For example, as to the most severe category of handicapped, funding under H.B. 650 with a weight of 3.01 creates a gap of approximately $9,000 before the district can seek additional funds from the State. (Brunson Depo. 127–28) The district would incur this additional $9,000 cost as to such a student and then would incur its percentage of the cost above $25,000, which Dr. Augenblick's methodology estimated could be up to almost $94,000. (Brunson Exh. 18) Thus, if the State is paying only 50% of that amount, (Davidson Tr. 167) the district would be bearing a cost burden of over $43,000 for that one student ($9,000 gap before $25,000, plus one-half of $68,961 [difference between $25,000 and $93,-961]), plus its share of the weights. If the district pays 50% of the weights, or $5,795, its share of the cost for this student is almost $49,000.

Deborah Gavlik of the Legislative Budget Office presented a power point presentation for a legislative group. (Brunson Depo. 136) Her presentation stated in part:

"Problem with using weights for special, vocational, and gifted education in the basic aid formula

"• Full cost for these additional students will be borne by the State

"• Additional cost over what State currently pays estimated at $600 million for special education"

(Brunson Depo. Exh. 21, p. 1)

### (2) Reduction of Funding for Weights by State Aid Ratio

Dr. Goff understood the weighting for special education pupils recommended by the School Funding Task Force to be a weight represented by multiplying the foundation amount for each pupil times the additional weight ascribed to that pupil. (Goff Depo. 156)

The weighted formula in H.B. 650 builds in a local and a state component. Thus, a .22 weighting is partially funded by state funds and partially funded by local funds. (Strawser Tr. 1797–98)

The illogic of a local component for a special education weight is illustrated by the testimony of Ernie Strawser, Treasurer of the Jackson City Schools: "So if one regular student moves out of the district, mom or dad transfer, and in the same house a new student moves in, and that student is LD, property taxes didn't go up, you see? The local dollars did not go up as a result. We've simply traded one student for another. So you're going to get the $3,851 from the state. That stays the same. But what happens to the weight? The weight is saying, well, 35% should come from local property taxes. There was no increase in local property taxes. The reality is that with that additional special education child coming you have additional costs and you still have the continuing regular classroom costs." (Strawser Tr. 1797–98)

Wealthier school districts will have a lower state aid ratio and poorer districts will have a higher state aid ratio. (Maxwell Tr. 1378) The application of the state aid ratio will cause 32 school districts to receive no additional funding for handicapped pupils because of their relative wealth. (State's Exh. 62)

Statewide, the use of the state aid ratio results in approximately $230 to $250 million less funding for special education than would otherwise have been the case had the weights been applied to the foundation formula without the use of a state aid ratio. (Maxwell Tr. 1389)

### (3) Sufficiency of the Special Education Weights

Under a concept called inclusion, in which services are taken to the child in his class as opposed to a child going to a program or service, the special education costs are essentially those additional costs of personnel and related services over

and above the regular education program in which the child in participating. (Osborn Depo. 82)

A special education student in reality is being served both in the regular classroom and in a pull out situation generally. (Strawser Tr. 1794) The weight for a special education pupil should fund the pull-out or extra services. (Strawser Tr. 1794–95) The reality is that a district must reserve a slot for a special education child in the regular education setting and add a teacher to serve them for their special education needs. (Strawser Tr. 1797)

The basic aid amount enacted in H.B. 650 is substantially lower than the amount recommended by Dr. Augenblick, and, thus, the amount provided for special education through the weighted formula is lowered. (Osborn Depo. 127–128) Further, the basic aid amount is not adequate for Putnam County. (Osborn Depo. 128)

### a. Multiple of .22 is Insufficient

The weight of .22 is insufficient, because if a district is *50%* State funded and 50% funded by local revenue, the district would receive less than $500 to provide special education services for a child classified as learning disabled (LD). The cost of a teacher is easily over $30,000. At $500 per student, a district would need 60 students to generate enough State funding to pay for one teacher if it was 50% State funded. If you consider the ratio of teacher to pupil by law, the district is not supposed to have over 16 LD pupils per teacher. Thus, the .22 weight is terribly underfunded. (Osborn Depo. 94–95)

In the example set forth by Mr. Maxwell, the identification of ten additional pupils as being handicapped pupils at the .22 weight will produce $4,369. Based on Mr. Maxwell's experience as Holmes County Superintendent in 1993, he could not provide an adequate education program for a learning disabled pupil for $436.99 per year. (Maxwell Tr. 1381–84; Pl. Exh. 466, p. 16)

In comparing the difference between the value of weights for special education pupils as provided in H.B. 650 with the value of those weights if they were added to the foundation formula, a school district would have received an additional $5,000 based on the weights assigned to ten developmentally handicapped pupils (weight of .22) excluding adjustment for the cost-of-doing business factor. (Maxwell Tr. 1388–89; Pl. Exh. 466, p. 14)

### b. Multiple of 3.01 is Insufficient

When attempting to calculate the cap in February 1998, the Department of Education took the total amount of money going to ESCs and divided that by the number of students receiving direct services from ESCs and came to an average of approximately $9,400 per Level II student. (Osborn Depo. 95) In FY99, a 50%

State funded district would receive $3,851 \times 3.01 \times 50\%$ or about $5,796 per Level II student to provide the special education service for that child. (Osborn Depo. 94–95)

The Putnam County Educational Service Center has estimated the approximate cost of providing services to a NIH student at close to $12,000. The Level II weight will result in significant local costs for school districts to educate MH children in Putnam County. (Osborn Depo. 144–45) The Putnam County Educational Service Center will spend approximately $36,000 on a teacher, including retirement and health benefits. The Educational Service Center has six MH classes and seven classroom aides at an average cost of at least $18,000. Additionally, the Educational Service Center has occupational therapy costs, facility costs, computer costs, and curriculum materials costs. (Osborn Depo. 145)

For Level III students, the average cost for a child in a county MRDD program is approximately $28,000 per year. There are about 4,000 children in those programs, and they would be the first 4,000 children to qualify for Level III reimbursement from the State. (Osborn Depo. 96)

c.   Stability and Sufficiency of Special Education Funding

Osborn Deposition Exhibit 2 shows the count of special education students by handicapping condition in the 1996–97 school year and for the 1997–98 school year and shows there were fluctuations up and down between those two years. The overall number of special education students declined by three, but the number of multiple handicapped students increased by three. (Osborn Depo. 33, Osborn Depo. Exh. 2)

There is no direct funding for the category of disability called speech only. There are about 43,000 pupils in that category. (Osborn Depo. 17) One of the concerns expressed by Mr. Shams but not rectified by the General Assembly was the absence of funding for handicapped pupils receiving speech services. (Shams Depo. 101–02)

There is no cost-of-doing business factor counted in the weighted side of special education funding. (Maxwell Tr. 1379; Payton Depo. 96)

School districts bear the costs of impartial due process hearings (hourly rate of impartial hearing officer, costs of transcripts and court reporters in addition to their own fees and costs and, if parents prevail, parents' attorney fees and costs) but they receive no State money for these expenses nor can they use federal IDEA funds for these expenses. (Osborn Depo. Exh. 8, p. 14)

A concern with H.B. 650 special education funding is the interaction with the cap, whereby districts do not receive the full funding of the formula. (Osborn Depo. 110)

A press release from the legislature indicated a 47.7 percent increase in special education funding moving from $642 million to over $900 million, which would indicate a $300 million increase. (See State's Exh. 8) That amount of money, however, was not provided for special education. (Osborn Depo. 23–24) (See, also, State's Exh. 64) As of July 17, 1998 (the time of the deposition of Jan L. Osborn) it was still unclear whether Ohio would actually maintain its effort in dollars provided for special education for FY99. The State must maintain the current amount of money or more than was expended for the previous fiscal year in order to continue receiving federal funds. (Osborn Depo. 17)

### (1) Related Services

Dr. Jan Osborn could not find anyone who would take ownership for indicating that 1/8th of the cost of special education should be provided for related services as required by H.B. 650 and 770. In a preliminary calculation for Putnam County, about 44% of the special education budget went for related services, if you include classroom aides or assistants. The 1/8th of the total special education cost is not high enough. (Osborn Depo. 57–58)

### (2) Mislabeling of Children

If a district could secure more funds under the weighted pupil formula for a multihandicapped (MB) student, they would have a tendency to identify the child as MH as opposed to developmentally handicapped (DH). With the weight of .22 times the basic aid and for a 50% State funded district, the result would be a little over $500 of State funding for the special education weight. For the same student under NIH, the $3,851 times 3.01 times 50% (for a 50% State funded district) the district is thousands of dollars ahead by labeling the child MH. (Osborn Depo. 20, 86)

Changing of labels for disabled children can and is done. While unit funding encouraged less restrictive placements, the weighted per pupil funding encourages more restrictive placements. (Osborn Depo. 87–88)

An incentive exists for districts to relabel children who are speech only as learning disabled (LD) to obtain additional funding to provide for their services. (Osborn Depo. 89)

### (3) Neutral Placement

The current weighting system for special education may cause misplacement of children in order for school districts and other entities to receive more funding.

(Osborn Depo. 17) Under H.B. 770, children placed with county boards of MRDD are not affected by any local cap and are calculated outside the chargeoff, which means that the MRDD placed children will receive the full $3,851 times the weight for FY99. Funding for pupils placed in local school districts is subject to the chargeoff, state aid ratio on the weight, and caps. Because more funding is thus provided for children placed in segregated facilities, such as county boards of MRDD, than with placement in a local school district, this violates the neutral placement requirement of the Individuals with Disabilities Education Act of 1997 (IDEA '97). (Osborn Depo. 17–20, 90–91)

Students in MRDD facilities have disproportionate amounts of funds in relationship to their counterparts in the public schools. Although some believe that this is somewhat negated by capping the number of children that would be taken to the county MRDD programs, which cap was put into effect in H.B. 770, the fact remains that the funding is disproportionate. (Osborn Depo. 97)

If a parent would request that a child move to a public school, the public school would not have the level of support from the State to provide for the needs of the child. The local school district would have to use more local funds to provide the same services. (Osborn Depo. 98)

### (4) Funding for Preschool Handicapped Pupils

When special education preschool unit requests are denied, preschool children are not counted in basic aid and school districts receive no State money to serve these children. Approximately 18% of identified preschool children with disabilities are unserved in Ohio. Some school districts are reluctant to identify preschoolers with disabilities because the districts lack the funds to serve such children. (Osborn Depo. Exh. 8, pp. 6–7)

### 6. Educational Service Centers and Special Education

The Putnam County Educational Service Center serves nine local school districts, including Columbus Grove, Continental, Jennings, Kalida, Leipsic, Miller–City, New Cleveland, Ottawa–Glandorf, Ottoville, and Pandora–Gilboa. Of the nine local school districts in Putnam County, five are in the lowest wealth quartile in the state. Seven districts are ranked in the poorest 291 districts and are therefore eligible for State equity funds. (Osborn Depo. 25–26; Osborn Depo. Exh. 8, p. 2) The Putnam County Educational Service Center offers classes for multi-handicapped, severe behavioral handicapped, developmentally handicapped, and preschool handicapped children. The Educational Service Center provides a supplemental service teacher, gifted education teachers in three locals, gifted education coordinators for all nine locals, 1.6 special education supervisors throughout the county, work study coordinators, speech therapists,

and a school psychologist. The Educational Service Center also provides services in general education, including general supervision K–12, a technology coordinator, a preschool program in six locals, an early intervention coordinator, and a substance abuse educator. The Educational Service Center also operates over twenty different grants. It provides programs and services for all nine locals. The Educational Service Center employs about 78 people, with most all of the employees out providing services in the various local school districts. The Educational Service Center has four employees that could be considered administrative: treasurer, assistant to the treasurer, administrative secretary and superintendent. (Osborn Depo. 26–27) The Putnam County Educational Service Center is a fiscal agent for a countywide insurance consortium, which involves managing approximately $1 million per year. The budget of the Educational Service Center is around $4 million per year. (Osborn Depo. 43–44)

The sources of funding for the Putnam County Educational Service Center include regular education funding in the amount of $32 per student and reimbursement based on a certain number of supervisors. In FY98, the Educational Service Center received unit funding for special education, and the Educational Service Center charged back costs beyond State funding for special education to the nine locals. For FY98, the charge back probably exceeded $400,000 to the locals for unfunded special education costs. (Osborn Depo. 45–46)

When Educational Service Centers do not charge back to local school districts or constituent districts 100% of the unfunded costs, the Educational Service Center must take those costs from their general fund, and, thus, from other programs. (Osborn Depo. 116–17)

The Putnam County Educational Service Center provides services for multifactored evaluation or parts of those evaluations which are required for every child for initial placement in special education and at least every three years for each student who is already placed (who has an individualized education program [EP]). These evaluations must be performed by a multi-disciplinary team. Most of the disabilities require that the child be assessed with a cognitive instrument that only a school psychologist is qualified to administer. The areas assessed vary from handicapping condition to handicapping condition, but generally the cognitive assessment is required for most multi-factored evaluations. (Osborn Depo. 31–32)

a) Mergers of ESCs

The Putnam County Educational Service Center has 7,500 students and the requirement is 8,000 students or an Educational Service Center must merge by the year 2,000. The Educational Service Center has met with four other counties and would have to increase payroll costs of the Putnam County Educational

Service Center by $100,000 to $140,000 to equalize the salary schedules and benefits to the other counties. Mergers do not necessarily decrease costs, but may increase costs without increasing direct services to students. (Osborn Depo. 110)

b) Instability Created By Required Contracts

The move from unit funding to a weighted per pupil formula for funding the education of school age handicapped children was a significant change for ESCs. ESCs were required to go out and secure contracts with the local districts to obtain funding for programs. ESCs had approximately 1909 special education units dissolved, which was approximately $700 million of funding that went directly to ESCs in FY98. That money was placed into the basic aid amount and flowed to school districts in FY99, which had the appearance of increasing the basic aid amount. (Osborn Depo. 55–56)

Requiring ESCs to contract with local districts for special education services results in concerns about stability and quality of employees, and employees question whether they will have jobs. Districts can notify ESCs by March 30th that they no longer want services. ESCs must convince people who can go to higher paying jobs that are more secure that they should stay and work for the ESC. Contracting also presents the problem of compromising educators' positions as advocates for children. When an Educational Service Center presents a more costly program to a district it does not make the Educational Service Center popular with them. The districts are not as willing to come back and contract with the Educational Service Center if the Educational Service Center gives tough economic news or presents higher cost solutions. The political reality is that these pressures weaken programming for students. (Osborn Depo. 113)

7. Special Education Funding in Specific School Districts

The Jackson City School District will receive approximately $90,000 for the 145 students at Category 1 weight of .22. For eight to twelve LD or DH students, the .22 weight would generate approximately $4,400 for the Jackson City Schools. That level of revenue would not fund a teacher for the required 12 to 1 or 8 to 1 pupil to teacher ratio. (Strawser Tr. 1795–96)

In FY98, the Jackson City School District had special education costs of $977,000. The formula for FY99 will provide approximately $450,000 in special education revenue from the State. The Jackson City Schools has a huge unfunded component in special education. (Strawser Tr. 1793) The Jackson City Schools has 145 special education students with 143 of those in Category 1 weight of .22.

In Putnam County, there are five low quartile or low wealth school districts. Under the Department of Education's simulations available as of July 16, the available dollars were not significant enough to help pay for the increased cost or even the current cost of special education. (Osborn Depo. 17–18; 143–44)

Under H.B. 650 and H.B. 770, the increase for Miller City in Putnam County is approximately $10,000 in new revenue. They have thirty Level I special education students. One of their special education students is in a NIH private residential setting and on his last IEP the parents requested a full-time attendant during his school time. The increased cost for the MB program due to the facilities needs for modular units at $231,000 is roughly $2,000 per student just for facilities space. Miller City has eight identified MB students. Miller City will need to take existing dollars or dollars that were going for other programs to pay for the mandated programs for children with special education needs. (Osborn Depo. 143–44)

Due to the legislative changes made in funding special education, Dawson–Bryant must contract out more services to other districts or to the Educational Service Center for personnel and provision of special education evaluations and programs. (Sites Depo. 53–54) The amount that Dawson–Bryant receives in special education funding does not cover the cost of educating special education students. (Sites Depo. 68)

The Plaintiff Dawson–Bryant Local School District will expend $200,000 more for special education services over the State funding provided by the weighted per pupil formula in FY99. Thus, the district will use $200,000 out of its general fund for special education. That would be an additional five classroom teachers that could be employed in the regular education program. (Washburn Tr. 1941–42)

In the area of special education, Groveport Madison had a deficit of over $1.6 million. That is, its total expenditures relating to special education exceeded total receipts, including income from State funding, by that amount. (Barr Depo. Exh. 18; Barr Depo. 193–94) The district has not calculated and as of the close of evidence in this matter, had not received final information as to its special education funding for fiscal year 1999. The Court would observe, however, that unless there were a dramatic change in the district's special education population, State funding would have to increase by over 100% to erase this deficit, which is statutorily impossible by virtue of the 10% cap. Accordingly, the evidence indicates that even under the new formula of funding for special education, it appears that Groveport Madison will continue to provide special education programs at a deficit of over a million dollars.

Lima City School District has a high percentage of students identified as special education students and also has a high percentage of students placed by

Courts outside the district. (Buroker Depo. 49) While the district may receive increased special education funding, the fact that its overall funding increase is subject to a 10% cap indicates that it will not receive sufficient funds to pay the actual cost of special education. (Buroker Depo. 53–54)

H.B. 650 and H.B. 770 result in a significant drop in special education funding for the Strongsville City Schools. Increasingly, dollars that would have been discretionary or earmarked to support general education or other programs will have to be diverted to special education to maintain services in those areas. (Grady Depo. 76) Aid to the Strongsville City Schools for special education will drop from more than $1 million to approximately $250,000. It takes additional dollars each year to maintain the same level of service for programs in the Strongsville City Schools. (Grady Depo. 77–78)

Wealthy districts in Ohio may receive zero or very little in the way of special education funding while facing tuition costs of between $12,000 and $15,000 per student. (Grady Depo. 78)

The District spends $20 million on special education each year, and the cost is going up a million dollars every year. The district, however, receives only $6 million from the State to support special education programs. Factoring all the money that is spent on special education in with regular education costs will result in a higher dollar amount compared to a suburban school district that might have better test results than Dayton does. (Williams Depo. 39)

The Chillicothe City Schools were projected by the Ohio Department of Education to receive a .82% increase (8/10ths of 1%) or roughly $42,000 for FY99 over FY98. However, the district had increased special education costs in excess of $200,000 that was required to be paid to the Ross County Educational Service Center (ESC) as a result of the loss of unit funding. (Overly Depo. 55–56)

8.  Conclusions Regarding Special Education

The special education funding under H.B. 650 and 770 has no relevance to the cost of educating special education students. (Strawser Tr. 1862)

Despite the Supreme Court's mandate to move away from local funding for education, Ms. Connolly highlights in her summary of H.B. 650 and 770 that the districts historically have provided local revenue funds for special education related services, and are expected to continue to provide at least that same amount of funds under the new legislation. (Connolly Depo. Exh. 11)

The Court finds that the regression analysis of Dr. Fleeter was based on inadequate expenditures. For that reason and in addition to other findings of this Court, the Court further finds that the special education weights have no reliable basis.

Dr. Fleeter testified that if the base cost or foundation level is too low, then the excess cost or weight adjustment will also be too low. (Fleeter Depo. 136) The Court finds that the foundation level is inadequate and thus the adjustment for special education is likewise inadequate.

Dr. Jan Osborn testified, "I have had twenty-six years of contact in one county in special education and it has been my experience that during tough economic times one of the first areas they look to decrease funding to is special education.... I have lived through two major recessions at that office at that time and experienced districts cutting programs with us. We are under the best economic setting in American history and we are questioning whether special education is appropriately funded by the State of Ohio. I cringe at the thought of what will happen if we have a major recession." (Osborn Depo. 112) The Court finds this testimony of Dr. Osborn credible and further finds that the funding for special education and other education programs to be dependent upon economic conditions.

The Court further finds that the Legislature modified Dr. Augenblick's approach as to how the weights are actually calculated, moving from a true weighted per pupil formula to a modified formula, which has the result of lowering how much money a school district receives for special education students. (Russell Depo. 68–69)

The Court also finds, as stated above, that the use of the state aid ratio results in approximately $230 million to $250 million less funding for special education than would otherwise have been the case had the weights been applied to the foundation formula without the use of a state aid ratio. (Maxwell Tr. 1389)

H. Gifted

Thirty-four states require services for identified gifted children. Ohio requires identification of gifted students but does not require service or even notification to parents of identification. (Grady Depo. 49)

Approximately two-thirds of identified gifted students in Ohio do not receive appropriate educational services. (Grady Depo. 25)

1. Identification and Service of Gifted Pupils

There are additional costs beyond basic education for gifted students. Some of these costs are items that need to be provided for all students, such as identification (districts should be assessing all of their students and identifying strengths and weaknesses) and professional development for regular education teachers who would be working with gifted children. Additionally, there are increased personnel costs for gifted programs, increased costs for materials and

for specific professional development as well as miscellaneous items such as transportation to programs. There is also some additional cost for supervision because districts need to have persons who understand the area and are trained in the issues who can administer or supervise these activities. (Grady Depo. 37–38)

Gifted students in Ohio may well be underidentified. (Grady Depo. 28)

The Ohio Revised Code and the Ohio Administrative Code list the criteria for identification of gifted children. (Grady Depo. 29) Each district is required to have a policy regarding the identification of gifted children. The law establishes four categories of gifted children and requires the reporting by the district to the Department of Education of the numbers of identified students, the categories, whether they are served via State funding or local funding or whether they are not served. (Grady Depo. 31) The Ohio Administrative Code is fairly specific on the threshold that needs to be met for identification of a gifted child. (Grady Depo. 33) There is a lack of technical assistance from the Ohio Department of Education in the identification of gifted children. (Grady Depo. 29)

There is a concern in the State of Ohio that with no requirement for service of gifted students, with no professional development, and with low levels of State funding available for gifted education, the regular education classroom could well be considered the most restrictive environment for a gifted student. However, there are a variety of options that can be used to serve gifted students. (Grady Depo. 41)

2. Funding of Services for Gifted Pupils FY91–FY98

The current Department of Education rule for gifted education units calls for fully funding 1,260 units. In 1991, the State had 515 units, and by 1995, the State had only 526 units. Between 1991 and 1995, the State level of funding for gifted education was relatively flat. (Grady Depo. 47–48, 57)

In fiscal year 1996, there was an increase in State funding for gifted units but a corresponding drop in local funding, because the local districts' ability to contribute to providing gifted services was reduced. The State Department of Education had required prior local commitment before forwarding a State funded gifted unit. Thus, for a district that could not afford to put any local money to start the program, it was difficult to secure any unit funding from the State. As districts came into financial difficulty, they substituted State funds for local funding in the years following fiscal year 1996. (Grady Depo. 48)

The overall numbers of identified gifted students in Ohio has remained fairly constant between FY91 to FY97. (Grady Depo. 55–56) The percentage of identified gifted students that are not receiving appropriate or adequate gifted

educational services has also remained fairly constant, and in fact increased from 137,844 in 1991 to 163,535 in 1996. (Grady Depo. Exh. 2) Between 60% and 65% of the total identified gifted population were unserved or were not receiving adequate gifted educational services between FY91 and FY97. (Grady Tr. 56) The following represents the percentage of unserved identified gifted pupils between the years 1991 and 1997:

| Fiscal Year | Percentage |
|-------------|------------|
| 1991 | 62% |
| 1992 | 63 |
| 1993 | 61 |
| 1994 | 61 |
| 1995 | 61 |
| 1996 | 64 |
| 1997 | 62 |

(Grady Depo. Exh. 2)

Even if the 1,260 units recommended by the Ohio Department of Education's rule were fully funded by the State, there would still be approximately one-third of districts in the state that would not qualify for a full unit of funding. (Grady Depo. 57)

In 1997, 41,424 gifted students were served via State funded units, representing just slightly more than 17% of all identified gifted students. In 1994, there was a higher percentage of identified gifted students served than in 1997. (Grady Depo. 46)

3. Funding of Services for Gifted Pupils in H.B. 650 & 770

a) Recommendations for Gifted Funding

Dr. Augenblick's written report indicated that the data was so poor and that there was such little data that a theory or analysis could not be made in terms of a recommendation for gifted education. Dr. Augenblick's verbal testimony to the School Funding Task Force indicated that gifted education should receive zero in supplemental funding. (Grady Depo. 58–62)

Recommendations out of the School Funding Task Force by Budget Director Greg Browning recommended a funding level of approximately $60 million for gifted education. (Grady Tr. 59)

b) House Bill 650

H.B. 650 took the same level of funding that was being provided for services to 41,000 gifted students and split that funding among 170,000 students. The formula as outlined in H.B. 650 was not based on any rational or defensible analysis of actual costs. It arbitrarily capped the number of gifted children that could receive funding at 10% per district. The sole basis of the funding

distributed under H.B. 650 was on district wealth as evidenced by the equalization using the basic aide figure as a part of the formula. Research of the Ohio Association for Gifted Children has shown that the wealth of the district is only one of the factors that can directly affect the cost of gifted services in the district. (Grady Depo. 51)

After the passage of H.B. 650, districts learned what they would be receiving for gifted education on the formula outlined in H.B. 650, and a number of school districts and educational service centers began to indicate they would be laying off people who were working in the field of gifted education. The formula as outlined in H.B. 650 was causing a great number of people to take reassignments outside the field or take an earlier retirement than planned. Specialists in the field were taking reassignments to general education because they feared losing their jobs. Many gifted units are located in ESCs, and reduction of force notices were preliminarily coming out to many teachers and coordinators who offered services through those ESCs. Districts were making plans to eliminate programs and services that in many cases they had offered for decades. (Grady Depo. 52, 64)

When the Ohio Association for Gifted Children, particularly Ms. Ann Sheldon and Ms. Colleen Grady, began advocating for removal of the H.B. 650 per pupil weighted formula for gifted education, the House leadership resisted. (Grady Tr. 64–65)

### c) House Bill 770

Unit funding for gifted pupils continues during FY99. There is no provision for gifted funding beyond that time. (Shams Depo. 45–46)

As a result of the efforts of the Ohio Association for Gifted Children and some legislators who recognized just how detrimental the effects of H.B. 650 would be on the overwhelming number of districts' gifted programs across the state, the funding formula for gifted education in H.B. 650 was amended by H.B. 770. The House Finance Committee, over the objections of the House leadership and the Committee chairman, first approved the change. Under the amendment, units were allowed to exist for FY99, but after FY99, there is no gifted education funding provided for in Ohio. (Grady Depo. 51–53)

H.B. 770 also revised the language of the statute to indicate that the General Assembly "intends to" begin a review and revision of the funding formula for gifted education services in 1999. (Grady Depo. 53–55; Grady Depo. Exh. 3)

The study that H.B. 770 refers to is the study that Ms. Sheldon and Ms. Grady of the Ohio Association for Gifted Children are working on that is funded by a grant through the Ohio Department of Education. (Grady Depo. 54–55; Grady Depo. Exh. 3)

4. Disparity in Gifted Education

Grady Deposition Exhibit 5 dispels the myth that gifted children reside only in wealthy school districts. The majority of identified gifted students in the state reside in districts that are at or below average state valuation per pupil. These districts with the lowest average per pupil valuation, and the lowest average daily membership (ADM) for size of district, were those districts that provided fewer services or no services through State funding. (Grady Depo. 66) The number of districts receiving no State support have smaller ADM and lower per pupil valuation. It is evident that levels of State funding to all school districts for gifted education is inadequate. Gifted students are short-changed by the State no matter what district they reside in, but they will be hurt most if they reside in a small, poorer district. Districts with higher ADM and higher valuation appear to provide somewhat more funding for gifted populations in the districts, but very few districts provide adequate educational opportunities for all of their gifted children. (Grady Depo. Exh. 5)

5.—Need for Gifted Education

When a gifted child enters elementary school, there is often a mismatch between what is being offered to the student and what they are developmentally and intellectually ready to learn. Frequently, improperly served gifted students begin to act out or become discipline problems.

Others completely tune out, and their achievement levels regress not only to the level of their non-gifted peers, but even below that at times, and they can become chronic underachievers. As gifted students get older and the educational fit is even more inappropriate, there are increased incidents of teen pregnancy, suicide, and drop-outs among the gifted population than would be expected. (Grady Depo. 36)

There is a great deal of information and literature on the need for gifted children to have the opportunity to work together. The level of quality of work quite frequently renders gifted students without a true peer group and general population situation. Thus, the opportunity to be grouped together for instruction with appropriately differentiated curriculum increases the achievement of gifted pupils. (Grady Depo. 42–43)

Gifted children receiving gifted programming scored significantly higher on achievement tests over their unserved gifted peers in a review of national studies on the effectiveness of gifted programming. Additionally, gifted children not receiving gifted education services scored lower than non-gifted peers after two years of attendance in a regular classroom setting. (Grady Depo. Exh. 6) Local district data mirrors the results of these national reports. In one Ohio school district, high ability students participating in gifted education programs were

higher than expected while gifted students not participating in gifted education programs scored substantially lower than expected. (Grady Depo. Exh. 6)

When the needs of gifted children are ignored, they are placed at risk for academic underachievement. Studies suggest that gifted children are at higher risks for dropping out, committing suicide, and turning to criminal activities. When systematic public school opportunities for gifted children are denied, those children whose families are unable to offer opportunities outside the public school system are hurt the most. (Grady Depo. Exh. 6)

In its 1996 master plan, which plan is required by Revised Code 3333.04, the Ohio Board of Regents stated that Ohio has been falling significantly below the national average in the number of adults with a college education, and that trend has not changed in the 1990s. The gap not only continues to exist but accelerates. (Grady Depo. 75–75) The Board of Regents found:

"In the 1950s, when participation in higher education began declining in Ohio, it did not signal a serious problem. Per capita income in 1955 was 10 percentage points above the national average, and jobs were plentiful. However, the world has changed dramatically since the 1950s. Employment in steel mills and automobile plants has declined significantly. In the 1980s alone, Ohio's manufacturers eliminated more than 170,000 jobs. New jobs required increasingly greater levels of skill."

The result was that Ohio's per capita income stopped growing in the 1980s and by 1995 had fallen to six percentage points below the national average. This swing of 16 points in per capita income, relative to the national average, equates to a cumulative loss in today's dollars of about $2,500 annually for every man, woman, and child in the state—a total in excess of $27.5 billion.

In part, this decline is related to relatively low levels of educational attainment by Ohioans.

National economic figures show that although gains in earnings for college graduates are not as rapid as they used to be, they are increasing while earnings for those without college education are declining significantly.

A recent national study indicates that about $590 is added to the state's per capita income for every one percent gain in the percentage of the population 25 years and older with baccalaureate degrees. For Ohio, this means that only a one percentage point gain in the number of adults with baccalaureate degrees would add an additional $6.5 billion to the state's economy each year and increase the state revenues generated annually by a minimum of $325 million without an increase in taxes. The fact that Ohio is 2.4 percent below the national average in the percentage of its population with baccalaureate degrees means $15.7 billion is lost annually in personal income. "If Ohio was at the national average, an

additional $799 million would be generated in tax revenues. This increase in state revenues could be used to benefit all Ohio citizens." (Grady Depo. Exh. 7)

In 1997, the advanced placement yearbook indicated that Ohio is performing well below the national average in the number of students who take advanced placement tests as well as their scoring level. (Grady Depo. 71)

Students can only move on to higher levels of education when their foundations have been laid. If school districts fail to provide challenging material at any level, it will depress the overall level of educational attainment that students can achieve. This is particularly the case for children who are already economically disadvantaged, because other educational opportunities are very limited. Ohio's education system indicates that it is not preparing a number of students for higher education, particularly in technical areas. (Grady Depo. 75)

As was the case at the time of trial in 1993, the Plaintiff Dawson–Bryant Local School District is serving only two grade levels with their talented and gifted program. Students in other grade levels who are identified receive no programming. (Washburn Tr. 1925–26) The district is funded in the amount of 70% of one unit of funding for gifted education. The district does not receive the full amount of the unit. (Washburn Tr. 1944)

I. Vocational Education Funding

Dr. Augenblick assigned a weight of 1.0 for vocational education. This was enacted into H.B. 650. The Department of Education has asserted that Dr. Augenblick underestimated the cost of vocational education and that an overall weight of approximately 1.68 is needed to reach the same amount of funding as before. The Legislative Budget Office has concurred in the Department of Education's position. (Keen Exh. 5, p. 4) The Court also concurs.

The reduction in vocational funding has potentially placed the State of Ohio at risk for failing to meet its "maintenance of effort requirements" to remain eligible for $47 million in Perkins grants of federal funds. (Keen Exh. 5, p. 3)

The Legislative Budget Office found that under the new legislation, the State's amount of spending on vocational education actually declined from FY98 to FY99. (Keen Depo. Exh. 5)

In May 1998, the Legislative Budget Office reviewed the Ohio Department of Education's presentation on vocational education funding and found several inconsistencies. First, the ODE indicated that it wanted to increase vocational funding from FY98 to FY99. The Legislative Budget Office found, however, that funding for vocational education units decreased from $315,676,639 in FY98 to $297,103,685 in FY99. Second, the GRADS program appeared to be completely cut out of the funding for FY99. Third, the Cuyahoga Vocational Apprenticeship

Program was budgeted to receive $600,000 in FY98, while receiving only $100,000 in FY99. Lastly, funding for special education in the vocational setting was reduced from $4,800,000 in FY98 to $3,100,000 in FY99. (Keen Depo. Exh. 5)

The Legislative Budget Office made the following analysis:

2. *Decline in total appropriations—FY1998 to FY1999:* The total State amount spent on VE declines from FY1998 ($397,932,597) to FY1999 ($388,998,-004, excluding the GRADS amount of $7,193,118). The amount of the decrease is $8,934,593, or 2.25%. If the GRADS funds were added to the FY1999 total, the total would rise to $396,191,122; the decline from FY1998 would then be held to just $1,741,475, or 0.44%. Note, however, that no funds are apparent in H.B. 650 for the GRADS earmark (see item 4 below). (Emphasis in original).

(Keen Depo. Exh. 5)

The Legislative Budget Office determined the decline in vocational educational funding was caused by:

3. *Components of the decline in appropriations:* The main components of the $8.9 million decline in total VE funding from FY1998 to FY1999 are provided below:

| Component | Change | Balance |
|---|---|---|
| FY1998 | | $397.9m |
| Reduction of 200–507/501 funds to the comprehensive VE programs (Because of low weight = 1.0; should ≅ 1.68?) | ($13.2m) | |
| Reduction of 200–507/545 funds to the JVSD's | ($5.4m) | |
| Additional funds for the comprehensive VE programs | $1.7m | |
| Loss of recomputation funds from ALI 200–501 | ($2.5m) | |
| GRADS not funded in FY1999 | ($7.0m) | |
| Cuyahoga funding, FY1999 (Funds erroneously appropriated) | $0.1m | |
| Other (net) increases | $2.1m | |
| FY1999 | — | $389.0m |

"Note that, if the GRADS amount for FY1999 ($7,193,118) were to be added to that year's appropriations, the total would still fall below that for FY1998 by approximately $1.7 million. The decrement would rise slightly to $1.8 million if the Cuyahoga error were corrected by removing the $100,000 item from FY1999's appropriations.

"While the legislature might not have intended that the total funds appropriated for VE for FY1999 be at least as much as in the previous year, it should be noted that such a decline might have implications for any 'maintenance-of-effort' requirement that is in effect for the retention of, say, federal funding for various programs. ODE advises that the Perkins grant of federal funds has such a requirement, as described in item 4 below."

(Keen Depo. Exh. 5)

The Department of Education, with the concurrence of the LBO, determined that Dr. Augenblick had underestimated the cost of vocational education and that instead of assigning a weight of 1 to a vocational education student, there should have been applied a weight of 1.68. (Keen Depo. Exh. 5) The Legislative Budget Office found:

8. *Reduction in funds to the comprehensives:* ODE contends that the switch to weights cost[s] the comprehensive VE units approximately $13.2 million in FY1999 and contributed to the decline in total VE appropriations from FY1998 (see item 3 above). The reduction occurred chiefly because Dr. Augenblick underestimated the cost of vocational education by saying that it costs the same as regular education, thereby assigning it the weight of 1.0. In contrast, ODE says that an overall weight of approximately 1.68 is needed to reach the same amount of funding as before.

In support of this claim, ODE provides a district-by-district comparison in the printouts on its blue sheets (April 4, 1998). It shows, on page 15, that the total FY1999 amount determined from the comprehensive districts' student FTE's ($172.1 million) does fall approximately $13.2 million below the net FY1998 total of $185.3 million.

After the reform package had been developed, ODE determined that the shortfall was equal to the $13.2 million (plus an amount needed to achieve panty). ODE discussed the matter with senators, saying the department needed that additional amount for the comprehensives because of the short weighting. However, only a few minor adjustments were made at that time.

During further budget discussions, it might have been agreed that $24 million in additional funds would be provided for comprehensive VE programs, rather than the $17 million that ended up in H.B. 650. There are no other data available to verify this contention.

If an increase in VE funding for FY1999 over FY1998 was intended, then the appropriation would bear increasing, since the current 2.27% *decrease* in the total appropriated amount (see item 2 above) could not have been intended. Even if GRADS were added to the FY1999 total at its earmark amount of $7,193,118, the total for FY1999 would still fall below that for FY1998, by 0.46%. (Emphasis in original.)

(Keen Depo. Exh. 5, attachment, p. 4)

The Court finds that by changing the method of funding of vocational education from unit funding to weighted funding and applying no weights to vocational education students, the State has actually reduced funding for vocational education, even after considering the $17 million appropriation for comprehensive

vocational education programs. Moreover, the vocational education guarantee creates problems of its own. The Legislative Budget Office indicates:

  b.  The new guarantee method has adverse effects:

  • Some districts get more DPIA funds under the reform. The additional funds tend either to keep the districts off the new guarantee or to remove them from it.

  • District officials who remember the old guarantee method say that they do not count VE FTE basic aid because they had been getting unit funding *in addition* to guaranteed basic aid. Thus, they see the new approach as a loss of funds for VE under the new guarantee. For example, Centerville CSD will lose approximately $1 million.

  • The new guarantee (1992 basic aid guarantee amount plus unit funding) is squeezing some districts' VE funds, since DPIA spending is independent of ADM and since special education and transportation also utilize dedicated funds.

(Keen Depo. Exh. 5, attachment, p. 5.)

H.B. 650 has a further damaging impact upon joint vocational school districts. The Legislative Budget Office found:

  c.  Problems with JVSD's:

  • The cap of 2,800 units is being tested. The JVSD's are requesting more units and ODE estimates that they will need upwards of 200 additional units by FY2000.

  • At the same time, the JVSD's are cutting some programs and/or stopping their expansions to the new high-tech programs.

  • The amount of special education funding to the JVSD's has decreased from $4.8 million in FY1998 to $3.1 million in FY1999. ODE estimates that the effect of H.B. 650 will be to *reduce* the number of SE units in JVSD's by 33%. (Emphasis in original.)

(Keen Depo. Exh. 5, attachment. p. 5)

Finally, adjusted for inflation, H.B. 650 provides reduced funding for vocational education and tech prep equipment replacement. The Legislative Budget Office found:

  d.  For FY1999, H.B. 650 provides vocational education and tech prep equipment replacement only at FY1996 levels ($4,941,622); thus, there's no allowance even for inflation.

(Keen Depo. Exh. 5, attachment, p. 5)

The Court finds that the State's system of funding vocational education programs has actually worsened since March 1997.

The new legislation likewise provides no additional funding to provide for vocational programs and comprehensive schools as in Columbus, even though there is additional cost, such as at Eastland Vocational School. (Russell Depo. 72) The Legislature attempted to address this by providing a vocational enhancement fund which has no reference or basis to the actual cost of vocational programs. Rather, the vocational enhancement fund was arrived at based upon the money available. (Russell Depo. 72)

## J. DPIA

DPIA funding is based upon the TANF count which was formally called ADC. This is a program that is targeted for drastic reduction and hopefully eventual elimination. Those students are going off the social welfare roles, but they are still in the school district's buildings. (Washburn Tr. 1915)

283 school districts will not qualify for any of the three categories of DPIA aid (safety and remediation, full-day kindergarten and class size reduction). 424 school districts will not qualify for aid under the DPIA or class size reduction provisions. 506 school districts will not qualify for any funding under the full-day kindergarten provisions of DPIA funding for FY99. (State's Exh. 67)

The methodology in H.B. 650 for calculating DPIA funding for all-day kindergarten is specifically tied to what the Legislative Budget Office determined to be the cost of providing all-day kindergarten, the cost of class size reduction, and the cost of safety and remediation programs. (Brunson Depo. Vol. 2, pp. 32–33)

The Plaintiff Dawson–Bryant Local School District TANF count has dropped approximately 25% in the last three years. The free and reduced lunch count of the district has gone from 32% in 1991 to a district-wide average of above 60% in FY98, with a 63% average at the elementary level. The students are still in the buildings and they still have additional needs. (Washburn Tr. 1916–17)

In FY98, the State reduced allocations for DPIA funding after districts had based decisions regarding personnel and purchases on the amounts indicated by the State they would receive. (Washburn Tr. 1917)

The ADC or TANF count does not provide an accurate count of the students who actually live at or below the poverty level. Those numbers are still targeted for reduction, and a more reliable way to provide funding to students who have increased needs based on true poverty level, such as free and reduced price lunch counts. (Washburn Tr. 18–19)

There are features of the TANF program which are different than ADC. One of the most important features is that ADC never had any limits for how long a

family could receive assistance, whereas TANF does. So, a district may have just as many kids in poverty as before, but their count is lower because the program that counts them works differently. (Fleeter Depo. 79–80)

Dr. Augenblick had conducted no study or analysis of the DPIA provision set forth in H.B. 650. Notwithstanding that lack of information, Dr. Augenblick was willing to opine that he believed it to be reasonable. He did not know what percent of Ohio's public pupils would be eligible to receive funds under the all-day kindergarten provisions, what percent of Ohio's public school pupils would be eligible to receive funds under the class size reduction provisions, or what percent of Ohio's pupils would be eligible to receive funds under the safety and remediation provisions of the formula. (Augenblick Tr. 930)

### 1. Illusory—All Dollars Now Targeted

DPIA dollars are targeted for one of three specific purposes: (1) reduction in class size, (2) all-day every-day kindergarten, and (3) safety or security. If funds are not used for one of the permitted purposes, they basically are not available to the school district. DPIA funding is subject to the 10% and 6% caps. (Goff Depo. 193–94)

DPIA funding is increasing by $109 million in fiscal year 1999 over fiscal year 1998. (State's Exh. 72) DPIA funding for all-day kindergarten for FY1999 is approximately $96 million and DPIA funding for class-size reduction for FY1999 is approximately $138 million for a total of $234 million. (State's Exh. 67) For those districts which were not providing all-day kindergarten and were not providing funding for class-size reduction, these funding programs will bring with them additional costs. (Cupp Tr. 430–35) Senator Cupp does not know and no evidence was presented to the Court as to whether the increase in DPIA funding will be a true net increase when netted against the increased cost of all-day kindergarten and class-size reduction. (Cupp Tr. 438) In fact, of the entire $341 million increase of State funding of primary and secondary schools for FY1999, no evidence was presented to this Court by the State as to how much of that increased funding is a net increase when netted against the cost of S.B. 55, H.B. 412, all-day kindergarten, class-size reduction, the reduction in vocational education funding (Keen Exh. 5), and ordinary cost increases experienced by school districts. (See, e.g., Cupp Tr. 441)

DPIA funds available to school districts for safety and remediation must either be spent for safety and remediation, for class size reduction, or in some combination between the two programs. (Payton Depo. 104–05)

Dayton City Schools looks like it will get an increase in FY99 due to H.B. 650 and 770, but the increase is illusory. Dayton will receive an increase in special education funds, but with the redeployment of DPIA money while still having to

fund the original programs, the increase in special education money does not balance against the increased funding needs of the district. (Williams Depo. 42–43)

Morgan Local School District is located in Representative Johnson's legislative district and is virtually a countywide school system composed of almost all of Morgan County. (Johnson Depo. 58) A projection of DPIA funding run on January 29 1998, indicates that Morgan Local received $470,896 in DPIA funding in 1998. The projection shows a DPIA index of 1.21, thus qualifying it for all-day kindergarten funding. Morgan Local has not provided all-day kindergarten. (Johnson Depo. 6) For fiscal year 1999 Morgan Local is scheduled to receive DPIA funds totaling $699,922. Of that amount, $356,647 can only be applied to all-day kindergarten, $218,168 can only be applied to class size reduction, and $125,107 would be applied to the category of security and remediation cost. In essence, over 50% of the DPIA funding for fiscal year 1999 for Morgan Local is in the category of all-day kindergarten. This is a new cost to the school district, since it did not provide all-day kindergarten in fiscal year 1998. As a result, the nearly 50% increase in gross funding of DPIA would not be a 50% increase in *net* funding when new costs are netted in with the additional funding.

The total DPIA funding for South–Western City School District in fiscal year 1998 was $660,569. Under the new DPIA formula, DPIA funding increases to $3,626,904. The increase is composed of the following amounts in the following DPIA categories:

| DPIA Category | Amount |
|---|---|
| Class Size Reduction DPIA | $ 285,936 |
| All–Day Kindergarten DPIA | 2,921,402 |
| Safety & Remediation DPIA | 419,566 |

(Hamilton Depo. Exh. 3)

South–Western City Schools experienced an increase in DPIA funding of approximately $3 million over the prior fiscal year. This amount of increase is approximately the same as the $2.9 million allocated to be spent only on all-day kindergarten. South–Western currently has minimal all-day kindergarten and to implement all-day, every-day kindergarten in qualifying buildings would cost approximately $2.9 million, which is a cost the district did not have before. (Hamilton Depo. 53–54) As such, the change in DPIA funding for South–Western City Schools is an example of a district that receives a significant increase in funding of this category, but when netted with the increased costs not previously incurred by the school district, the net increase in funding evaporates and may even be negative.

With the application of the 10% cap, to which the DPIA funding is applied, South–Western City Schools is placed in the position of either accepting DPIA

all-day kindergarten funds, which can be spent only on all-day, every-day kindergarten and which would cause a directly proportionate loss of $2.9 million of basic aid that could be used as general revenue toward operation of the entire school district. The ability to use that $2.9 million as part of the general revenue to operate the school district at the district's discretion will allow the district to delay going to the voters to pass an operating levy for an additional year. (Hamilton Depo. 51–59) If the district were to receive this level of DPIA funding for all-day kindergarten two consecutive years, it would fund the program and suffer a loss of close to $6 million over two years. (Hamilton Depo. 59)

Much of the funds appropriated under the DPIA provisions will not necessarily flow to school districts. For example, South–Western City Schools will not be able to implement all-day every-day kindergarten and, thus, will be unable to use those funds. (Phillis Tr. 2227–28)

The Southern Local School District will be providing all-day, every-day kindergarten in FY99 funded partially through earmarked DPIA money. The DPIA funds will not cover the cost of all-day, every-day kindergarten, and the district will fund the rest of it out of the district's general fund. The cost of the program will likely be at least double the funding provided by the State. (Grandy Depo. 19–21)

The Southern Local School District will be receiving approximately $64,000 more in DPIA funding in FY99 over FY98. However, the district will have a reduction in equity money of about $81,000 for FY99 compared to the previous year. One of the problems with the DPIA in FY99 is that the district previously was able to have more flexibility in how it was going to use the money and was able to use some of the money in the general fund. The district is concerned that with the reduction of equity money and the stipulations on the DPIA money, the district will not have enough money in the future. (Lanning Depo. 86–89) The district's fear with only a 10% increase in funding overall between FY98 and FY99, with the mandates involved, and taking away equity, that there is a big cloud ahead and the district is concerned that it will be going back to rationing toilet paper and supplies as it did before equity money. (Lanning Depo. 89–90).

LBO performed an analysis comparing DPIA funding, as enacted under H.B. 650 and H.B. 770 versus Dr. Augenblick's formula. (Brunson Depo. Exh. 48) It shows that districts with a DPIA index of one or more received greater DPIA funding under the legislation than Dr. Augenblick's formula. Likewise, every district with a DPIA index of less than one received less under the legislation than Dr. Augenblick's formula. (Brunson Depo. Vol. 2, pp. 24–35) Dr. Augenblick's proposal was purely a distributional model that did not specify how school districts were to use that money. For example, Dr. Augenblick did not tie his methodology to the cost of implementing all-day kindergarten or the cost of

implementing safety and remediation programs. He only tied his methodology to the percent of ADC. (Brunson Depo. Vol. 2, p. 30) Thus, while there appears to be increased funding of DPIA under H.B. 650 compared to Dr. Augenblick's methodology, Dr. Augenblick's formula did not mandate spending in specific areas, such as all-day kindergarten and class size reduction. Thus, for those districts which received an increase in funding under H.B. 650 compared to Dr. Augenblick's formula by virtue of having a DPIA index of one or more, those increased funds were now tied to specific programs they would have to implement at additional costs. For that matter, districts with a DPIA index of 6.0 or more who qualify for DPIA funding for class size reduction receive less under H.B. 650 than Dr. Augenblick's formula even though their DPIA funding is now tied to a specific category, including class size reduction, which will bring with it an additional cost. For example, if a district was not providing all-day kindergarten but is eligible for DPIA funds for all-day kindergarten in the amount of $100,000, it will have an additional cost of $100,000 to hire the new teachers, set up the classrooms, etc., required for these additional classes. (Brunson Depo. Vol. 2, p. 37)

The Superintendent of Public Instruction and the Director of the Legislative Budget Office sent a packet of information to all treasurers and superintendents. It contained a worksheet intended to give districts assistance in modeling for themselves the effects of H.B. 650 both in fiscal year 1999 and over the next four to six years. (Brunson Depo. Vol. 2, p. 89) The worksheet shows how the new funding is calculated using Youngstown City Schools as an example. (Brunson Depo. Vol. 2, p. 90)

Youngstown has a DPIA index of more than 2.5%; therefore, it is to receive funding to reduce class size to a ratio of 15 to 1. An analysis of this indicates that Youngstown will be required to hire 89 additional teachers at an estimated cost of $39,092 for each new teacher (this amount was arrived at by averaging the district's beginning teacher salary and average teacher salary), leading to a total amount of DPIA funding for class size reduction for Youngstown in the amount of $3,480,192. (Brunson Depo. Exh. 69)

Youngstown was estimated to receive DPIA funding for all-day kindergarten in the amount of $2,076,141. (Brunson Depo. Exh. 69)

In fiscal year 1998, Youngstown received DPIA funds of $9.3 million. Under the new DPIA formula, it is estimated to receive $11.645 million, an increase of over $2.3 million. (Brunson Depo. Exh. 69) However, that $11.645 million in DPIA funding for FY99 includes over $5.5 million in funds which can only be spent on either class size reduction or all-day kindergarten, which are directly tied to the additional costs of those programs. (Brunson Depo. Vol. 2, pp. 30–31) Thus, although Youngstown has a total increase in funding from fiscal year 1998

to fiscal year 1999 of almost $5 million (see lines 25 and 26 of worksheet, Brunson Exh. 69), there may be no net increase in funding for the City of Youngstown if this $5 million increase is entirely offset by the $5.5 million increased cost of all-day kindergarten and class size reduction. These figures are before even considering other cost increases to the district resulting from contracted-for salary increases, step increases, S.B. 55 requirements, and H.B. 412 set-asides. The worksheet also does not show the charge-off increases. (Brunson Depo. Vol. 2, p. 132) Worse, the $2.35 million increase in DPIA funding is equal to almost 3% of the entire $79 million general fund (3% of $79 million is $2.37 million). This 3% increase alone, assuming no other increases, would be enough to trigger the requirement of H.B. 412 that the district set aside 1% into a budget reserve, even though the increase is entirely consumed by additional costs. (Brunson Depo. Vol. 2, p. 137) (This is only an example. Since Youngstown is on fiscal emergency, it is not required to maintain a budget reserve.)

Projected increases in DPIA funding and particularly funds for all-day, every-day kindergarten and class size reduction will only flow to school districts if they are, in fact, able to utilize those funds for the intended purposes. (Maxwell Tr. 1572)

While the State presented to the Court evidence of a gross increase in the dollars of funding for DPIA, no evidence was presented to the Court as to whether or not there was a net increase in funding when considering any additional costs of all-day kindergarten or class size reduction. When Representative Johnson was asked to speak as to this issue, he testified, "I am not aware of the details of DPIA funding, and so I'm not even willing to answer those questions." (Johnson Depo. 64)

2. No Guarantee Of Adequacy

The early prevention of school failure screening or kindergarten screening performed by the Plaintiff Dawson–Bryant Local School District has shown that students of the district are less prepared to enter school today than they were five years ago. In FY98, the district found that its students were, on the average, nine months behind developmentally. That does not mean that the students are less intelligent, but it simply means that they have fewer opportunities and exposures. Nine months is quite a large developmental gap, because educational research and literature indicate that students in the top 50% usually gain two months academically during the school year. Students in the bottom 50% will show a two-month loss and may increase their gap from seven months to sixteen months behind their peers. Not only does the district need to reduce class size at the primary and kindergarten level to provide more appropriate intervention to those students who have a high degree of need, but the district

needs extended time with them. The district needs to extend the school year and the amount of contact time so that the developmental gap does not continue to grow as they go through the education system. (Washburn Tr. 1921)

Eighty-three percent of the fourth grade students of the Plaintiff Dawson–Bryant Local School District were eligible for Title I remediation services. (Washburn Tr. 1922)

Before FY99, the Plaintiff Dawson–Bryant Local School District has used its DPIA funds primarily for three purposes: (1) to hire additional teachers to reduce the student to teacher ratio and to stay within the State minimum guidelines of 25 to 1 at the primary level, (2) to hire two additional staff members at the middle school level to provide small group intervention to assist students in passing the ninth grade proficiency test, and (3) to reduce the amount of fees that parents are charged for additional school supplies such as workbooks and to supply money that cannot be collected from parents who are on ADC. The district will be provided approximately $100,000 additional DPIA dollars in FY99. However, the $100,000 will not allow the district to meet the needs of the students. The district needs more one-on-one instruction at the first grade level with programs such as Reading Recovery. They need a full-time facilitator for the Success For All reading program, which was recommended by John Hopkins University. The district needs to expand their talented and gifted programs and needs to add a physical education and music program for the elementary students. The district needs a full-time psychologist and a parent liaison who can coordinate the family support team with school personnel and other agencies that provide services and to provide training of that person. The district needs extended time with students. (Washburn Tr. 1923–25)

Prior to H.B. 650, districts which received DPIA funds were permitted to spend those funds at their discretion within several programs. (Russell Depo. 98) DPIA under H.B. 650 now limits spending to three programs: all-day kindergarten, class size reduction, and safety and remediation. While there is no disagreement that all-day kindergarten is beneficial, the Court finds that under the current program, certain school districts do not have the physical facilities to accommodate all-day kindergarten, so that even if they are eligible for such funds, they could not elect to receive such funds. (Russell Depo. 97) Related to this issue is the fact that the Ohio School Facilities Commission has promulgated a set of standards for school construction programs which do not take into account the issue of all-day kindergarten and reduction in class size. (Russell Depo. 99)

As to the choice of indicator for economic disadvantage, the DPIA index, this indicator is based upon the number of students in the district who receive the benefit formally known as ADC, now called Ohio Works First. School Districts

are seeing fewer students who receive Ohio Works First benefits, but are seeing an increase in students enrolled in the free and reduced lunch program. This indicates that those districts have the same children in poverty but no longer qualify for the State definition of economic disadvantage. (Russell Depo. 98–99)

Payton Deposition Exhibit 3 represents the formulas used for calculating DPIA aid for FY99. (Payton Depo. 100–01, Payton Depo. Exh. 3, pp. 3–4) In recent years, the number of pupils on ADC has declined due to the fact that Ohio has fewer families on welfare; however, the needs of pupils in conditions of poverty continue whether or not the pupil is characterized as an "ADC pupil." (Payton Depo. 101–02)

Funding for some programs formerly required by law for pupils in conditions of poverty may not be included in H.B. 650. (Payton Depo. 109–10)

Urban districts, poor rural districts and Appalachian districts are those usually having the highest percentage of ADC pupils. (Shams Depo. 38)

Safety and remediation is one of the three components of DPIA. The DPIA funding amount for safety and remediation is calculated by taking the average ADM of the school district that has an ADC index of more than .35 and multiplying that by $230. Additional funding is provided if the district's DPIA index is greater than 1. (Shams Depo. Exh. 4)

The second component of DPIA is funding for all-day every-day kindergarten. Additional funding is provided only for those districts with a DPIA index of greater than 1, except for the South–Western City School District that does not have a DPIA index greater than 1. Districts that do not provide all-day every-day kindergarten will not receive the additional funding. (Shams Depo. 41; Shams Depo. Exh. 4)

The third component of DPIA is class size reduction. This represents funding provided to reduce class sizes in grades kindergarten through grade 3 and provides funding based on a ratio of 1 teacher to 15 students if the district's DPIA index is greater than 2.5. Funding is provided based on a ratio of 1 teacher to 23 students if the DPIA index is less than .6, and based on a sliding scale if the index is between .6 and 2.5. Funding under this provision is only available for districts that reduce classes to those specified. (Shams Depo. 42)

For FY99, districts are guaranteed to receive no less than the DPIA funding received the previous year. This guarantee does not exist after FY99. (Shams Depo. 44)

With the restructuring of welfare in Ohio and the removal of many families from the public rolls, the amount of DPIA funding will decrease to Dawson–Bryant. (Sites Depo. 82) "[The children and their families will] still qualify for poverty rate, but the Welfare reform changes will negatively affect the family

households. They may not qualify for ADC money, but they are still just as poor as they were." (Sites Depo. 82–83) This could reduce Dawson–Bryant's DPIA funding by one third, but the District, with less money, is still required to somehow educate these disadvantaged students up to an even playing field. (Sites Depo. 83–84)

The Groveport Madison Local School District's DPIA index for fiscal year 1999 is .561. As such, the district does not qualify for DPIA funds for all-day kindergarten or class size reduction. It does qualify for DPIA funds for safety and remediation. (Barr Depo. Exh. 16) H.B. 650 calculates this category of DPIA funding based on a head count of students receiving ADC, now known as Ohio Works First. Yet, in Groveport Madison, its population of students who receive ADC has been declining even though it has the exact same students who have the same difficulties they had before. (Barr Depo. 218–19) Superintendent Barr testified, "We are still working with those same students. We are just not getting that additional funding to help educate those students." (Barr Depo. 219)

To make funding of education equitable, one must look at the needs of the children in the context of the community. It costs more to educate a child coming out of a poverty-stricken environment, with poor social and emotional conditions, than it costs to educate a child coming out of a wealthy district. (Williams Depo. 26)

Lima City School District received Title I monies from the federal government. Federal law bars the district from commingling these funds with State and local funds. Such funding is based upon the number of students who are on ADC. The district primarily uses its Title I funds for all-day, every-day kindergarten, which has been in place for one year at all nine elementary schools. (Buroker Depo. 74–76) Prior to using these federal funds for all-day kindergarten, Lima Schools had spent such funds to pay for teachers who were hired to supplement instruction in math and reading in grades K through 8. It was decided to eliminate those services and to implement all-day kindergarten, which the district determined would provide a much better return on the monies than trying to intervene with the children later. (Buroker Depo. 78–79)

Lima City School District had approximately 1,600 children who received DPIA funding for fiscal year 1998. This is a decline from 2,300 DPIA students in 1994. (Buroker Depo. 295) The district has a DPIA index of 2.0505, which means, in effect, that the number of its students who live in poverty is double the State average. (Buroker Depo. Exh. 12) The number of students counted to determine the district's DPIA index has been decreasing. (Buroker Depo. 293) Since this headcount is based upon the number of students who receive Ohio Works First benefits, it appears that this may not be an appropriate method of measuring poverty where, while the student population of children who receive Ohio Works

First benefits has been declining, the number of students enrolled in the free and reduced lunch program has increased. (Buroker Depo. 293) This would indicate that while the number of students receiving Ohio Works First benefits may be decreasing, the true level of poverty is not. While this would not necessarily change the district's DPIA index, it would change the dollar amount the district receives for safety and remediation, which is calculated in part by the number of students who receive Ohio Works First.

The Southern Local School District is concerned about the effects of welfare reform and the effect on the ADC numbers which result in the DPIA funding. (Lanning Depo. 136) The district is also concerned about the reduction of $81,000 in equity money and the ultimate phase out of that program. (Lanning Depo. 136, 87)

The Southern Local School District had about 22.9% of its students eligible for DPIA. (Lanning Depo. 117)

Southern Local anticipated that the DPIA numbers would be going down due to welfare reform. (Lanning Depo. 136)

Wendy Zhan of the Legislative Budget Office sent a memorandum to Brian Perera on the subject of the cost of funding statewide all-day kindergarten. The memorandum indicates that if the State were to provide statewide all-day kindergarten, calculated at a foundation level of $3,663 for fiscal year 1998, the "additional cost" would be $208,170,033. (Brunson Depo. Exh. 38) The Legislative Budget Office notes that this additional cost is "compared to total basic aid cost under the current budget, which includes partial all-day kindergarten funding for the Big 8 school districts." If this had been calculated on the higher foundation level of $3,851 for fiscal year 1999, the cost would have been significantly higher. (Brunson Depo. 195)

3. Class–Size Reduction

The Plaintiff Dawson–Bryant Local School District is unable to reduce class size to the fifteen to one pupil to teacher ratio recommended by the State due to inadequate resources. (Washburn Tr. 1920)

The teacher to pupil ratio in the Jackson City School District includes one fourth grade classroom with 32 students, a fifth grade classroom with 31 students and 900 in that room. (Strawser Tr. 1787) The district does not have teachers available who can take a child or 3 to 5 children and work with those children as needed. (Strawser Tr. 1787–88)

Dawson–Bryant currently has a 23.5 to 1 student-teacher ratio. (Sites Depo. 26)

In Mount Vernon City School District, class size at the elementary level is about 22 to 1. The district has pockets of large classes at the middle school with student-teacher ratios in the high 20's. The high school has class sizes comparable to similar districts. (Sonedecker Depo. 62–63)

A schedule showing Groveport Madison's pupil-teacher ratio for the years 1991 through 1997 does not reflect the true number of students in the classroom, as it takes into account all of the teachers out of ASP Personnel. (Barr Depo. 103, Barr Depo. Exh. 11) The district has slightly over a 25 to 1 pupil-teacher ratio in grades K–4. Its collective bargaining agreement with the teachers allows for a pupil to classroom teacher ratio of as much as 30 to 1, and the district has received grievances because those levels have exceeded 30 to 1 in the elementary grades. (Barr Depo. 103–04)

Groveport Madison has been unable to pass levies to keep up with the loss of revenues. Another contributing factor to the difficulties encountered by the district is that the district experienced very rapid growth in the 1970's where, at one point, the district was building a new school building every year along with hiring a large number of young teachers. That teaching staff is now more mature, more qualified, and their salaries are higher. (Barr Depo. 31) The district's difficulties have been further compounded by State mandates imposed over past years, such as the limitation of the pupil-teacher ratio which is a "very expensive mandate for most school districts." (Barr Depo. 32)

The Southern Local School District will not be able to implement the class size recommended for all-day, every-day kindergarten of a 15:1 pupil to teacher ratio. Because it does not have the space, facilities, or funds to hire the teachers. The district will employ two aides to help with the class size. (Grandy Depo. 115)

There are studies, such as the *Starr* study in Tennessee, that indicate that the students of the Southern Local School District also need class size reduction at approximately a 15 to 1 pupil to teacher ratio if the district is going to try to remedy some of the problems they have with the proficiency test in students who are culturally deprived and not reading at the appropriate level. The district is not able to afford to do this. (Lanning Depo. 72)

The class size reduction provisions of H.B. 650 provide $39,092 for the payment of each additional teacher. That amount is fixed and no provision is made for changing it in future years. (Payton Depo. 111–12)

Brunson Exhibit 39 is a memorandum from the Legislative Budget Office to Representative Michael Fox dated January 14, 1997, discussing the subject of the estimated cost of reducing class size to a 15 to 1 ratio in grades K through 4. In fact, the Legislative Budget Office performed several analyses of the cost of class size reduction. (Brunson Exh. 39)

Brunson Exhibit 45 is a Legislative Budget Office memorandum dated October 1, 1997, to Brian Perera on the subject of the cost of reducing class size to a 15 to 1 ratio for grades K through 3, the grades eligible for class size reduction funds ultimately enacted in the DPIA formula in H.B. 650. (Brunson Exh. 45)

The Legislative Budget Office prepared a schedule of estimated costs for reducing the classroom pupil/teacher ratio to 15/1 in the "Urban Eight" (sometimes called "Big Eight") school districts. The Legislative Budget Office estimates that those districts would need to hire 3,166 additional teachers to achieve such class size reduction. By applying only a beginning teacher salary, this would cost $93,391,337. By applying an average teacher salary, this would cost $173,733,551. (Brunson Exh. 45)

The amount of funds available for class size reduction in DPIA funding for fiscal year 1999 is over $138 million. (State's Exh. 67) All Big Eight school districts qualify for this category of DPIA funding as they have DPIA indices over 2. (Brunson Exh. 48) Under H.B. 650, districts with a DPIA index of 2.5 or above are to receive funding for class size reduction to a 15 to 1 ratio. (Brunson Exh. 69) Five of the Big Eight districts have a DPIA index over 2.5. (Brunson Exh. 48)

Even if these Legislative Budget Office estimates are modestly incorrect, it is apparent from the evidence from the State's own records that the cost of class size reduction is very significant on a statewide basis.

The Legislative Budget Office ran numerous scenarios estimating the cost of different types of class size reduction. For those districts with an academic standing of academic emergency or academic watch, the Legislative Budget Office determined that reducing class sizes to a 15 to 1 ratio for grades K through 4—even using a beginning teacher's salary—would cost $74,022,068. When added to the total cost statewide, it is estimated to cost $675,508,786 to hire an additional 17,725 teachers. (Brunson Exh. 40)

Brunson Exhibit 41 is the same type of analysis as Brunson Exhibit 40, except that it assumes an average teacher salary as opposed to a beginning teacher salary. (Brunson Exh. 41)

The Legislative Budget Office estimated the cost of achieving an 18 to 1 pupil/teacher ratio for 163 districts $106,227,169, which includes a cost of over $62 million for the Urban 21 districts. (Brunson Exh. 46)

Three separate analyses were prepared estimating the cost of reducing class size to 15 to 1 pupil/teacher ratio for grades K through 4 respectively using (1) average teacher salary, (2) beginning teacher salary, and (3) using average teacher salary for only the Urban 21 districts only. The estimated cost of these

three different scenarios are respectively $901,812,909, $506,683,363, and $250,-752,332. (Brunson Exh. 47)

The Legislative Budget Office apparently has the capacity to estimate the number of additional teachers needed in each district as well as the potential cost of each of those new teachers. The State has estimated the cost of class size reduction for grades K through 3. It is funding a portion of that cost for some districts through the DPIA funds. (Brunson Depo. 205) The State is also funding a portion of the cost of all-day kindergarten for some districts, which is a cost the schools were not required to incur before H.B. 650. (*Id.*)

4. All-day, Every-day Kindergarten

An all-day kindergarten program is important for children, particularly poor children and at-risk children. (Goff Tr. 524)

All-day kindergarten is good for all children, not just those living in conditions of poverty. (Goff Tr. 579)

Research clearly indicates that students benefit academically from all-day, every-day kindergarten. That fact has been known in Ohio since 1992 when the Department of Education study made clear that all-day, every-day kindergarten had proven to benefit students of all backgrounds. The Department of Education's recommendation was that every student should have the opportunity for all-day, every-day kindergarten. (Washburn Tr. 1971)

Very few school districts in Ohio provided all-day kindergarten prior to the enactment of H.B. 650. (Brunson Depo. 49) Under the DPIA formula established in H.B. 650, not all districts would be eligible for funding for all-day, every-day kindergarten. Such eligible districts would only be those with the DPIA index of one or more. Of the $341 million increase in State funding for primary and secondary schools for FY99, approximately $96 million of that increase is allocated to qualifying schools for all-day every-day kindergarten. (State's Exh. 67) If very few schools were providing all-day kindergarten, the Court infers from these facts and finds that most of the $96 million brings with it corresponding new costs.

To implement all-day kindergarten, Youngstown has had to hire more teachers and purchase more desks, chairs, equipment and classroom space. (Funk Depo. 30, 45)

In Dawson–Bryant, all-day kindergarten is available to all students, but only about half of the kindergarten students attend all day. In order to offer all-day kindergarten with the desired 15–1 student-teacher ratio, the district anticipates hiring more teachers, and has already diverted its Title I teachers from middle school to kindergarten. (Sites Depo. 25–27)

Dayton City Schools is offering all-day kindergarten in 65 of 150 units. The district's ADC count is about 70%. (Williams Depo. 122)

37% of Dayton City's students are developmentally behind when they start school in kindergarten, with serious problems in receptive and expressive language, hearing, seeing, serious health issues. In order to address these issues (to provide a thorough and efficient education for these students) the District needs:

- Smaller classes, K–3.
- All the children should be in a preschool program.
- All–day kindergarten for all children.
- Amplification systems, grades K–3.
- Health centers in schools to address seeing, hearing, UTIs, diabetics, crack babies, and attention deficit disorder.

(Williams Depo. 37)

Almost two-thirds of the children coming to Dayton City Schools are 2 to 3 years behind developmentally at the kindergarten level. Two-thirds of the children have expressive and receptive language problems, that is, being able to communicate and follow directions. (Williams Depo. 117) The instructional component of their education reform plan includes smaller classes, speech pathologists, sound and amplification systems, and more space due to all-day kindergarten. (Williams Depo. 118)

The South–Western City School District will not be providing all-day every-day kindergarten for students in FY99. Because of the cap, if the district implements all-day every-day kindergarten, the district will still receive $41 million total in State funding, not the $44 million that State printouts project. The District will receive $41 million if it does or does not implement all-day every-day kindergarten due to the cap. (Hamilton Depo. 5 1–57)

Youngstown City School District qualifies for a substantial amount of disadvantaged pupil impact aid. In connection with Youngstown's fiscal recovery plan, the District was required to reduce teaching staff. In order to qualify for DPIA aid for class size reduction and all-day kindergarten, Youngstown will be required to either reassign existing staff or hire additional staff for Kindergarten positions. (Goff Tr. 608)

5. Safety–Remediation

DPIA funding for safety and remediation is a 1960s solution to 1990s problems. (Williams Depo. 62) The State should look at an upper middle class model—a boarding school concept where safety and security can be inclusive of the structure, and not an add-on piece. This means building boarding schools in the city. (Williams Depo. 63)

K.  Transportation

H.B. 650 includes a formula to determine district transportation costs based on an average cost per pupil for a given level of density.  For FY99, 50 percent of the calculated transportation cost is provided.  That figure increases to 60 percent over the next four years.  (Payton Depo. 97)

The primary factors utilized for the reimbursement of transportation costs are the number of pupils and the density of the pupils;  factors such as types of highway or road conditions are not considered.  (Rogers Depo. *158–59* )

Rogers Deposition Exhibit 5 is a summary of his analysis of a transportation reimbursement methodology initially developed for the Panel of Experts.  (Rogers Depo. 156)

Under the transportation formula set forth in H.B. 650, some school districts would receive less money in FY99 than in the previous year, but for the operation of the guarantee provision.  The guarantee is in place *only* for FY99.  (Goff Depo. 191)

Mr. Keen requested that the Legislative Budget Office prepare a chart that showed the total district costs for transporting students, not including bus purchases, the amount of funds the State contributed towards those costs, and the percent of the total costs the State funds constituted.  In FY97, Ohio school districts' total expenditures for transporting students, excluding bus purchases, was $463,837,616.  The State funded only $158,888,844, or 34.26 percent of these costs in FY97.  In FY98, the State level of funding was raised fractionally to 37.61 percent.  The Legislative Budget Office forecasted the State's share of pupil transportation for FY99 as only 39.66 percent of a district's total expenditures, leaving $296,933,208 for the districts to fund locally.  (Keen Depo. 34–37, Keen Depo. Exh. 3)

Plaintiff Dawson–Bryant Local School District expended a little over $400,000 in FY98 for transportation, and the State reimbursement was slightly less than $150,000.  For FY99, the district will receive approximately $200,000 in State reimbursement, which means that it will continue to supplement transportation costs with general fund revenue in the amount of $200,000, which could employ five classroom teachers.  (Washburn Tr. 1942–43)

Plaintiff Dawson–Bryant Local School District needs to purchase two buses per year as the old buses are phased out.  The treasurer's projections include only a purchase of one bus per year.  A school bus in the district will run about $50,000 and the reimbursement from the State is about $34,000.  The district travels 1,000 miles per day with its buses and 40 percent of the roads are gravel.  In the fleet of buses, the average mileage is 94,000.  Eight of the thirteen daily buses have in excess of 100,000 miles on them.  Bus inspections this year revealed five

frames that were cracked due to the rough conditions of the roads in the district. (Washburn Tr. 1943)

Although Dayton City Schools anticipates getting an increase in transportation funding, the bus fleet in Dayton is very old. The district can purchase 7 new buses a year, but with 250 buses, it will be 35 years before all those buses can be replaced. (Williams Depo. 159) The district spends $14 million a year in transportation, but receives only $7 million from the State. (Williams Depo. 160) No buses are purchased with local money. (Williams Depo. 162)

The Jackson City School District has about $1.8 million in transportation and special education costs. Under H.B. 650 and H.B. 770, the district will receive about $800,000 in State revenue for these two expenditures. The $1 million must be taken from the district's general revenues, which would otherwise be spent on regular education students. (Strawser Tr. 1789–90)

The Southern Local School District will receive an increase of only $22,000 for transportation for FY99 over FY98. (Lanning Depo. 91)

L. Technology

1. Statewide Overview

Schools need to infuse technology into their instruction and need access to up-to-date hardware and software. Teachers who are trained in the utilization of the hardware and software are critical to the access of pupils to technology. (Goff Depo. 164–65) At the present time access to technology varies from school district to school district across the state. (Goff Depo. 166)

There is no specific source of funding from any agency of the State of Ohio to provide access to technology for pupils in grades 5 through 12. Although unused SchoolNet or SchoolNet Plus dollars could be used for that purpose, some schools have been unable to utilize SchoolNet (wiring) money because they lack electrical capacity in their buildings. (Gaff Depo. 167–69)

Director DeMaria testified about the SchoolNet and SchoolNet Plus programs. He is not involved in the day-to-day operations of those programs. By virtue of his position of being Director of the Office of Budget and Management, Director DeMaria is a member of the Information Learning Technology Authority ("ILTA") and has been since March 1998. ILTA is the oversight organization that oversees the Office of Information Learning and Technology Services, which is the agency that actually implements the SchoolNet and SchoolNet Plus programs. (DeMaria Tr. 1328) While Director DeMaria is able to speak as to certain statistics relating to the SchoolNet and SchoolNet Plus programs, he provided no testimony as to the actual effectiveness of those programs in the education community. For example, State's Exh. 59 was identified and authenti-

cated by Director DeMaria and is a summary of statistics showing the status of technology wiring of the schools as well as information as to the number of computers which have been provided to the school districts through these programs. Yet, Director DeMaria was unable to give any testimony as to the level of effectiveness of these programs. For example, while State's Exhibit 59 indicates that these programs had provided over 130,000 computers to school districts, Director DeMaria could not testify as to how many of those computers are being plugged in and actually used or whether they were even Year 2000 compliant. (DeMaria Tr. 1332–34)

Some schools have yet been unable to use SchoolNet (wiring) money because of the presence of asbestos in their buildings. (Goff Depo. 169)

As Chair of the Buckeye Association of School Administrators Technology Committee, Mr. Sonedecker believes that while districts are making local commitments to technology, a number of school districts do not have the support staff necessary to integrate technology within their educational program. (Sonedecker Depo. 38–39)

One of the problems with the SchoolNet and SchoolNet Plus programs is that buildings that have been identified by the State as having great needs or buildings that should be closed, are in many cases being rewired. In addition, there is no provision for the extension of the SchoolNet Plus into grades 5 through 12 and no provision for updating the technology within K through 4. (Phillis Tr. 2225–26)

Some schools do not have adequate access to technology. (Gaff Depo. 167)

Most of the SchoolNet and SchoolNet Plus money has been spent or committed for expenditure, and at the present time there is no more. (Goff Depo. 255)

### 2. Level of Technology in the Districts

#### a) Dawson–Bryant Local School District

The Plaintiff Dawson–Bryant Local School District received around 220 computers through the SchoolNet and SchoolNet Plus projects. (Washburn Tr. 1962) The district serves 1,393 students and the computers went only to the elementary level. The project did not go to the middle school or secondary level and students at those levels do not have access to work stations in classrooms. (Washburn Tr.1973) Wiring of the district's buildings and connection to the Internet was not fully covered by SchoolNet funds. The district had to put in local dollars to have the project completed. The district still has one laboratory that is not networked and although the buildings are connected to the Internet, not every classroom is connected. (Washburn Tr. 1962–63)

Dawson–Bryant does not know whether it will continue to receive SchoolNet funds in the future, or in what amount. (Sites Depo. 33)

Dawson–Bryant's middle school students do not have a computer lab of their own. The middle school students must attempt to use the high school computer lab on the occasions that it is not busy. (Sites Depo. 32)

Some parents are attempting to provide computer training at home, since it is not yet available for some children at Dawson–Bryant Local schools. (Sites Depo. 33)

The parents must rely on hope that their children will be able to make up for the lack of computer training in the elementary and middle schools of Dawson–Bryant by the few courses available during their high school years. (Sites Depo. 33)

### b) Dayton City School District

The facilities component of Dayton's education reform plan includes, among other things, plumbing and electrical wiring. SchoolNet and SchoolNet Plus do not include the total wiring of schools needed for those programs. (Williams Depo. 115–16)

### c) Groveport Madison School District

Groveport Madison has received funding from SchoolNet and SchoolNet Plus, but beyond grades K through 4, the district has very little in the way of technology. It seeks donations of computers and takes old computers from the community. It also is in regular contact with the State surplus store and even received computers from the Governor's Office when that office received a computer upgrade. (Barr Depo. 105–06) By using older equipment, the district has run into problems where new software will not run on the old equipment. It is not unusual that in the business education class which has 30 computers, five or six may not be working on any given day. Superintendent Barr testifies:

"So I go in, and they have big pieces of paper taped on them, out of order, not working, and the kids will have to double up. So they don't have their own computer to use. And the classroom teachers get frustrated with that, and so they want to make sure I feel their frustrations and know what's going on."

(Barr Depo. 107)

Superintendent Barr further testifies as to Groveport Madison's technology difficulties:

"We add to the fact that we didn't have the money. A computer—the hardware doesn't stand alone. You've got to purchase the software, which is extremely expensive. And one of the things that I'm beginning to find now that

it's very difficult to pay for the telephone bill. But as far as, you know, the kids just don't have access to the Internet, which they need.

"You know, the problem that bothers me as the superintendent is that other students in Franklin County and students that our students are going to be competing with on the job market has access to all these things, and it makes it difficult, I believe, for our students to have an equal footing with those other students."

(Barr Depo. 107)

### d) Lima City School District

Lima City School District has received over $2 million under the SchoolNet and SchoolNet Plus programs over the last four years. (Buroker Depo. 332) The district provides computers to grades K through 5 at a ratio of one computer per five students. (Buroker Depo. 333, 339) Above grade 5, the district has one computer lab in each of its three middle schools, with each lab containing approximately 30 computers which are Apple 2e's. These are old computers with very little software available for them and are used primarily to teach keyboarding. (Buroker Depo. 339)

The Lima City School District does not have appropriate laboratory settings for most of its students. The high school building was built in 1954 and the laboratories have not been upgraded. (Buroker Depo. 158–60)

### e) Mt. Vernon School District

The SchoolNet Funding in the Mt. Vernon School District provides only for K through 4, which has created "incompleteness." (Sonedecker Depo. 37)

In the area of technology, the high school in the Mt. Vernon School District is deficient in that it has only 3 labs, when the district's technology plan calls for 5 students per work station. It currently has 3 labs and no work stations in the classroom. No more than 10 percent of the high school classrooms have stand alone PC's. (Sonedecker Depo. 34–35) The technology support is also inadequate in the area of teacher training, available software programs that integrate with adopted curriculum, and repair and maintenance. (Sonedecker Depo. 36) All three of these areas are important when making a commitment to technology. (Sonedecker Depo. 36)

In Mt. Vernon elementary schools, technology deficiencies still remain. Specifically, there is insufficient availability of software that relates to the adopted graded course of study so that students are better able to use technology. Also, wiring is not complete in order to have access to the Internet, although it is being installed. Nevertheless, the issue of teacher training on the use of technology and repair and maintenance can be applied to all levels and this district does not

have sufficient funds for repair and maintenance of its technology. (Sonedecker Depo. 50–52) In essence, as to technology, there is a $6 million gap between what the district feels it needs to do and what it is doing. (Sonedecker Depo. 136)

### f) Northern Local School

At Sheridan High School in Northern Local School District, the sum total of equipment in the physics lab was a TV monitor, a computer, a faucet and a sink. (Phillis Tr. 2085–86)

### g) Southern Local School District

The Southern Local School District has applied for all of the technology grants that it can apply for. One of the district's problems with technology has to do with having the money for repairs of equipment. About 30 percent of the computers are four years old. When one of these old machines break down, class instruction must be stopped so that the instructor can walk from one end of the complex to the other to repair someone's computer. The district does not have a person who works only on repairs, and it does not have a budget for repairs. The district needs VCRs, overhead projectors, and tape recorders. The district needs about $15,000 per year for repairs, without taking into consideration trying to upgrade or replace the computers as they get older. The district needs a person to repair the computers because it cannot take a person repeatedly out of the classroom to repair computers or send the person for training in computer repairs. The training for computer repairs is also an item for which the district needs funding. (Lanning Depo. 65–67)

### h) Youngstown City School District

Most of the computers that Youngstown currently has will not be functional due to the year 2000 incompatibility. Almost all of the computers in the schools will need to be replaced if the District wishes to continue with any computer training of the students. (Funk Depo. 31–32)

## M. Badges of Residual Budgeting

State witnesses called by the State or called on cross-examination by Plaintiffs often took great pains to deny that cost was a material factor in determining a methodology to arrive at a base cost of an adequate education. (See, *e.g.,* testimony of Keen, Brunson, Davidson, and Cupp)

Of course, if cost were a material factor of consideration, this would indicate that a methodology was arrived at with a greater consideration toward budgetary constraints than educational adequacy. Indeed, the overwhelming documentary evidence from the State's own records, as well as admissions by certain witnesses

from the State, strongly indicates that the State developed a "rational" methodology as a guise for continued residual budgeting.

The Court has already found several examples of residual budgeting in its findings as to the analysis and change of the income screens, the change from weighted to unweighted averages, the imposition of caps, and the alteration of the recommended special education formula. (See Sections IV(B), (D)(1), (D)(2), and (E)(1)(a), *supra*) Senator Cupp testified that cost only became a factor at the end of the process. (Cupp Tr. 416–17) Yet, detailed analyses of the cost was occurring among the staff of the School Funding Task Force as early as May 1997. (See Section IV(B)(1), *supra* )

Evidence of residual budgeting further surfaced in Speaker Davidson's testimony. In fact, Speaker Davidson does not deny that during the summer of 1997, she was looking at "where you are going and what dollar amount you have to operate in, you're always going to look at the overall situation." (Davidson Tr. 281–82). Moreover, Speaker Davidson admits that she made the following statement to the media in July 1997:

"Speaker Davidson said that while the House and Senate leaders have reached consensus on some parts of the balanced proposed budget, there are some areas that have not been resolved. She mentioned, for one thing, that the House may want to lower slightly the Governor's plan to set per-pupil funding at $4,296, an amount recommended by Dr. John Augenblick, a consultant who was brought in by the Ohio Department of Education. She said the amount was calculated on inexact data and that the lower per-pupil funding would *help make up revenues lost from scrapping the cigarette tax and expanding property relief.*" (Emphasis added.) (Pl. Exh. 525; Davidson Tr. 283–84)

Speaker Davidson testified that cost did become a factor of the legislative process prior to the completion of H.B. 650. She testified:

"Cost always becomes relevant when you're putting together a piece of legislation that is operating within an already established budget. You knew that you had a certain amount of money that was allocated from the budget for its particular purposes and that if you exceeded that amount of money, you had to make modifications in the balance of the budget that had already been enacted. So cost did become a factor as we worked to completion of H.B. 650." (Davidson Tr. 1480–89)

The Court finds this to be a further admission that at some point in the legislative process, cost became a consideration of the legislature and is further evidence of continued residual budgeting.

Other evidence on this subject is found in the testimony of Liz Connolly. Ms. Connolly repeatedly asserted in her deposition that cost was not a factor in

selecting a school funding methodology. (Connolly Depo. 25, 29–32, 36) The credibility of this testimony is reduced by other evidence that cost was a consideration in legislative deliberations. For example, Ms. Connolly commented in a memorandum summarizing the Coalition's remedy that the Coalition had not determined the cost of their proposed adequate education. (Connolly Depo. Exh. 1) Additionally, she and Brian Perera, the fiscal analyst for the Senate Majority Caucus, distributed two draft plans to Republican senators and tied both directly to cost: "The first, called the 'Fair Share Percentage Plan,' is a complete overhaul of the current school funding system. The assignment we were given in constructing this plan was to address all of the Court's concerns and keep the price tag within the one-cent sales tax increase revenue projections. The second approach is called the 'Targeted Resourced Plan.' This approach was based on having no new revenue and moderate spending cuts within the existing FY99 budget." (Connolly Depo. Exh. 3) Finally, Ms. Connolly did admit in another portion of her deposition that the overall cost of the school funding legislation was a factor. (Connolly Depo. 31–32)

Likewise, Timothy Keen acknowledged that the cost of forming a response to the *DeRolph* decision was always a consideration in the legislative deliberations. (Keen Depo. 31–32)

Further evidence of picking a methodology to get to a specific number was found in Brunson Exhibits 15 and 16, which showed the base cost of several scenarios brought forward to 1999.

Regarding why the bottom line "base cost" appeared on a number of various scenarios with different cuts or screens for wealth and income of districts, Mr. Brunson testified:

"Q. ... My question is: why are the two headings 'base cost estimates' and the numbers that follow each of those headings even on this [Exhibit 15]?

"A. Well, again, I think just like this is an important number, just like any— all these other things are important information about what that particular option means.

"Q. Why is it important?

"A. It's a piece of information.

"Q. Why is it an important piece of information?

"[Objection of counsel deleted.]

"A. It's just something that is produced. It's the end result of these calculations. I think you—it's the final result of that calculation.

"Q. You certainly want to know what the cost is?

"A. You want to know what the result is, yes.

"Q. And the result is the cost, right?

"A. That is a cost number, yes." (Brunson Depo. 114–15)

Without eliminating districts based on property valuation or income, 169 of Ohio's 607 school districts met 17 of the 18 performance objectives established by Dr. Augenblick. (Klein Depo. 141, 156)

With respect to the Panel of Experts' report, Dr. Augenblick acknowledged that the changing of any of the screens would also change the bottom line recommendation. (Augenblick Tr. 828–29)

In January 1998, Dr. Augenblick met with members of the General Assembly, including Senator Cupp, Senator Finan and Senator Watts. He was asked to travel to Columbus from Colorado to attend this meeting. (Augenblick Tr. 912) At that time the legislators in attendance talked about changes in methodology and removal of the expenditure flow model. Dr. Augenblick opposed the use of the median as a means of selecting the base cost because it focused on a single district. He was asked if he would support changes by the General Assembly in his methodology. (Augenblick Tr. 917) Dr. Augenblick has not changed any of the recommendations he made to the school funding task force in July 1997. They are still his recommendations. (Augenblick Tr. 921)

What has happened is that factors are just being added and subtracted to reach a dollar amount that is available—a predetermined dollar amount that the General Assembly can afford.

(Alexander Tr. 1648)

Evidence of residual budgeting is found in the testimony of Representative Johnson. After the Governor's proposal supporting Dr. Augenblick's methodology failed to pass the Legislature, a Joint Subcommittee of Finance of both the House and Senate Finance Committees was formed that Representative Johnson co-chaired with Senator Roy Ray. (Johnson Depo. 35–36)

Johnson Deposition Exhibit 2 is an in-house staff memorandum separately describing the roles of the Joint Subcommittee of Finance and the Joint Subcommittee of Ways and Means. Although Representative Johnson can speak only to the Joint Subcommittee of Finance, he believes that this document lists the issues that came before his Subcommittee. (Johnson Depo. 36–37)

A draft document of the scope of the duties assumed by the Joint Subcommittee of Finance, under the heading "The Charge of the Joint Committee," states in part:

"The purpose of the Joint Committee is to review how the Legislature might determine the cost of an adequate education program. OBN, working with Dr.

John Augenblick, developed a rational basis method to determine the cost of an adequate education program. The OBM/Augenblick method was never fully embraced by many of those involved in the school funding discussion, including many legislators. Some were not comfortable with the results of the study, they felt the base cost dollar amount should be higher (or lower)."

(Johnson Depo. Exh., p. 1)

When asked if any legislature rejected the methodology because it would cost too much, Representative Johnson testified: "But there were certainly legislators that were concerned about the cost, concerned—had all kinds of different concerns." (Johnson Depo. 44)

A handout given to the Joint Subcommittee of Finance at one of its meetings discusses three different possible methodologies for determining the cost of an adequate education, labeling them as (1) the "Resource Cost Model," (2) the "Regression Model," and (3) the "Expenditure Model." The memorandum briefly discusses in outline form these three different models and further outlines the "advantages" and "challenges" of each of these models. Notably, the outline discussing the "Resource Cost Model" which is sub-labeled "Shorthand: Fund a List of Inputs," contains the following challenge: "Coping with 'sticker shock' over the final cost figure." (Johnson Depo. 49–57; Johnson Depo. Exh. 4) The Court finds the foregoing to be evidence that when choices of methodologies were considered by the Legislature, cost was a factor.

The evidence indicates that after it was decided to alter his methodology, the State sought cover from Dr. Augenblick. Mr. Brunson kept handwritten notes of at least one conversation with Dr. Augenblick. At one point, Mr. Brunson wrote in those notes:

"Different people can make different choices—I don't feel comfortable backing other decisions.'—John A."

Mr. Brunson next wrote:

"Different decisions could take 2 people to defend. He can still defend it generally, but you then need to have the other person testify on that issue. He will say other methods are reasonable."

(Brunson Depo. Exh. 28)

The "he" referred to in the above quote is Dr. Augenblick. (Brunson Depo. 164–65)

Mr. Brunson later wrote in his notes:

"We can just aim for 51% of defined cost. We don't have to include local input above 23 mills. We need to adjust local share for the roll back to get to a revised local share."

(Brunson Depo. Exh. 28)

It was the goal of the individuals involved in the school funding process to achieve a 51% State share of defined costs to "make the local share less than the state share." (Brunson Depo. 166) The Court finds this goal to be one of form over substance and of little weight.

The Legislative Budget Office prepared a discussion document on Dr. Augenblick's plan, which states in part:

"The Augenblick's [sic] proposal includes an estimated $1,000 per pupil funding in addition to the $4,269 foundation level in FY99. This $1,050 per pupil 'add-on' amount accounts for adjustments for special education 'excess costs,' transportation, DPIA, and up to 18% of the cost of doing business factor. *The total cost of these adjustments under the Augenblick's [sic] proposal would be approximately $1,834,000,000 [$1,050 × 1,746,322 (ADM)].*" (Emphasis added.)

(Brunson Depo. Exh. 201, p. 1) The memorandum goes on to note the FY99 funding levels "recommended by the conference committee" for the same categoricals which show lower numbers. (*Id.*)

The Legislative Budget Office memorandum on Dr. Augenblick's plan discusses the cost of increasing the foundation level to the base cost number recommended by Dr. Augenblick. It states:

- "● The additional cost of increasing the foundation level to $4,269 in FY99 under the current formula is $743 million (compared with the funding level recommended by the conference committee).
- "● By increasing the foundation level from $3,663 in FY98 to $4,269 (16.5%) in FY99, special, vocational, and gifted education funding needs to be increased by approximately same percentage to prevent the 'parity' issue.... The 16.5% increase for special, vocational, and gifted education in FY99 would be approximately $170 million.
- "● Total cost: $913 million ($743 million plus $170 million)."

(Brunson Depo. Exh. 20, p. 2)

The Court observes that the actual increased funding for FY99, including the foundation level and the categoricals is approximately $341 million (State's Exh. 63), a difference of $572 million from the additional cost estimated as derived from the foundation level recommended by Dr. Augenblick. The Court deems this to be further evidence that from July 1997 to the end of January 1998, when H.B. 650 was enacted, the cost of Dr. Augenblick's recommendations was a factor in the legislature's alterations of those recommendations.

Perhaps the most disturbing testimony on this subject comes from one of the State's own consultants, Dr. Howard Fleeter, who testified:

"My concerns about what the legislature did is that they made changes in the approach for the purpose of coming up with a lower number ... but more I based it on listening to the public comments of many legislators who expressed concerns over the cost of doing this and concerns over the necessity of responding to the DeRolph decision at all because of the feeling that the state had already made significant progress since 1991 and that they didn't need to do anything else. And that suggestion to me concerns me that the alterations that they made were made with the intention of coming up with a lower number, which would mean a less costly system." (Fleeter Depo. 241)

### N. Foundation Level Is and Will Remain Inadequate

#### 1. Foundation Level In General

State Superintendent Goff would not testify that the current funding level is adequate for the needs of Ohio's pupils. (Goff Depo. 230)

The Legislative Budget Office replicated the Gottel/Gossen Adequate Education Model of determining funding levels for producing minimum and adequate levels of education with recent numbers. (Keen Depo. 33–34, Exh. 2) The Gottel/Gossen Model was run for two groups of schools: type one included rural, high poverty districts, and type six included major urban, very high poverty districts. For FY99, the cost of a minimum education in for a type one pupil was computed to be $3,388 and $4,110 for type six district pupils. If the programs were raised from minimum up to adequate, the costs increase to $3,625 for type one pupils, and $4,398 for type six pupils. The assumptions used in the Gottel/Gossen Model include a 25:1 student-teacher ratio for regular education in all grades, only half-day kindergarten, and a 12:1 student-teacher ratio for special education. (Keen Depo. Exh. 2)

The historical rate of increase in the foundation level has been in the neighborhood of 4.8% per year. (Goff Depo. 214)

Dr. Goff characterizes school funding components that are driven by the base foundation figure established by H.B. 650 as "auto pilot" items, including special education, transportation, and vocational education. If the base funding amount is insufficient the "auto pilot" items are also inadequate. (Goff Depo. 217–20)

See, also, "No New System", *infra.*

#### 2. Salaries In Specific Districts Reflect the Inadequate Foundation Level

In the last five years, the Putnam County Educational Service Center has provided its employees either a 3% or 4% pay increase each year. The County Educational Service Center salary schedule historically has lagged in the lower one-third of salary schedules in the county. The increases each year were an

attempt to address the recruitment and retention of good staff members. The board and the superintendent recognize the need to raise salary schedules to keep quality employees and not lose them to other areas. (Osborn Depo. 52) The Putnam County Educational Service Center has a minimal number of step increases in its salary schedule in relationship to other school districts. Additionally, some districts have a "masters plus 30 hours" column which the Educational Service Center does not. Also, the Educational Service Center does not have a tuition reimbursement program. (Osborn Depo. 53)

Increases in costs for the Putnam County Educational Service Center in FY99 in addition to salary increases include an 11% increase in health insurance for FY99, which is down from a 20% increase in the previous year. Additional increases in costs include spending $50,000 to $100,000 to keep up with technology and the purchase of six modular classrooms for approximately $231,000. (Osborn Depo. 48–49)

Since 1990, the teachers of the Plaintiff Dawson–Bryant Local School District have received a 2%–2.5% salary increase in each year. However, the average teachers' salary for the district is still $10,000 below state average. Also, for a teacher in the district to receive the state average teachers' salary, it would require 27 years of experience and 30 hours above a master's degree. (Washburn Tr. 1959)

As the Groveport Madison Local School District's finances have eroded, its salary schedule has likewise eroded. The District had one of the highest salary schedules in Franklin County 20 to 25 years ago; it now has the lowest salary schedule in Franklin County. Specifically, it has the lowest beginning salary schedule in Franklin County. (Barr Depo. 30) As such, the District is not able to compete with nearby school districts for new hires. It has also dismantled programs in order to try to cut back on costs. (Barr Depo. 30–31)

The Groveport Madison Local School District's salary schedule for beginning teachers is the lowest in Franklin County. The District competes with growing districts in the same county, such as Hilliard and Dublin. Because the District is not competitive with beginning teacher salaries, it often does not successfully recruit a first choice candidate and has to settle for third or fourth choice. (Barr Depo. 216) The problem is further aggravated by the fact that the District has experienced occasions where after a teacher completes a couple of years in the District and becomes a more accomplished teacher, the teacher's reputation spreads to other Districts and the teacher is recruited away. Groveport Madison has also lost administrators for the same reason. In essence, by the District not being able to provide competitive beginning teacher salaries, it is in "a circumstance where the new teachers are cutting their teeth on your children and then moving on to another district." (Barr Depo. 217) None of the new legislation

helps Groveport Madison with its problem of teacher recruitment and retention. (Barr Depo. 218)

Superintendent Barr has not taken a salary increase for 3 years. His assistant superintendent, Glen Savage, has had the same salary for the last 2 years. (Barr Depo. 100)

The increases provided to teachers at the Chillicothe City Schools have been below what is needed to attract the best teachers possible to the profession. (Overly Depo. 34)

The South–Western City School District has redirected dollars in areas to succeed with the rules that the State has established, such as proficiency test scores and items on the report card. The market dictates every expenditure made by the District and the District is at the low end of the scale in the market for salaries and benefits. (Hutchinson Depo. 97–98)

Reducing the expenses of Lima City Schools is not a realistic option. (Buroker Depo. Exh. 1) The District is already behind competitive districts in terms of salary and benefits, which consume almost 80% of the District's budget. (Buroker Depo. 118) The third page of Buroker Exhibit 7 is a schedule of districts against which Lima competes for staff. The schedule shows that during the 1989–1990 school years, Lima was second of those ten districts as to average salary. By the 1997–1998 school years, it had fallen to sixth in average salary. For the 1998–1999 school years, it is estimated that Lima will be seventh out of those ten districts in starting salaries. (Buroker Depo. 121–22, 125–26) This translates into the District not hiring the best teachers it can get. In some circumstances, it has hired teachers who are not even certified. (Buroker Depo. 127)

The Southern Local School District salary schedule provides $20,752 for a beginning teacher with a bachelor's degree for FY99. (Lanning Depo. Exh. 8) The top level for a teacher in the district is slightly over $40,000 with 28 years' experience. (Lanning Depo. 146)

It is very difficult for the Southern Local School District to recruit teachers, and the District has a difficult time getting applicants. The District needs to be competitive if it is going to have a good educational system; otherwise, good teachers are going to go to the schools that pay more dollars. (Lanning Depo. 24) Further, the last time the District negotiated with teachers, if the Board had not granted the teachers a pay increase, the Board would have had to deal with a strike. (Lanning Depo. 25)

The Southern Local School District had four applicants for a position and eventually had to hire the fourth applicant, the one that the district felt was least qualified, because the others turned down the position to go where there was a

higher starting salary. Often, the District does not get as many applicants, or they have to hire applicants that are not as qualified as they would like to have, because they have a tough time competing with other districts for salaries. (Lanning Depo. 77)

## V. ELIMINATE RELIANCE ON LOCAL PROPERTY TAX AND WEALTH–BASED DISPARITIES

### A. Wealth–Based Disparities Continue

#### 1. Ability of Students to Compete

Defendant Dr. Goff agrees that fairness requires that children have a level playing field in terms of their opportunity to pass proficiency tests. (Goff Tr. 553)

Defendant Dr. Goff agrees that access to educational resources should not be determined by wealth differences among school districts. (Goff Depo. 37).

As was the situation at the time of the DeRolph trial, there continues to be vast disparities in the educational opportunities afforded students with disabilities in low and high wealth districts. As was the situation at the time of the DeRolph trial, children with disabilities in poor school districts are being denied equal opportunities to benefit from educational programs and services because of the lack of sufficient funding. (Osborn Depo. 17–18; 128–29; 143–44; Osborn Depo. Exh. 8, pp. ii, 15)

Under the current funding system a child could move from a district offering all-day every-day kindergarten to a district that did not and thus lose an educational benefit. Under that circumstance the quality of the child's education would depend on where the child happened to live at the time. (Goff Tr. 579)

Between the years 1991 and 1997, Dr. Osborn has not observed substantially different or improved programs in the Putnam County schools. The school districts in Putnam County are not getting ahead in providing significantly more programs. No school district in Putnam County provides all-day, every-day kindergarten. No school district in Putnam County offers any honors or AP courses. (Osborn Depo. 148–49)

The differences observed in the summer of 1997 between the opportunities students have in Putnam County versus the opportunities students have at Dublin indicate that the basic aid amount is too low. (Osborn Depo. 129)

The numbers of students from Appalachia going on to higher education is lower than the statewide average going on to higher education. Also, the statewide average is lower than the national average for students going on to higher education. (Washburn Tr. 1949)

The graduates of Plaintiff Dawson–Bryant Local Schools compete for scholarships in higher education as well as for employment with students of other districts. The students of the district continue to be at a disadvantage because the district does not offer any advanced placement (AP) or honors courses. Some institutions of higher education require AP or honors courses for scholarships. (Washburn Tr. 1947)

For the students of the Plaintiff Dawson–Bryant Local School District to compete in employment and in higher education, the district needs to address the gap between where students are developmentally when they enter school and where they should be. The district needs to have additional resources in personnel and professional development and technology in order to do this. The district needs to provide extended time with students, needs to provide more intervention, and needs to reduce class size. The Plaintiff Dawson–Bryant Local School District is not currently able to provide its students with an adequate education because it does not have the resources to do so. (Washburn Tr. 1950–51)

Beginning in FY99, students passing all parts of the twelfth grade proficiency test will be eligible for a $500 scholarship for any institution of higher education in Ohio. Because the passage rate on the twelfth grade proficiency test at the Plaintiff Dawson–Bryant Local School District is not nearly what it is in other districts having additional resources, the district's students are at a disadvantage. (Washburn Tr. 1947)

## 2. Differences in Districts' Funding Due to Wealth Disparities

Defendant Dr. Goff understood the Supreme Court's decision to require a redesign of how schools are funded and to provide an adequate amount of money to meet the goals of equity and adequacy as he has defined them. (Goff Depo. 48)

Cohen Deposition Exhibit 37 does not specify the actual revenue to be received by any school district for FY99. (Cohen Depo. 507)

Income adjustment is an adjustment in the property wealth of a school district based upon the income of the people who live in that district. The adjustment is made based on the State's median income per return compared to that of the school district. Income adjustments enacted in previous legislation were frozen in H.B. 650 such that the maximum adjustment is now $12,000 of valuation per pupil. In the example provided by Mr. Maxwell, the income adjustment amounted to $55 per pupil per year. Income adjustment was being phased in prior to 1998; however, that adjustment is now being phased out of the foundation formula and will be eliminated by the year 2000. (Maxwell Tr. 1375–76) The

Court finds that this feature of the school funding legislation does not bring about any significant improvement.

The Ohio Department of Taxation reviewed the sources for local property taxes. Different types of property are taxed at different rates to produce local property taxes. The disparities among districts continue among the different classes of property: for class one real property, one mill produced $272.90 per student for the highest amount, while the lowest amount accrued by one mill for one student was $13.34. For class two real property, one mill produced $182.12 per student for the highest district, while the poorest district collected only $.33 per student. For public utility tangible property, the highest earning district received $209.38 per student for one mill of tax, while the lowest earning district collected a mere $2.34 per student. For business tangible property, the wealthiest district received $228.85 per student for one mill, while the poorest district received only $.23 per student. (Connolly Depo. Exh. 2)

The Ohio Department of Taxation prepared an overview of local school funding in Ohio. This study found that disparities of money, and therefore opportunity, between rich districts and poor districts can easily be seen in the amount of money one mill of local property tax brings in per pupil. For tax year 1995, for example, in Cuyahoga Heights Local School District, one mill produces $551.93 per pupil. In stark contrast, one mill in Trimble Local School District produces a mere $18.80 per pupil. (Connolly Depo. Exh. 2) This Court finds the study to be credible evidence of the continuing disparities of wealth and available services between districts.

One mill produces only $33,000 per year in the Plaintiff Dawson–Bryant Local School District. (Sites Depo. 17) Dawson–Bryant ranks last in property tax yield among the 611 school districts in Ohio. (Sites Depo. 17)

One hundred nineteen Ohio School Districts assess income tax upon the residents or workers within their districts. For tax year 1994, the wealthiest district in the state was Indian Hill Exempted Village School District, which averaged an adjusted gross income of approximately $138,000 per tax return. The poorest district in the state, New Boston Local, reported an average tax return income of $18,300. The ability to raise funds for schools through a local income tax is necessarily limited by the earnings and wealth of the district's constituents, and poor districts simply cannot raise a comparable amount of revenue through income tax. (Connolly Depo. Exh. 2)

Vast disparities still exist in district per pupil expenditures. For fiscal year 1996, Georgetown Exempted Village School District spent a total of $3,776 per student. For that same year, Cuyahoga Heights Local School District spent $13,706 per student. The Office of Budget Management commented, "This range of nearly $10,000 reflects the difference in available resources between districts

on the two extremes of the state property wealth and income." (Connolly Depo. Exh. 2) The State presented little, if any, evidence as to how the legislation enacted since March 1997, has or will address these disparities.

In fiscal year 1991, there was an approximate $2,000 per pupil difference between the wealthiest 10% of Ohio school districts, and the poorest 10% of Ohio school districts. (Alexander Tr. 1662; Pl. Exh. 477, Chart 5). The difference in spending per pupil between the wealthiest 10% and poorest 10% of Ohio school districts, in fiscal year 1998 is still about $2,000. (Pl. Exh. 477, Chart 11) This means that there has not been a systematic overhaul of the funding of public education in Ohio, because through 1998 everything looks about the same as it did in 1991 when the facts were first brought before the trial Court. (Alexander Tr. 1666-67)

Dr. Alexander's analysis shows that there is a relatively minor increase in spending per pupil in the poorer school districts, but education still remains a function of wealth, with $1,900 being the difference between per pupil spending in the poorest decile of school districts compared with the wealthiest decile of school districts. (Pl. Exh. 477, Chart 17.1; Alexander Tr. 1670)

There was about a $2,600 difference in per pupil spending between the wealthiest 5% of Ohio school districts, and the poorest 5% of Ohio school districts in fiscal year 1991. (Alexander Tr. 1671; Pl. Exh 477, Chart 21) For fiscal year 1999, there is a $2,600 difference in per pupil spending between the wealthiest 5% of Ohio school districts and the poorest 5% of Ohio school districts. (Pl. Exh. 477, Chart 29) These charts reflect that there is a marginal increase in per pupil spending in the poorer school districts for 1999, but does not show a systematic overhaul of the system as required by the Ohio Supreme Court. (Alexander Tr. 1672)

Mr. Dana Shams of the Ohio Department of Education prepared a quintile analysis reflecting the effect of the phased-in foundation amounts under H.B. 650 for FY98, FY99, and fully phased in. Based on this analysis, the ratio of the gap between rich and poor districts would *increase* when FY99 funding is fully phased in. (Shams Depo. Exh. 10)

Shams Deposition Exhibit 11 represents fully phased in State aid compared with FY98 revenue and FY99 first year revenue. Again, the gap between the richest and poorest school districts increases at the point between the FY99 phase in and the fully phased in analysis. (Shams Depo. Exh. 11)

Mr. Driscoll concluded, upon completion of a simulation projecting school funding as provided by H.B. 650 through the year 2004: "Considering the system as a whole, the analysis does not show dramatic improvement toward a more

equitable balance in per pupil revenues after accounting for differences in costs around the state." (Driscoll Depo. 116; Driscoll Depo. Exh. 10, p. 7)

Wealth-based disparities among Ohio's public school districts have not been eliminated by the General Assembly. The State's contribution is insufficient to offset the local disparities created by wealth. If the trend continues, the need for greater local resources will increase. As the State fails to use State dollars to offset those differentials, the disparities will increase. The differences in the prospects in education, and in quality of education, will be exacerbated under this system as it moves into the future. (Alexander Tr. 1679)

B.  No Relationship Between Wealth Of District And Its Level of State Funding in FY99 and Beyond.

The per pupil increases that school districts will receive as a result of H.B. 650 and 770 are shown on Plaintiffs' Exh. 485. The districts are ranked from the poorest to the wealthiest. Page 13 of that exhibit summarizes that the lowest quartile or the poorest 150 school districts will receive a weighted average increase per pupil of $273. The next 150 poorest districts will receive a weighted average of $274 with the third quartile receiving an average of $171 per pupil and the wealthiest quartile of school districts receiving a $127 per child increase on the average. (Strawser Tr. 1775–75)

The increases under H.B. 650 and H.B. 770 did not involve a correlation based upon district wealth. (Strawser Tr. 1821–22)

Jackson City School District is ranked 130 on the poverty ranking of the Ohio Department of Education presented in Plaintiffs' Exhibit 485. The per pupil increase for Jackson City Schools under H.B. 650 and 770 is $133. In 1990, the Jackson City Schools spent $800 less per pupil than the State average expenditure and in 1997 the district spent $1,100 less per student than the state average. The Treasurer of the Jackson City Schools, Earnie Strawser, was very upset by this legislative response that "does not provide the adequate dollars." He testified, "so there's less there to work with, fewer dollars over that period of time to work with per child, and th[e]n to see an increase that basically is $5.00 over even the wealthiest quartile ... so I have a tremendous amount of frustration ...." (Strawser Tr. 1776–78)

A review of per pupil increases under H.B. 650 and 770 with districts rank ordered according to wealth shows that the per pupil increases are random and scattered. For example, Adena Local School District with a wealth ranking of 39 received a per pupil increase of $37.89. Right next to that district, with a wealth ranking of 40, another district received $152 per pupil increase. The district with a wealth ranking of 41 received an increase of $443 per pupil. Instead of any type of tight pattern, where you would look at the poorest district to the

wealthiest district and see some type of distribution based on that, what is presented is a scattergram of up and down increases with no relation to wealth. (Pl. Exh. 485; Strawser Tr. 1779)

C. The System's Reliance on Local Property Tax Has Not Been Reduced

All funds raised for public education are raised pursuant to state law regardless of whether the funds are state revenue or local revenue. (Goff Depo. 42)

Dr. Fleeter testified that reliance on local property taxes has not been reduced and inequity remains:

"My biggest concern with the system the way it stands right now as far as equity is concerned is with respect to one of the directives ... of the DeRolph decision, which was to reduce the emphasis or reliance on local property taxes. Since the disparity in the local property tax base, particularly for class II property is what drives the inequities in spending and creates the big differences in fiscal capacity across differences, the fact that reliance on local property taxes hasn't been reduced gives me my biggest concern about equity." (Fleeter Depo. 150)

For fiscal year 1996, the State funded a mere 45 percent of an average district's operating funding. Comparatively, local property and income taxes supplied 48 percent of the district's operating funding. The remaining seven percent of funding came from federal sources. (Connolly Depo. Exh. 2)

1. Effects of House Bill 920

House Bill 920 does not protect individual taxpayers from paying increased property taxes. It does, however, operate to prevent school districts from realizing any increase in revenue due to inflationary growth and property values. (Maxwell Tr. 1515)

The number of school district levies on the ballot statewide have typically been over 400 a year. (Russell Depo. 79)

House Bill 920 is one of the factors that have contributed to the lack of adequate funding for public schools. (Goff Depo. 25)

Dr. Howard Fleeter testified that four key parameters were necessary for the State to be in compliance with the DeRolph decision. One of those was to address the problems presented by H.B. 920. Dr. Fleeter's concerns regarding H.B. 920 remain unaddressed. (Fleeter Depo. 158–61)

H.B. 650 provides that after it is fully phased in, the base cost shall be adjusted annually at the rate of 2.8%. This inflation factor is unreasonable in view of the fact that Ohio's school funding system remains one where the State considers the

valuation per pupil as an indication of property tax available so that on paper where values go up 6% to 8% because of reappraisals and updates, that level of money is not provided. (Russell Depo. 77–78) As to local revenue, growth occurs only in school districts based on the amount affected by their inside millage or, if they are fortunate, any new construction. (Russell Depo. 78) For those districts that are able to pass levies, there is growth in local property tax, but only for those districts that can go back to their citizens and pass levies. (Russell Depo. 79)

Ohio's public schools receive in excess of 70% of the revenue produced from property tax. Ohio's property tax base has continued to erode over the last several years. (Russell Depo. Exh. 1) Deregulation of the telecommunications industry which reduced tax assessment from 88% to 25% on all long distance carriers and on new equipment installed by local carriers has resulted in a reduction of over $100 million in local revenue. (Russell Depo. 138–39; Russell Depo. Exh. 1) More recently, the gas industry in Ohio has been deregulated, likewise resulting in a tax assessment rate being reduced from 88% to 25% effective immediately. This has been calculated to have a tax loss as high as $50 million. (Russell Depo. 141; Russell Depo. Exh. 1) In addition to these enactments, action by the Board of Tax Appeals in the Courts is contributing to further erosion of the tax base, as exemplified by recent cases known as the *United Telephone* case and the *Texas Eastern Pipeline* case, which have resulted in significant losses of local revenue to school districts. (Russell Depo. 141, Russell Depo. Exh. 1) The Court finds that this erosion of tax base required additional tax levies and that the State has not reduced school districts' reliance upon property taxes.

2. Specific Districts Have Not And Will Not Be Able to Reduce Reliance on Property Taxes

a) South–Western City Schools

The South–Western City School District received the same amount of money from the State of Ohio beginning in FY87 and continuing for seven years, requiring the district to go to the ballot for 8.9 mills to operate. State funding for the South–Western City School District has not outpaced inflation. (Hutchinson Depo. 95–96)

Hamilton Exhibit 6 is a compilation of the budget history of South–Western City Schools for the years 1990 through 1998. (Hamilton Depo. 87) The compilation reflects the cycle the district experiences as to the gap between revenues and expenditures, which narrow annually until a new operating levy is passed. It shows the following unencumbered balance for the corresponding years:

| | |
|---|---|
| 1990 | $1,667,380 |
| 1991 | $3,132,068 |
| 1992 | $2,724,521 |
| 1993 | $1,143,794 |
| 1994 | $ 778,468 |
| 1995 | $1,191,122 |
| 1996 | $5,845,459 |

The jump in the unencumbered balance from 1994 to 1996 is reflective of a new operating levy. (Hamilton Depo. 90)

The constituents of the South–Western City Schools are supportive of education in general but they are not supportive of additional property taxes. The constituents believe and the district's study shows that the taxpayers' ability to pay is about at capacity and for those residents to pass a levy and do more would be a sacrifice beyond their ability to pay. (Hutchinson Depo. 119–20)

The South–Western City Schools is an average wealth district and 38% of its funding comes from state revenues with the remainder coming from local dollars. (Hutchinson Depo. 105–06)

Although South–Western is one of the eight largest urban school districts, it is not considered one of the "Big 8." It receives no additional funding as the "Big 8" school districts do. Likewise, because of its place on the equity list, South–Western receives no State assistance for its facilities. (Hamilton Depo. 227, 229–30) That is, even though it requires $50 to $70 million in repair and upgrades of its existing facilities and another $128 million worth of new facilities to accommodate growth, it receives absolutely no assistance from the State of Ohio for its facilities. (Hamilton Depo. 230–32, 266) Even modest State assistance of 10% to 20% would assist the district in its efforts to pass the bond issues. (Hamilton Depo. 267) During the last 20 years, the district has placed a total of 21 bond issues or operating levies on the ballot, of which 16 (76%) have failed and 5 (24%) were approved. (Hamilton Depo. Exh. 14) The last 3 bond issues placed on the ballot since November 1996, have failed.

As of the hearing in this matter, South–Western School District had placed on the ballot a $128 million bond package which, if it passes, will allow the district to build one additional high school, a replacement vocational technical school, four intermediate schools, which would house 5th and 6th grades, replacement of the Park Street School, plus other additions and renovations. (Hamilton Depo. 216–17)

South–Western City School District is in fundamentally no different position today than it was prior to the enactment of the legislation the State has identified as its response to *DeRolph*. While some of the computations have changed, the results for South–Western City Schools are largely unchanged. (Hamilton Depo. 230–32)

Based upon the uncontested, unrefuted testimony of Dr. Hamilton, the Court finds that the State's new method of funding primary and secondary schools will not alter South–Western School District's degree of reliance upon local property taxes. The district's "dependence on local tax dollars is as significant and as strong today as it was before a new funding mechanism was put in place." (Hamilton Depo. 179)

### b) Groveport Madison Local Schools

Groveport Madison School District's enrollment has remained in the area of 6,000 students. Its revenue per pupil is composed of $2,430 from local funds, $2,332 from State funds, and $183 from federal funds. Its State funding per pupil is below the state average of $2,438. (Barr Depo. Exh. 13, p. 8; Barr Depo. 162)

While Groveport Madison has received a slight increase in funding from the State in gross dollars since 1991, as a percentage of funding, State funding has declined since 1991. (Barr Depo. 170)

Since 1987, Groveport Madison has placed 16 levies on the ballot, of which only 4 passed, including the most recent emergency 3–year levy which passed in May 1997. (Barr Depo. Exh. 6; Barr Depo. 59–60)

The Groveport Madison Financial Recovery Plan provides 3 alternatives, one assuming the passage of a 3–year, 9½ mill levy, another assuming the failure of such a levy, and the last assuming the passage of such a levy, but without renewal at the end of 3 years. (Barr Depo. 35; Barr Depo. Exh. 3) Of these 3 alternative plans, the Groveport Madison School District has implemented the plan which assumes passage of the 3–year emergency 9½ mill levy, assuming further that it would be renewed after 3 years. (Barr Depo. 38) The first 3–year emergency levy passed in May 1997. (Barr Depo. 59–60) Page 3 of the Financial Recovery Plan lists 14 items which the school district cut and were not reinstated after the passage of the 9½ mill levy. Those items were:

1. Eliminate Director of Curriculum

2. Eliminate one Secretary

3. Eliminate one Building Level Administrator

4. Salary Freeze on all Administrators

5. Eliminate Seventh Grade Sports Programs

6. Combine Ninth Grade Sports with High School Program

7. Eliminate Faculty Manager Positions at Middle School

8. Eliminate 2 Guidance Counselors at Middle School

9. Eliminate Field Trips

10. Eliminate DPIA Proficiency Testing Program

11. Reduce expenditures for Equipment by $500,000

12. Reduce expenditures for Supplies by $500,000

13. Eliminate Summer School Program

14. Eliminate Classes Where Fewer Than 25 Students Enrolled

(Barr Depo. 39–42; Barr Depo. Exh. 3)

The cuts implemented in the Financial Recovery Plan were in addition to the Groveport Madison School District's cutting a half million dollars out of its current budget before the 14 cuts were implemented. (Barr Depo. 39) As such, the cuts made prior to the implementation of the plan added to the cuts in the 14 categories implemented under the plan total $2.5 million.

The legislation identified as S.B. 55, H.B. 412, H.B. 650, and H.B. 770 have not altered Groveport Madison's degree of reliance upon local revenues and local property taxes as part of its operating budget. The set-asides required by H.B. 412 aggravate the district's deficit situation and only increase the need of the district to return to the ballot. In fact, the requirements of H.B. 412 have placed the district in a situation where in 1997 it represented to the voters that 9½ mills would be sufficient, but will now have to represent to the voters that 9½ mills was not enough. (Barr Depo. 219–20) Likewise, this legislation does not reduce the district's dependence upon borrowing to maintain operations. (Barr Depo. 220)

### c) Other Districts

Between the years 1991 and 1997, Dr. Osborn has not observed substantially different or improved programs in the Putnam County schools. Pandora–Gilboa, which is number 148 on the equity list, in May 1998 passed a renewal of its five-year 34% income tax. In light of the current funding, this income tax will be necessary to maintain the programs that it has. The board is already considering running another operating levy next year. The district voters turned down the facility proposal in which it needs more classrooms three times. At Leipsic Local, the district four years ago (FY95) ran an emergency levy of almost 10 mills. It appears that the district will again need to renew the levy at a level of 10 mills. (Osborn Depo. 148–49)

The five-year projection of the Chillicothe City Schools shows an anticipated $1.6 million deficit by end of fiscal year 2001. The only two options available for the district are making staffing cuts or passing additional millage levies. The district failed three levy attempts in the last two years. (Overly Depo. 23–24, 56) If the Chillicothe City School District Board of Education does not go to the

ballot for additional money, then programming for the district will suffer. (Overly Depo. 45–46)

The minimal funding provided by the State forces the Dayton City School District to go back to voters to try and pass a levy. This is a very tiresome and cumbersome process and is not what Superintendent Williams was trained or hired to do. Levies usually are based on keeping the ship floating, and are basic operating levies. (Williams Depo. 60) The growth in Dayton City School District's local education revenues is declining. Real estate taxes are decreasing in Dayton due to businesses moving out and lowering their inventories. House Bill 920 has created problems for the district in that local revenues do not keep up with inflation. (Williams Depo. 138)

There will be no material change in Mt. Vernon City School District's degree of reliance upon local property taxes and local revenue and that, in fact, there will be a projected reduction in State funds for special education, thus increasing reliance on local revenue for that category of education. (Sonedecker Depo. 219)

70% of the students in the Lima City School District are enrolled in the free and reduced lunch program. The district is one of the poorest districts in the State of Ohio in terms of local property tax as well as personal income. As such, it cannot afford to pay additional property taxes (Buroker Depo. 117) and has not passed a new levy since 1990, although it has renewed 4 levies since 1992.

Even if the Lima City School District renews its 6.9 mill operating levy in the year 2000, it remains that it will begin incurring deficits in the year 2001 which are projected to grow to a deficit of $6,963,157 by fiscal year 2003.

The Plaintiff Southern Local School District voters have been very supportive of tax levies. The district passed a bond levy in 1991 to obtain school facilities, renewed a five-year operating levy in 1994 after one defeat, and the renewal of that levy is again on the ballot in November 1998 for 3.9 mills. One mill in the Southern Local School District brings in approximately $24,000. Renewal of the levy will bring in the same amount of money it brought in ten years ago. If the district had opted for a replacement levy, it might have gained the district about $5,000. (Grandy Depo. 40–41) To cover the district's projected deficit, the district would need to levy at least 50 mills. (Grandy Depo. Exh. 1; Grandy Depo., 44, 86, 116–20)

Plaintiff Dawson–Bryant is expecting a reduction in property values in the six-year update. (Sites Depo. 14–15) Currently 1 mill generates about $33,000 for the district. (Sites Depo. 17) The district would need to pass more than 17 mills to cover its projected deficit if property values do *not* decline. (Sites Depo. Exh. 1)

Plaintiff Youngstown's local property valuations have been continuing to decline, which causes the district to receive less in local revenues. (Funk Depo. 30) The district is in debt over $37.2 million. The State is requiring repayment of the debt through 2005. (Brown Depo. 68)

The Court finds based upon a review of all the testimony, that the great weight of testimony shows that the State has presented no options for these other districts but to increase reliance on property taxes or cut programs.

3. Reliance On Property Taxes Has Increased

The chargeoff supplement enacted in H.B. 650 will impact the manner in which a school district plans for local tax levies because increased tax revenue can result in a loss of the chargeoff supplement. Thus, any additional tax levy would need to be inflated to make up for that loss. (Maxwell Tr. 1398) This feature of H.B. 650 will increase reliance on property taxes. (Maxwell Tr. 1398)

The State fiscal effort in supporting public schools from fiscal year 1991 through fiscal year 1999 (the last year being an estimate) indicates that State effort in support of public schools has decreased, while local effort has increased. (Alexander Tr. 1674; Pl. Exh. 477, Chart 56)

A chart depicting the local effort from school districts from fiscal year 1991 through fiscal year 1999 (the latter being an estimate) shows that the totality of local effort to support public schools had increased from fiscal year 1991 through fiscal year 1998, which is a substantial increase in local effort during this decade for local school districts and funding their schools. (Alexander Tr. 1672; Pl. Exh 477, Chart 35)

The poorer school districts have increased their local fiscal effort, from fiscal year 1991 to fiscal year 1998, more than the effort of the richest school districts. "Local fiscal effort" is the measure of what the local taxpayers have put forth to support their schools. From fiscal year 1991 to fiscal year 1998, there has been a modest increase in equalization, but it is due to the poorer school districts pulling themselves up by increasing local effort, and the State is intervening very little. (Alexander Tr. 1667; Pl. Exh. 477, Charts 6, 12)

A chart depicting the local effort of school districts in support of education from fiscal year 1991 through fiscal year 1999 reflect an increase of $2,707 per pupil, on average daily membership, in 1991, to $3,383 for fiscal year 1999. This indicates that there has been a substantial increase of over $600 per pupil in constant dollars and local revenue toward schools over this decade. "Constant dollars" means dollars adjusted for inflation. (Alexander Tr. 1674; Pl. Exh. 477, Chart 37.1)

Per pupil State revenue for fiscal year 1991 was $2,045 and for fiscal year 1998 was $2,195 in constant dollars. (Pl. Exh. 477, Chart 38.1) Comparing charts 37.1 (local revenue) to chart 38.1 (State revenue), shows that the State is not assuming the funding burden in Ohio, and that the localities continue to fund a greater portion of the burden of public school education. If this trend continues, the State would continue to recede from the business of funding education. The trend is that local participation is becoming greater, while State participation is becoming less. If this trend is projected out, the State would become less of a partner in the funding of the State's system of public education. (Alexander Tr. 1676)

State and local per pupil revenues for public education increased from $4,750 to $5,730 (the latter an estimate) from fiscal year 1991 to fiscal year 1999 in constant dollars. (Pl. Exh. 477, Chart 39.1) However, most of this increase is coming from local effort. There has been about $1,000 increase in State and local revenues over this decade, but only approximately $300 of that is due to the State's share. This indicates that the differentials between State and local effort will get wider in the future if the trend continues among the school districts. (Alexander Tr. 1676)

During fiscal year 1987 to fiscal year 1996, State revenue per pupil has increased 36.2% while local revenue per pupil has increased 74.49%. Since 1991, State revenue per pupil has increased 16.94% while local revenue per pupil has increased 24.8%. This indicates that since 1991, the reliance of school districts on local property taxes has only increased. (Russell Depo. Exh. 3, p. 109)

Plaintiffs' Exhibit 493 was prepared by Dr. Phillis and shows for FY88 through FY97 the relative percent of school district operating revenue by source. During that period the State's percent has decreased from 49.5% in FY88 to 42.3% in FY97 while the local share has increased from 47.4% in FY88 to 51.7% in FY97. (Phillis Tr. 2020; Pl. Exh. 493, p. 2)

The last page of Plaintiffs' Exhibit 493 is a graphic representation of the relative shares of revenue from the State and local sources during that period. (Phillis Tr. 2021)

Plaintiffs' Exhibit 494 was prepared by Dr. Phillis. It represents a decile analysis with the poorest 10% of the school districts being shown at the left-hand side of the graph and the richest at the right-hand side. For the period from FY90 through FY96, State support has declined for both the poorest and the richest school districts, with the greatest reduction in State support flowing to the highest wealth districts, and for each of the deciles in between. (Phillis Tr. 2022)

The second page of Plaintiffs' Exhibit 494 compares State funding in FY90 and FY96 for equity districts, non-equity districts, and all school districts. Both for

equity and non-equity districts, a smaller share of their budgets was represented by State funding in FY96 than in FY90. (Phillis Tr. 2024)

## VI. NO NEW SYSTEM

Among the school funding problems yet to be addressed are vocational funding, special education funding, and funding for gifted pupils. The legislation made school funding considerably more complicated. (Goff Depo. 230–31)

At the conclusion of the process of school funding reform the State should have a system of school funding that was significantly different from the one in existence before the process began. (Goff Depo. 48)

Dr. Phillis does not believe that taking into account H.B. 650 and 770, H.B. 412 and S.B. 55 that the State has performed a systematic overhaul of the system of funding primary and secondary schools in Ohio. (Phillis Tr. 2108)

### A. Phantom Revenue

There are five different scenarios by which phantom revenue operates to impact school district funding. The first scenario representing the gap between the chargeoff millage and the 20 mill floor millage reductions has been addressed in part by the chargeoff supplement. The second phantom revenue relates to the inflated valuation for districts above median income. This feature is being phased out of the formula. The third phantom revenue is the structural problem with the impact of reappraisal on the basic aid. This problem continues to exist even though increases due to reappraisal and updated values are now phased in. The fourth aspect of phantom revenue occurs as a result of the state aid ratio in special education funding. This is a new type of phantom revenue that did not previously exist. The fifth type of phantom revenue is the one resulting from power equalization of millage between 20 and 25 mills. This type of phantom revenue also did not previously exist. (Maxwell Tr. 1399–1400)

### 1. "Old" Phantom Revenue Continues

Under H.B. 650, "Type I" phantom revenue (referring to the difference between the foundation program's charge-off of 23 mills and the actual revenue realized by school district levies) will continue to exist for some districts. (Driscoll Depo. 98)

"Type 2" phantom revenue representing the effects of property tax reappraisal or update which cause a district to look "richer" to the school foundation formula continues to remain in effect despite the provisions of H.B. 650 providing for a phase-in of valuation increases over a three-year period. (Driscoll Depo. 100–01; Driscoll Depo. Exh. 8, p. 1176)

H.B. 650 has not addressed the problem of phantom revenue that results from reappraisal of property values. It remains that if a school district has an increase in valuation as a result of reappraisal, its 23 mill chargeoff is multiplied by the new valuation with the assumption that such revenue is actually available when that is not the case because of the tax reduction factors. (Russell Depo. 81–84)

An example of the continuing phantom revenue problem is Geneva School District which, in 1995 had local tax revenue of $5,400,182. This revenue grew to $5,629,835 by fiscal year 1998, a 4% increase of $229,654. At the same time, however, the chargeoff increased by 23% where in 1995 the chargeoff amount had been $3,296,292 and by 1998 it had grown to $4,041,870. (Russell Depo. Exh. 3; Russell Depo. 129–30) In another example, the Dayton City School's local tax revenue *shrank* during those three years by $8,070. At the same time, the chargeoff increased by $815,209. While Dayton did receive increases in State aid, those increases were for specific items so that it remains that Dayton's discretionary revenues fell by approximately $800,000. (Russell Depo. Exh. 3; Russell Depo. 129–30)

Recognized value is a current feature of school funding in which reappraised values and values increased as a result of triennial update are phased in over a period of three years. (Maxwell Tr. 1370) Recognized value was first enacted in House Bill 215 and became effective for FY98. The concept of recognized value is described on pages 2, 3, and 4 of Plaintiffs' Exhibit 466. Prior to the implementation of the recognized value concept, when values increased due to reappraisal or update, it caused the school district to look "richer" to the school foundation formula, thus creating what has been described as phantom revenue. In the example set forth on page 4 of Plaintiffs' Exhibit 466, two school districts are identical in every respect except that one has an increase in property value due to reappraisal and the other one does not. Over the three-year period of time the district having the increase in value loses $297,000 in operating revenue as the result of phantom revenue. (Maxwell Tr. 1371–73)

## 2. New Phantom Revenue

The manner in which H.B. 650 provides for the funding of special education has created an additional (new) type of phantom revenue. (Driscoll Depo. 103–04) The concept of phantom revenue applies to the state aid ratio for special education funding because, as recognized valuation increases, the district's state aid ratio will decrease. The increase in recognized valuation will not result in any offsetting increase in revenue. (Maxwell Tr. 1390–91)

H.B. 650 has created a new type of phantom revenue relating to the equalization of the 24th and 25th mills. If a district has 25 effective mills on Class One

property and has a valuation below the state average, such a district will receive a state supplement that would reflect what the district would produce at that amount and what the state average would produce for mills between 23 and 25. However, if as a result of reappraisal, the district's valuation rises slightly above the state average, the subsidy disappears even though the reappraisal may not result in any additional dollars for that district. This results in a penalty to the district simply· by virtue of reappraisal with no additional dollars on the local level, and the loss of dollars at the state level. This form of phantom revenue did not exist before H.B. 650. (Russell Depo. 86–87)

Power equalization is a concept that has two eligibility criteria—districts with an average or below average wealth per pupil and effective millage applied to class I (residential and agricultural property) which is more than 23 mills. Power equalization operates to provide funding to eligible school districts based on the difference between the per pupil yield per mill in that district and the statewide average yield per pupil per mill. Power equalization applies only to millage between 23 and 25 mills (effective class 1). For example, if a district's yield per pupil is $55 per mill and the statewide average yield per pupil is $95 per mill, the power equalization feature of H.B. 650 would provide an additional $40 per mill but only to millage between 23 and 25 mills. (Maxwell Tr. 1392)

A change in property values as the result of reappraisal or triennial update can adversely impact a school district's eligibility for power equalization benefits. An example of that is portrayed on pages 5 through 7 of Plaintiffs' Exhibit 466. Increases in valuation (which will, in turn, bring about a reduction in a school district's rate of effective millage) will reduce the amount of power equalization benefits that a district is entitled to receive. Increases in valuation will also reduce the rate of a district's effective millage and may cause it, as a result of that reduction, to lose eligibility for power equalization benefits.· Thus, power equalization has created a new form of phantom revenue that did not exist before H.B. 650. (Maxwell Tr. 1394–95)

As a result of the operation of phantom revenue, districts will continue to need to go to the voters to ask for additional local taxes to make up for lost revenue. (Maxwell Tr. 1401) The Court finds that the structural problems in the school funding formula associated with phantom revenue have not been eliminated and, in fact, have worsened.

B.    Education Remains Low In The State's Budgetary Priorities.

From 1992 to 1998, the Department of Rehabilitation and Correction's budget increased 279%. In that same span of time, the Department of Education's budget increased 69%. (State's Exh. 54)

The third page of Plaintiffs' Exhibit 494 is a comparison of increases in the average expenditure per prisoner versus the average expenditure per pupil for

FY90 through FY97. During that period, the average cost per prisoner has increased by 55% while the average adjusted per pupil expenditures increased by 32%. (Phillis Tr. 2024–25)

The State's budget has shown a surplus over the past several years. The State plans on providing an income tax reduction due to this surplus in excess of $700 million for FY99. In FY98, the State provided income tax relief in excess of $260 million. In FY97, over $400 million of excess funds was refunded to Ohio income taxpayers through this program. (DeMaria Tr. 1327)

The rate of increase for State funding of school districts since 1979 has been decreasing. From 1979 to 1988, State education funding increased 137%. From 1982 to 1992, the increase was 92%. But from 1992 to 2002, the increase was only 62.9%. (State's Exh. 5)

In 1991, Ohio was about 24th in the country in public school revenue per $1,000 of personal income—about $44 per $1,000 of personal income. In 1998, Ohio had fallen in its contribution based upon its capacity, to about $40 per $1,000 of personal income. This would drop Ohio into the 30's in ranking, among the states in its effort to support elementary and secondary education. (Alexander Tr. 1679–80)

If the State of Ohio had maintained growth in education expenditures equal to the growth in the total State budget between 1980 and 1997, the 1997 education expenditures would have been over $1 billion greater than they actually were. (Driscoll Depo. Exh. 7, pp. 1152–53)

Driscoll Deposition Exhibit 7, page 1152, indicates the difference between growth in education expenditures and growth in the State budget for each of the years from 1980 through 1997. Growth in the education budget lagged behind the rate of growth in the State budget in all but 4 of the last 18 years. (Driscoll Depo. 89–90, 93)

The State has provided or committed to provide funding to the City of Cleveland by loan or allocation in the amount of $37 million for a sports stadium in Cleveland. (Davidson Tr. 302) Also, the State is experiencing a surplus, from which it is returning $700 million in the form of income tax reduction. (Davidson Tr. 303) The Court finds that these are indicia that the State has not complied with the admonition of the Supreme Court that it place funding for primary and secondary education high in the State's budgetary priorities.

C. New Funds Canceled Out By Costs Of New Unfunded Mandates

1. Overview of House Bill 412 and Senate Bill 55

a) Legislative Development

There is no evidence before the Court that the Legislature enacted H.B. 412 and S.B. 55 with any real idea of the fiscal impact these pieces of legislation

would have on the school districts. Senator Cupp's testimony suggests the Legislature was more interested in showing the voters legislative imposition of fiscal and academic accountability than the cost those requirements would have on school districts. (See, *e.g.*, Cupp Tr. 389–90)

The Legislature did no studies on the potential cost of S.B. 55 and H.B. 412 on individual school districts. (Davidson Tr. 121) Likewise, neither the Legislature nor the Legislative Budget Office performed a study as to whether H.B. 412 or S.B. 55 would lead to cost savings. (Davidson Tr. 125) Yet even without any such studies and without presenting any empirical evidence before the Court, Speaker Davidson opined that H.B. 412 and S.B. 55 would lead to savings by the school districts. (Davidson Tr. 125–26)

The State has performed no analysis of the net effect of increased State spending, adjusted for inflation, netted with the additional cost of all-day kindergarten, class size reduction, and the budget set-asides in H.B. 412. (Brunson Depo. Vol. 1, pp. 204–05)

The State's level of funding for schools is projected to increase over the next five years by approximately 6% to 7% a year. (Brunson Depo. Vol. 1, pp. 200–01) Adjusted for inflation, this would be approximately 3% to 4% a year. (Brunson Depo. Vol. 1, p. 204) These percentages include the increased DPIA funding in specific categories and assume that schools will take those monies and will spend those monies in the areas required. (Brunson Depo. Vol. 1, p. 206)

As to whether there has truly been a net increase in funding, Mr. Brunson testified:

"Q. My question is: What's the net increase to schools relative to increased funding and increased cost? Are you even understanding my question?

"A. Oh, yeah, I understand your question. It's like I said, you can't—there are too many things going on to—that are unknown to try to—I mean, it's an interesting question; but as far as finding an answer, I don't think you can at this point. We don't know enough."

(Brunson Depo. Vol. 1, pp. 206–07)

Mr. Brunson believes that part of the difficulty of determining whether net funding to schools has increased is due to the lack of knowledge of how much districts have been spending on textbooks and materials and capital. Yet, when asked who may be a better source of information for such historic spending, Mr. Brunson testified:

"Q. Well, who's in a better position to know historical spending on textbooks and instructional supplies, the treasurer out in the field or you?

"A. The treasurer in the field." (Brunson Depo. Vol. 1, p. 208)

The Court was presented with no evidence of any survey attempted by the Legislative Budget Office or any State agency of district treasurers' responses to any of the legislation at issue before the Court, including S.B. 55, H.B. 412, and H.B. 650. While there is evidence of a gross increase in funding provided by the State, there is no evidence whatsoever before this Court as to the net increase in funding as netted against either additional costs or more restricted areas of spending, such as all-day kindergarten and class size reduction, which have their own additional costs.

Brunson Deposition Exhibit 32 is an article which appeared in "Budget Footnotes," a publication of the Legislative Budget Office. This article was published in February 1998. (Brunson Depo. Vol. 1, p. 179) This publication is written for legislators. (*Id.*) Mr. Brunson would have reviewed this article before publication and believes he did review it. If he had seen anything seriously wrong or a very serious misstatement, it would have been his practice to have it corrected. (Brunson Depo. Vol. 1, p. 180) The Legislative Budget Office writes in this article:

"Since March 24, 1997, legislative activity directed at finding a remedy has been ceaseless. First, in August, 1997, the legislature adopted S.B. 55 dealing with educational outcomes and H.B. 412 dealing with school district financial management. Then, in early 1998, and after intense debate, the legislature adopted three separate bills that constitute the state's financial response to the *DeRolph* decision. The outcome of this effort now hinges on the statewide referendum vote on the 1¢ sales tax increase, scheduled for May 5th."

The Legislative Budget Office article goes on to state:

"H.B. 697 sends a 1¢ sales tax increase to the voters on May 5th. LBO estimates that the new sales tax will bring in about $1.05 billion in FY99, the first year of the tax, and that revenues will increase to about $1.4 billion by the end of the phase-in in FY2004."

(Brunson Depo. Exh. 32) The 1¢ sales tax issue did not pass. (Brunson Depo. Vol. 1, p. 183)

H.B. 412 and S.B. 55 were proceeding through the legislature at approximately the same time as Senate Joint Resolution 3, which would have placed a $1 billion sales tax issue on the ballot. (State's Exh. 2) However, the Senate Joint Resolution failed to come out of the House Finance Committee by one vote and was never passed by the General Assembly. (Johnson Depo. 31) A "fiscal note" is prepared by the Ohio Legislative Budget Office. The Legislative Budget Office is required to prepare fiscal notes on each bill that is receiving legislative action. A fiscal note is an estimate of the fiscal impact a piece of legislation may

have on the state or local government. (Brunson Depo. Vol. 1, p. 43) The LBO prepared fiscal notes for both S.B. 55 and H.B. 412.

It is apparent from a review of the fiscal note to S.B. 55, that the legislative thinking as reported by the Legislative Budget Office was that the academic requirements of S.B. 55 unquestionably would cause school districts to incur new costs, but it was expected that these new costs would be funded by the then *hoped for* billion dollar sales tax. This is shown in the following excerpts of the fiscal note to S.B. 55:

"This bill is the academic accountability component of the primary and secondary school funding reform plan. State funding for primary and secondary schools is likely to be increased in the range of a billion dollars per year beginning FY99. This funding will be in another bill.

"The bill sets academic performance standards and would apply these standards to school districts beginning in FY2000. The state would increase its school funding in the range of a billion dollars per year beginning in FY99. This funding increase would help districts to make any necessary changes to meet performance standards proposed by the bill. These funding increases are not part of this bill, and are dependent on voter approval of the tax package."

(Brunson Depo. Exh. 5, pp. 1–2)

The fiscal note indicates that the fiscal impact upon school districts for both fiscal year 1999 and "future years," will be expenditures in "varying increases." Notably, it does not say "none to varying increases," only "varying increases." (Brunson Depo. Exh. 2)

Chillicothe City Schools would need an additional $1.5 million per year to meet the requirements that have been placed upon the district in S.B. 55 and H.B. 412. (Overly Depo. 34) The Chillicothe City Schools serves between 3,600 and 3,700 students. (Overly Depo. 36) The Court finds this district is but one example of the great weight of evidence that S.B. 55 and H.B. 412 impose major cost increases to many districts.

b) Contradictory Effects of the Academic and Fiscal Legislation

As to the set-asides required by H.B. 412, there is little disagreement that the concept of such set-asides for textbooks and instructional material, capital and maintenance, and budget reserves is a good idea. However, since H.B. 412 provides no funding to facilitate these set-asides, certain school districts have been placed in a situation where they will be required to set aside funds which they do not have. (Russell Depo. 116)

The State presented no evidence as to the rational basis for the contradiction between obeying fiscal watch laws and obeying H.B. 412 set-asides and presented

no evidence whatsoever as to why the set-aside requirements of H.B. 412 as to textbooks and instructional materials and capital and maintenance are binding upon school districts which are under fiscal watch or even fiscal emergency.

In the recent legislation, the General Assembly has not provided adequate funds to maintain a district's solvency and provide for an adequate education with the current allocation scheme. (Sites Depo. 93) Having the General Assembly mandate accountability and standards is fine, provided it allocates the necessary amount of funds to adequately perform those requirements. (Sites Depo. 99)

The school funding system should have been like a three-legged stool: one leg was the fiscal accountability for schools, the second leg was the increased academic standards, and the third leg was increased funding to allow the schools to meet the higher legislative mandates. The third leg was not provided by the General Assembly, and a two-legged stool cannot stand. (Sites Depo. 65, 86)

In order for the formula under H.B. 650 and H.B. 770 to even come close to delivering what it says it will deliver as the foundation level, the unfunded special education and transportation costs must be taken care of, and there are a whole list of other unfunded mandates that are eroding and taking dollars away from base cost. (Strawser Tr. 1822)

Many districts do not have the funds to comply with the set-asides. (Sites Depo. 75)

The legislative mandates are inflexible and unfunded, and thus, school districts will find it difficult, if not impossible, to comply with the law and stay solvent. (Sites Depo. 74–75)

Amendment of the financial recovery plans to include the mandatory set-asides will increase the amount of indebtedness to the extent that the districts were not already spending the required set-aside percentage. (Brown Depo. 121)

Reductions normally made by school districts in an effort to balance expenditures with available revenue include deferring expenditure of textbooks and supplies and the laying off of personnel. (Brown Depo. 114–15) Reductions normally taken by school districts in an effort to balance revenue and expenditures also include deferral of maintenance. (Brown Depo. 119) Fiscal recovery plans currently in effect do not include set-asides for textbooks, supplies, capital and maintenance, and budget reserves required by H.B. 412. (Brown Depo. 121)

Mr. Brown was not aware of any school district that has submitted a repayment plan in connection with an emergency school assistance loan that spent 4% of its budget for textbooks and supplies and 4% of its budget for capital and maintenance. (Brown Depo. 123–24)

In addition to H.B. 412 set-asides driving Groveport Madison further into debt, the set-aside requirements of H.B. 412 expressly clash with the financial recovery plan approved by the Auditor of State, which is now binding upon the district. That financial recovery plan includes a requirement that the district reduce "expenditures for equipment" by $500,000 and "expenditures for supplies" by $500,000. (Barr Depo. Exh. 3, p. 4)

Groveport Madison's reductions in line items are in conformance with the district's proposed financial recovery plan, which requires a total of $1 million in reductions in these areas. However, H.B. 412 requires an *increase* in these very same areas beginning in fiscal year 1999 with an increase of $1,094,500, an increase in fiscal year 2000 of $1,899,021, and then at the full 4% level, an increase in fiscal year 2001 in the amount of $2,547,029. (Barr Depo. Exh. 12, p. 3) For the district to be statutorily required to cut supplies and equipment by a million dollars and then to be statutorily required to increase capital and maintenance and textbooks and instructional materials by up to $2.5 million a year is completely irrational and requires this district either to violate the law as to its requirement to comply with its financial recovery plan or to violate the law as to the requirements under H.B. 412.

Barr Deposition Exhibit 12 is a cash flow analysis for actual and projected fiscal years including fiscal years 1996 through fiscal year 2004 for the Groveport Madison Local School District. (Barr Depo. 117–19) The third page of this exhibit has separate line items showing the dollar impact of the H.B. 412 set-asides relating to textbooks and instructional materials and capital and maintenance as projected for fiscal years 1999 through 2004. Those dollar amounts are in addition to the expenditures shown on the first page for "materials, supp. & text" and "capital outlay & repl." (Barr Depo. 121–22) This projection shows that for fiscal years 1999 through fiscal year 2004, there is projected a positive ending cash balance. However, it shows that after the set-aside requirements of H.B. 412 are applied, Groveport Madison School District goes into a deficit beginning fiscal year 1999 in the amount of $44,967, which continues to grow each year with an ultimate projection of a deficit of $14,258,800 by fiscal year 2004. The impact of the H.B. 412 set-asides upon a district such as Groveport Madison, which is already deeply in debt and on fiscal watch, reveals the damaging impact of this particular piece of legislation which creates these requirements with no separate funding. As Superintendent Barr stated:

"What good does it do if you have to go borrow the money in order to meet the set-aside? So, again, it forces you back to borrow money to meet the mandate." (Barr Depo. 122)

The increase in the basic foundation money does not offset the mandatory re-direction of funds in the set-asides. For poor districts, such as Plaintiff Dawson–

Bryant, to re-direct the money into the set-asides, the district must cut operational costs, which means a reduction in staff. Reducing staff goes against the intent of reducing class sizes, increasing proficiency scores, and imposing greater accountability upon the schools. (Sites Depo. 65–66)

Stacy Overly, Treasurer of the Chillicothe City Schools, testified:

"What I think is going to happen is if we're required to reprioritize our expenditures such that we meet those requirements, [H.B. 412 set-asides], I think there's programming that's going to suffer in schools, and that's my concern about the set asides.

". . .

"I think if they're appropriately funded, they advance the initiative of the State to improve the level of our schools, because obviously schools want to have good textbooks, and obviously schools want to have good buildings for children to go to school in. But, if we have to prioritize our efforts, then we want to prioritize our expenditures and—in such a way that the children's education is what is maximized. And so, yes, it would be nice to spend money for textbooks and instruction materials and capital and maintenance, but it's, in my opinion, more of a priority to make sure that you have the staffing and the programming and the teachers in place to deliver the education to the students."

(Overly Depo. 31, 33)

The Court finds this testimony of Mr. Overly very credible and finds that programming will suffer in the Chillicothe City Schools and in other schools as a result of the unfunded set-aside requirements.

2.  House Bill 412

a) Legislative Development

As to the 4% set-aside requirement for textbooks and instructional materials in H.B. 412, this percentage number was arrived at by Senator Cupp's working group by a consensus that this was an appropriate number. (Cupp Tr. 378) Neither the working group nor the Department of Education, however, had any numbers or statistics as to what school districts spend in this category and no evidence was presented to this Court that this 4% was determined by any analysis of school district spending.

The set-aside amounts in H.B. 412 are arbitrary levels set through a negotiations process with legislators. (Hutchinson Depo. 88) Allen Hutchinson, Treasurer of the South–Western City Schools, testified, "I believe that the percent [for set-asides] should be based on some sound, rational thinking of what is an adequate education and what does it take to provide an adequate education

instead of some arbitrary percentage." (Hutchinson Depo. 105) The Court finds this testimony credible and further finds that the set-aside percentages were arbitrarily established.

The set-aside requirements of H.B. 412 were not discussed or contemplated by the staff members of the School Funding Task Force in developing the recommendations for a base cost. However, Dr. Augenblick indicated that they were "contemplated only in the respect that the intent of the methodology was to require periodic updates so that as conditions changed—for example, the introduction of new legislation that may or may not have impact on cost—this whole process needed to be revised." (Cohen Depo. 434, 436)

As to the set-aside requirements of H.B. 412, the Legislative Budget Office undertook no efforts whatsoever to determine the cost districts had already been spending in the areas of capital and maintenance and textbook and instructional materials. There was no specific organized effort to set up criteria and a structure to conduct a survey to find out from the districts as to what they have been spending on textbooks and instructional materials and capital repair and maintenance. The effort was simply not done and no one from the legislature asked the Legislative Budget Office to do it. (Brunson Depo. Vol. 2, pp. 130–31)

The Legislative Budget Office has likewise done no study whatsoever as to whether the fiscal requirements of H.B. 412 will force districts already in debt to borrow more to meet those requirements. The Legislative Budget Office has not even been asked to perform such a study. (Brunson Depo. 61) The lack of evidence and the lack of even any effort to determine the true fiscal impact of H.B. 412 is made more problematic when considering that it is the State which has the burden of proof to show that it has complied with the constitutional mandates as described by the Supreme Court.

Of the $800 million combined impact relating to the capital and maintenance fund and the textbook and instructional materials fund, the Legislative Budget Office undertook no studies and conducted no calculations as to how much of that $800 million is above what districts statewide historically spend in the areas of capital and maintenance and textbook and instructional materials. (Brunson Depo. 59–60) More specifically, while the Court has before it specific evidence of the fiscal impact of the set aside requirements on specific school districts, the State has presented no evidence to the Court whatsoever as to whether the requirements of H.B. 412 are forcing districts to set aside on a statewide basis an additional $100 million from their historic spending or $500 million from their historic spending. In contrast, Plaintiffs have presented specific examples from specific school districts, such as South–Western, Groveport Madison, Lima, Chillicothe, Southern, Dawson–Bryant, etc., where those districts have calculated very specific negative fiscal impacts this legislation has on them. The State did

not present the Court with even one district out of the entire state which can say that the requirements of H.B. 412 have no negative impact.

As to the 4% set-aside requirement for capital and maintenance in H.B. 412, no data was available to the Legislature to determine what the districts were spending in this area. (Cupp Tr. 382) The 4% figure came from Senator Cupp contacting an architectural firm in his district which develops school building designs and was told that a rule of thumb was 4%. (Cupp Tr. 382) No evidence was presented to this Court of any survey of architectural or engineering firms which normally provide services to school districts, any survey of district superintendents or treasurers as to what local districts spend, any effort to determine if certain districts require less capital maintenance than others, or any survey as to the cost impact of such a requirement.

Senator Cupp believes provisions of H.B. 412 could lead to cost savings for school districts, but such a view is based only upon his own supposition with no analyzed data provided to him and none were presented to the Court. (Cupp Tr. 388) The Court gives this testimony very little weight and further finds it to be greatly offset by the testimony and evidence from representatives of various school districts indicating the cost increases they will incur as a result of the requirements of H.B. 412. (See "Costs to Districts" and "Projections of Districts," *infra* )

Dr. Goff is not aware of any information the Department of Education provided to the General Assembly indicating that a 4% set-aside percentage was either appropriate or inappropriate for either textbooks or capital repair and maintenance. (Goff Tr. 572)

Brunson Depo. Exh. 4 is the fiscal note and local impact statement for H.B. 412, as passed by the Senate. It is dated July 30, 1997, the same date the General Assembly passed H.B. 412 (State's Exh. 2) and therefore presumably relates to the final, enacted version of H.B. 412. (Brunson Depo. 52–53) The State presented no evidence and did not argue at the hearing on this matter that this did not relate to the final version of H.B. 412.

### b) Costs to Districts

The third page of Brunson Depo. Exh. 4 indicates the dollar impact of the set aside and budget reserve requirements of H.B. 412. Specifically, as to the capital and maintenance fund, the legislation requires that school districts set aside 4% of their annual general operating revenue, after phase in, to be applied only to capital and maintenance. This 4% requirement is estimated by the Legislative Budget Office to total $400 million statewide. The same is true as to the 4% required to be set aside for the textbook and instructional materials fund, which

the Legislative Budget Office has estimated will likewise total an additional $400 million statewide. (Brunson Depo. Exh. 4; Brunson Depo. 54–56)

While the fiscal note for H.B. 412 does not similarly quantify the fiscal impact of the 5% budget reserve requirement, if each of the two set-asides at 4% have a $400 million impact, then the 5% budget reserve would have a $500 million statewide impact. (Brunson Depo. 57) Accordingly, these three requirements from H.B. 412 total $1.3 billion, although the budget reserve requirement would not have the same cumulative impact year to year, as it only needs to be achieved and then maintained. (Brunson Depo. 57–58) There is no legislation which earmarks any specific money for any of these three funding requirements. (Brunson Depo. 59)

The set-asides required by H.B. 412 may be enough for some districts and may be too much for others. (Phillis Tr. 2004)

Charles Brown of the Department of Education is concerned about where school districts will receive the funds to make the set-asides required by H.B. 412. (Brown Depo. 133)

### (1) Chillicothe City School District

Mr. Overly testified as Treasurer of the Chillicothe City Schools that there is no excess spending that should be cut in the five-year projections he presented for the district in Overly Deposition Exhibit 1. Specifically, he stated that "there is no fat in that budget." (Overly Depo. 33)

The deficit of the Chillicothe City School District will reach $3.6 million at the end of FY03 without the additional requirements of H.B. 412. If the district spends the set-aside requirements of H.B. 412, the deficit balance would grow to $5.737 million at the end of FY03. (Overly Depo. 53)

For the Chillicothe City Schools, the set-aside requirements may be at appropriate levels if funding levels were provided to meet the requirements. The students would definitely benefit if the district could meet the set-aside requirements. The district cannot comply with the set-aside requirements for capital and maintenance with their current budget. (Overly Depo. 30–31)

### (2) Groveport Madison Local School District

Although Groveport Madison is not required to establish a budget reserve fund, it is still statutorily obligated to set aside money for the capital and maintenance reserve and the textbook and instructional materials reserve established by H.B. 412. (Barr Depo. 86)

The Court observes that Groveport Madison's actual expenditures for fiscal year 1997 for materials, supplies, and textbooks were $735,123 (a 12.8% reduction

from the prior year) and that this category was reduced by close to a half million dollars for fiscal year 1998 to $248,657 (a 66.2% reduction). Likewise, expenditures for the line item of "capital outlay & repl." has been reduced from $481,182 in fiscal year 1996 to $318,662 in 1997 (a 33.8% reduction), to $170,385 in fiscal year 1998 (a 46.5% reduction), and projected to be further reduced to $32,578 in fiscal year 1999 (an 80.9% reduction). (Barr Depo. Exh. 12, p. 1)

### (3) Lima City School District

One district which shows the most obvious clash in the numbers is the Lima City School District. In certain years, as much as 89% of that district's budget has been devoted to teacher salaries and benefits. (Buroker Depo. 91–92.) If that district now has to re-prioritize 13% of its budget to three specific, confined areas, this clash in numbers is further exacerbated by the fact that the district will still need to pay its utility bills, its share of transportation costs, its share of special education costs (the State only pays its share of special education costs attributable to the weights, which are likewise not adjusted by the cost-of-doing business factor), etc. The Court finds that to impose such a fiscal requirement on struggling districts like Lima City Schools and Groveport Madison has exacerbated, not reduced, the flaws in the State's system of funding primary and secondary schools.

The Lima City School District's 5–year projection contains separate line items that show the impact of the set-asides and budget reserve requirements of H.B. 412. The amounts under the category of "reservation of fund balance" are *additional expenses above* what the district currently pays for the textbooks and instructional materials and capital improvements. The cumulative affect of these set-asides are also shown each year so that the set-aside requirements and budget reserve requirement total the following *additional* dollar amounts for each of the following respective years:

| | |
|---|---|
| 1999 | $ 203,347 |
| 2000 | $ 536,148 |
| 2001 | $ 983,755 |
| 2002 | $1,050,697 |
| 2003 | $1,118,736 |

(Buroker Depo. 186, 191; Buroker Depo. Exh. 7)

It is apparent from the 5–year projection (Buroker Depo. Exh. 7) that deficits for the Lima City Schools are materially attributable to the set-asides mandated by H.B. 412. Again, the State offered absolutely no testimony or evidence to rebut these calculations and projections. The Court finds that even if the degree of deficits is overstated, there was no factual dispute in the testimony presented to this Court that there will be a significant cost impact to Lima City School District as a result of the set-aside requirements of H.B. 412, especially when the

Court considers that this is a district that has 87% to 89% of its operating budget devoted to teacher salaries and benefits resulting from State-mandated collective bargaining. (Buroker Depo. 91–92) It is Dr. Buroker's unrebutted opinion, which the Court accepts as true, that the projected deficits for the Lima City School District are primarily caused by the set-asides required by H.B. 412. (Buroker Depo. 208)

### (4) Southern Local School District

When the treasurer of the Southern Local School District was asked whether the set asides would require the district to reprioritize and do other things in lesser amounts he testified, "I'm not sure that we have anywhere to reprioritize it, and like I said before, there is no fat in this budget. Really, there is not. I don't know where it would be to reprioritize." (Grandy Depo. 121) The Court finds this testimony of Mr. Grandy credible and further finds that the State has introduced no evidence to contradict his testimony, and that the State has failed to provide adequate funding for the Southern Local School District and other school districts.

### (5) South–Western City School District

The budget of the South–Western City Schools is approximately $105 million. (Hutchinson Depo. 39) The South–Western City School District will have a deficit of roughly $12.3 million in FY02. The district will be in a deficit situation because of the H.B. 412 set-asides. The district may not be able to hire teachers to teach the classes because the district will not have the operating dollars to hire people and keep them. (Hutchinson Depo. 128–29)

South–Western City Schools has been able to quantify in dollars and project over five years the impact of the set-asides established under H.B. 412. Hamilton Exhibit S is the district's response to certain questions of a questionnaire relating to H.B. 412. The combined financial impact of the set-asides required under H.B. 412 upon South–Western City School District is $18,077,756, which will have to be spent or reserved over the next 5 years. (Hamilton Depo. 73–74) Hamilton Exhibit 10 projects that over a 5–year period, the district will proceed from an unencumbered carryover balance of $15,931,986 for fiscal year 1999 to a deficit of $33,635,465 by fiscal year 2003. Exhibit 10 shows by separate line items how much of those declining balances and deficits are attributable to the H.B. 412 set-asides and budget reserve and demonstrates the cumulative effect of those requirements over a 5–year period. As much as $18 million of the projected 5–year deficit is attributable to the set-aside and budget reserve requirements of H.B. 412. (Hamilton Depo. 161–62)

c) Capital and Maintenance

H.B. 412 mandated that each school district establish a capital and maintenance fund. Districts are required to set aside 2% of their general fund revenues into this fund in FY99, 3% in FY00 and 4% in FY01 and beyond. (Ohio Revised Code 3315.18; Ohio Administrative Code 3301–92–02, 117–2–23)

H.B. 412 requirements do not allow expenditures from a self-initiated permanent improvement fund account toward meeting the set-aside requirements in H.B. 412. (Overly Depo. 39)

Historically, the South–Western City School District has spent funds on capital improvements in maintenance based on needs of the facilities and not based on percentages of the budget. The district has about $66 million worth of capital and maintenance needs. The district is likely to spend whatever it has to set aside because it is needed. The set aside amount will not generate the $55 million needed for a new high school. Four percent of $105 million is approximately $4 million. (Hutchinson Depo. 70–71) For the district, the 4% set aside for capital and maintenance is like giving a rubber bone to a starving dog. (Hutchinson Depo. 71)

As to the capital maintenance set-aside requirement, the South–Western City School District historically has spent in the range of 1.6% to 2.2% on capital and maintenance. This averages 1.9% per year or approximately $1.6 million. (Hamilton Depo. Exh. 5) The following is the district's chart which shows the dollar impact each year as the capital maintenance set-aside is phased-in:

| Year | Required Set–Aside Percent | Required Set–Aside Amount | District Estimated Amount | Increase Over/ (under) |
|---|---|---|---|---|
| FY99 | 2% | $1,698,418 | $1,613,497 | $ 84,921 |
| FY00 | 3% | $2,616,339 | $1,657,014 | $ 959,325 |
| FY01 | 4% | $3,631,618 | $1,725,019 | $1,906,467 |
| FY02 | 4% | $3,774,223 | $1,792,756 | $1,981,467 |
| FY03 | 4% | $3,912,582 | $1,858,476 | $2,054,106 |

This will require South–Western to outlay or reserve an *additional* $6,986,286 over what the district had anticipated over the next 5 years. (Hamilton Depo. Exh. 5, p. 2)

The set-aside requirement for capital and maintenance under H.B. 412 will require this part of South–Western's budget to increase by 130% where, over the same 5-year period, it had been estimated to increase 15.2%. This represents an additional outlay or reservation of $6,986,418 over the next 5 years. (Hamilton Depo. Exh. 5, p. 2) The district has no income stream from a permanent improvement levy which could be applied toward this particular set-aside pursuant to H.B. 412. (Hamilton Depo. Exh. 14)

A bond issue cannot be passed consistently enough to keep a 4% of budget level of expenditure for capital and maintenance going for the South–Western City Schools. (Hutchinson Depo. 87–88)

The Jackson City School District has capital improvement needs and will be funding these improvements with the 4% of its budget level in each year of its five-year projection proceeds from a permanent improvement levy. With this levy, the district residents increased their rate of taxation by 25% between the years 1990 and 1997. At the same time, expenditure per pupil for the district decreased relative to the state average from $800 less per pupil than the state average to $1,100 less per pupil than the state average. (Strawser Tr. 1777; 1806)

The Mount Vernon City School District has a 2–mill permanent improvement levy which has been renewed 3 times and allows the district to deal with routine maintenance, but not greater needs. (Sonedecker Depo. 33)

The Chillicothe City School District is spending at about a 2 percent level on capital and maintenance needs, which has been based on limits on how much there is to spend rather than the needs of the district. (Overly Depo. 22) Other areas of the budget would suffer if the district were required to spend or set aside at the 4 percent level for capital and maintenance. (Overly Depo. 23)

Due to the lack of money in the district, Youngstown historically has spent only tenths of a percent of its budget on capital outlays. (Funk Depo. 19)

The additional dollars the Lima City School District must spend for capital and maintenance pursuant to H.B. 412 will begin at $244,209 additional dollars in the year 2000 and will go up to $608,114 by the year 2003.

### d) Textbook/Instructional Materials

H.B. 412 mandated that each district establish a textbook and instructional materials fund. Districts are required to set aside 2% of the general fund revenues into this fund in FY99, 3% in FY00, and 4% in FY01 and beyond. (Ohio Revised Code 3315.17; Ohio Administrative Code 3301–92–01, 117–2–23)

### (1) Dawson–Bryant Local Schools

The Plaintiff Dawson–Bryant Local School District historically funds its textbooks and instructional materials in the same way the State has funded education: it pays for the mandatory items, such as negotiated agreements, school lunches, necessary building repairs, and transportation, and then with whatever is left over, attempts to buy textbooks and instructional materials. (Sites Depo. 41–42)

In order to comply with the required 4% set-aside for textbooks and instructional materials, Dawson–Bryant will be required to create approximately $172,000 of funds per year out of whole cloth. (Sites Depo. Exh. 1) The District does not know where this money will come from. The General Assembly did not fund this mandate. (Sites Depo. 47–48)

In FY98 the Plaintiff Dawson–Bryant Local School District received approximately $19,000 in textbook subsidies. That amount is a little over $13 per student. Last year, the district purchased one math series which cost a little over $55,000 or over $38 per student. The textbook subsidy would not permit the district to replace even one series per year. (Washburn Tr. 1944)

### (2) Jackson City Schools

The Jackson City School District is currently spending at approximately 2% of its budget, or $230,000, per year on textbooks and instructional materials. Although the district does need to expend additional money for supplies, over the four years FY00 to FY03, the district will be required to set aside or spend $694,000 more on instructional supplies and textbooks than it currently is spending in FY98. (Strawser Tr. 1805; Pl. Exh. 487) The five-year projection indicates that the district will carry forward dollars in excess of the 2% level of expenditure in that category, because the district is projecting a deficit. To actually expend those dollars would increase the cash deficit by $694,000. (Strawser Tr. 1806)

### Lima City School District

As to textbooks and instructional materials, the Lima City School District has historically set aside no monies for textbooks and has spent about $20,000 a year on replacement textbooks. (Buroker Depo. 187) The 5–year projection shows that H.B. 412 will require that in the category of textbooks and instructional materials, the district spend the following *additional* amounts in the following respective years:

| | |
|---|---|
| 2001 | $163,622 |
| 2002 | $173,727 |
| 2003 | $182,466 |

(Buroker Depo. Exh. 7)

### Chillicothe City School District

The Chillicothe City School District has historically spent about 4 to 4½ percent of its general fund for instructional materials and supplies as defined by H.B. 412, so the district is not going to be required to set an additional amount aside for textbooks and instructional materials. (Overly Depo. 20) These facts illustrate the continuing disparities among districts.

(5) South–Western City Schools.

As to the textbook and instructional materials set-aside required by H.B. 412, South–Western City Schools traditionally has had expenditures in this area ranging from 1.4% to a high of 2.3% of its general operating revenue. This averages 1.7% per year or approximately $1.44 million. The following chart reflects the increased cost to the district as a result of the new set-aside requirements for textbook and instructional materials:

| Year | Required Set–Aside Percent | Required Set–Aside Amount | District Estimated Amount | Increase Over/ (under) |
|------|------|------|------|------|
| FY99 | 2% | $1,698,418 | $1,443,656 | $ 254,762 |
| FY00 | 3% | $2,616,339 | $1,482,593 | $2,088,180 |
| FY01 | 4% | $3,631,618 | $1,543,438 | $2,088,180 |
| FY02 | 4% | $3,774,223 | $1,604,045 | $2,170,178 |
| FY03 | 4% | $3,912,582 | $1,662,848 | $2,249,734 |

This will require South–Western to outlay or reserve an *additional* $8,851,034 over what the district anticipated over the next 5 years. (Hamilton Depo. Exh. 5, p. 3)

In fiscal year 1999, the South–Western City School District is adopting math and science text books and some language arts textbooks. The adoption of the math textbooks has been postponed for a year, and the adoption of the math and science textbooks will result in spending nearly the 2% set aside for instructional materials and supplies with some remainder for the language arts textbooks. (Hutchinson Depo. 85) The Treasurer would prefer to spend funds based on the needs of the district rather than a percent of the budget. (Hutchinson Depo. 84–85)

(6) Southern Local Schools

The Southern Local School District has historically spent less than one-half percent of its general fund budget on textbooks and instructional materials or about $10,000. In one year, the district spent approximately $35,000 purchasing textbooks for one subject matter. (Grandy Depo. 53–55)

It would be desirable for the Southern Local School District to spend the set-aside amounts on instructional materials and textbooks. (Grandy Depo. 65) However, the set-aside requirements cause the district to be in a deficit situation in FY01. (Grandy Depo. Exh. 1) The district needs additional money to be able to expend at the set-aside levels that are established. (Grandy Depo. 66) The increase the district is getting is not big enough to handle what it is required to do. (Grandy Depo. 68) If the district is required to expend at the set-aside levels, the district will spend more in textbooks, but less on teacher's salaries because they will have to lay off teachers. (Grandy Depo. 69) The Southern Local Schools would have a deficit situation even if the set-asides were not in force, but the set-

asides increase the deficit substantially. (Grandy Depo. Exh. 1, Grandy Depo. 70–71)

It is obvious that the Southern Local School District cannot meet the set-aside requirements. Additional funding is necessary for the district to be able to meet the set-aside requirements. (Grandy Depo. 92; Grandy Depo. Exh. 1)

The Southern Local School District treasurer would like to spend 4% of the district's budget on textbooks and instructional materials, but the bottom line is that the district cannot afford to do that on the funding within its budget. (Grandy Depo. 96)

### (7) Youngstown City School District

The Youngstown City School District historically has spent above four percent of its budget on textbooks and instructional materials, in large part due to outside agreements with the teaching union. (Funk Depo. 18)

### (8) "Opt–Out" Provision

H.B. 412 provides that if the Superintendent, the local head of the teachers' organization, and the head of the local school business counsel agree, and the school board unanimously determines that the school district has sufficient textbook instructional material, that the district is not obligated to provide a full 4% set-aside. (Cupp Tr. 379) However, for the school districts which historically have been in great need of textbooks and instructional materials because of a lack of funding, such as Lima City School District, those districts would be unlikely to be in a position to be excused from the 4% set-aside requirement and would still have to find the money to fund it.

Mr. Maxwell is unaware of any school district that has or is likely to "opt out" of the mandatory set-asides for textbooks under H.B. 412. (Maxwell Tr. 1575–76)

H.B. 412 allows for the textbook set-aside to be waived if the unanimous Board of Education, the Superintendent, and the teaching union all agree that they have adequate materials and supplies. While this provision is possible in theory, it is not probable in the real world. In districts that have been in such financial distress, such as Plaintiff Dawson–Bryant, no one could possibly say that the instructional materials are adequate in order to exercise this option. (Sites Depo. 87–88)

### (9) Textbook Subsidy

Textbook subsidy is available only to districts with a valuation per pupil of less than $200,000 and represents an amount of approximately $16 per pupil. (Shams Depo. 60)

e) Budget Reserve

(1) Effects on Districts' Budgets

H.B. 412 mandated that each school district establish a reserve balance account ("budget reserve"). All districts are required, with a few exceptions, to set aside 1 percent of its revenues each year, beginning with FY99, until its budget reserve is 5% of its base revenues. (Ohio Revised Code 5705.29(H))

The Jackson City School District will be required to set aside $152,706 in FY99 and in each of the next four years pursuant to the required set-asides for budget reserves under H.B. 412. There are very specific guidelines on how the money in the budget reserve account may be used and how it must be authorized for expenditures. (Strawser Tr. 1808)

As to the budget reserve requirement established by H.B. 412, the following schedule quantifies in dollars the amounts South–Western will have to set aside to establish the budget reserve. This includes the workers' compensation refund which, by statute, is required to be placed into the budget reserve.

|  | Required Set–Aside |
|---|---|
| FY99 | $849,209 |
| FY00 | $872,113 |
| FY01 | $907,556 |
| FY02 | $943,556 |
| FY03 | $978,146 |
| WCR | $372,423 |
| Total | $4,906,457 |

The foregoing numbers were calculated pursuant to rules adopted by the Ohio Department of Education and Auditor of State and establish that the district must set aside $4,906,457, which may not be included in available balances to offset future deficits. (Hamilton Depo. Exh. 5, p. 1)

The exception in H.B. 770 whereby a school district is not required to set aside a budget reserve of 1% due to excessive student growth, will not benefit the South–Western City Schools. (Hutchinson Depo. 90–91)

The 5% budget reserve required by H.B. 412 will ultimately cause the Lima City School District to set aside into the reserve approximately $1.5 million, which is projected to be achieved by around fiscal year 2002. (Buroker Depo. 317–19) If the District's 5-year projection is correct, the District will be obligated to borrow money to achieve the reserve. (Buroker Depo. 319)

The Southern Local School District would not have a budget reserve account if the State did not require one, because the District cannot afford to have one and does not have the money to set aside. (Grandy Depo. 116)

## (2) Workers' Compensation Rebate

H.B. 770 required school districts to set aside the worker's compensation reimbursement in the budget reserve set aside, which seems punitive because that requirement is not present for any other entity in the State of Ohio except for schools. (Hutchinson Depo. 79)

Due to being in Fiscal Emergency, the Youngstown City School District is exempted from the budget reserve set-aside. However, the district received $476,555 in the workers' compensation rebate from the State, and those funds were mandated by law to go into the budget reserve. (Funk Depo. 46)

Dawson–Bryant received over $26,000 from the workers' compensation rebate, which was required to be placed in the budget reserve instead of being used on needed materials or services. (Sites Depo. 24)

The Dayton City School District is getting a Bureau of Workers' Compensation rebate of $3 million this year. By law, H.B. 770, they are required to place the Bureau of Workers' Compensation rebate into the rainy day fund. (Williams Depo. 17–18)

The Chillicothe City School District will not be required to set aside 1 percent of its budget in the Budget Reserve account because the district is not projected to have a 3 percent increase in funding in any year of the five-year projection. However, the district's Bureau of Workers' Compensation rebate, received in June 1998, was required to be deposited in this account, which was in the amount of $127,000. (Overly Depo. 27–28; Overly Depo. Exh. 1)

The Groveport Madison Local School District is receiving a rebate from the Ohio Bureau of Workers' Compensation and is in a state of fiscal watch. Groveport Madison is statutorily required to deposit that rebate into its budget reserve. Yet, at the same time, H.B. 412, which requires each district to ultimately establish a 5% budget reserve, exempts from this requirement those districts which are in fiscal watch. So, one statute excuses Groveport Madison from placing any money into a budget reserve, but another statute requires that the Workers' Compensation rebate be placed into its budget reserve. Placing the money into the budget reserve prevents the district from using that money to pay off any of its debt which would allow the district to emerge from debt more quickly and to save on interest payments. (Barr Depo. 83–84)

## (3) Effect on Local Levies

The budget reserve requirement of H.B. 412 may have a further impact upon a district's ability to pass levies. The Court finds the following testimony of Dr. Hamilton persuasive:

"And it seems to me it would be very difficult for a school district to politically say, if you look at our circumstances, when you have $5 million, you know, in a pot sitting there and everyone knows it's there and you're going to the voters for additional operating revenues—school funding is a difficult topic. I'm sure you're well aware of that, and it's a difficult thing to understand. Most people don't. A lot of highly educated people don't. And when you're trying to explain school funding and how that works and clearly communicate your need to the public, you know, that's further complicated by this, and it's hard, you know—it's hard to say, we need to go to the public when there's that $4 or $5 million that you could access to continue to operate and actually delay any additional taxes."

(Hamilton Depo. 98–99)

The $18 million which will have to be either set aside or spent pursuant to the requirements of H.B. 412 will cause South–Western to go to the voters to pass an operating levy one to two years before it would normally do so. (Hamilton Depo. 118)

The South–Western City Schools will have $3.9 million in the rainy day fund (budget reserve fund) the year that the District is in a deficit. That circumstance will be a difficult thing to explain to constituents. (Hutchinson Depo. 93)

### 3. Senate Bill 55 ("Academic Accountability")

#### a) Legislative Development

Under S.B. 55, a district must meet seventeen of eighteen performance criteria to be ranked as effective. If a district satisfies between 9 and 16 performance criteria, it is ranked as in need of continuous improvement. A district falls into academic watch when it meets only between six to eight of the indicators. If the district satisfies five or fewer of the indicators, it is in a state of academic emergency. (Rogers Depo. 49–50) Report cards containing the district's results of the eighteen criteria are based on an average of the prior three years' data. (Rogers Depo. 50)

The Ohio Department of Education has released school district report cards for FY99. (Rogers Depo. 48) Report cards include four levels of rating: effective, continuous improvement, academic watch and academic emergency. (Rogers Depo. 49)

The 18 performance criteria by which districts will be evaluated on their annual report cards are:

a. Three percent or lower dropout rate;

b. At least 75 percent of the fourth graders proficient on the mathematics section of the proficiency exam;

c. At least 75 percent of the fourth graders proficient on the reading section of the proficiency exam;

d. At least 75 percent of the fourth graders proficient on the writing section of the proficiency exam;

e. At least 75 percent of the fourth graders proficient on the citizenship section of the proficiency exam;

f. At least 75 percent of the ninth graders proficient on the mathematics section of the proficiency exam;

g. At least 75 percent of the ninth graders proficient on the reading section of the proficiency exam;

h. At least 75 percent of the ninth graders proficient on the writing section of the proficiency exam;

i. At least 75 percent of the ninth graders proficient on the citizenship section of the proficiency exam;

j. At least 85 percent of the tenth graders proficient on the mathematics section of the proficiency exam;

k. At least 85 percent of tenth graders proficient on the reading section of the proficiency exam;

l. At least 85 percent of the tenth graders proficient on the writing section of the proficiency exam;

m. At least 85 percent of the tenth graders proficient on the citizenship section of the proficiency exam;

n. At least 60 percent of the twelfth graders proficient on the mathematics section of the proficiency exam;

o. At least 60 percent of the twelfth graders proficient on the reading section of the proficiency exam;

p. At least 60 percent of the twelfth graders proficient on the writing section of the proficiency exam;

q. At least 60 percent of the twelfth graders proficient on the citizenship section of the proficiency exam;

r. At least a 93 percent attendance rate.

(Ohio Revised Code 3302.02)

School district report cards provide comparison of the reported district's results to the average for twenty school districts that are most similar to the district. (Rogers Depo. 58) Criteria used to identify comparison districts include district ADM, blue collar employment, white collar employment, residential and

agricultural valuation, level of college education, percent of residents living in an urban setting versus those living in a rural setting and possibly family income. (Rogers Depo. 60, 61)

Under S.B. 55, after September 15, 2001, fourth graders will be required to pass the fourth grade reading proficiency test in order to be promoted to fifth grade unless such a decision is overridden by the building principal and the child's teacher. (Goff Tr. 513)

Beginning July 1, 1998, S.B. 55 also required school districts to assess students to provide intervention services to each student reading below grade level in grades one, two, and three. The statute also requires districts to provide "intense remediation services" during the summer following the third grade for each student identified as reading below grade level at the end of the third grade. Additionally, for each student who does not pass the fourth grade reading proficiency test, districts must provide "intense remediation services and another opportunity to take that test in the summer following the fourth grade." Parental involvement in developing an intervention strategy is also required. (Ohio Revised Code 3313.608) S.B. 55 also increased the requirements for a high school diploma from 18 to 21 credits.

S.B. 55 was enacted at least in partial response to a sense that constituents of at least one member of the Legislature made it clear that if more tax dollars were to be placed in the schools, they wanted their investment to yield results and improve student learning. (Cupp Tr. 390) When asked his understanding as to whether S.B. 55 will impose costs or lead to fiscal savings, Senator Cupp testified: "Well, I don't know what the net costs or savings are going to be and I don't think anybody can at this point." (Cupp Tr. 390)

As to S.B. 55, the Legislative Budget Office prepared fiscal notes on each version of the Bill as it progressed through the General Assembly. (Brunson Depo. Vol. 1, pp. 43–44) S.B. 55 enacted various academic requirements and is referred to as "education accountability." (Brunson Depo. Vol. 1, pp. 44–45)

Brunson Deposition Exhibit S is the fiscal note for S.B. 55 dated August 1, 1997, the same date this legislation passed the General Assembly. (State's Exh. 2) The State presented no evidence to this Court that this fiscal note relates to anything other than the final version of S.B. 55 ultimately enacted.

It is the job of the Legislative Budget Office to determine the cost of legislation at both the state and local level. In this case, the Legislative Budget Office has reported in the fiscal note and local impact statement for S.B. 55 that the academic requirements of S.B. 55 will certainly require many districts to incur additional costs to meet these requirements. Conversely, the Legislative Budget Office was only able to articulate vague and speculative areas of savings to offset

these increased costs. Based on the evidence before the Court largely from the State's own records and testimony, the Court finds that S.B. 55 will have a significant economic impact upon many school districts statewide and will cause them to incur in many cases significant additional expenditures to meet these new academic requirements even though the State has provided no additional funds for them to do so.

Speaker Davidson was unaware that the Legislative Budget Office had done a random survey of 20 school districts as to their view of the fiscal impact of the academic requirements of S.B. 55. (Davidson Tr. 225–27) She had never seen Brunson Deposition Exhibit 59 nor did anyone share with her verbally that the Legislative Budget Office had done such a study. (Davidson Tr. 225–27) After being shown the results of this survey and being shown that 14 of the 20 districts indicated additional costs under S.B. 55 that would total $3.6 million, Speaker Davidson testified:

"I did not say, I believe, ever in my testimony, that I did not believe S.B. 55 had additional costs to it. I said it was very difficult to estimate what the specific additional costs were because of the flexibility that school districts had and what internal decisions that they might make to meet the requirements of S.B. 55."

(Davidson Tr. 229)

The Court finds this to be an admission by a material witness of the State that S.B. 55 will bring "specific additional costs" to the school districts, but that the State is unsure only as to the extent of the additional costs.

The Legislative Budget Office further reported as to S.B. 55:

"Establishing additional science laboratories needed for teaching science courses is another area that could cost school districts. School Districts are currently required to offer at least two science laboratory courses each year for ninth to twelfth graders. However, the bill increases the number of required science units of credit for graduation from one to three. In order to insure every high school student meets the bill's science requirement component, school districts might need to make more science classes available. This could result in a need for additional laboratories and/or equipment upgrade unless current lab space is now significantly underutilized. The spokesperson from the Akron City School District indicated that the district had planned to increase the science unit requirement from one to two. However, due to high costs of needed new laboratories and additional science teachers, the plan had not been actually implemented. According to the Department of Education, the average cost for a biological laboratory is estimated at $140,000."

(Brunson Depo. Exh. 5, p. 8)

The Court is mindful of the Legislative Budget Office's suggestion that "school districts that currently require 21 units or more for graduation . . . could lower their net cost by *eliminating some existing courses* and shifting these resources into newly required areas." (Emphasis added.) (Brunson Depo. Exh. 5, pp. 7–8) This would appear to be only a suggestion of a lowering of *net* costs and only available to those districts which currently provide 21 or more units for graduation. The Court finds that the LBO's suggestion of lowering costs by eliminating programs or courses is directly contradictory to the General Assembly's stated goal of improving academic programs. The Court also finds persuasive the very detailed and specific dollar amounts the districts report these requirements will cost them and the State has provided no comparable evidence as to how or even whether these increased costs could be offset by course eliminations.

### b) Effects on District Programs

S.B. 55 not only increases the number of units of credit required for graduation from 18 to 21, but also increases the number of minimum units of credit required in four particular subject matters:

| Subject matter | Credit Requirements Before S.B. 55 | Credit Requirements Under S.B. 55 |
|---|---|---|
| English Language Arts | 3 | 4 |
| Mathematics | 2 | 3 |
| Science | 1 | 3 |
| Social Studies | 2 | 3 |

(Brunson Depo. Exh. 5, p. 6)

The Legislative Budget Office reported that the Department of Education has recently conducted a graduation requirement survey to which 359 school districts responded. Of those school districts responding, only *5.6%* (20 school districts) met all of the requirements of S.B. 55 and 12% (44 school districts) were in the process of increasing the number of units of credit necessary for graduation to the bill's level. The survey further indicated that 24% of the districts responding were not providing four or more units of English and 38% of the districts responding were not providing three or more units of Social Studies. The survey further showed that 79% of the responding districts did not provide three or more units in mathematics and 92% of the responding districts did not provide three or more units of Social Studies. (Brunson Depo. Exh. 5, p. 7) From this, the LBO reported:

"The survey results clearly indicate that many school districts' current graduation standards, especially in mathematics and science areas, do not meet the bill's proposal. To meet the bill's requirements, many school districts would likely have to hire additional mathematics and science teachers. In FY96, the state-

wide average teacher salary was $38,121. These could be offset by the elimination of teaching positions in elective courses. *It should be noted that mathematics and science teachers are currently in short supply and a significant number of current teachers are not certified in these areas. The high demand for additional mathematics and science teachers could further compound the problem. School Districts might have to compete with each other and pay high salaries in order to attract these teachers.*" (Emphasis added.)

(Brunson Depo. Exh. 5, p. 7)

S.B. 55 relies totally on proficiency testing and attendance. There is much more to take into consideration in terms of providing children an education and looking at how good that education is besides just looking at proficiency testing and attendance. (Lanning Depo. 26) If schools are going to turn out graduates who are considered well-educated and good citizens, other things need to be considered in addition to outcomes of proficiency tests. (Lanning Depo. 29)

Students from the Southern Local School District are from a very poor, culturally deprived area. Many of the students have not even traveled to Columbus, for example. If the district spends all of its time working only on trying to get students to pass proficiency tests, it is not developing well-rounded students. Student may not be exposed to other essential elements in the curriculum, such as the arts, which develop them culturally. If the district was trying to develop well-rounded students and did not focus on just the proficiency tests, the district would be taking students on field trips to museums, concerts, and concentrating on other areas of the curriculum. (Lanning Depo. 29–30)

The Southern Local School District is working hard on improving in some areas of proficiency testing, but the district is still not meeting the 75 percent passage rate. (Lanning Depo. 35)

The portion of S.B. 55 that prohibits school districts from promoting fourth graders who do not pass the fourth grade reading proficiency test may well cause very large classes of fourth grade students. The Southern Local School District desires to provide all the remediation that it can afford, but if the students still do not pass the test, the Superintendent really does not know how to handle the problem of having very large classes. If students are held back one year, holding them back an additional year is not going to solve the problem. (Lanning Depo. 38–39)

Lima City School District, before S.B. 55, required three units of English, two units of math, and two and a half units of social studies. S.B. 55 requires four units of English, three units of math, and three units of social studies. The district will have to hire additional social studies, science, and math teachers to comply with the new requirements of S.B. 55. (Buroker Depo. 271)

The Lima City School District currently uses Title I federal funds also for summer intervention programs. Because S.B. 55 now mandates that Ohio school districts offer summer intervention programs, Lima will not be able to use those federal funds for what is now a State mandate. (Buroker Depo. 211) The district will not be able to use Title I funds in this area, but will still have to hire additional staff for the summer intervention program mandated by S.B. 55 which, in the past, has cost approximately $250,000 a year. The State offered no rebuttal or contradictory evidence, that the net effect of this will cause the district's deficit to be larger. (Buroker Depo. 212)

### c) Effects on District Costs

Brunson Deposition Exhibit 59 is an attachment to one or more versions of the fiscal note to S.B. 55. (Brunson Depo. Vol. 1, pp. 45, 62–63, 61–62) It was prepared by the Legislative Budget Office and shows the results of its survey of 20 school districts who reported the cost impact of S.B. 55. (*Id.*) Of the 20 districts, 6 districts reported that the bill would have no fiscal impact on them. Fourteen districts, however, reported that "the bill would incur additional costs." The districts reported that they would have to hire additional teachers, acquire additional laboratories, purchase portable classrooms, purchase new textbooks, convert existing space, convert or renovate existing laboratories. The following is a summary of the additional costs these districts reported they would incur as a result of the additional credit requirements of S.B. 55:

| District | Total Costs |
|---|---|
| Buckeye Local (Medina County) | $480,340.00 |
| Mohawk Local (Wyandot County) | $271,402.00 |
| Ridgewood Local (Coshocton County) | $398,587.00 |
| East Guernsey Local (Guernsey County) | $134,182.00 |
| Massillon City (Stark County) | $142,460.00 |
| Wolfe Creek Local (Washington County) | $415,235.00 |
| Coldwater Exempted Village (Mercer County) | $175,062.00 |
| Millford Exempted Village (Clermont County) | $219,411.00 |
| Marion City (Marion County) | $453,301.00 |
| Chagrin Falls Exempted Village (Cuyahoga County) | $ 73,655.00 |
| Lakeview Local (Trumbull County) | $276,439.00 |
| Westbranch Local (Mahoning County) | $326,815.00 |
| Amanda–Clearcreek Local (Fairfield County) | $187,976.00 |
| Arlington Local (Hancock County) | $ 80,044.00 |

(Brunson Exh. 59)

The Court observes that these 20 districts are approximately 1/30th of all Ohio school districts. While the Court understands that this was a random survey, if these types of costs are consistent throughout the state, the cost for Ohio school districts to implement S.B. 55 would be in the range of $90 million.

The Legislative Budget Office conducted its random survey of school districts as to the potential fiscal impact of S.B. 55 at the time that piece of legislation was moving through the Senate. (Brunson Depo. Vol. 2, p. 128) Although S.B. 55 has been enacted for over one year at the time of hearing, the Legislative Budget Office has not gone back to survey those same districts to see if they have better information to calculate the impact of S.B. 55. When asked why not, Mr. Brunson testified, "We have enough to do without doing that. Our time is pretty-well fully occupied." (Brunson Depo. Vol. 2, pp. 129–30) The Legislative Budget Office is currently in no position to dispute any district's calculation of costs of S.B. 55. (Brunson Depo. Vol. 2, p. 130)

The Plaintiff Dawson–Bryant Local School District will have additional costs as a result of S.B. 55. The bill requires remediation and intervention, which means additional costs to the district for the additional personnel to conduct those programs. Summer school, intervention and a third grade guarantee require that the district access every student at the first, second, and third grade level. If those students are not reading at level, then the district must provide interventions for those students to help them get at grade level. The intervention could be during the school year for the first and second grades. For third and fourth grade students, the district is required to provide summer school intervention. The district needs extended time with these students because they are developmentally behind when they enter public schools. That gap is going to continue to grow if the district does not have extended time with the student in summer school or extended school days. The district will need to expend about $93,000 per year to implement the required intervention under S.B. 55. That figure has not been factored into the five-year projections for the district found in Sites Deposition Exhibit 1. (Washburn Tr. 1939–41)

The Plaintiff Dawson–Bryant Local School District was able to implement the additional requirements for graduation under S.B. 55 through the use of equity money and a venture capital grant for the purpose of doing the school restructuring. The district's staff spent a year studying block scheduling, brought in practitioners who were using the program and had an opportunity to visit and observe block scheduling. Implementing this program allowed the district to keep about the same number of staff members, while expanding curriculum offerings and meeting minimum requirements for graduation. In order to continue the block scheduling, the district needs funds to continue professional development, which is a key component of block scheduling. It is not simply changing the amount of time students are in the classroom, but rather it involves changing instruction and getting students involved in engaged learning. As new personnel come on board, it is very important that they have the training necessary to implement the program appropriately. (Washburn Tr. 1974–76)

However, equity money is being phased out, the Venture Capital monies are exhausted, and the district is projected to be in a deficit situation in FY02. (Washburn Tr. 1915; 1934; Sites Depo. Exh. 1)

The cost to the Jackson City Schools of the implementation of S.B. 55, including offering additional science and social studies at the high school level for additional credit and remediation to assist students who are not passing the proficiency test, will total approximately $785,000 over the five years FY99 through FY03. (Strawser Tr. 1810–11) As a result of H.B. 412 set-asides and S.B. 55 costs, the unreserved fund balance deficit of the district will balloon to $2.095 million in FY03 on a budget of approximately $14 million. (Strawser Tr. 1811–12; Pl. Exh. 487)

Superintendent Williams does not disagree with any aspect of performance standards in S.B. 55. In order to implement the provisions, Dayton will probably have to lay off some employees and cut programs. This is an unfunded mandate. (Williams Depo. 76) Superintendent Williams' budget department has calculated costs of implementing the provisions of S.B. 55, but he is not aware of the amount. Those calculations, however, are not incorporated into his 5–year budget plan projections. (Williams Depo. 78)

As to the requirements of S.B. 55, Mount Vernon currently requires 18 units for graduation. (Sonedecker Depo. 159) It does not provide enough math and science units to meet the new requirements of S.B. 55. It will have to add a science credit and a math credit to meet those requirements and is projecting at least 2½ additional teachers required, with none of the funding provided from the State. (Sonedecker Depo. 160) The fourth grade intervention program was started this year and will cost $15,000. (Sonedecker Depo. 160)

If the Southern Local School District is going to try to meet the performance standards of S.B. 55, then the district has a need for additional teachers and expanded facilities. (Lanning Depo. 112)

D. Historical Rate Of Growth In The "Old" System Would Have Produced More Money Than "New" System Produces.

1. Ohio Department of Education Funding in General

The Department of Education will receive approximately $6 billion in FY99. All of these funds do not, however, go to primary and secondary education. Out of these funds come expenditures for preschool, head start, MR/DD funding, charter schools, private schools, and department administrative costs. The actual amount of State funds which reach and benefit primary and secondary education is closer to $4.3 billion. (DeMaria Tr. 1312–14, State's Exh. 55, 62) In stark contrast, the combined federal, State, and local funding going to primary and

secondary education for FY97 was stated as a little over $10 billion, and likely increased by FY99. The State's funding to the public schools constitutes less than half of the funds with which the Ohio public school districts operate. (State's Exh. 86)

Funds are included in the Department of Education's budget that have nothing to do with K–12 education, for example, head start subsidy, non-public auxiliary services, non-public administrative costs, MR/DD subsidy for transportation and funding for the School for the Blind and School for the Deaf. (Phillis Tr. 2007–08; Pl. Exh. 490)

Contained in the $6 billion of budgeted funding to the Department of Education is the 10% and 2½% rollback in property tax relief. What a school district loses in tax revenue due to these rollbacks in H.B. 920, the State reimburses through this money. In effect, the school district comes out even in regard to this reimbursement. (DeMaria Tr. 13, 17–18; State's Exh. 55, 56)

If the State had allocated the same percentage of the State budget to public education during the 1990's as it did in 1975 (45.1%), schools would have received approximately $12 billion more in State aid during this decade. Had the 1980 (42.2%) percentage been applied during the 1990's, schools would have received approximately $8 billion more. Had the 1985 (38.4%) percentage been applied, schools would have received approximately $3 billion more. Had the 1990 (36.4%) percentage been applied, schools would have received approximately $500 million more. (Phillis Tr. 2011–12; Pl. Exh. 491, p. 2)

If the State of Ohio had put forth the same effort in State revenues in fiscal year 1998 as it had in fiscal year 1991, it should have put $1.1 billion more into elementary and secondary education, just to maintain its effort level. (Alexander Tr. 1679–80)

Mr. Maxwell believes there has been no improvement in school funding from 1993 to the time of his testimony in 1998. (Maxwell Tr. 1444)

2. SF–12 Funds

Plaintiffs' Exhibit 492 was prepared by Dr. Phillis. It represents a breakdown of SF–12 funds as a percent of the total State budget for Fiscal Years 1981 through 1999. (Phillis Tr. 2015; Pl. Exh. 491, p. 1)

From Fiscal Years 1991 to 1999, the percentage of the State budget allocated to the SF–12 items has been reduced substantially from a total of 32.1% to 28.2%. (Phillis Tr. 2017)

Page 4 of Plaintiffs' Exhibit 492 is a graphic representation of the decline in SF–12 funds as a percent of the total State budget. (Phillis Tr. 2018)

3. Decline in State Contributions to School District Operating Revenue

From FY75 to FY99 the percent of the State budget devoted to primary and secondary education declined from 45.1% to 36.8%. (Phillis Tr. 2008; Pl. Exh. 490)

Four of the five plaintiff school districts are estimated to receive a decline in per pupil revenue as percent of state average between FY98 and FY04 as follows: Northern Local from 85% to 80%, Southern Local 96% to 86%, Dawson–Bryant 95% to 82% and Lima from 95% to 92%. The only exception being Youngstown, which is estimated to increase from 111% to 113%. (Driscoll Depo. 123–24; Driscoll Depo. Exh. 10, p. 6)

4. Foundation Level

Plaintiffs' Exhibit 495 identifies the per pupil foundation level for Fiscal Years 1999 through 2002—at the top of the page and at the bottom, a list of the tax duplicate of the State as used for SF–12 purposes for FY90 through FY98. Assuming increases in the State tax duplicate similar to those which have occurred in the past, the local contribution to the school foundation formula at 23 mills times assessed value will also increase. On the average, the foundation level has gone up an average of 5.6% per year from FY90 through FY98. The rate of increase as provided by H.B. 650 is 5.1%, a lower rate than has been the case prior to H.B. 650. (Phillis Tr. 2029)

The historic rate of increase in the foundation level over the past ten years has been about 4.8% with the foundation level at times exceeding that rate. (Maxwell Tr. 1365–66)

Dr. Goff believed that reduction in the base foundation level amount below the level of $4,269 for FY99 would imperil Court approval of the State's funding plan and communicated that belief to the Speaker of the House of Representatives and the President of the Senate. (Goff Depo. Exh. 9; Goff Depo. 148)

Dr. Goff believes that there should be a provision for annual growth in school district revenue. (Goff Depo. 24–25)

5. Problems Created for School Districts Under The Funding Mechanism Created by House Bill 650

On the subject of special education funding, H.B. 650 has created a problem for the Mount Vernon City School District by reducing or eliminating funding for LD tutor reimbursement or transportation. This will result in a net loss of about $150,000 for the Mount Vernon School District for fiscal year 1999 compared to fiscal year 1998. (Sonedecker Depo. 78–79) While the State projects an increase in funding in fiscal year 1999 for the Mount Vernon School District of approxi-

mately $400,000, this includes a redirection of approximately $300,000 which had gone to the County Education Service Center, but is now being channeled through the Mount Vernon City School District which will direct it back to the county center so that, on paper, there is a $300,000 increase coming to Mt. Vernon City Schools which, in reality, represents no net increase. In addition to that, the Mount Vernon City School District projects approximately $250,000 will be lost because of tutors not being reimbursed and transportation not being reimbursed in the same way as the previous year, thus arriving at a net reduction in funding to Mount Vernon City Schools in the amount of $150,000. (Sonedecker Depo. 80, 84–87) The district is also receiving $25,000 less in gifted funding from the prior year. (Sonedecker Depo. 80–82)

The South–Western City School District's problems are further aggravated by the phase in of the basic aid per pupil amount. (Hamilton Depo. 61–62)

Between 1990 and 1997, there were increases for the Jackson City School District in State aid. However, certainly those hovered around the inflationary rate. But the increases that have occurred since 1990 were not capacity-building increases, they were not program-building increases. (Strawser Tr. 1781)

E. Problems of H.B. 650/770

1. Simulation of Effects of House Bill 650

The Simulation Unit utilizes data from the Ohio Department of Taxation, the Ohio Department of Education Information Management Services, and the Education Management Information System as part of the simulations that they prepare. (Shams Depo. 8) The same data is available to the Legislative Budget Office and the Office of Budget and Management. (Shams Depo. 10). Mr. Shams and Dr. Payton are the two individuals primarily responsible for the actual work of the Simulation Unit. (Shams Depo. 7)

The Simulation Unit in which Mr. Shams is employed is supervised by Dr. Matt Cohen and simulates the fiscal effect of legislative proposals and budget proposals developed by the General Assembly. (Shams Depo. 6)

The Simulation Unit of the Ohio Department of Education was not asked to provide any input into H.B. 650 until it had passed the House. The initial simulation was, to Mr. Shams' knowledge not used at all and the Simulation Unit had no further involvement until H.B. 650 became law. The Simulation Unit had a great deal of difficulty attempting to simulate the effect of H.B. 650 because some of the data were not readily available and because some of the provisions were not clear to them. (Shams Depo. 12–13) Mr. Shams and Dr. Payton participated in meetings with legislative representatives and others designed to develop corrective legislation clarifying the concerns. (Shams Depo. 13–14)

In order to simulate the effects of H.B. 650 after its enactment, the Simulation Unit was required to estimate certain components of data that did not exist, in particular, the allocation of pupils from an educational service center (ESC) back to the district of residence and the allocation of the funding that the ESC received from those pupils. The estimations were necessary because the data was not available. (Payton Depo. 40)

One of the difficulties in simulating H.B. 650 was the need to count students in the district of residence rather than, as had formerly been the case, in the district in which they received educational services. (Shams Depo. 16–17) The change in counting students from the district of education to the district of residence represented a change in the Average Daily Membership for many school districts. Average Daily Membership is one of the most important factors in determining actual school district funding. (Shams Depo. 20)

The Simulation Unit was unable to implement some portions of H.B. 650 (for simulation purposes) as it was written. (Payton Depo. 48) Mr. Shams and others in the Simulation Unit had significant concerns about the ability to implement H.B. 650 as passed. (Shams Depo. 20)

H.B. 650 involved calculations more complicated than anything Dr. Payton had to deal with previously. (Payton Depo. 48)

Payton Deposition Exhibit I is a listing of those aspects of H.B. 650 that Dr. Payton believed could not be implemented and which he proposed for change. (Payton Depo. 44–45; Payton Depo. Exh. 2, pp. 50–51)

Shams Deposition Exhibit I is a document reflecting a meeting with various Department of Education personnel at which a number of issues, particularly the question of where to count students under H.B. 650, were discussed. The meeting was held on April 8, 1998. (Shams Depo. 15)

H.B. 650 required that a final FY98 funding calculation be made. The data to make such a calculation did not exist in some instances and had to be estimated. Shams Deposition Exhibit 2 represents a description of the kinds of data that had to be estimated. (Shams Depo. Exh. 2; Shams Depo. 21–22)

The Department of Education did not have available the amount that school districts' paid to the ESC's as "excess costs" (amounts that exceeded special education program costs paid by unit funding) nor did the Department have available the amounts paid by school districts for special education programs that exceeded available State funding. (Payton Depo. 42)

Shams Deposition Exhibit 9 is a comparison of changes under H.B. 650 and a summary of issues identified by the Department of Education. (Shams Depo. 96)

Payton Deposition Exhibit 3 is an outline of the operation of H.B. 650 prepared by Dr. Payton and distributed to all school districts. (Payton Depo. 51–53)

## 2. Phaseout of Equity Money

Mr. Maxwell compared, utilizing the Plaintiff Dawson–Bryant School District, the effect of the phaseout of equity money. As a result of the phaseout of equity money, Dawson–Bryant would receive an average of 1.06% increase per year for each of the next four years. (Maxwell Tr. 1368) The 1.06% increase is far less than the historical increases in expenditures per pupil. (Maxwell Tr. 1368)

The Dawson–Bryant Local School District will receive fewer basic foundation dollars per pupil in 2000 than in 1999 due to the phasing out of the equity program, and the slow phasing in of the basic foundation funding. State per pupil funding for Dawson–Bryant, including equity money, for fiscal year 1998 was $4,413, fiscal year 1999 is decreased to $4,275, fiscal year 2000 will be decreased to $4,210, fiscal year 2001 will be $4,414. (Sites Depo. 64, 79, 90–91) Some districts have seen an increase in their State funding in the 1990's, mainly due to the implementation of equity funds. But even this does not remedy the too low base foundation funding that has not even been able to keep pace with inflation. (Sites Depo. 80, 95)

The phaseout of equity aid is damaging to the Lima City School District, causing it to lose $2 million. (Buroker Depo. 233)

## 3. Power Equalization

Power equalizing assistance is available to districts with a per pupil valuation below the statewide average per pupil valuation with effective Class I millage between 23 and 25 mills. (Shams Depo. 62–63)

For FY99 the power equalization feature of H.B. 650 will total approximately $10.6 million or approximately one-fourth of 1% of State aid. "Gap aid" will produce approximately $7.3 million or approximately one-fifth of 1% of State aid. For FY99, 228 school districts will receive equity aid. During the previous year, 292 school districts received equity aid. The reduction in equity aid from FY98 to FY99 amounted to a reduction of approximately $43 million. (Maxwell Tr. 1426–28)

The Plaintiff Dawson–Bryant Local School District will receive no funding under the power equalization formula because its millage rate is at 20.6 mills and the power equalization provides funding between the chargeoff and 25 mills. (Washburn Tr. 1945) The chargeoff supplement is not something under which the district anticipates being able to receive revenue because in May 1993, the district's voters voted themselves to the maximum debt permitted by law, and

they increased their property taxes by 26% at that time. Since 1993, the average income for residents of the district has increased only 15%. It would be difficult to expect the residents of the district, based upon their income level, to have any additional expendable income to use to pay for additional taxes. (Washburn Tr. 1946) The free and reduced price lunch rate of the district is approximately 60%. (Washburn Tr. 1917)

Because for FY99 power equalization will produce, statewide, estimated $10.6 million total additional revenue, which is less than ¼ of 1% of State aid (Maxwell Tr. 1426), the Court finds this to be insignificant in responding to the Supreme Court's decision.

### 4. Chargeoff Supplement

The chargeoff adjustment is an adjustment based on the total school district receipts from all local taxes including income tax, emergency and operating levies. If that total is less than the chargeoff amount (23 mills times adjusted recognized value) the district will receive an adjustment equal to the difference. The chargeoff supplement benefits high wealth districts as much as low wealth districts. One relatively high wealth district will receive $1.3 million of the $7.3 million total chargeoff supplement. (Maxwell Tr. 1397)

The Southern Local School District effective millage for FY98 was $23.8 mil. The district will not be assisted by the chargeoff supplement (Lanning Depo. 92) or by the equalization of the 24th and 25th mill. (Lanning Depo. 93–94)

In FY99, the Plaintiff Dawson–Bryant Local School District is projected to receive about $66,000 in gap aid or chargeoff supplement. The district levies 20.6 mills and the chargeoff is 23 mills. (Washburn Tr. 1944–45)

### 5. Other Concerns Regarding House Bill 650

Dr. Goff would not testify that the level of funding provided by H.B. 650 is adequate. (Goff Tr. 628)

Among the concerns Mr. Maxwell expressed concerning the operation of H.B. 650 were: (1) The impact of the loss of equity funds. (2) We have not done an adequate job of actually determining the needs of students. We need to identify the needs of students and fund them accordingly. (3) We have not done a very good job of determining the local school district's capacity to support the funding formula. Capacity in the modern era cannot be only property wealth. (4) We have not solved the phantom revenue issue. Inflationary property value increases drive up wealth, thereby giving the school district less revenue. (5) And, finally, the lack of a permanent solution to facilities creates a major problem. Mr. Maxwell does not believe the funding system will bring about a reduction in

the extent to which local property taxes are relied upon. The Court, upon consideration, agrees and finds this to be a fact. (Maxwell Tr. 1425)

The Chillicothe City Schools were projected by the Ohio Department of Education to receive a .82% increase (82/100ths of 1%) or roughly $42,000 for FY99 over FY98. However, the district had increased special education costs in excess of $200,000 that were required to be paid to the Ross County Educational Service Center (ESC) as a result of the loss of unit funding. (Overly Depo. 55–56)

The Chillicothe City Schools is currently meeting nine of the eighteen performance criteria on its most recent report card. (Overly Depo. 54) The Chillicothe City Schools reduced staffing to be able to afford to add staff to meet the requirements of S.B. 55. The staffing and programming reductions will decrease the level of student performance. (Overly Depo. 54) If the district added the additional staff required by S.B. 55 without making other reductions, it would create a deficit in the reserve fund balance of $500,000 by the end of FY00. (Overly Depo. Exh. 2, p. 3)

Plaintiffs' Exhibit 486 compares the list of Augenblick 102 school districts that were used in Dr. Augenblick's analysis to the Jackson City School District. The weighted average expenditure for Augenblick's school districts is $5,011. Of that amount, $3,930 is base cost. Comparatively, the Jackson City School District spent $4,134 per child "current expenditures." Of that amount, $2,542 was a base cost for the Jackson City Schools. (Pl. Exh. 486, p. 3) The Jackson City School District has $1,400 less per child available for base cost. For a classroom of 27 students, that is $37,000 per classroom. The weighted average ADC percent for the Augenblick's districts is 3.95%, while Jackson City Schools has 18.37% ADC pupils. The weighted averaged income of the Augenblick 102 districts is $36,420, while the average income for the Jackson City School District is $25,991 for tax year 1996. The average teachers' salary in the Augenblick 102 districts is $38,531, while the average teacher in the Jackson City Schools earns $33,012. Jackson City Schools would have to add eight teachers to lower its student-teacher ratio to the Augenblick 102. (Strawser Tr. 1784–86; Pl. Exh. 46) The Augenblick 102 districts served as the basis for the methodology underlying H.B. 650 and 770. Whether it was changed to eliminate 18 districts and pick up 18 or 19 districts, the reality is that the 102 methodology was used. The H.B. 650 formula based on the Augenblick analysis resulted in $133 per pupil for the Jackson City Schools, which will not make up the difference of $1,400 per pupil that Jackson was below the Augenblick 102. (Strawser Tr. 1784–87) Jackson City Schools needs to add nine teachers to get to the average teacher to pupil ratio of the Augenblick 102 districts. (Strawser Tr. 1874) The Court finds that the H.B. 650 distribution of State funding is flawed in that it does not provide adequate funding for the Jackson City Schools and other school districts as well.

6. No Long–Term Funding

State Issue 2 was a proposal placed on the ballot by the Legislature in May 1998. (DeMaria Tr. 1273) State Issue 2 was to provide a long-term structure of funding the changes in school funding enacted in H.B. 650. Mr. DeMaria testified:

"Q: What is the impact of the future funding of primary and secondary public education in Ohio as a result of the defeat of Issue 2[?]

"A: The significant revisions made to the way Ohio funds schools and the phase-in of those revisions present a structural change to the expenditure side of Ohio's budgetary equation. A structural change to the spending side. It was felt that the structural change needed to be matched to a structural change on the revenue side.

"Q: So both Senate Joint Resolution 3 and Issue 2 were designed to address that structural imbalance that might exist?

"A: Again, from a long-term perspective. As we discussed about the phase-ins, it takes increasing amounts of resources in the out years to support the provisions of H.B. 650.

" . . .

"Q: . . . I thought I heard you say that since 650 substantively changes the structure of school funding long term, the purpose of State Issue 2 was to provide likewise a long-term structure for funding that new structure, right?

"A. That's correct." (DeMaria Tr. 1273–74; 1310)

State Issue 2 was defeated and there was no evidence presented to this Court that the Legislature has provided any long-term substantive funding for the changes set forth in H.B. 650.

F. Conditions in School Districts

1. Academic Emergency

A district is deemed in "academic emergency" when it meets less than 33 percent of the 18 performance criteria on the district's report card. (Lanning Depo. 36)

Districts identified as being in a state of academic emergency are expected to show improvement within three years. The standard unit of improvement is 2.5 percentage points. (Rogers Depo. 53)

A district would have thirteen years to advance from academic emergency to a rank of "effective" under regulations adopted by the State Board of Education. (Rogers Depo. 54)

Districts have a total of 13 years to move from being identified as being in academic emergency to being identified as effective. (Goff Tr. 568)

Southern Local School District is in academic emergency. (Lanning Depo. 36) On its report card, Southern Local met only one of the 18 performance criteria. (Lanning Depo. 153) Superintendent Lanning is currently working on Southern Local's strategic plan and will modify that into the continuous improvement plan in an effort to get the district out of academic emergency. (Lanning Depo. 36–37) However, the projected deficit of the district will require cuts in the district's programs or passage of more than 50 mills to avoid the approximately $1.4 million deficit. (See Grandy Depo. Exh. 1)

Dayton City School is also in "Academic Emergency." The district met only two of the 18 performance criteria on its report card. (Williams Depo. Exh. 6)

In trying to fund and implement the provisions of S.B. 55, Dayton City Schools likely will have to lay off some employees and cut programs. (Williams Depo. 76)

Getting qualified teachers, especially in mathematics, is very problematic for Dayton right now. (Williams Depo. 77–80)

To meet the mandates of S.B. 55, Dayton City Schools must implement the fourth grade guarantee, scale down its summer school program to deal with just third graders who are not on reading level, and do other programming readjustments. (Williams Depo. 77–80)

2. School District Performance Standards

a) Dawson–Bryant Local School District

At the time of trial in 1993, the Plaintiff Dawson–Bryant Local School District was unable to meet the State's minimum standards. In the fall of 1998, the District still does not meet the State's minimum standards in the following respects: The District does not have a specialized music program at the elementary level. The District does not have a specialized physical education program or physical education teacher at the elementary level. At the secondary level, the District is still not able to offer art to all of its students. The District has one part-time art teacher who serves both the middle school and the high school. The only music program available for middle school and high school students is band. This District does not offer foreign language below the high school level. (Washburn Tr. 1927–28)

The Plaintiff Dawson–Bryant Local School District met nine of the eighteen performance criteria on its latest report card. The District is presently in academic watch. (Washburn Tr. 1928)

Based on the improvements that Plaintiff Dawson–Bryant Local School District has made in its ninth grade proficiency test scores, the District could make similar improvements in the fourth, sixth, and twelfth grade proficiency test scores if it had adequate resources to do so. The District needs additional teachers in math and science and needs additional small group instructions, including tutors. The District needs to retrain its teachers, especially at the secondary level, about the twelfth grade proficiency outcomes and interdisciplinary teaching. (Washburn Tr. 1929–30) The District is unable to implement these things due to inadequate resources. (Sites Depo. Exh. 1)

### b) Groveport Madison Local School District

### (1) Report Cards

The Groveport Madison Local School District presents an example of school districts throughout the state being held to the same 18 performance standards but with greatly varying resources.

Superintendent Barr testified:

"I believe in accountability 100%. And I believe that all districts should be accountable, but then if you're going to hold all districts accountable, I think all districts should have a level playing field. And by that I mean if a district—it's easier for me to look in Franklin County because I know that so well—but if a school district can raise local funds by passing, lets say one mill, and right here in one county one school district passes one mill and it raises three times what the other one can do, and when you look at, that on a statewide level and you look down into Perry County, down into Morgan County where you've got Wayne National Forest and those types of things, where you have mines that are not open, you can pass 100 mills and it's not going to make any difference. They can't raise the money locally. I see the same scenario on a different level in Franklin County. A lot of people don't realize we've got that in Franklin County the same as we have—all I hear about, I hear about Southern Ohio and the disparities down there, and I know those exist. I've seen them and I know that. We've got those same things right here in the capital of Ohio here in Franklin County. And those disparities exist between Groveport Madison School compared to Dublin. Compare Groveport Madison School to Worthington, you'll see those, Groveport Madison to Hilliard, you'll see those. Hamilton Local, the same thing. Those disparities are not just down in Southern Ohio, like some people think they are. They are—I see them even here in Franklin County.

"And so I believe in accountability, yes, but I think we're all being held to the same accountability, but we don't all have the same input. So the kids—I believe it's unfair and immoral to me to expect kids to all be able to achieve the same

when some of them have a playing field that's all uphill for them and they don't have the things we've been talking about today." (Barr Depo. 148–49)

Again, the State offered no rebuttal to this testimony and the Court finds it is persuasive.

According to the Groveport Madison Local School District's 1998 school district report card, the District met 8 of the 18 performance criteria identified on the report card. (Barr Depo. Exh. 13; Depo. 135–36) By virtue of this performance, the District is on what is called "academic watch." (Barr Depo. 136) Superintendent Barr attributes this level of performance to the district's deteriorating programs and worsening student/teacher ratios resulting from its fiscal difficulties. He testified:

"Well, if you remember, the most important thing that I can think of that would relate to student outcomes and student learning is the teacher in the classroom. Research shows that—that classroom teacher is the most important thing in the classroom. When you start cutting back class, you raise teacher ratios, as we have cut out teachers who would be providing instruction, and this goes way beyond the last two years. This is the point that I'm saying is that we have increased class size at the elementary level, we have cut out programs that would help these students to do better. This year we're even cutting out a preschool program which will help get those students ready for learning.

"As the finances have decreased, we have had to cut programs because we've had to be able to balance the books and to meet those financial obligations, and so we make those cuts; but as we make those cuts, as you get rid of the things that are important to education for students whether its supplies and materials, whether its instruction, whether its tutoring or whatever it might be, those students are not going to score as well." (Barr Depo. 137–38.)

· The State offered no rebuttal testimony to dispute Superintendent Barr's views on this matter and the Court finds them persuasive. The financial recovery plan now binding upon the Groveport Madison Local School District focuses almost exclusively upon the fiscal condition of the district with virtually no consideration as to the academic impact of the reductions mandated in the plan. The fiscal emergency and fiscal watch programs provide no additional funding for districts in fiscal watch or fiscal emergency, only financial oversight with virtually no sensitivity to the impact expenditure reductions have upon the district's ability to educate its children.

### (2) Comparison with Effective School Districts

Superintendent Barr was presented with a document entitled, "The List of 103 Effective School Districts." He understood these to be districts which meet 17 of the 18 performance criteria. (Barr Depo. Exh. 23; Barr Depo. 201–2) His

attention was directed to Wadsworth City School District at the bottom of the first page of Exhibit 23 and was shown that this district has a similar valuation per pupil, spends $3,596 per pupil, significantly less than Groveport Madison, and yet met all 18 of the performance criteria in fiscal year 1996. He was then asked to account for how a district which spends less per pupil than Groveport Madison is able to meet all 18 performance criteria and Groveport Madison is not. Superintendent Barr gave the following answer:

"I will attempt to answer. I don't—this information is meaningless as far as being able to answer that question, but I would think that someone has pulled out some items that evidently they think are important to rank the school districts with. Because they are effective school districts and there are other things that are much more important, I would believe, then the base cost per pupil, the median income, median income percentile ranking and valuation per total ADM, Wadsworth City, I don't know what kind of city that is, whether it has urban problems, where a high percentage of students are on ADC, I don't know whether they have a large percentage of handicapped students that are required by law to provide educational programs. I don't know where their teachers might be.

"Groveport Madison. I know we have a mature staff which means those teachers would cost more on the salary schedule than the ones who would be beginning teachers.

"There is just a lot—there's too many things that I would not know to be able to even attempt an intelligent answer to that question because it's like guessing. I really don't know about Wadsworth City. I would like to know what their debt load would be that they would be carrying. There are a lot of things, you know. Are they retiring debt?

"I would think the demographics, which Wadsworth City doesn't ring a bell to me like I think of Columbus, Ohio, would for most people. There are—and the State has recognized that there are special problems that go with city school districts. And, yet, because I'm a suburban school district, I still get students from the City of Columbus. In fact, most of our students, yet it's recognized for the suburb of Groveport Madison.

"So we have a lot of the similar problems a school district like Columbus City would have. We are not a total urban school district, but we do have some of the same problems.

"I would be interested to know how many parents in Wadsworth City, for example, are two-parent families. How many of those students come from two-parent families. It would be interesting to know. And one of the most important things from what the research tells me is that I would like to know what the level,

highest level of education that was attained by the mother of these students. What is the educational background of the community and the people there, because that certainly has an impact on what they believe the students should be doing. Is education an important thing for Wadsworth City? Do they value education? Off the top of my head, that's what I can think of." (Barr Depo. 202–05)

The Court agrees with this testimony and finds such comparisons, in the absence of any further evidence, quite difficult to make.

### c) Dayton City School District

Williams Exhibit 6 is a State of Ohio 1998 school district report card for Dayton City Schools. It shows that the District is meeting 2 of the 18 State standards. (Williams Depo. 80) Their dropout rate is 6% to 7%, meaning those students that are enrolled in September and those who graduate in June. (Williams Depo. 125)

### d) Chillicothe City School District

The Chillicothe City School District is currently meeting nine of the eighteen performance criteria on its most recent report card. (Overly Depo. 54) Chillicothe City Schools reduced staffing to be able to afford to add staff to meet the requirements of S.B. 55. The staffing and programming reductions will decrease the level of student performance. (Overly Depo. 54) If the District added the additional staff required by S.B. 55 without making other reductions, it would create a deficit in the reserve fund balance of $500,000 by the end of FY00. (Overly Depo. Exh. 2, p. 3)

### e) South–Western City School District

For the South–Western City Schools, the best way to improve its report card is to designate people time to go and do things that the district has not been able to do in the past, such as track students and try to get them into the classroom. It takes additional dollars to make positive outcomes. (Hutchinson Depo. 76–77)

### f) Lima City School District

A district's dropout rate is one of the academic accountability measures. Dr. Buroker testified and the Court finds persuasive that the manner in which the dropout rate is calculated is not proper. For example, the State counts all students who are in open enrollment as dropouts from Lima City School Districts. That is, it considers 150 students from the Lima City School District who are enrolled in other districts (and who may be doing very successfully) as dropouts. (Buroker Depo. 262) If Lima was not required to include students on open enrollment among dropout students, it would meet the dropout criteria of S.B. 55. (Buroker Depo. 263)

### g) Southern Local School District

Although the Southern Local School District has tried the best it can with what it has had, the District achieved only one out of eighteen items on the report card. The District is not providing an adequate education because it does not have the resources to do so. The students of the Southern Local School District do not have an adequate education because they do not have the same kind of opportunities as other students, such as college preparatory science, college preparatory chemistry, and other types of subjects. The Southern Local School District needs to offer more classes, have more teachers, reduce class size, purchase additional computers, textbooks, and supplies, and the District needs more of everything. (Grandy Depo. 107–09)

### 3. Declining Enrollment

#### a) Youngstown City School District

Student populations in Plaintiff Youngstown City School District have had a slow but steady decline, which will reduce the amount of basic foundation funds from the State. (Funk Depo. 30) Further funds will be diverted away from the district due to open enrollment and students attending charter schools. For fiscal year 1999, an estimated 620 students will attend community schools instead of Youngstown City Schools, which will remove approximately $3.1 million from the district's budget. (Funk Depo. 30–31; Funk Depo. Exh. 1)

#### b) Dayton City School District

Dayton has approximately 27,000 students. The district is projecting enrollment decline of about 1,200 to 1,500 students for this year. The enrollment trend has been pretty flat over the last 10 to 12 years. However, the enrollment decline for this year is significant and is due to a voucher program, and adjacent school districts with open enrollment and inner city students attending the JVS programs. (Williams Depo. 13)

With reference to the budgetary process, a district does not know how much money it is going to get from the State because it is driven by average daily membership. That is not taken until October 15, and the settlement does not occur until January of the next year. Therefore, the budget process is always an estimate. (Williams Depo. 19) A district does not know its exact figures until about May because corrections are always being made. (Williams Depo. 20) The Dayton City School District usually budgets 90% of the total budget, because of uncertainties in getting the total 100% of funds. (Williams Depo. 21)

### c) Lima City School District

The Lima City School District has had declining enrollment for the last 25 years. (Buroker Depo. 89) The Lima City School District has nine elementary school buildings, three of which have been shut down due to declining enrollment. (Buroker Depo. 274–75)

### d) Dawson–Bryant Local School District

The information contained in Sites Deposition Exhibit 1 is the best numbers that the administrators of the Plaintiff Dawson–Bryant Local School District had at the time of trial, and together with their testimony is the latest information available. (Washburn Tr. 1976)

The financial condition of the Plaintiff Dawson–Bryant Local School District has improved since the summer of 1993 when it went into FY94 with an unencumbered balance of $3,000. The expenses of the district at that time were $18,000 to $19,000 per day. Since then, primarily due to equity monies and grants, the district has a carryover balance of approximately $340,000, which would be a thirteen- or fourteen-day carryover. However, the district is still not at the recommended carryover balance of thirty days, as established by the Division of School Finance of the Ohio Department of Education. Additionally, the district has been very aggressive and has had people who have been willing to donate their time and effort to secure an additional $1.4 million in revenue and donations through grants and other sources outside State aid for the district between FY93 and FY98. (Washburn Tr. 1932–33)

The Treasurer of Plaintiff Dawson–Bryant Local School District, Mr. Stephen Sites, projected a 2.56% increase in total operating revenues for FY99 over FY98. (Sites Depo. Exh. 1) The district will have less discretionary dollars than it had in FY98 due to the DPIA mandates and the required set-asides. (Washburn Tr. 1935–36) Additionally, enrollment for the first two weeks of FY99 was down 42 students unexpectedly. Thus, a guarantee provision may need to kick in to provide the district with the same amount of State funding for FY99 as it had in FY98. (Wasburn Tr. 1936–38)

The enrollment at Plaintiff Dawson–Bryant Local Schools was down unexpectedly in the first two weeks of FY99. Superintendent Washburn has looked at options to reduce staff because of the possibility that the district may have the same amount to operate on this year as it had last year. However, it is difficult to make reductions when the 42 students are spread out over thirteen grade levels. The district cannot eliminate a first grade teacher based on a reduction of three students because that throws the other classrooms into an overload. Similarly, the district cannot eliminate a bus driver and still have 1,000 miles per day that must be traveled. The district does not have a segment where all of the

forty-two students have moved out. The district still has the same amount of square footage each day that must be cleaned by the custodians and still has food service and meals that must be provided, and it is currently above the recommended meals served per manhour. (Washburn Tr. 1936–38)

The Plaintiff Dawson–Bryant Local School District will need to replace at least two buses per year, which was not a part of the treasurer's projections set forth in Sites Deposition Exhibit 1. Also, the district was surprised with a declining enrollment of forty-two students that was not a part of the projection. The additional costs for summer school remediation at the elementary level (about $93,000) which do not include middle school or secondary level are not a part of the projection. Although the treasurer included a 1% set-aside, it appears that the district will not be getting a 3% increase and will not need to do so in the approximate amount of $63,000. Even so, the district would attempt to set aside the 1% budget reserve. The needed bus purchases alone that are not included in the projection would wipe out the $63,000 budget reserve that was included in the projection. (Washburn Tr. 1938–40; 1943; 1951–52; 1978) The treasurer of the district projected a deficit of $552,744 for FY03. The changes testified about and described above for the district's financial future would cause this deficit to increase. (Washburn Tr. 1953)

The problem with the current funding system based so heavily on enrollment figures is appropriately summed up by the testimony of Ernie Strawser:

"It's almost like every cost in a school district is supposed to be variable. If you lose one student, you ought to be able to lose 1/27 of a teacher. That's not the way it works." (Strawser Tr. 1798)

4. Inadequacies Continue

a) Southern Local School District

The following inadequacies exist at the Plaintiff Southern Local Schools because of lack of funding:

The Southern Local School District does not offer enough courses for students. Arts I, II and III are taught at the same time in the same classroom. The District does not have advanced placement classes. The District has students who want to have a second foreign language, but cannot take it. The District has students who are going on to college and want to have some specific classes, but the District does not offer those classes. The District has students who would like to have some of the course offerings that students are able to have at other schools. There are a lot of programs that the District cannot offer because it does not have the personnel and does not have the facilities even if it did have the personnel. The District needs to provide much more remediation for students in

K–4 and the middle school in 5–8. The District does not have enough personnel to work with students who are at risk. The District needs parent involvement programs to assist students who are coming to school in Kindergarten and first grade who are not prepared to come to school. These are homes that do not have books, and have parents who are concerned about where the next meal is coming from because they are on ADC. Teachers and staff of the District need more staff development. It is difficult for the District to have professional development during the school year because the District has a tough time paying for substitutes to take teachers away from their classes. In addition to that, the District has a difficult time getting substitutes in the rural area. The teachers do take training in the summer, but again, the location prohibits them from going very far to a campus to get instruction. Some staff development activities are cost prohibitive. There are a lot of areas that are lacking in the Southern Local School District that the District needs to have in order to improve educational delivery. (Lanning Depo. 54–56).

An adequate education for the students of the Southern Local School District would include advanced placement courses and other educational opportunities that are afforded to students in some of the wealthier school districts. (Lanning Depo. 58)

The Southern Local School District does not have an advanced math class because it does not have the instructor for it. The students do not generally enroll in college courses because of the location of the Southern Local School District and the treacherous roads to drive there. One student was killed on those roads two years ago, and that has frightened a lot of parents and students away from traveling to other campuses. The location prohibits it. (Lanning Depo. 58–59)

The Southern Local School District lacks adequate staff to have a teacher for advanced math I and II. The District is currently using the guidance counselor to teach those courses. (Lanning Depo. 62) The District does not have educational opportunities for students in dance. In FY97, the District had a teacher who was qualified to teach drama. In FY98, the District had to drop drama and the District has no class plays. In FY98, the District did not have a reading teacher at the high school level because there were no available candidates to hire. None of the candidates interviewed was certified in reading. (Lanning Depo. 63–64)

The Southern Local School District offers Spanish I through Spanish IV, but all in the same classroom with the same teacher at the same time. The District would like to offer the courses in separate classrooms. The district provides no foreign language to students in the seventh and eighth grade. (Lanning Depo. 59–61)

The equipment currently available for student use includes tables that were donated by Ohio University because they no longer wanted them. Microscopes were also donated by Ohio University. Out of twelve microscopes two of them work. The district is attempting to put pieces of some of the other microscopes together to make them work. The district does not have the proper eye wash equipment or safety equipment. Some of the problems with the science labs are being addressed through the emergency repair money, such as plumbing problems and gas leak problems. Also in the middle school, the district has a science lab, but it does not have items needed for the teachers to conduct experiments. (Lanning Depo. 74–75)

### b) Dayton City School District

The Dayton City School District is not providing a thorough and efficient education for the total population of his students. (Williams Depo. 36, 134) The Dayton City School District's education reform plan and its associated cost are estimated to be $430 million and comprise a calculation that Dr. Williams believes to be an equitable and adequate education for the students in Dayton. (Williams Depo. 134–35) There is a wide disparity between the cost of the District's education reform plan and the amount of money that the District now has in revenue. (Williams Depo. 136)

### c) Dawson–Bryant Local School District

#### (1) Courses

Despite the Supreme Court of Ohio's specific note of the following deficiencies, these deficiencies continue to exist at the Dawson–Bryant Local School District. Elementary and middle school students at the Plaintiff Dawson–Bryant Local School District still have no opportunity to take foreign language courses or computer courses. The district's elementary and middle school students still have no opportunity to take music or art classes other than band. Junior high students in the district still have no science lab. Plaintiff Dawson–Bryant still offers no honors program and no advanced placement courses, and Plaintiff Dawson–Bryant still does not have enough money to pay tutors to assist students who do not pass proficiency examinations. (Washburn Tr. 1954–57)

Since 1993, the Plaintiff Dawson–Bryant Local School District has made an effort to give its students a better opportunity to pass the 9th grade proficiency test, recognizing that it is a minimum requirement for a high school diploma. The District has made considerable progress and is now above state average in students passing the 9th grade test. However, the District has not been as successful in the 4th, 6th and 12th grade proficiency tests due to lack of resources. (Washburn Tr. 1912–13)

The Plaintiff Dawson–Bryant Local School District has been able to implement some programs since 1993 to address the needs of students in the lower grades. These programs include all-day, every-day kindergarten funded through federal funds and the Success For All Reading Program funded through a Jennings · Foundation Grant and Venture Capital Grant. However, the Venture Capital Grant monies have been exhausted. (Washburn Tr. 1913–15)

### (2) Attendance

Plaintiff Dawson–Bryant Local School District has no attendance program, and has a need for a parent liaison to identify early truancy problems and make contacts with the home to see if there is something the school can do to assist in making sure that the child is at school. (Washburn Tr. 1926)

### (3) Staff

Plaintiff Dawson–Bryant Local School District has a need like all other districts for a tremendous amount of support for employees. The District needs to continue the Success For All Reading Program, teachers need to be exposed to the outcomes on the proficiency tests, be involved in curriculum mapping, and be exposed to continuous improvement plans. The requirement in S.B. 55 to have a continuous improvement plan also requires professional development for teachers to understand what is expected and how to get there. The minimum recommendation by SchoolNet for a "scholar in technology" is 180 hours of professional development per teacher. Teachers need extended time for this amount of professional development. (Washburn Tr. 1926–27)

Student to teacher ratios in the Plaintiff Dawson–Bryant Local School District have not changed since the time of trial in 1993. At the elementary level, the District is still running 23.33 to 1 in its ratios. For FY99, the District has added two additional teachers at the lower grades, but the teacher to pupil ratio has not changed significantly since the time of trial. (Washburn Tr. 1915–16)

### d) South–Western City School District

The expenditures of the South–Western City Schools on textbooks and instructional materials have been confined within the parameters of how many dollars the District has had available that year to spend. The District has deferred textbook adoption when the board has determined that those adoptions were necessary, such as in 1993 and 1994 when the District deferred most of its textbooks adoptions. At this point, the District is trying to catch up to the five-year cycle to replace those textbooks. Additionally, instructional supplies and materials like science kits and scientific calculators, CD–Rom materials, manipulatives and the like have also been deferred. (Hutchinson Depo. 117–18)

Textbooks and instructional materials such as science kits, that can be used only once and then must be replaced in the next year, continue to increase the cost of providing updated materials. Those kinds of curriculum items are changing every day, and science kits have improved the test scores in science in the South–Western City Schools. (Hutchinson Depo. 127–28)

e) Lima City School District

(1) Textbooks

It is Dr. Buroker's view and the evidence indicates that Lima City School District is currently not providing a thorough and efficient education to its students. (Buroker Depo. 155) The District cannot offer opportunities to its students that are necessary to allow them to become full, contributing members to society. (Buroker Depo. 156) One particular area of failure is supplies and materials. With one exception, the District has not bought new textbooks in ten years. The District has bought replacements, such as books copyrighted in 1985, but has not bought new editions in any material purchase. (Buroker Depo. 156–57) While the replacement books cost as much as a new edition, only a few copies need to be purchased as opposed to an entire set. The only new editions purchased in the last ten years were new mathematics textbooks for grades K through 8 in 1992. (Buroker Depo. 157)

As to textbook and instructional supplies in the Lima City School District, this Court found the following in its findings of fact following the original trial of this matter:

(Findings of Fact, p. 260) Lima, 57 percent of the texts in use in the elementary school have copyright dates of 1985 or older. Sixty-seven percent of the middle school and 78 percent of the high school texts have copyright dates of 1985 or older. A textbook for Afro–American Studies having a date of 1972 is presently in use in the district. That textbook references African countries which have changed names and configurations as often as two or three times since the textbook was published. (Buroker Tr. 2930)

Apart from the textbooks purchased to attempt to implement part of the model math curriculum at the junior high level and replacing copies of current adoptions, the district has not purchased any new textbooks for six years. (Buroker Tr. 2933)

Complete revision of texts in each major course of study will require the expenditure of approximately $1,500,000. The district can afford to spend only $100,000 a year on textbooks. (Buroker Tr. 2933)

A survey of equipment and supplies needs of individual classroom teachers in Lima revealed a total amount of current additional funds needed of $2,120,344. (Buroker Tr. 2955)

As noted above, Dr. Buroker's more recent testimony reveals that the district is now down to spending $20,000 a year on textbooks. The State presented no evidence whatsoever that the district's equipment and supplies needs of $2.1 million identified in 1993 have diminished in any way. H.B. 412 mandates that the district spend more in this area, but with no additional funding.

### (2) Staff

Other areas of deficiencies for the Lima City School District include insufficient staffing for an urban district such as Lima. It does not have support services such as nursing at a ratio that is appropriate, nor does it have school social workers who can coordinate community efforts to make sure the children's needs are met. It has no elementary guidance staff. It has much need for basic classroom equipment, such as chairs and desks which are "rickety and falling apart." (Buroker Depo. 157–58)

The Lima City School District has not taken steps to remedy these problems because it does not have the resources. (Buroker Depo. 161) While teacher salaries have increased, it is not realistic to suggest that there is a choice between textbook purchases and teacher salary increases. As Dr. Buroker testified:

"What I will tell you is that we are forced to operate under the bargaining law which was passed by the legislature which is a law which in many respects grants to the employees considerable power. And the board makes a decision that, in the arena of whether or not you raise salaries or buy textbooks, that it's probably best that you avoid a strike." (Buroker Depo. 161)

### f) Cleveland City School District

There were three districts that met none of the 18 performance criteria that were looked at by the core group of the School Funding Task Force. One of those districts was the Cleveland City School District. (Cohen Depo. 384–85)

The high school dropout rate in the Cleveland City School District is in the range of 60% and in the other big 8 cities from 40% to 50%. (Goff Depo. 205)

### G. Financial Projections of Districts

### 1. Requirement to File Five–Year Projections

School Districts are now required to file 5–year projections of school finances with the Ohio Department of Education. Those projections are required to take into account the effect of the set-asides under H.B. 412. (Goff Tr. 583)

The format for H.B. 412 five-year projections was developed and made available on a spreadsheet format by the Auditor of State. Many of the computations on the spreadsheet are computed by the spreadsheet itself. (Strawser Tr. 1801–02)

Prior to H.B. 650 in 1998, school districts have not known what funding would be received from the State for more than two years. So, for school districts heavily dependent upon State funding, a five-year projection would be guesswork in the fourth and fifth years because of uncertainty about the future of State funding. (Grandy Depo. 15–16)

## 2. Financial Projections of Specific School Districts

### a) Jackson City School District

The five-year projection of the Jackson City School District (Pl. Exh. 487) is the best estimate with the information available at the time of the hearing. (Strawser Tr. 1819) The Jackson City School District is projected to have a deficit of $779,000 in FY03, and a deficit in the unreserved fund balance of $2.095 million. (Strawser Tr. 1802; Pl. Exh. 487) The cash deficit is not as great as the unreserved fund balance because the district will not spend the set-aside amounts for which there is no cash to cover. (Strawser Tr. 1806) The options for the Jackson City School District given its five-year projection include impacting programs over time and increasing teacher to pupil ratios to try to make the district fiscally sound over the five-year period. The district would need to pass approximately 4 mills to be able to operate without the projected deficit. Considering that the taxpayers have taxed themselves an additional 25% since 1990, and that this level of operating millage would be a 17% to 18% increase, and considering that the district needs school facilities and will be required to pass millage to participate in the cost of facilities act program administered by the school facilities commission, the options for the district can be boiled down to: It is very difficult to pass levies. (Strawser Tr. 1819–20) Further, to bring the Jackson City School District expenditure per pupil up to the average expenditure of the Augenblick 102 would require passage of a levy of 28 mills. (Strawser Tr. 1821)

H.B. 650 and 770 do not present a solution for the Jackson City Schools. (Strawser Tr. 1780) The district's ADM for funding calculations is 2,549. (Strawser Tr. 1860)

Between FY98 and FY99, the Jackson City Schools will receive a $340,000 increase in total State aid. That is approximately a 4.4% increase or $133 per pupil. However, the State's funding formula does not provide the district with as much money as it would have received last year. So, the district will be placed on a guarantee and $60,000 will be added to the district's funding to bring it up to

the level it obtained last year for basic aid. In short, the formula is not working for the Jackson City Schools. (Strawser Tr. 1790–92)

The capacity of the Jackson City School District has not been enhanced in its ability to obtain additional per pupil funding. (Strawser Tr. 1821)

Under H.B. 650 and H.B. 770 Jackson City School District will receive 65% of the foundation level of $3,851 from the State and 35% will be the local component for FY99. (Strawser Tr. 1799)

### b) Chillicothe City School District

The five-year projection of the Chillicothe City School District treasurer, Stacy Overly, is the best estimate of what he anticipates the future is going to look like. His estimates for last year represented less than a three percent margin of error. Mr. Overly testified, "I am very comfortable with my projections and what assumptions I have used to make the projections." (Overly Depo. 46–67) The Court finds this testimony credible and finds that the State has presented no evidence indicating any errors in Mr. Overly's projections, and thus the projections are found to be the best estimate of the financial future of the district. Further, the Court finds that these estimates are very conservative in that the treasurer has included a wage freeze in FY01 through the end of the projection in FY03. (Overly Depo. Exh. 2, p. 2)

The five-year projection of the Chillicothe City Schools shows a $1.6 million deficit by end of fiscal year 2001. The only two options available for the district are making staffing cuts or passing additional millage levies. The district failed three levy attempts in the last two years. (Overly Depo. 23–24, 56)

If the Chillicothe City School District Board of Education does not go to the ballot for additional money, then programming for the district will suffer. (Overly Depo. 45–46)

The deficit of the Chillicothe City School District will reach $3.6 million at the end of FY03 without the additional requirements of H.B. 412. If the district spends the set-aside requirements of H.B. 412, the deficit balance would grow to $5.737 million at the end of FY03. (Overly Depo. 53)

### c) South–Western City School District

The South–Western City School District has prepared five-year financial forecasts since 1983. (Hutchinson Depo. 10) Mr. Hutchinson spent about a week and a half to get all the information together to prepare the five-year financial forecast presented as Hutchinson Deposition Exhibits 1–5. (Hutchinson Depo. 13) Mr. Hutchinson's projection has been provided to the Board of Education, and it is the last best update of these estimates. (Hutchinson Depo. 15) In the past, the Treasurer's Office has never been less than 96–97 percent accurate in revenue

projections. (Hutchinson Depo. 38) The wage increases in the Treasurer's five-year projections on expenses (Hutchinson Depo. Exh. 2) include less than a 3 percent increase through FY03. (Hutchinson Depo. 42–43)

The five-year projections for the South–Western City Schools include the expense of additional staff to open new buildings, assuming that the school district's levy passes in November 1998. If the levy does not pass, the money will have to be spent to renovate additional space, and it will probably cost more than the additional salaries included in the projections necessary if new buildings are built and opened. (Hutchinson Depo. 50–51)

The South–Western City School District's problem in the past and problem into the future are how to reduce a budget when it is growing at 250 plus students per year. (Hutchinson Depo. 98–99) The District's growth pattern for enrollment is rising more rapidly than the growth in revenue. (Hutchinson Depo. 99) The District began making reductions in the increases in the budget in fiscal year 1997. (Hutchinson Depo. 100)

The South–Western City School District has no area of its budget that could be dramatically cut that would make any significant difference. The district is projecting a deficit in FY02 in the amount of $8.4 million and a deficit in FY03 in the amount of $28.7 million. (Hutchinson Depo. Exh. 4).

### d) Lima City School District

The first two pages of Buroker Deposition Exhibit 7 are a 5–year projection prepared by the Lima City School District as required by law. (Buroker Depo. 24–25) The 5–year projection was prepared by the district's treasurer, Michael Kinnear. (Buroker Depo. 25)

Approximately 87% to 89% of the Lima City School District's overall budget is devoted to teacher's salaries and fringe benefits. (Buroker Depo. 91–92) The current 3–year contract with the teachers expires in 1999 and has salary increases for the 3 years respectively at 0%, 1%, and 4%, for a 3–year average of 2.92% increase. (Buroker Depo. 85) For purposes of making financial projections, however, the District assumes no increases in salary after the current year. (Buroker Depo. 99)

The 5–year projection shows alternative balances based on whether the Lima City School District's 6.9 mill operating levy is renewed in the year 2000. (Buroker Depo. 30, 182–84) It projects that if the 6.9 mill operating levy is not renewed in the year 2000, the district will proceed from a positive balance in fiscal year 1999 to a deficit in fiscal year 2000 of $1,096,378. If the levy is renewed in the year 2000, it is projected the district will not experience a deficit for another year, when it will experience a deficit in the year 2001 in the amount of $1,785,417.

### e) Southern Local School District

Kirk Grandy, Treasurer of the Southern Local School District, initially prepared a financial forecast for the district in a very short amount of time, perhaps two hours, and he indicated that projection was not a thorough job. This initial document is Grandy Depo. Exh. 2. (Grandy Depo. 28, 96–97, 102, 104) Mr. Grandy then spent about ten days bringing information together for a more thorough and more accurate five-year financial forecast for the district which is Grandy Deposition Exhibit 1. (Grandy Depo. 100) Mr. Grandy intended to present to the school board at its September Board Meeting his five-year financial forecast as contained in Grandy Deposition Exhibit I. He did not plan to rework or redo the document before December 31. (Grandy Depo. 27–29) When Mr. Grandy was with the State Auditor's Office, he was considered one of their better forecasters. (Grandy Depo. 33) Mr. Grandy's forecast is done to the best of his abilities. (Grandy Depo. 85) Mr. Grandy's forecasts have in the past always been within four to six percent of actual figures. (Grandy Depo. 33)

The treasurer of the Southern Local School District strives to have a carry-over balance of 8% to 12% of the prior fiscal year's expenditures. His days of cash were somewhere around 30 in FY98. (Grandy Depo. 106)

The Southern Local School District will receive approximately $435,000 more in FY99 over FY98. The district superintendent has concerns about having enough staff for the programs that the district needs, about its facility needs, about the building that needs to be torn down, and about the programs that are needed to be put in place to provide a quality education for the students of the district. (Lanning Depo. 158–159)

Mr. Grandy failed to reduce the set-aside category on his five-year projection (Grandy Depo. Exh. 1) by approximately $10,000 per year, which is the usual expenditure of the district for textbooks and instructional materials. Correcting this oversight would result in reducing the projected deficit by $50,000–$55,000 for the district in FY03. (Grandy Depo. 118–19) Mr. Grandy failed to reduce capital outlay expenditures for school buses and those purchases were also included in the required H.B. 412 set-aside amounts. Assuming that the entire capital outlay expenditure shown on Grandy Deposition Exhibit 1 would be reduced from expenditures of the district, ($125,000 FY99; $130,000 FY00; $135,200 FY01; $140,608 FY0[2]; and $146,232 FY03) totaling $677,040 in the aggregate over those five years, the unencumbered balance of the Southern Local School District Board of Education in FY03 would be a $1.462 million deficit. Confined with the $55,000 for the textbooks and instructional materials, the outlook for the Southern Local School District in FY03 would still be a $1.047 million deficit. The district would need to levy 56 mills to cover that deficit. (See Grandy Depo. Exh. 1; Grandy Depo. 44, 86, 116–20) Realistically, there is

nothing the District can do locally to raise that kind of money. This is the first time since Mr. Grandy became treasurer in 1991 that the Southern Local School District has had a three-year projection or forecast with deficits, other than planning projections in which the board was examining various options for implementing new programs. (Grandy Depo. 86–88)

If the Southern Local School District is required to implement a K–3 15:1 pupil to teacher ratio, the expenditures of the district would be higher than those shown on Mr. Grandy's five-year projection in Grandy Deposition Exhibit 1. (Grandy Depo. 105)

The Court finds as to all of the school districts' financial projections in the record of this case that:

The projections were prepared to the best of the abilities of the treasurers, but

The projections may be subject to update as information becomes available.

The projections are all records of matters observed pursuant to duty imposed by law as to which matters there is also a duty to report.

The projections are supported by credible testimony as to their reliability and validity.

The State has had an opportunity through its resources in the State Auditor's Office, the Department of Education, the Legislative Budget Office, and the Office of Budget and Management to test these projections and to provide any rebuttal testimony as to how these projections may be materially incorrect. The State has provided no such rebuttal testimony or evidence. Except as noted in the findings above, there is no evidence in the record that any 5–year projection contains any error or mistaken assumption. The Court gives great weight to the testimony of the Treasurers and finds their projections to be very credible.

H. Deficits

Brown Deposition Exhibit 4 is a list of districts with projected year-end deficits (or near deficits) in FY99. (Brown Depo. 34)

Plaintiffs' Exhibit 523 is a listing of school districts projected to be in a deficit situation as of June 30, 1999. It indicates some 53 school districts projected to be in a deficit of over $49 million as of that time. (Pl. Exh. 523; Goff Tr. 604–05)

Districts projected to be in a deficit situation will, nonetheless, be required to make mandatory set-asides under H.B. 412. (Goff Tr. 605)

Indicators of school district financial distress include a declining year-end balance, a percentage increase that varies from year to year that is low or diminishing, or an increased deficit due to the loss of revenue from an expiring tax levy. (Brown Depo. 32–33)

School districts may be required to make repayments of taxes as the result of successful appeals by taxpayers. (Brown Depo. 36) The Switzerland of Ohio School District was required to make repayments in the neighborhood of $2 million as the result of successful appeals by taxpayers. (Brown Depo. 37)

The Plaintiff Youngstown City School District is in debt in the amount of $37.2 million. (Brown Depo. 68) The FY98 ADM of the district is approximately 12,599. (State's Exh. 76, p. 20) Thus, the debt of Youngstown City Schools is about $2,953 per pupil. (Goff Tr. 548)

Presently, the Youngstown City School District owes $37,202,587, including principal and interest. (Brown Depo. 68)

Plaintiff Dawson–Bryant Local School District has an annual budget of approximately six million dollars, and its projection indicates one-half million dollars in deficit by FY03. (Sites Depo. 66; Sites Depo. Exh. 1)

I. Outlook for the Future

H.B. 650 requires that in the year 2001 a committee will be appointed to again review the funding methodology. Speaker Davidson suggests various studies are being done by the Legislative Education Oversight Committee or the Department of Education or groups of legislators to look at what will be done in the future. If some of these studies show problems, she believes, "The legislature will adjust the problems." (Davidson Tr. 178–79) As Speaker Davidson is unable to predict any results of these studies, let alone the view of each member of the General Assembly or the Governor in the future or even who those people will be, the Court gives little weight to this testimony.

As accountability and expectations increase for the students of the Plaintiff Dawson–Bryant Schools, resources and personnel needed to meet those increased expectations will be decreased. (Washburn Tr. 1954)

VII. FINDINGS OF FACT CONCLUSIONS

A. No Evidence of Net Increase in Funding

The Supreme Court admonished the State to "create an entirely new financing system" and to perform a "complete systematic overhaul" of the system of funding primary and secondary schools. The Court clearly intended a new system with dramatic improvement, not slight changes. One indicium of improvement would be an increased level of State funding. A systematic overhaul must result in dramatic increases in State funding.

Yet, the Court finds that the State failed to present any evidence of a net increase in the State's funding of primary and secondary education. Not a single witness presented by the State had performed any analysis to determine if there

will be a net increase in funding for fiscal year 1999 or the years following. Not only is there an absence of evidence presented by the State, the Plaintiffs presented substantive and material evidence indicating that while the gross dollars funded by the State are increasing, such gross dollar increases are materially offset by increased costs either mandated by the State or made a condition of additional funding.

State funding for primary and secondary schools will increase a gross amount of $341 million for FY99 over FY98. (State's Exh. 67.) When this level of funding is netted against increased costs, it is significantly reduced and may even be eliminated by the following:

- *H.B. 412 Set–Asides.* H.B. 412 mandates that all school districts statewide set aside 8% of their general revenue funds each to be used only in two categories of expenditures and another 1% for a budget reserve each year for at least five years. The Court has received testimony from superintendents and treasurers of several districts who have graphically quantified the fiscal impact of these set-aside requirements which, in some cases, is traumatic. If, on a statewide basis, these set-aside requirements have only a 1% impact on the school districts (although it is obviously much higher), this would be an increased cost statewide of $100 million. (1% of a $10 billion school system.) (State's Exh. 85)

- *S.B. 55.* The LBO has preliminarily determined that S.B. 55 will cause school districts to incur additional costs to meet the additional graduation requirements, the additional course requirements, and the additional forms of required intervention. If the results of the LBO's random survey of 20 districts stayed consistent on a statewide basis, this could be a cost in the range of more than $90 million.

- *DPIA Strings Attached to New Costs.* As discussed above, while DPIA funding for fiscal year 1999 is increasing by $109 million over fiscal year 1998 (State Exh. 72), H.B. 650 now ties this funding to three specific categories of spending. Two of those categories are all-day kindergarten and class size reduction, respectively funded for FY99 at $96 million and $138 million for a total of $234 million. There is evidence that some districts may not accept these funds because of the costs attached and the fact that they apply against their cap and cuts into their discretionary spending. (See, *e.g.,* Hamilton Tr. 51–59—District may turn away $2.9 million) Other districts may not have the facilities to implement these programs. For those districts that do elect to receive these monies, there is likely to be new costs and/or costs over and above the State funding. For example, very few school districts in Ohio provided all-day kindergarten prior to the enactment of H.B. 650. (Brunson Depo. 49) Thus, most of the $96 million in funding for all-day

kindergarten for FY99 is simply a funded or partially funded mandate for those districts that elect to receive DPIA kindergarten funds.

The combined effect of the three scenarios discussed above reduces the $341 million gross increase by $100 million for H.B. 412 set-asides, $90 million for S.B. 55 mandates, and $96 million for all-day every-day kindergarten. This leaves about *$50 million* or a ½ of one percent increase in total funding between FY98 and FY99—a year in which there is a one-time "blip" in special education funding due to the move of special education pupils into ADM for computing State foundation payments. Fifty million is left before even considering the further impact of (1) ordinary rising costs to districts, for which the State statutorily projects to increase its funding at 2.8% in H.B. *650*, (2) the continued impact of phantom revenue which remains materially unabated, and (3) the continued erosion of the local property tax base. (Russell Depo. 138–41 and Exh. I)

The Court finds that, in the absence of any State evidence to the contrary that the State has failed to meet its burden of showing any material improvement in the net level of funding provided by the State for secondary and primary schools.

B.   Summary of Findings of Fact

In conclusion, the Court finds that the State has failed to meet its burden of demonstrating compliance with the constitutional mandates as those mandates were defined by the Supreme Court. The Court finds that while many minor changes have been made, with little exception, those changes are largely changes of form and not substance.

The Supreme Court admonished the State to address the horrific facilities problem which faced the State in the earlier part of this decade. While the State has increased its level of funding to address the facilities problem, it remains that the facilities problem is so immense that the State's effort has been woefully inadequate. The unrebutted evidence presented by the Plaintiffs using the State's own records indicates that even after a combined State and local effort of $4 billion in capital spending, the facilities problem has only worsened from a $10 billion problem in 1990 to a *$16.5* billion problem in 1997.

Ohio's aging infrastructure has only aged another eight years since 1990 and the State does not even know (or at least presented no evidence) as to what it costs to simply maintain against the new decay that occurs each year as hundreds of Ohio's school buildings become more ancient. (Dr. Phillis called this "rolling decay.")

Borrowing remains as much a part of Ohio's system of school funding now as it was in 1993. While the State has created new programs and given them new names, it remains that school districts follow virtually the exact same procedures

to now secure an "advance" from the State as they did to secure a loan from banks. The State *still* requires program reductions to repay advancements. The only substantive alteration is that the State is now the lender and it does not charge interest.

Moreover, the State did not present a single witness who could testify as to how the State addressed circumstances which generally lead a school district into debt. Not only did the State fail to meet its burden of proof on this issue, but Plaintiffs presented substantive credible evidence that the legislation may actually exacerbate the circumstances which lead a district into debt. For example, Superintendent Barr testified as to the impact of H.B. 412:

"What good does it do if you have to go borrow the money in order to meet the set-aside? So, again, it forces you back to borrow money to meet the mandate." (Barr Depo. 122)

The State has failed to meet its burden of proof that it has eliminated undue reliance by school districts upon local property taxes. While the State has attempted to soften the impact of phantom revenue, phantom revenue itself remains and, in fact, has multiplied. (See, *e.g.*, Maxwell Tr. 1399–1402) Not only does phantom revenue continue to be a structural problem, but the local tax base itself has actually eroded since the original trial of this matter. (See, *e.g.*, Russell Depo. 138–41)

Not only did the State fail to produce credible evidence of a structural change that would lead to a material reduction in the reliance upon the local property taxes, Plaintiffs produced substantive credible evidence that, in fact, such reliance may actually increase as a result of the legislative changes. For example, it is undisputed that the State has provided no additional funding for the additional costs school districts will incur as a result of the requirements of H.B. 412 and S.B. 55. If the State is not going to provide the funding for these costs, then the districts can only pay for these increased costs by returning to the ballot sooner or, if that fails, borrowing from the State and/or cutting programs. In essence, the Court finds that the problem of undue reliance upon local property taxes by school districts remains as much of a problem now as it was in 1993, and it may even be worse.

The Court further finds that the State has not materially altered the foundation program in any substantive way to address the problems discussed by the Supreme Court. The State presented evidence claiming that the methodology used by the State in determining the base cost of an adequate education was rational. Yet, the evidence shows that several different methodologies were considered, all of which were acclaimed rational. It is undisputed that modifications could have been made to the chosen methodology which would have resulted in the same foundation level in FY99 as existed in 1997 and it would still have

been deemed rational by the State and Dr. Augenblick. As applied here, the Court concludes that if rational means anything, then rational means nothing.

Moreover, the funding methodology enacted in H.B. 650 itself is fraught with a stunning array of problems including (1) that it is based on the cost levels of an already unconstitutional funding system, (2) that it is based on one year's data even though the performance of students in that data is achieved through many years of expenditures, (3) that it is based on 1996 per pupil costs and completely ignores the new costs mandated under H.B. 412 and S.B. 55, (4) that it is unsupported by any studies or analysis which demonstrate reliability or predictability of the methodology, and (5) that the methodology was modified to achieve a lower base cost number over the objections of *Dr. Goff* and by decision of individual legislators, none of whom presented evidence of expertise.

Worse, the legislature then inflicted upon this already highly flawed methodology caps of any funding increase and a phase in of the new base cost number. The pretense of these further reductions in funding is the suggestion that the school districts simply cannot efficiently handle more money. Yet, no expert testimony or any type of detailed analysis was provided to the Court to support this proposition which leaves as the only logical motive for these funding limitations a budgetary concern.

The evidence does not indicate that categorical spending would offset these numerous flaws in the base cost methodology. For example, the funding of special education is now expressly tied to the flawed base cost methodology so that by design, special education funding is underfunded. Funding of vocational education has not been materially changed. Gifted funding remains flat. DPIA funding is tied to new categories of expenditures and is targeted only toward a limited category of students in a limited number of school districts.

Moreover, there is overwhelming evidence that as early as May 1997, the State engaged in an effort to develop a methodology which would allow the State to back into a base cost number that would be acceptable from a budgetary standpoint, regardless of whether it would be adequate to provide a thorough and efficient system of funding primary and secondary education. The numerous charts and graphs run by the Legislative Budget Office and the Department of Education, virtually all of which have as their bottom lines a base cost number, as well as the testimony of the State's own employees and consultants, including Keen, Connolly, Brunson, Fleeter, Davidson, and Johnson, all indicate that the State expended tremendous effort to engage in residual budgeting under the guise of developing a "rational methodology." The use of phase in and the caps, with a complete absence of credible evidence justifying the phase in and caps, causes the Court to conclude, after weighing the credibility of all of the witnesses, that the strongest basis for these limitations was budgetary comfort.

In summary, the State has failed to meet its burden of proof of demonstrating that it has provided a complete systematic overhaul of its system of funding primary and secondary education. While that funding system has a *few* new names and new programs, it functions at virtually the same inadequate level as it did in 1993. Accordingly, the Court finds that the State has failed to meet its burden of proof and finds that the State has failed to comply with the constitutional mandates as those mandates were described by the Ohio Supreme Court in its decision of March 24, 1997.

VIII.  CONCLUSIONS OF LAW

1.  Each of the conclusions of law set forth in the Court's Findings of Fact, Conclusions of Law, Memorandum and Order of July 1, 1994 continue to be valid and applicable to this ease and are, by reference, incorporated herein.

■ 2.  The State has continued to impose unconstitutional borrowing requirements (for the purpose of maintaining school operations) upon school districts. The unconstitutional requirements include the combined operation of Revised Code Sections 133.301 and 5705.29 to the extent that those sections permit or require school districts to enter into spending reserve loans.

■ 3.  The State has continued to impose unconstitutional borrowing requirements (for the purpose of maintaining school operations) upon school districts through the operation of Revised Code Section 3316.20, which provides for the school solvency assistance fund. The Court finds that in substance the operation of this fund is not legally different from the operation of the emergency school assistance loan provisions (R.C. 3313.483, 3313.487, 3313.488, 3313.489, and 3313.4810) struck down by the Supreme Court and therefore finds the provision of R.C. 3316.20 to be unconstitutional as well.

■ 4.  The State has failed to fund R.C. Chapter 3318 to a constitutionally acceptable level. The constitutional deficiencies in that chapter identified by the Supreme Court on March 24, 1997 have not been remedied.

5.  The State has failed to implement a complete systematic overhaul of Ohio's school funding system and has failed to eliminate the operation of the School Foundation Program.

A.  The school foundation amounts established by H.B. 650 and 770 are, as a matter of law, inadequate to ensure the provision of a thorough and efficient system of public education.

B.  The special education funding method established by H.B. 650 and 770 fails, as a matter of law, to ensure the provision of a thorough and efficient system of public education.

C. The cost of doing business adjustments provided by H.B. 650 and 770 fail, as a matter of law, to ensure the provision of a thorough and efficient system of public education.

D. The transportation funding provisions of H.B. 650 and 770 fail, as a matter of law, to ensure the provision of a thorough and efficient system of public education.

E. The disadvantaged pupil impact aid provisions of H.B. 650 and 770 fail, as a matter of law, to ensure the provision of a thorough and efficient system of public education.

F. The gifted education funding provisions of H.B. 650 and 770 fail, as a matter of law, to ensure a thorough and efficient system of public education.

6. The unfunded set-aside requirements of H.B. 412 have further contributed to the unconstitutionality of Ohio's school funding system. As such, the set-aside provisions of that bill (R.C. 3315.17, 3315.18 and 5705.29) are unconstitutional due to a lack of funding.

7. The unfunded mandates of S.B. 55 have further contributed to the unconstitutionality of Ohio's school funding system. As such, the provisions of that legislation that require the expenditure of additional school district funds are unconstitutional due to a lack of funding.

8. The State has failed to eliminate the emphasis of Ohio's school funding system on local property tax.

9. The Court finds, as a matter of law, that the State has failed to enact legislation that recognizes that there is but one system of public education in Ohio and that the establishment, organization and maintenance of public education are the State's responsibility.

10. The Court further finds, as a matter of law, that the State has failed to comply with the Supreme Court's directive that education be placed high in the State's budgetary priorities.

## IX. THE COURT HEREBY ORDERS AND DECLARES

1. That the Defendant State of Ohio is directed forthwith to provide for and fund a system of funding public elementary and secondary education in compliance with the Ohio Constitution and the directive of the Ohio Supreme Court.

2. That the Superintendent of Public Instruction and the State Board of Education shall forthwith prepare a report setting forth proposals to comply with the previous orders of this Court and the directive of the Ohio Supreme Court. Said report shall be presented to the Ohio Legislature upon completion.

3. That the Superintendent of Public Instruction and the State Board of Education shall forthwith prepare a report after the legislative session is completed for calendar year 1999 setting forth the steps taken to comply with the orders of this Court and the Supreme Court of Ohio regarding the funding for Ohio public elementary and secondary schools.

4. That the State Board of Education shall provide a summary of all proposals and reports required by this Order to the Superintendent and school board presidents of the Plaintiff School Districts as well as all school districts throughout this State.

5. That this Court does not deem this case a proper one in which to retain ongoing jurisdiction. It is this Court's desire to retain jurisdiction for a period of time to assure that this Order is followed and steps are being taken to resolve the matters involved in the case at bar. The progress of the State to resolve these issues shall be monitored upon a timely motion by either party or by a motion of this Court.

6. That the Plaintiffs are awarded the costs they have incurred during the remand portion of this matter including reasonable attorney fees.

## MEMORANDUM

This matter having come on for trial on August 24, 1998 upon Remand from the Ohio Supreme Court and evidence having been adduced and exhibits having been admitted into evidence this Court thereafter took this matter under advisement and ordered the parties to provide this Court Proposed Findings of Fact and Conclusions of Law. In the case at bar the Supreme Court of Ohio has ordered that the State bears the burden of proving that its remedy complies with the mandates of the Ohio Supreme Court. Wherefore, this Court must determine if the State has implemented a "complete systematic overhaul" of the Ohio School Funding System in compliance with the Order of the Ohio Supreme Court and the Ohio Constitution.

The case at bar was tried for 9 days commencing August 24, 1998 and concluding September 3, 1998. The transcript of these proceedings totals 2,397 pages. The additional deposition testimony read and ruled on by this Court included 5,260 pages with 141 objections, with the total record of testimony being 7,657 pages. There were 491 exhibits admitted into evidence. Twelve witnesses testified at trial while 35 testified by way of deposition. Five attorneys represented each side in this dispute. As in the original trial the preparation time for the attorneys and Court has been enormous. In reading, cross-referencing and ruling on post–trial briefs alone and proposed Findings of Fact and Conclusions of Law as well as reading over 5,000 pages of depositions, this Court consumed over 100 hours. The record of this case including the original trial consists of 39

days of testimony, 8,039 pages of live testimony, 10,445 pages of deposition testimony with 422 objections. 50 live witnesses, 68 witnesses by deposition, over a thousand exhibits and a total record of testimony being 18,487 pages. Since the filing of this case over 7 years ago, the thoroughness to detail exhibited by the attorneys for both sides has been extraordinary.

### The Requirement of a Thorough and Efficient System of Common Schools

The issue before this Court is framed around the requirements set forth in the Ohio Constitution. The Constitution of the State of Ohio requires the General Assembly to "secure a thorough and efficient system of common schools throughout the State." Section 2, Article VI.

It is the constitutional duty of this State's General Assembly to provide this State's students with the necessary tools to choose their direction in life.

The Road Not Taken

Two roads diverged in a yellow wood,
And sorry I could not travel both
And be one traveler, long I stood
And looked down one as far as I could

To where it bent in the undergrowth;
Then took the other, as just as fair,
And having perhaps the better claim,
Because it was grassy and wanted wear;
Though as far that the passing there
Had worn them really about the same,

And both that morning equally lay
In leaves no step had trodden black.
Oh, I kept the first for another day!
Yet knowing how way leads on to way,
I doubted if I should ever come back.

I shall be telling this with a sigh
Somewhere ages and ages hence:
Two roads diverged in a wood, and I—
I took the one less traveled by,
And that has made all the difference.

Robert Frost

All the children of this State are entitled to the opportunity to better themselves and to choose their lot in life ... to choose their own path and not be faced with roadblocks to their future which a lack of school funding creates.

## LEGISLATION

The General Assembly has enacted 15 separate items of legislation as part of its proposed remedy to the school funding issue. Five items have been passed since the Supreme Court's ruling of March 24, 1997. The bulk of the testimony of this case on Remand relates to legislation involving school funding, accountability and facilities assistance being Am. Sub H.B. 650 and Am. Sub H.B. 770 (which shall be referred to as H.B. 650), Sub H.B. 412, Am. Sub S.B. 55, Am. Sub S.B. 102 and H.B. 215.

H.B. 650 sets forth the State's funding plan for the operation of the State's schools. H.B. 412 contains provision for mandatory set-asides, borrowing and accountability measures. S.B. 55 sets forth requirements for report cards labeling school districts according to their achievement of performance standards, increased graduation requirements, mandatory remediation programs and mandatory retention of certain fourth grade pupils who fail to pass the reading portion of the proficiency tests. Sub S.B. 102 provides for the creation of the Ohio Facilities Commission and transfers the operation of the classroom Facilities Act, R.C. Chapter 3318, to that agency.

## SCHOOL FACILITIES

In order for a school district to have the ability to meet its requirements, for providing a thorough and efficient education for its pupils, it is clear that the facilities in which the pupils are receiving instruction must be adequate. In its ruling, the Supreme Court stated "a thorough and efficient system of common schools includes facilities in good repair and the supplies, materials and funds necessary to maintain these facilities in a safe manner, in compliance with all local, state and federal mandates." *DeRolph,* 78 Ohio St.3d 193, at 212–213, 677 N.E.2d 733, at 746–747.

The 1990 Ohio Public School Facility Survey identified $10.2 billion in facility needs. That survey was requested by the State of Ohio. An update of that survey by the State Legislative Budget Office puts the facility needs in 1997 dollars at $16.5 billion. In 1990 the Building and Assistance List included 44 school districts eligible for construction funds. Eight years later the evidence shows that those projects have not yet been completed with only 14 being completed, nine in the closeout phase and 9 more still under construction.

The State's Emergency Repair Program was designed to assist schools with urgent life-threatening conditions in their school buildings. Emergency grants were available only to equity districts. The 319 non-equity districts received no Emergency Repair Program money. Grants totalled $118 million, however. Applications totalled $157 million for the emergency life-threatening needs of the

equity districts. There are at present no Emergency Repair Program funds available.

The Defendants also placed funds in a Disability Access Program. The 1990 Facility Survey identified that there were $153 million required to make facilities handicapped accessible. Federal law required all public schools to be handicap accessible by January 25, 1995. From 1991 until 1997 the State appropriated no funds to assist schools in making their facilities handicap accessible. The Disability Access Program made $5 million available for $14.7 million in applications for matching grants. There were 210 equity districts that applied for grants and *53* received them. From the 157 districts that did not receive grants 7,653 handicapped students received no assistance. The State has not determined how many handicapped students go unserved daily in the remainder of the State's school districts.

Asbestos continues to be a problem for the schools of this State. Despite the requirements of the United States Environmental Protection Agency the 1990 Facility Survey identified $328 million in needs for asbestos abatement. There has been no program put in place to directly meet these needs.

At the present rate of repair and replacement by the State of Ohio it will take 55 years to meet the facility needs of our public school districts. (Phillis Tr. 2234–35) The overcrowded schools, code violations, leaking roofs, asbestos, faulty electrical wiring and outdated labs continue while the State claims to have done "too much too quickly." (See State's Opening Statement Tr. 37) H.B. 770's language which requests the Governor and Director of Budget and Management "to request" $300 million each year for classroom facilities certainly does not assure the school districts that their needs will be met by doing "too much too quickly." This request does not require the General Assembly to fund any amount. The State claimed that only $300 million could be "absorbed into the system" each year (Davidson Tr. 85–86), however. State Superintendent of Public Instruction Dr. Goff testified that the Facilities Commission had conducted no studies regarding the ability of the construction industry to undertake additional projects and that as co-chair of BEST he agreed with a recommendation that $700 million per year of State funds be dedicated to funding for school facilities. (Goff Tr. 626–27)

## FUNDING SYSTEM

■ One of the central issues in the case at bar is whether the State of Ohio has eliminated the foundation formula found unconstitutional by this Court and the Ohio Supreme Court and replaced it by providing an "entirely new school financing system." *DeRolph v. State*, 78 Ohio St.3d at 213, 677 N.E.2d at 747. The Supreme Court of Ohio has acknowledged its responsibility for determining

what is a constitutionally adequate educational system. *DeRolph v. State*, 78 Ohio St.3d at 197–198, 677 N.E.2d at 736–738. The General Assembly cannot merely express in legislation that the amount of funding it provides for education is adequate. Section 2, Article VI of the Ohio Constitution requires more.

The new funding formula proposed by the legislature provides for a funding increase of 4.75% between FY99 and FY02. Historically during the 1990's the unconstitutional funding system provided the schools an average increase of 5% per year. Even the 4.75% increase is somewhat illusory. The increase in total state support between FY98 and FY99 is $341.4 million; however, approximately $125 million of that figure is represented by special education funds which had formerly not been counted in the foundation amount. The total remaining for regular education and DPIA totals approximately $216.4 million.

The State of Ohio relies on the methodology of Dr. John Augenblick in making changes to the funding formula for its 1.8 million students. This Court ordered the Superintendent of Public Instruction and the State Board of Education to prepare a report setting forth proposals for the elimination of wealth-based disparities among the school districts within the State of Ohio. Dr. John Augenblick was one of the Panel of Experts selected to assist the State Board of Education in preparing said report. Other members were Dr. Alexander, Dr. Guthrie and Messrs. Levin and Driscoll. The recommendations of the Panel were based on consideration of both inputs and outputs. The Panel discussed numerous alternatives which eventually resulted in progressively lower base cost recommendations. The Panel of Expert's highest recommendation was $5,051 base cost per pupil.

Thereafter, Dr. John Augenblick was retained to assist the Legislature in arriving at a remedy for the school funding problem. On June 10, 1997 Dr. Augenblick recommended the figure of $4,269 base cost per pupil to the Governor's Task Force. This recommendation was based on a weighted average of 102 school districts that met certain "screens" and based in part on the "eyeballing" of a graph concerning property valuation per pupil. This method was used to eliminate the top and bottom 5 percent of school districts rather than making use of a more sophisticated statistical method. (Augenblick 737–39, 741–42, *852–58*) All the large city districts were excluded and many other districts in areas of high poverty. No input measures were used as screens, only outputs.

Dr. Augenblick, the school funding expert relied on by the State, set income screens at five percent at the top and bottom of the scale. The Legislature, in H.B. 650, doubled that to 10 percent thus driving down the base cost. By eliminating an additional 5 percent of the high wealth school districts that essentially met all the output screens and adding another 5 percent of low wealth districts that did not, the base cost was driven down. Dr. Augenblick recom-

mended an efficiency screen. The Legislature eliminated that screen. Dr. Augenblick's base cost was arrived at using a weighted average. The Legislature used an unweighted average. Each of these changes by the Legislature resulted in a lowering of the base cost per pupil. The additional 18 performance screens, used by the Legislature for arriving at 102 efficient schools, make use of passing percentages on proficiency tests, attendance, graduation rates and dropout rates. After averaging the base cost of these "efficient" schools the Legislature arrived at a figure of $4,063 base cost as being sufficient for an adequate education.

After making this determination, the Legislature failed to fund an amount equal to its "adequate" figure but rather appropriated $3,851 for FY99. The "adequate" figure of $4,063 will not be available to schools until FY02. This issue was addressed during the remedy phase of the State of Wyoming school funding litigation. The trial Court held that the State's use of a phase in period was an impermissible violation of the deadline imposed by the Supreme Court.

See *Campbell v. Wyoming* (Dec. 31, 1997), Laramie Cty., Wyo. District Court No. 129–59. The "adequate" figure of $4,063 is further reduced by caps, new unfunded mandates, expenses to schools related to special needs, transportation and debt.

A cap has been installed by the new legislation which limits each school district to a 10 percent additional increase in revenue in one year (6 percent in the case of per pupil increases). The caps apply to basic aid, special education, DPIA, cost-of-doing business adjustments and transportation. In FY99, 158 school districts will be effected by the 10 percent caps while 19 more school districts will be subject to the 6 percent per pupil cap. These caps reduce by $102 million the amount of funds to school districts that the State has deemed to be adequate.

Dr. Augenblick explained the needs for caps by stating:

"A cap on the increase in state aid is designed to avoid distributing more funds than a district might be able to use widely in any given year."

(See State's Ex. 16, p. 6)

This Court is not convinced that a low wealth district with funding needs cannot distribute its funds as efficiently as a high wealth district. This Court further notes that the Department for Rehabilitation and Correction received dramatic funding increases of more than 10 percent, to wit, 15 and 18 percent in 1994 and 1995, respectively. (DeMaria Tr. 13 23–24)

The initial recommendations of the Governor's Task Force were estimated to provide an additional $1.8 billion for Ohio public schools in FY99. The Legislation enacted provides for approximately $340 million for FY99. Of that figure some funds will not be disbursed because additional DPIA funds require more

classroom space for all-day kindergarten or reduced class size and some districts cannot comply with the funding requirements. (See Brunson Depo. 36–37)

## SPECIAL EDUCATION

Under H.B. 650 special education students are now counted as part of the school districts ADM. Formerly, these students were funded through units. Funding for disabled students is determined by assigning "weights" to certain types of disabled students. These weights result in additional funding in accordance with the type of disability.

The weights assigned by the new legislation are based on the assumption that school districts in FY96 spent the amounts needed to efficiently educate their special education students. Dr. Augenblick testified that this assumption "may be inappropriate." (Augenblick Tr. 901–903) The previous rulings of this Court and the Supreme Court of Ohio regarding the lack of special education funding belies the inappropriateness of accepting this assumption.

An additional flaw in the formula for funding special education is that no analysis was performed for lumping all special education students into two classes for funding purposes and further no analysis was performed to determine if the funding levels arrived at actually adequately educate these special education students.

And finally, Dr. Augenblick's recommendations called for a weight to be assigned to the basic aid amount (ex. $3,851 \times .21 = $809) resulting in additional funds for special education students. The Legislature in H.B. 650 reduced the weights by a factor known as a state share percentage, which is essentially the percent of the foundation level received by the district. Under H.B. 650, 33 school districts receive no additional funding for special education. Since the unit funding was eliminated, these districts received no special education funding directly or through the County Educational Service Centers. They must assume the funding for these students thereby resulting in a Robin Hood effect in conflict with the rulings of the Supreme Court. *DeRolph,* 78 Ohio St.3d 193, 677 N.E.2d 733.

## GIFTED EDUCATION

Beginning in 1975 the State of Ohio recognized the need for gifted education when the first program providing funding was created by the Ohio General Assembly. Ohio Revised Code Section 3317.024 was substantially changed by H.B. 650. The General Assembly thereafter passed H.B. 770, which removed any gifted funding formula and provides for the General Assembly in 1999 to review and revise the funding formula for gifted education in the State of Ohio. (Grady Depo. Ex. 3) In that no gifted funding formula is in place the General Assembly

obviously has not complied with the rulings of this Court nor the deadline established by the Ohio Supreme Court regarding gifted education.

## PROPERTY TAX RELIANCE

The overreliance on local property taxes continues to be a problem for local school districts after the Legislative responses to the orders of this Court and the Ohio Supreme Court. Due to the failure of the Legislature to even fund the base cost that it deems adequate until FY02, the inevitable result will be a continued requirement for local school districts to rely upon voters to fund their schools. As stated by Mr. Driscoll in analyzing the effects of H.B. 650 over the next four years, "Considering the system as a whole, the analysis does not show dramatic improvement toward a more equitable balance in per pupil revenues after accounting for differences in costs around the state." (Driscoll Depo. 116; Driscoll Depo. Exh. 10, p. 7)

## PHANTOM REVENUE

The problem of phantom revenue continues to plague the local school districts in our State. Phantom revenue is a flaw in this State's funding system that makes a school district appear to be wealthier than it actually is. When a school district has an increase in its property wealth through reappraisal it appears to have more local funds in the state formula than it actually does. This is due to H.B. 920, which ensures that local school districts receive no increase in funds as a result of these reappraisals. H.B. 650 and other related legislation did address some aspects of this dilemma. However, as a result of these changes additional phantom revenue problems have been created.

State Aid Ratio is a phantom revenue problem that deals with the weights given to a school district's disabled pupils. The State Aid Ratio is the percent of the maximum available foundation funding received by a school district in state basic aid. Just as wealthier school districts receive less state basic aid they also receive a lesser percentage of the weighted value assigned to their disabled pupils. As the value of a district's property increases, the state share I percentage used to calculate the value of the school district's special education funding decreases in proportion. (Driscoll Depo. 103–04; Maxwell Tr. 1390–91)

Recognized Value is an aspect of phantom revenue that results when under the State's school funding system a school district's property is reappraised in one year and the effects of that reappraisal are seen over 3 years. The results are the same—with the effects spread over 3 years. (Maxwell Tr. 1371–72)

Power Equalization is an aspect of phantom revenue that results from H.B. 650. Under this new legislation, school districts receive additional state revenue when they levy more than 23 effective mills against class I (residential and

agricultural) property with a valuation per pupil below the state average. The equalizing feature raises the yield from the mills between 23 and 25 up to the statewide average yield per pupil. As district property values increase, the per pupil valuation will be higher and the district receives less in power equalizing aid. Additionally, increased value from reappraisal or update will further create a reduction in the district's effective millage which can further reduce the level of power equalizing funds. (Maxwell Tr. 1394–95; Pl. Exh. 466, pp. 5–7)

### SET–ASIDES AND RESERVE ACCOUNTS

H.B. 412, when fully implemented, will require each school district in the State to set aside 4 percent of its general fund revenue into a capital and maintenance fund. Additionally, 4 percent must be placed into a textbook and instructional materials fund. Through a phase in procedure each school district must set aside into each account 2 percent in FY99, 3 percent in FY00 and 4 percent and in FY01. If a school district's superintendent, business advisory council and teachers union certify to the board of education that the district has sufficient textbooks, instructional software, instructional materials, supplies and equipment to ensure a thorough and efficient education the school board may vote to avoid setting aside the 4 percent. The board's resolution to forgo this set-aside must be unanimous. Obtaining an agreement on this measure may be difficult.

Neither the Legislature nor the Department of Education performed any studies to determine the cost to school districts associated with H.B. 412. Dr. Augenblick's base cost methodology did not take into account the impact of H.B. 412 on the budgets of this State's school districts. The evidence before this Court portrays a massive impact on local school districts. Southwestern City School District foresees an $18 million cost over the next 5 years. (Hamilton Depo. Exh. 5) Dawson–Bryant will need an additional $172,000 over the same period. (Sites Depo. 47–48) Chillicothe City School District believes its $3.6 million deficit will increase to 15.737 million by FY03 due to set-asides.

In addition to there being no studies to determine the cost of the H.B. 412 set-asides there also were no studies by the Legislature or the State Board of Education establishing that 4 percent was the amount districts actually needed to satisfy the requirements of each account. (Brunson Depo. 59–60; Goff Tr. 572)

### CURRICULAR AND PERFORMANCE MANDATES

As part of the provisions of S.B. 55 school districts now have additional requirements in the areas of math, science, English and social studies in order to grant a high school diploma. The Legislative Budget Office performed a survey of school districts which showed that most will need to add additional units of credit to meet the requirements of S.B. 55. The LBO report further indicated

that many school districts would likely have to hire additional math and science teachers and due to the demand in this area districts may have to compete for these teachers and pay high salaries to attract these teachers. (Brunson Depo. Exh. 5, p. 7)

Assuming no cuts in staff, S.B. 55 would require Chillicothe City Schools to pay an additional $500,000 through the end of FY00. (Overly Depo. Exh. 2, p. 3) Staff cannot merely be cut and replaced with math and science teachers. Certified, very possibly higher paid, teachers must be hired and proper facilities must be provided. The Department of Education has estimated the cost of an additional biological laboratory at $140,000 per lab (Pl. Exh. 515, p. 8)

H.B. 412 and S.B. 55 were intended to be funded by the state sales tax that did not pass. The mandates of these two pieces of Legislation without providing the accompanying funding will have a devastating impact upon the budgets of our State's school districts. As Dawson–Bryant Treasurer Stephen Sites explained, the set-asides are like a "three-legged stool. We have the accountability in 412 ... we have the increase [sic ] academic standards in 55, but we didn't get the increase necessary in funding. So we have a two legged stool." (Sites Tr. 65)

### BORROWING

The Supreme Court of Ohio addressed the issue of school district borrowing when it stated:

"The debt which stems from mandated borrowing programs is in many instances staggering, and the cyclical effect of continued borrowing has made it more difficult to maintain even minimal school operations. Sec R.C. 133.301 and 3313.483. These loan programs, discussed above, are nothing less than a clever disguise for the state's failure to raise revenue sufficient to discharge its constitutional obligations." *DeRolph,* 78 Ohio St.3d at 202, 677 N.E.2d at 740.

This Court in *DeRolph* received evidence of two specific types of school district borrowing and found both to be unconstitutional. The first type is known as the "Spending Reserve Loan" fund. By statute schools at the end of a fiscal year were required to borrow from the next fiscal year with the debt repaid by diverting school foundation funds which would otherwise have gone to the schools. The Spending Reserve Loan Program continues with there being a phasing out of it by lowering the amounts school districts can borrow over each year between 1999 and 2002. R.C. 5705.29. School districts will continue to be forced to borrow. At the end of FY98 fifty school districts borrowed a total of $54,723,516. (Brown Depo. Exh. 3, p. cb 1851; Brown Depo. 24) State Superintendent Goff verified that 55 school districts currently project a deficit in FY99 and another 26 project a carryover balance of less than $50,000 at the end of FY99. (Pl. Exh.

523) Those with a projected deficit will be forced to borrow to cover the debt. (Brown Depo. 108)

The second type of borrowing that this Court addressed in its earlier order is known as the Emergency School Assistance Loan Program. This program provides for longer term loans than the spending reserve program and usually 2 years but for some districts much longer. Under Emergency School Assistance loans, school districts are required to develop a cost reduction plan that would allow them to repay the debt by the end of the loan term. The plans include eliminating courses, teaching and nonteaching positions, as well as eliminating or reducing facilities maintenance. School districts must first use the Spending Reserve Fund and then may resort to the Emergency School Assistance Program to meet their needs. The Emergency School Assistance Program is now named the School Solvency Assistance Fund and they are strikingly similar. (See Revised Code 3316.20) The former loans are now called advancements. Prior to accessing either program spending reserve borrowing is required. Additional deficit levels must be projected under each program. Expenditure reduction plans still must be developed. The State Superintendent still must give his approval for such a loan. (Brown Depo. 103–04) Repayment continues to be required within 2 years and is made through a reduction in the school district's school foundation funds. (Brown Depo. 104–05; Goff Tr. 589) Under the School Solvency Assistance Fund the funds are now borrowed from the State without interest rather than through private financial institutions; however, the need to borrow against future school foundation funds continues to force school districts to reduce the quality of the education provided to their students in order to meet borrowing requirements.

The cyclical effect of continued borrowing addressed by this Court and the Supreme Court continues today and without any additional borrowing will require repayment through the year 2007. (Brown Depo. Exh. 1, p. 1719)

## CONCLUSION

On July 1, 1994 this Court declared the system for funding public schools in the State of Ohio to be unconstitutional. On March 24, 1997 the Supreme Court of the State of Ohio confirmed this Court's ruling and ordered the State to remedy the problem while staying the effect of its order for 12 months. In October 1993, this Court began the original trial of this matter which consumed 30 days of testimony with 71 witnesses, over 500 exhibits and a transcript of nearly 11,000 pages. The trial on Remand commenced August 24, 1998 and continued for 9 days, included 47 witnesses, 491 exhibits and a transcript of over 7,600 pages. This case was filed with this Court December 19, 1991 over 7 years ago. In the

fall of 1991 there were thousands of young school children across this State attending their first day of school—next fall they will be entering high school.

Hearing the problems that continue to plague the schools of this State, without relief in sight, reminds this Court of baseball great Yogi Berra's confused quote: "It's like deja vu all over again." In 1991 the school facilities survey requested by the State showed needs of $10.2 billion. The Legislative Budget Office now puts those needs at $16.5 billion. The State continues to fail to provide a basic aid amount sufficient for the needs of this State's students. The figure deemed to be presently adequate by the State isn't even appropriated until FY02. The issue of phantom revenue remains. School districts now face additional revenue problems due to the unfunded mandates resulting from H.B. 412 and S.B. 55. Funding for special education is a continued concern and gifted education has yet to be addressed. The end result is continued unconstitutional borrowing by school districts and an overreliance on property tax.

Wherefore, this Court finds that the State of Ohio has failed to comply with the rulings of this Court and has failed to follow the directive of the Ohio Supreme Court. The State has not implemented a complete systematic overhaul of the Ohio school funding system. As such, the State has failed to meet its burden of proving that its remedy complies with the mandates of the Ohio Supreme Court. The system for funding Ohio's public schools continues to be unconstitutional.

This Court awards the Plaintiffs reasonable attorney fees and costs.

## ONGOING COURT JURISDICTION

This Court does not deem this case a proper one in which to retain ongoing jurisdiction. It is this Court's desire to retain jurisdiction for a period of time to assure that this Order is followed and steps are being taken to resolve the matters involved in the case at bar. Therefore, the Superintendent of Public Instruction for the State of Ohio and the State Board of Education are required to forthwith prepare a report setting forth proposals for complying with the Order of this Court and the directives of the Ohio Supreme Court. The same shall be presented to the Legislature upon completion. Thereafter, the State Superintendent and the State Board of Education shall forthwith prepare a report after the legislative session for calendar year 1999 setting forth the steps taken to resolve the issues in the case at bar.

*Judgment accordingly.*